**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ERNEST FLAGG, as Next Friend
of JONATHAN BOND,

        Plaintiff,

                                   Case No. 05-74253
v.                                   Hon. Gerald E. Rosen

CITY OF DETROIT, ELLA BULLY-CUMMINGS,
CARA BEST, JOHN DOE POLICE OFFICERS,
MIKE COX, JERRY OLIVER, KWAME KILPATRICK,
and CHRISTINE BEATTY,

        Defendants.
_____/

**OPINION AND ORDER REGARDING**
**DEFENDANTS' MOTIONS TO DISMISS**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     August 31, 2006

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

## I. INTRODUCTION

Plaintiff Jonathan Bond, through his next friend Ernest Flagg, commenced this suit

in this Court on November 7, 2005, alleging that the Defendant City of Detroit and

several individuals — including Detroit mayor Kwame Kilpatrick, his former chief of

staff, the current and former Detroit police chiefs, certain unknown Detroit police

officers, and Michigan attorney general Mike Cox — violated Plaintiff's federal

constitutional right of access to the courts and conspired among themselves to commit

this constitutional violation by inadequately investigating the April 3, 2003 death of

Plaintiff's mother, Tamara Greene, and concealing material evidence concerning this

incident. Ms. Greene died from gunshot wounds after several shots were fired into her

vehicle, and Plaintiff suggests in his complaint that there is a connection between this

shooting, Defendants' subsequent investigation and alleged acts of concealment, and Ms.

Greene's purported performance as an exotic dancer at a widely-rumored party at the

Detroit mayor's official residence, the Manoogian Mansion, about six months before her

death.

In lieu of filing answers, two groups of Defendants have moved pursuant to Fed.

R. Civ. P. 12(b)(6) to dismiss Plaintiff's complaint for failure to state a claim.[1] As the

principal ground for this relief, Defendants argue that a federal constitutional violation

cannot rest upon the purported failure of public officials to properly investigate or

prosecute a crime.[2] In response, Plaintiff concedes that he cannot recover for a mere

_____

[1]The two motions before the Court were filed by (i) Defendants City of Detroit, Kwame
Kilpatrick, Christine Beatty, and Ella Bully-Cummings; and (ii) Defendant Mike Cox. The
remaining two Defendants, former police chief Jerry Oliver and deputy police chief Cara Best,
evidently have been served with the complaint, but have yet to file an answer or other response.

[2]Defendant Mike Cox has separately moved for dismissal of the claim against him on the
ground of Eleventh Amendment immunity. As noted in Plaintiff's response to this motion,
however, this immunity is available only to the extent that Defendant Cox has been sued in his
official rather than his individual capacity. See Shepherd v. Wellman, 313 F.3d 963, 967 (6th
Cir. 2002). While Plaintiff's complaint is not altogether clear on this point, his response to the
motion to dismiss clarifies that Defendant Cox is being sued in his individual capacity only. In
addition, the complaint's allegations refer — albeit to only a limited extent — to acts specifically
undertaken by Defendant Cox personally, which suggests an effort to impose individual liability
rather than to sue Defendant Cox solely in his official capacity as attorney general of the State of
Michigan. Accordingly, the Court denies this aspect of Defendant Cox's motion to dismiss.

failure to investigate, but contends that his claims are supported by a line of cases holding that the federal constitutional right of access to the courts can be violated through a cover-up or similar conduct that effectively defeats or substantially prejudices the opportunity to seek judicial redress.  Here, Plaintiff asserts that his allegations are sufficient to sustain a claim that he has been denied the opportunity to bring a wrongful death suit against those responsible for his mother's death.

On July 6, 2006, the Court held a hearing on Defendants' motions.  Having reviewed the parties' written submissions and the record as a whole, and having considered the arguments of counsel at the July 6 hearing, the Court now is prepared to rule on these motions.  This opinion and order sets forth the Court's rulings.

## II.  FACTUAL BACKGROUND

According to the complaint, Plaintiff Jonathan Bond's mother, Tamara Greene, was shot and killed at approximately 3:40 a.m. on April 3, 2003, as she sat in her car with a friend.  The perpetrator allegedly drove up to Ms. Greene's vehicle, fired several shots into the car, and then drove off.  Ms. Greene died at the scene.  As of the date Plaintiff filed his complaint in November of 2005, no one had been arrested in connection with the killing of Ms. Greene, and no viable suspects had yet been identified.

Plaintiff alleges in his complaint that the investigation of his mother's murder was significantly impaired by its apparent overlap with an investigation into a rumored party at the Detroit mayor's official residence, the Manoogian Mansion.  According to the complaint, shortly after Plaintiff's mother was killed, an investigative journalist

3

uncovered information suggesting that three exotic dancers, including Ms. Greene, had performed at this alleged party, which reportedly occurred a few months before Ms. Greene's death. The journalist allegedly passed this information along to unspecified members of the Detroit Police Department.

Plaintiff alleges that the Detroit police officers who attempted to look into a possible connection between Ms. Greene's presence at the rumored Manoogian Mansion party and her murder became the targets of retaliatory action, thereby discouraging other officers from further investigating the matter. Nine days after Ms. Greene's death, for example, Detroit deputy police chief Gary Brown was dismissed from his position as head of the Detroit police department's internal affairs bureau, allegedly because of his efforts to look into the claims of exotic dancing at a party at the Manoogian Mansion. Plaintiff further alleges that the mayor's office distributed a memo to the media shortly after Brown's dismissal, singling out Detroit police officer Harold Nelthrope as the source of the rumors concerning the Manoogian Mansion party and possible misconduct by the mayor's security team at this party. Finally, Plaintiff alleges that Lieutenant Al Bowman of the homicide section of the Detroit police department was called into a meeting with Detroit police chief Ella Bully-Cummings and other senior Detroit police officials, instructed to cease his investigation into Ms. Greene's murder, and transferred to another position after he began sharing the information learned in his murder investigation with Michigan State Police officials who were looking into the rumored

Manoogian Mansion party.[3]

In the wake of these developments, Plaintiff alleges that Detroit's homicide detectives came to view the investigation of Ms. Greene's murder as a "hot potato" that could prove harmful to their careers.  As a result, Plaintiff alleges that little or no investigation was done in the months immediately following his mother's death.  Plaintiff asserts, for example, that the Detroit police deliberately avoided sending the bullets and bullet casings retrieved from the scene of Ms. Greene's murder to the appropriate agencies for analysis, that the police deliberately declined to interview certain key witnesses, and that no effort was made to subpoena critical documents that might have aided the murder investigation.  (See Complaint at ¶¶ 26-28.)

The complaint also cites other alleged anomalies in the investigation into Ms. Greene's death.  Plaintiff alleges, for instance, that the homicide investigation was designated a "cold case" within a year of his mother's death, contrary to the usual practice that cases would be transferred to the "cold case" squad only after the passage of at least two years.  Plaintiff further asserts that Michigan attorney general Mike Cox, upon becoming involved in the murder investigation, conducted an interview of Detroit mayor

---

[3]All three of these Detroit police officers have filed whistleblower suits against the City of Detroit and various high-ranking city officials, with all three enjoying some degree of success to date.  In October of 2005, a jury awarded Lieutenant Bowman $200,000 following a state-court trial on his claim under Michigan's whistleblower protection statute.  More recently, in July of 2006, the Michigan Court of Appeals held that a state trial court had properly denied summary judgment on the whistleblower claims brought by Deputy Chief Brown and Officer Nelthrope against the City of Detroit and Mayor Kwame Kilpatrick, and these claims have now been remanded for trial.  See Brown v. Mayor of Detroit, __ N.W.2d __, 2006 WL 2089232 (Mich. Ct. App. July 27, 2006).

Kwame Kilpatrick and his wife that was merely a "facade" designed to shield the couple from "potentially damaging information." (Id. at ¶ 48.)[4]

Beyond these purported deficiencies and irregularities in the investigation of Ms. Greene's murder, Plaintiff affirmatively charges in his complaint that "material evidence" was "actively concealed" in "an effort to avoid inflicting damaging information upon and the potential implication of high city officials in Greene's murder, including Mayor Kwame Kilpatrick and his wife, Carlita Kilpatrick." (Complaint at ¶ 34.) Although no specific instances of such "active[] conceal[ment]" are cited in the complaint, Plaintiff has advanced three such allegations in his responses to Defendants' motions — albeit only as the bare statements of Plaintiff's counsel, and without citation to the record. First, Plaintiff points to the purported removal of police precinct activity logs that allegedly contained information about a police run to the Manoogian Mansion on the night of the rumored party at which Ms. Greene allegedly performed. Plaintiff further alleges that, on the night of the party, Ms. Greene was escorted by unidentified government officials from

_____

[4]As discussed in greater detail below, Plaintiff's responses to Defendants' two motions include various allegations that go well beyond those advanced in his complaint, while misleadingly suggesting that these allegations can be found in the complaint itself. For example, Plaintiff states in his response to Defendant Cox's motion that the complaint alleges (i) "that Mike Cox . . . fail[ed] to formally interrogate Mayor Kwame Kilpatrick or [his wife] Carlita Kilpatrick specifically about the occurrence of the [Manoogian Mansion] party," (ii) that the attorney general "refused to allow the State Police lead investigator of the alleged party to be present during the interview of the Mayor," (iii) that Attorney General Cox "refused to issue subpoenas to the Michigan State Police in support of the investigation into the alleged party at the Mayor's official residence," and (iv) that the attorney general "publicly announced after five weeks of investigation that the 'party' at the Manoogian Mansion never occurred." (Plaintiff's Response to Defendant Cox's Motion at 5.) Yet, none of these specific allegations can be found anywhere within the four corners of Plaintiff's actual complaint.

6

the mayor's residence to a local hospital for treatment of injuries she allegedly suffered at the party, and that she was forced to use an alias to obtain treatment. Finally, Plaintiff cites the alleged destruction of the recordings of 911 calls reportedly placed by the mayor's neighbors on the night of the alleged party.

Based on these allegations, both in his complaint and in his subsequent submissions to the Court, Plaintiff alleges that some or all of the Defendants have violated his federal constitutional right of access to the courts, and that some or all of these same Defendants conspired among themselves to commit this constitutional violation.[5] Specifically, Plaintiff claims that, in light of Defendants' allegedly inadequate investigation and purported concealment of material evidence, he has been deprived of the opportunity to seek meaningful judicial redress for the killing of his mother, presumably in the form of a state-court wrongful death action. Plaintiff alleges that any such filing would be futile, where the facts and evidence that could lead to the identification and apprehension of his mother's killer — and, thus, the identification of the proper defendants in a wrongful death action — either have remained unexplored or have been actively concealed.

### III.  ANALYSIS

### A.      The Standards Governing Defendants' Motions

---

[5]Apart from the above-noted discrepancies between the complaint's allegations and the assertions made in Plaintiff's responses to Defendants' motions, the complaint also is quite vague as to the precise role allegedly played by each Defendant in either (i) thwarting the investigation into the death of Ms. Greene, or (ii) concealing evidence or information that might have assisted in this investigation.

Through the present motions, Defendants seeks the dismissal of the claims against them under Fed. R. Civ. P. 12(b)(6).[6]  In resolving a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the Court must accept as true the well-pleaded factual allegations set forth in Plaintiff's complaint.  Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987); Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976).  However, the Court "need not accept as true legal conclusions or unwarranted factual inferences."  Morgan, 829 F.2d at 12.  "Under Rule 12(b)(6), a complaint may be dismissed only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  829 F.2d at 12 (footnote, internal quotations and citations omitted).  The Court will apply these standards in considering Defendants' motions.

**B.    Plaintiff's Present Allegations Fail to Establish Each Element of a Claim of Denial of Access to the Courts, But Leave Will Be Granted to File an Amended Complaint that Addresses These Deficiencies.**

Plaintiff's federal constitutional claims in this case rest upon the allegations that Defendants both (i) failed to properly and thoroughly investigate the circumstances surrounding the death of Tamara Greene, and (ii) actively concealed information and evidence that could have led to the identification and apprehension of those involved in Ms. Greene's murder.  Focusing on the former, Defendants argue that a federal

---

[6]Although the City of Detroit Defendants have captioned their motion as seeking "summary judgment," they cite only to Rule 12(b)(6) in the body of the motion, and they neither point to nor rely upon any matters outside the four corners of Plaintiff's complaint.  Accordingly, the Court treats their motion as seeking dismissal under Rule 12(b)(6) for failure to state a claim.

constitutional claim cannot be predicated upon the failure of the police or other government officials to investigate or prosecute a crime. See, e.g., White v. City of Toledo, 217 F. Supp.2d 838, 841 (N.D. Ohio 2002).[7] This is true even where, as is alleged here, the police are "lax in their investigatory duties." Bell v. City of Milwaukee, 746 F.2d 1205, 1261-62 (7th Cir. 1984); see also Kelso v. City of Toledo, No. 02-3190, 77 Fed. Appx. 826, 833 (6th Cir. Oct. 1, 2003); Flores v. Satz, 137 F.3d 1275, 1278 n.7 (11th Cir. 1998).

Yet, Plaintiff's allegations of active concealment cast his claims in a somewhat different light, and lend at least some support to a federal constitutional claim of denial of access to the courts.[8] The leading Sixth Circuit decision in this area is Swekel v. City of River Rouge, 119 F.3d 1259 (6th Cir. 1997), in which plaintiff Delores Swekel alleged that the defendant city officials covered up the identity of one of the two drivers involved in an accident in which her husband was struck and killed while crossing the street.

---

[7]More accurately, only the City of Detroit Defendants have advanced this argument. Defendant Cox, for his part, states only that "Plaintiff's claims against all defendants are ridiculous in that it [sic] alleges violations . . . arising out of the investigation of the murder of his mother." (Defendant Cox's Motion, Br. in Support at 6.) Unlike the City of Detroit Defendants, Defendant Cox has not cited any pertinent authority on this point, but instead offers only the conclusory assertion that the case law fails to support Plaintiff's theory of recovery.

[8]As noted earlier, Plaintiff's complaint is vague in several respects, and generally fails to link its various allegations of inadequate investigation and concealment of evidence to any particular subset of Defendants. Most notably, there are absolutely no specific allegations that Defendant Mike Cox engaged in concealment of evidence, as opposed to conducting an investigation that did not sufficiently explore a possible link between the rumored Manoogian Mansion party and Ms. Greene's death. Arguably, then, to the extent that Plaintiff's allegations of concealment of evidence might support a denial-of-access claim, it does not appear that such a claim could go forward against Defendant Cox. The Court returns to this issue below.

2:05-cv-74253-GER-RSW   Doc # 20   Filed 08/31/06   Pg 10 of 22   Pg ID 91

According to Ms. Swekel, the defendants ignored various evidence, refused to perform certain forensic tests, failed to interview witnesses, and failed to disclose material information to her, all in an effort to cover up the fact that the second, undisclosed driver was the son of a high-ranking police official. Thus, while Ms. Swekel successfully pursued a wrongful death action against one of the two drivers involved in the accident that claimed her husband's life, she alleged that the defendants' actions "deprived her of a similar suit against the second driver, because she could not discover his identity before her time to file suit expired under the Michigan statute of limitations." Swekel, 119 F.3d at 1261.

The district court dismissed Ms. Swekel's claim of denial of access to the courts, and the Sixth Circuit affirmed. In so ruling, the court initially observed that the federal constitutional guarantee of "[a]ccess to courts does not only protect one's right to physically enter the courthouse halls, but also insures that the access to courts will be adequate, effective and meaningful." Swekel, 119 F.3d at 1262 (internal quotation marks and citation omitted). "Therefore, if a party engages in actions that effectively cover-up evidence and this action renders a plaintiff's state court remedy ineffective, they have violated his right of access to the courts." 119 F.3d at 1262.

The court then addressed the criteria for determining whether a defendant's actions have left the plaintiff with only an "ineffective" state court remedy:

> A court must analyze several factors before deciding whether a person's fundamental right of access to the courts has been violated. First, a court must ascertain whether the abuse occurred pre- or post-filing. When

the abuse transpires post-filing, the aggrieved party is already in court and that court usually can address the abuse, and thus, an access to courts claim typically will not be viable. If the abuse occurs pre-filing, then the plaintiff must establish that such abuse denied her "effective" and "meaningful" access to the courts. She can do this only by showing that the defendants' actions foreclosed her from filing suit in state court or rendered ineffective any state court remedy she previously may have had. In most instances, state courts can address pre-filing abuses by tolling the statute of limitations or allowing for a "spoliation of evidence" lawsuit.

119 F.3d at 1263-64 (footnote and citations omitted).

Turning to the case before it, the court observed that Ms. Swekel had alleged pre-filing abuses, so that she bore "the burden of showing that [the defendants'] actions foreclosed her from filing suit in state court." 119 F.3d at 1264. The court then found that she could not meet this burden solely through allegations of a police cover-up, absent some basis to conclude that she would be unable to raise these allegations of misconduct before the state court:

Swekel alleges that the police covered-up proof against one of their own, destroyed critical evidence, and delayed Swekel's own investigation. These allegations, if true, would substantially prejudice Swekel's ability to recover in state court. Delay alone causes stale evidence and the fading of material facts in the minds of potential witnesses. Swekel, however, never presented evidence that the state court could not adequately address these problems. In fact, none of the evidence before this court establishes that Swekel even attempted to go to the state court in [the] first instance. Before filing an "access to courts" claim, a plaintiff must make some attempt to gain access to the courts; otherwise, how is this court to assess whether such access was in fact "effective" and "meaningful"?

A plaintiff cannot merely guess that a state court remedy will be ineffective because of a defendant's actions. Rather, the plaintiff must present evidence that the defendants' actions actually rendered any available state court remedy ineffective. Swekel has failed to do so.

11

119 F.3d at 1264 (footnote, internal quotation marks, and citations omitted).

At first glance, the ruling in <u>Swekel</u> appears to foreclose Plaintiff's denial-of-access claim in this case.  So far as the complaint discloses, Plaintiff has made no "attempt to gain access to the courts" prior to the present suit, nor has he suggested any basis for the Court to conclude "that the state court could not adequately address" his allegations of a flawed investigation and police cover-up in the context of a state court wrongful death action.  Rather, Plaintiff appears to be "merely guess[ing] that a state court remedy will be ineffective."  <u>Swekel</u> does not permit a denial-of-access claim to go forward on such bare speculation.

Yet, in a footnote accompanying the above-quoted passage, <u>Swekel</u> acknowledges a possible exception to the usual rule that a plaintiff must at least *try* to pursue his state court remedies before claiming a denial of "effective" and "meaningful" access to the courts.  In particular, the Sixth Circuit "recognize[d] that in some instances it would be completely futile for a plaintiff to attempt to access the state court system."  <u>Swekel</u>, 119 F.3d at 1264 n.2.  Plaintiff asserts that this exception is applicable here, alleging in his complaint that "it would be futile to file a state court claim when plaintiff ha[s] no one to file against."  (Complaint at ¶ 39.)  The question, then, is whether Plaintiff's inability to identify his mother's killers provides a sufficient ground to excuse him from pursuing any state court remedies before advancing a denial-of-access claim in federal court.

While <u>Swekel</u> suggests the availability of a "futility" exception, it also indicates that such an exception would not be available under the circumstances presented here.

12

There, as here, the inadequate investigation and concealment of evidence left the plaintiff allegedly unable to discover the identity of the proper defendant to a wrongful death suit — in that case, the second driver involved in the accident that killed the plaintiff's husband.  Despite this claimed inability to identify the proper party to sue, the district court in Swekel found that Ms. Swekel "possessed a sufficient factual basis to file a 'John Doe' suit in state court," based on the account of a witness who testified that two cars, rather than one, were involved in the accident that killed Mr. Swekel.  Swekel, 119 F.3d at 1261.  Although this testimony did not specifically identify the driver of the second car, the district court reasoned that this additional information could have been revealed in discovery in a "John Doe" suit, just as it ultimately was learned in the course of discovery in the federal case.  This case seemingly cannot be distinguished from Swekel, then, on the ground that Plaintiff here lacks information regarding the proper party to sue.

Indeed, such a distinction would be particularly difficult to draw, where the Sixth Circuit declined to invoke a "futility" exception *despite* its evident recognition that Ms. Swekel had, in fact, been hindered in her ability to identify the other driver who perhaps bore some responsibility for her husband's death.  In particular, the court reasoned that its prior decision in Joyce v. Mavromatis, 783 F.2d 56 (6th Cir. 1986), was not controlling, because the plaintiff in that case, unlike Ms. Swekel, "knew the identity of the defendant and had all of the requisite facts to file suit."  Swekel, 119 F.3d at 1263.  Despite this significant factual distinction, the court nonetheless concluded — in the very same footnote in which it recognized a possible "futility" exception — that Ms. Swekel had

13

failed to demonstrate that a state court suit would have been futile. 119 F.3d at 1264 n.2. It readily follows, in this Court's view, that Swekel's "futility" exception is not triggered merely by a plaintiff's inability to discern the precise parties to name as defendants in a state court suit.

The Supreme Court's recent ruling in a denial-of-access case supports this conclusion, albeit through a somewhat different analytical route. In Christopher v. Harbury, 536 U.S. 403, 122 S. Ct. 2179 (2002), the plaintiff, Jennifer Harbury, alleged that various federal government officials and agencies intentionally misled her regarding the whereabouts and fate of her missing husband, a Guatemalan rebel leader. According to Ms. Harbury, the defendant federal officials and agencies knew that her husband had been captured, tortured, and eventually killed by Guatemalan army forces who had been trained in the United States and used as CIA informants, but withheld these facts out of a desire to gain information secured through her husband's torture and to cover up their complicity in her husband's detention and death. Based on these allegations, Ms. Harbury advanced a variety of causes of action, including a claim that her right of access to the courts had been violated through the concealment of information that, if timely disclosed, could have provided the basis for "a lawsuit that might have saved her husband's life." Harbury, 536 U.S. at 405, 122 S. Ct. at 2181.

The Supreme Court held that Ms. Harbury had failed to state a claim of denial of access to the courts. In addressing this theory of recovery, the Court first drew a general distinction between "forward-looking" claims in which "systemic official action frustrates

14

a plaintiff or plaintiff class in preparing and filing suits at the present time" — a category

that would encompass, for example, a prisoner's suit seeking access to a law library —

and "backward-looking" claims based on "specific cases that cannot now be tried (or tried

with all material evidence), no matter what official action may be in the future."  536 U.S.

at 413-14, 122 S. Ct. at 2185-86.  The plaintiff in this latter type of case — of which the

Court cited <u>Swekel</u> as an example — "do[es] not look forward to . . . future litigation, but

backward to a time when specific litigation ended poorly, or could not have commenced,

or could have produced a remedy subsequently unobtainable."  536 U.S. at 414, 122 S.

Ct. at 2186 (footnote omitted).  "The ultimate object of these sorts of access claims, then,

is not the judgment in a further lawsuit, but simply the judgment in the access claim itself,

in providing relief obtainable in no other suit in the future."  536 U.S. at 414, 122 S. Ct. at

2186.

        The Court then cited its recognition in prior rulings that "the right [of access] is

ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by

being shut out of court."  536 U.S. at 415, 122 S. Ct. at 2186-87.  This "ancillary,"

dependent nature of a denial-of-access claim led the Court to impose two specific

pleading requirements in "backward-looking" cases:

> It follows that the underlying cause of action, whether anticipated or lost, is
> an element that must be described in the complaint, just as much as
> allegations must describe the official acts frustrating the litigation.  It
> follows, too, that when the access claim (like this one) looks backward, the
> complaint must identify a remedy that may be awarded as recompense but
> not otherwise available in some other suit that may yet be brought.  There
> is, after all, no point in spending time and money to establish the facts

> constituting denial of access when a plaintiff would end up just as well off
> after litigating a simpler case without the denial-of-access element.

536 U.S. at 415, 122 S. Ct. at 2187.  As to the first of these requirements, the Court

explained that "the predicate claim [must] be described well enough" to establish that it is

"nonfrivolous" and to "show that the 'arguable' nature of the underlying claim is more

than hope."  536 U.S. at 416, 122 S. Ct. at 2187 (footnote omitted).  As to the second, the

Court emphasized that "the remedy sought must itself be identified to hedge against the

risk that an access claim be tried all the way through, only to find that the court can award

no remedy that the plaintiff could not have been awarded on a presently existing claim."

536 U.S. at 416, 122 S. Ct. at 2187.

Applying these rules of pleading to the case before it, the Court held that Ms.

Harbury had failed to state a viable denial-of-access claim.  Even assuming that she had

sufficiently identified a nonfrivolous underlying claim that could have been brought while

her husband was still alive, the Court found that Ms. Harbury "could not satisfy the

requirement that a backward-looking denial-of-access claim provide a remedy that could

not be obtained on an existing claim."  536 U.S. at 420-21, 122 S. Ct. at 2189-90.

Through the other theories of recovery that she had advanced and that were still pending

in the lower courts, Ms. Harbury had the opportunity to recover damages and forward-

looking injunctive relief for the harms allegedly inflicted upon her and her late husband.

The only sort of relief that could no longer be awarded through a presently-pending claim

was a posited court order which, if timely sought and obtained, potentially could have

saved her husband's life.  Yet, such an order plainly could not be timely and meaningfully

secured through the vehicle of Ms. Harbury's denial-of-access claim brought *after* her

husband's death.  "And it is just because the access claim cannot address any injury she

has suffered in a way the presently surviving [tort] claims cannot that Harbury is not

entitled to maintain the access claim as a substitute, backward-looking action."  536 U.S.

at 422, 122 S. Ct. at 2190.

The case before this Court plainly does not present this stark dilemma of a

potentially available remedy that has been indisputably and irretrievably lost.  Instead,

while the relief at issue in Harbury had been *mooted* by subsequent events, Plaintiff's

request for relief here is properly characterized as *premature*.  In either event, however,

Plaintiff here, just like Ms. Harbury, has not satisfied the requirement of "identify[ing] a

remedy that may be awarded as recompense but not otherwise available in some suit that

may yet be brought."  Harbury, 536 U.S. at 415, 122 S. Ct. at 2187.  As discussed earlier,

beyond Plaintiff's bare assertion of "futility" in light of his present inability to identify

those who might have been responsible for his mother's death, Plaintiff has not

affirmatively alleged that this lack of knowledge has foreclosed any opportunity to pursue

a state-court wrongful death action.  It follows that he cannot establish, at least at this

juncture, that the denial-of-access claim advanced before this Court provides a vehicle for

some form of relief that would otherwise be unavailable in any such state-court suit that

might yet be brought.  Accordingly, Plaintiff's complaint, as it presently stands, has failed

to allege the second of the two elements that are required under Harbury to sustain a

17

backward-looking claim of denial of access to the courts.

Although <u>Swekel</u> does not frame the issue in precisely these terms, other courts have cited the premature nature of a denial-of-access claim as a ground for dismissing the claim without prejudice.  In <u>Delew v. Wagner</u>, 143 F.3d 1219 (9th Cir. 1998), for example, a woman died when her bicycle was struck by a car, and the parents and husband of the victim alleged that the police had covered up the facts surrounding this incident in order to protect the driver, the wife of a police officer.  The victim's family commenced a wrongful death action in state court, and then asserted a separate denial-of-access claim in federal court upon uncovering evidence of an alleged cover-up during discovery in the state-court suit.

Relying largely on the Sixth Circuit's decision in <u>Swekel</u>, the Ninth Circuit found that the family's allegations were sufficient to state a viable denial-of-access claim. Nonetheless, the court held that this claim should be dismissed without prejudice while the family's wrongful death action remained pending in state court.  The court reasoned that, absent the final disposition of the state-court suit, it could not be determined whether "the defendants' cover-up violated [the plaintiffs'] right of access to the courts by rendering any available state court remedy ineffective."  <u>Delew</u>, 143 F.3d at 1223 (internal quotation marks and citation omitted).  A dismissal of the plaintiffs' federal constitutional claim without prejudice, in the court's view, would properly preserve the family's "opportunity to re-file their section 1983 action if in fact the defendants' alleged cover-up actually rendered all state court remedies ineffective."  143 F.3d at 1223; <u>see</u>

18

also Karim-Panahi v. Los Angeles Police Department, 839 F.2d 621, 625 (9th Cir. 1988)

(ordering the dismissal without prejudice of a denial-of-access claim, where the plaintiff's

"cover-up allegations would be mooted" if he were to succeed in his underlying claims

that remained pending).

In accordance with the consistent teachings of this case law, the Court finds that

Plaintiff's claim of denial of access to the courts is not viable as currently pled.  In his

initial complaint, Plaintiff does not allege that he is foreclosed from bringing a state-court

wrongful death action against "John Doe" defendants, which in turn would provide a

vehicle for discovery concerning any alleged concealment of evidence or any promising

leads that were abandoned in the local and state investigations of Tamara Greene's death.

Nor does Plaintiff allege that any pertinent statute of limitations has run,[9] or that key

evidence or witness testimony has been irretrievably lost.[10]

There remains only the question of the proper remedy for these deficiencies in

Plaintiff's complaint.  As discussed, Plaintiff's allegations fail to establish the

---

[9]In this regard, the Court notes that Michigan law confers an additional two-year period in which to commence an action in cases of "fraudulent[] conceal[ment] [of] the existence of the claim or the identity of any person who is liable for the claim."  Mich. Comp. Laws § 600.5855.

[10]Notably, all of Plaintiff's allegations to date concerning the purported concealment or destruction of evidence relate to the rumored party at the Detroit mayor's official residence, as opposed to the circumstances surrounding the shooting of his mother.  Yet, any alleged cover-up as to the former incident would not necessarily entail a cover-up as to the latter — at present, any link between the two would be purely speculative.  Moreover, even assuming that Tamara Greene's alleged presence at the rumored Manoogian Mansion party made the investigation of her murder a "hot potato" that Detroit homicide detectives were reluctant to pursue, this by itself would suggest only an inadequate investigation which, as noted earlier, does not suffice to sustain a denial-of-access claim.

19

unavailability of an effective and meaningful state-court remedy as a result of Defendants' actions. Yet, it is also true that Defendants' motions did not squarely raise the denial-of-access issues and precedents addressed in this Court's opinion — indeed, Defendants did not even **_cite_** the rulings in <u>Swekel</u> and <u>Harbury</u>, much less endeavor to apply them to the facts alleged in this case. Instead, Defendants narrowly construed Plaintiff's claims as resting solely upon a failure-to-investigate theory, in plain disregard of the complaint's express allegations of concealment of evidence.

Under these circumstances, the Court finds that Plaintiff should be given an opportunity to file an amended complaint that addresses the various shortfalls identified in this ruling. First and foremost, this amended complaint must include allegations which, if proven, would establish the unavailability of an effective and meaningful state-court remedy. As indicated, these allegations must extend beyond the mere assertion, as set forth in the initial complaint, (<u>see</u> Complaint at ¶ 39), that Plaintiff presently is unable to ascertain the identity of the proper defendants to name in a state-court wrongful death action. In addition, Plaintiff must identify, in accordance with <u>Harbury</u>, some form of relief that is recoverable here but is "not otherwise available in some other suit that may yet be brought." <u>Harbury</u>, 536 U.S. at 415, 122 S. Ct. at 2187. Finally, Plaintiff must specifically identify actions allegedly taken by each Defendant that would subject this individual to liability under a denial-of-access theory.[11] Upon Plaintiff's filing of such an

---

[11]As noted earlier, the existing complaint is hopelessly vague as to which Defendants, if any, might have participated in the various alleged acts of concealment. Moreover, the specific

amended pleading, Defendants may then file answers or renewed motions to dismiss, as

each of them deems appropriate in response to the allegations of the amended complaint.

### IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that the City of Detroit

Defendants' December 5, 2005 motion to dismiss is GRANTED IN PART and DENIED

IN PART, in accordance with the rulings in this opinion and order.  IT IS FURTHER

ORDERED that Defendant Mike Cox's December 22, 2005 motion to dismiss also is

GRANTED IN PART and DENIED IN PART.  Finally, IT IS FURTHER ORDERED

that Plaintiff shall file and serve an amended complaint within ***twenty-one (21) days*** of

the date of this opinion and order, and that Defendants shall then respond to this amended

pleading in accordance with the terms of Fed. R. Civ. P. 12 and any other applicable

federal and local rules.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  August 31, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on August 31, 2006, by electronic and/or ordinary mail.

---

allegations directed against certain Defendants — most notably, Michigan attorney general Mike
Cox — appear to be wholly inadequate to sustain a denial-of-access claim against these
individuals.

s/LaShawn R. Saulsberry
Case Manager