UNITED STATES OF AMERICA
IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERNEST FLAGG, as Next Friend of
JONATHAN BOND, a minor,

      Plaintiff,

Case No.: 05-CV-74253
Hon. Gerald Rosen

-vs-

CITY OF DETROIT, a municipal corporation;
DETROIT POLICE CHIEF ELLA BULLY-CUMMINGS;
DEPUTY DETROIT POLICE CHIEF CARA BEST;
JOHN DOE POLICE OFFICERS 1 - 20;
ASST. DEPUTY POLICE CHIEF HAROLD CURETON;
COMMANDER CRAIG SCHWARTZ;
POLICE LT. BILLY JACKSON;
MAYOR KWAME M. KILPATRICK,
CHRISTINE BEATTY, jointly and severally

      Defendants.
_____/

| **Norman Yatooma & Associates, P.C.** | **City of Detroit Law Department** |
|---|---|
| By: Norman A. Yatooma (P54746) | By: John A. Schapka (P36731) |
| By: Robert S. Zawideh (P43787) | Attorneys for Defendants |
| Attorneys for Plaintiffs | 1650 First National Building |
| 219 Elm Street | Detroit, Michigan 48226 |
| Birmingham, Michigan 48009 | (313) 224-4550 |
| (248) 642-3600 | |

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

NOW COMES THE PLAINTIFF, JONATHAN BOND, through his Next Friend ERNEST FLAGG, and by and through their attorneys, Norman Yatooma & Associates, P.C., and states the following for his Second Amended Complaint:

1.    That Plaintiff Jonathan Bond, is a resident of the State of Michigan, County of Wayne and City of Detroit, and resides there with his father and Next Friend, Ernest Flagg.

1

2. Jurisdiction is conferred on this court pursuant to Title 28 USC §§ 1331, and 1343(a)(3) and (4).

3. Defendant, CITY OF DETROIT, is a Municipal Corporation, organized under the laws of the State of Michigan.

4. On information and belief, Defendant, ELLA BULLY-CUMMINGS, is a resident of the City of Detroit, County of Wayne, State of Michigan.

5. On information and belief, Defendant, CARA BEST, is a resident of the City of Detroit, County of Wayne, State of Michigan.

6. On information and belief, Defendant, HAROLD CURETON, is a resident of the City of Detroit, County of Wayne, State of Michigan.

7. On information and belief, Defendant, BILLY JACKSON, is a resident of the City of Detroit, County of Wayne, State of Michigan.

8. On information and belief, Defendant, CRAIG SCHWARTZ, is a resident of the City of Detroit, County of Wayne, State of Michigan.

9. On information and belief, Defendant, KWAME M. KILPATRICK, current Mayor of the City of Detroit, is a resident of the City of Detroit, County of Wayne, State of Michigan..

10. On information and belief, Defendant, CHRISTINE BEATTY, the former Chief of Staff for Defendant Kwame M. Kilpatrick, is a resident of the City of Detroit, County of Wayne, State of Michigan.

## GENERAL ALLEGATIONS

11. Tamara Bond-Greene was the mother of plaintiff JONATHAN BOND, a 14-year-old minor child.

2

12. Tamara Bond-Greene was a licensed exotic dancer and employed in various clubs in the City of Detroit and by private parties. Ms. Greene performed under the stage name of "Strawberry".

13. It has been widely reported in the local media that, sometime in the fall of 2002, a wild party occurred at the Manoogian Mansion.[1] It was rumored that Defendant Kilpatrick attended this party,[2] as well as several of his close friends, certain Detroit Police Officers, and nude exotic dancers, including Tamara Bond Greene. According to various accounts, it is alleged that Defendant Kilpatrick's wife, Carlita Kilpatrick arrived at the party unexpectedly, and assaulted one or more of the dancers.

14. On information and belief, that night, following the alleged attack by Mrs. Kilpatrick, Defendant Kwame Kilpatrick's security detail, known as the Executive Protection Unit, or "EPU", escorted, transported, or otherwise accompanied the injured dancer to the emergency room of a local hospital.

15. On information and belief, at least one Emergency Medical Technician ("EMT") reported to the media that, on or about the time of the alleged Manoogian party, individuals who appeared to be members of the EPU brought in an injured woman for treatment and arranged for all EMT's to be removed from the emergency room.

16. On or about the time of the alleged party, and at all relevant times thereafter, Harold Nelthrope ("Nelthrope") was a detective in the EPU before he was transferred.

17. Beginning in March of 2003, Nelthrope reported allegations of illegal conduct and misconduct by fellow EPU officers and by Detroit Mayor Kwame Kilpatrick and his wife to the police department's Professional Accountability Bureau. These allegations included claims that

---

[1] The Manoogian Mansion is the traditional residence of the Mayor of the City of Detroit and his or her family.
[2] On information and belief, Defendant Kilpatrick and his family had not as yet moved into the Manoogian Mansion, as it was undergoing renovations at the time.

3

close friends of Defendant Kwame Kilpatrick on EPU were claiming overtime pay to which they were not entitled, and drinking on the job; there were also allegations that Carlita Kilpatrick assaulted one or more of the dancers at the alleged party at the Manoogian Mansion in the fall of 2002, and that there were efforts to cover up these crimes.

18. Gary Brown, the deputy chief of the Professional Accountability Bureau, summarized these allegations in a 5-page memorandum dated April 24 and April 30, 2003, (attached hereto as Exhibit A) and authorized a preliminary investigation into these allegations.

19. According to Brown, "[t]he most serious allegation made by Officer Nelthrope is that Mrs. Carlita Kilpatrick was involved in a physical altercation with a female dancer, causing bodily injury requiring medical attention. If this allegation is proven to be fact, the potential for assault charges to be filed against Mrs. Carlita Kilpatrick as well as potential obstruction of justice charges and or misconduct in office charges against anyone found to have collected and destroyed activity logs will warrant national headlines and severely damage the political future of Mayor Kilpatrick."

20. Brown prepared another memorandum regarding Nelthrope's allegations. See Memorandum dated May 6, 2003, attached hereto as Exhibit B. In that memorandum, Brown stated that Nelthrope made a point of saying that he was wearing a bulletproof vest because "he didn't trust many police officers."

21. These memoranda were given to then police chief, Jerry Oliver, and then passed along to Defendant Christine Beatty, the mayor's Chief of Staff or to others in Defendant Kilpatrick's office.

22. On information and belief, on or about this time Defendant Christine Beatty, the Mayor's Chief of Staff, without having conducted any investigation to support the claim,

4

reported to Defendant Kilpatrick that Brown was conducting an unauthorized investigation, and that he needed to be removed from his department.

23. Former Police Chief Oliver, Defendant Mayor Kilpatrick, Defendant Beatty and other City officials had a meeting regarding Brown's investigation. Following that meeting, Defendant Kilpatrick decided to terminate Brown, a decorated, well-respected twenty-year member of the Detroit Police Department.

24. Approximately two days after the May 6, 2003 memorandum was submitted to former Chief Oliver, Brown was discharged from his position as deputy chief of the Professional Accountability Bureau.

25. On information and belief, Defendant Mayor Kwame Kilpatrick fired Deputy Police Chief Gary Brown shortly after he submitted the May 6, 2003 memorandum to former Chief Oliver to avoid further investigation into the allegations of the "wild party," or that his wife, Carlita Kilpatrick, assaulted an exotic dancer at that party.

26. Further, members of Defendant Kwame Kilpatrick's office then identified Nelthrope as being the source of the allegations of misconduct to the media, and the mayor publicly called Nelthrope a liar. See Deposition of Defendant Kwame Kilpatrick, pp. 60-62, attached hereto in its entirety as Exhibit C. Nelthrope was likewise terminated from his employment.

27. Approximately one month after Det. Nelthrope first began reporting allegations of misconduct to internal affairs, and around the time that Deputy Chief Brown was authoring his two memos to former chief Oliver, on April 30, 2003, at approximately 3:40 a.m., Tamara Greene was murdered in a drive-by shooting that occurred in front of her home on Roselawn in the City of Detroit, while she sat behind the wheel of her automobile with a friend who sat in the front passenger seat. The passenger survived the shooting.

28. On information and belief, twelve .40 caliber shell casings were found at Ms. Green's murder scene. Witnesses reported that the shooter left the scene in a "white trailblazer."

29. On information and belief, .40 caliber Glocks, Model 22, are standard issue weapons for members of the Detroit Police Department.

30. On information and belief, the Detroit Police Department, Homicide Section, was assigned to investigate the murder of Tamara Greene.

31. On information and belief, Lt. Al Bowman of the Detroit Homicide section of the Detroit Police Department was a detective investigating Greene's homicide assigned to 'Squad 8.'

32. Sgt. Marian Stevenson, a former homicide investigator who worked under Lt. Bowman, was also assigned to the Tamara Greene murder investigation. Sgt. Stevenson concluded that someone ordered Greene's murder. The basis for her belief was that (1) Greene was shot first, and (2) that Greene's passenger was able to exit the vehicle, and (3) an eyewitness reported that the shooter's vehicle turned around after shooting Greene and had the opportunity to shoot the passenger as well, but did not.

33. According to Sgt. Stevenson, someone erased her case notes on the Tamara Greene murder investigation from her police department computer hard drive, and her zip storage files disappeared from a locked cabinet inside the police department.

34. Sgt. Stevenson did not report the theft to her superiors out of fear for her safety.

35. According to Sgt. Stevenson, she and her colleagues in the Homicide Section were concerned that they may lose their jobs if they continued to investigate the case.

36. On information and belief, in the course of his investigation, regarding the identity of the shooter, Lt. Al Bowman concluded that "given the number of rounds fired with that one individual with that one gun, it was presumed it could have been someone in law enforcement."

37. On information and belief, Lt. Bowman gave the information directly to Defendant Police Chief Ella Bully-Cummings.

38. On information and belief, Lt. Bowman was called into a meeting with Defendants, Police Chief Ella Bully-Cummings, Assistant Chief of Police Harold Cureton, Commander Craig Schwartz, and Lt. Billy Jackson, and was directed by them to cease investigating Greene's homicide and to "put the file away".

39. On information and belief, Lt. Bowman did not cease the investigation as ordered by Police Chief Bully Cummings, Assistant Chief of Police Harold Cureton, Commander Craig Schwartz, and Lt. Billy Jackson

40. On information and belief, Defendant Cara Best, Bowman's supervisor ordered Bowman to be transferred out of homicide ultimately because of his investigating of Greene's homicide. He was then transferred to the 2nd Precinct, to a different position and placed on the midnight shift.

41. The Greene homicide file was seized from the homicide section and locked away in the office of Lieutenant Billy Jackson immediately after Lt. Al Bowman was transferred out of the Homicide Section. See page 7 of 15 of transcript of telephone call between Michigan State Police D. Sgt Mark Krebs and Lt. Al Bowman, attached hereto as Exhibit D.

42. On information and belief, when Lt. Bowman asked his immediate supervisor why he was moved to the overnight shift, Bowman was told, "I guess you've been asking too many questions about the Strawberry case."

7

43. On information and belief, these Defendants either directly or indirectly through their agents erased the case notes of the Greene investigation that Lt. Al Bowman and Sgt. Stevenson collected and maintained on their computers at the Detroit Police Department.

44. That Defendant, Ella Bully-Cummings ordered the Greene homicide file to be placed in the Cold Case file after only one year, contrary to the Detroit Police Department standard policy and/or practice of waiting two years before designating a homicide file as a "cold case". See page 8 of 15 of transcript of telephone call between Michigan State Police D. Sgt Mark Krebs and Lt. Al Bowman, attached hereto as Exhibit D.

45. At all relevant times, once Tamara Greene's murder file was transferred to Cold Case, it would have been under the control of Sgt. Godbow of the Detroit Police Department.

46. On information and belief, Sgt. Godbow as head of the Cold Case section of the Homicide division, has control over this investigation despite the rumors that a family member of Sgt. Godbow was once romantically involved with the decedent, Tamara Greene.

47. Lt. Alvin Bowman subsequently brought a Whistleblower action in the Wayne County Circuit Court against Defendant City of Detroit and Defendant Ella Bully-Cummings, alleging that they retaliated against him for continuing to investigate the murder of Tamara Greene.

48. A jury found in favor of Lt. Bowman, that the City of Detroit had retaliated against him for his investigation of the murder of Tamara Greene.

49. On information and belief, Lt. Bowman testified that, out of fear for their jobs and their safety, at least two of his officers begged to be removed from the case.

50. On information and belief, Defendant Commander Craig Schwartz alleged that he was unable to review Greene's file for progress or make any recommendations in the investigation because the file was missing for a period of time.

51. Likewise, Nelthrope and Brown sued the mayor, former Police Chief Jerry Oliver and the city of Detroit in the Wayne County Circuit Court for retaliating against them after Brown began investigating Nelthrope's allegations of misconduct.

52. Likewise, the Wayne County Circuit Court rendered a verdict in favor of Nelthrope and Brown, finding that the Defendants indeed retaliated against them for reporting and investigating Nelthrope's allegations.

53. These Defendants, acting either individually or in concert with one another, have actively, intentionally and deliberately worked to terminate or otherwise hinder this investigation, and to deter qualified homicide detectives from investigating Tamara Greene's murder.

54. Defendants' conduct as described herein was motivated by an evil motive or intent; namely a desire to protect the mayoral administration of Kwame Kilpatrick from embarrassing allegations regarding himself or his family and to protect his political future.

55. Defendants' conduct as described herein involves reckless or callous indifference to the federally-protected rights of others, particularly this Plaintiff's right to meaningful access to the courts.

56. On information and belief, as a direct and proximate result of Defendants' actions, the investigation into the murder of Tamara Greene has been effectively terminated.

57. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, the pertinent three-year statute of limitations has expired, thus

barring a wrongful death action that may have been brought against the murderer of Tamara Greene.

58. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, key evidence or witness testimony has been irretrievably lost, and others have expressed fear for their careers and their very safety should they offer assistance of any kind in investigating the murder of Tamara Greene.

59. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiff is foreclosed from bringing a state-court wrongful death action against "John Doe" defendants, which in turn would have provided a vehicle for discovery concerning any alleged concealment of evidence or any promising leads that were abandoned in the local and state investigations of Tamara Greene's death.

60. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiff has been denied the opportunity to learn the identity of his mother's killer.

61. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiff has been denied the opportunity see his mother's killer brought to justice.

62. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiff has been denied the opportunity to recover damages as a state court or jury would have considered fair and equitable, under all the circumstances including reasonable medical, hospital, funeral, and burial expenses; reasonable compensation for the pain and suffering, while conscious, undergone by Tamara Greene during the period

intervening between the time of the injury and death; and damages for the loss of financial support and the loss of the society and companionship of his mother.

### COUNT I - VIOLATION OF 14TH AMENDMENT (RIGHT OF ACCESS TO COURTS) PURSUANT TO TITLE 42 U.S.C. §1983

63.  That plaintiff repeats, realleges and incorporates by reference the allegations in paragraph 1 through 62 above with the same force and effect as if herein set forth.

64.  Defendants, acting individually, in their official capacities, or in concert with one another, deliberately and continuously delayed and obstructed the Greene murder investigation, and deliberately ignored and actively concealed material evidence in the investigation of Greene's death, and threatened and retaliated against anyone who pursued any aspect of the investigation.

65.  Defendants' acts described herein deprived plaintiff of his right of access to the courts by denying him of the ability to bring a wrongful death action in state court.

66.  As a proximate result of Defendants' actions, Plaintiff's filing of a state court action would be futile and meaningless because:

   a) Under the law of the State of Michigan there is no civil cause of action for "spoliation of evidence" that could be brought against the City of Detroit Police Department.

   b) The plaintiff cannot bring an action against the City of Detroit for negligence in the investigation of the homicide of Greene because under Michigan law, police owe no duty to any one particular individual in performing its duties, and, therefore, it would be a frivolous lawsuit that would subject plaintiff to sanctions by the court.

   c) The plaintiff does not have a sufficient factual basis to file a "John Doe" suit in state court due to the fact that the investigation has been terminated and otherwise tampered with by these Defendants.

d) Further, the filing of a "John Doe" lawsuit does not toll the running of the statute of limitation applicable to an action under Michigan law. Defendants not specifically named in a "John Doe" complaint are not yet parties to the suit, and if added later are considered new parties to the litigation. Accordingly, amendments to a complaint that add new parties do not relate back to the original complaint.

e) The plaintiff is precluded by the applicable statute of limitations from bringing any action in state court for the wrongful death of Tamara Bond Greene. This preclusion is not circumvented by MCL §600.5855 (Fraudulent concealment of claim or identity of person liable) because concealment of the identity of parties liable, or concealment of the parties, has been held not to constitute concealment of the cause of action, and not to be available to avoid the running of the statute of limitations.

f) Michigan does not have a tolling provision, either common law or statutory, that will operate to save Plaintiff's wrongful death action if the identity of the killer is discovered beyond the three year statute of limitations period. *Trentadue v. Buckler Lawn Sprinkler*, 479 Mich. 378, 738 N.W.2d 664 (2007).

g) Further, the act of a third person in concealing a cause of action against the defendant does not constitute such a concealment as to prevent the running of the statute of limitations in favor of the defendant.

h) All applicable statutes of limitations have expired, barring Plaintiff's state law claims.

i) Given the above enumerated facts of the case, there is no state court remedy available to plaintiff for damages.

j) The actions of defendants resulted in the termination of Tamara Greene's murder investigation. Not only have Defendants' actions caused evidence to grow stale and cause the fading of material facts in the minds of witnesses and potential witnesses such that testimony and evidence have been irretrievably lost, but Defendants have also frightened and intimidated witnesses from coming forward as well as deterred officers from vigorously investigating Tamara Greene's murder.

67. Defendants' actions were performed under color of state law, and violated Plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution, as well as his rights under the First Amendment to the United States Constitution.

68. As a proximate result of Defendants' actions as described herein, Plaintiff, or anyone acting on Plaintiff's behalf, has been foreclosed from filing suit in state court and seeking a

meaningful state court remedy; it would be completely futile for the plaintiff to attempt to access the state court system given (1) the missing evidence, (2) the expired statute of limitations, (3) the prior retaliation against Bowman, Brown and Nelthrope in their investigation of the murder and related misconduct, (4) the lack of evidence, (5) destroyed information, (6) the intimidation of witnesses, (7) the intimidation of investigators, (8) the total lack of any viable suspects, and other pre-filing abuses by defendants.

69. The conduct of Defendants was willful and exhibited a flagrant disregard for Plaintiff's federally secured rights. Accordingly, the defendants are liable to Plaintiff under 42 U.S.C. ' 1983.

70. The plaintiff has suffered damages as a proximate result of the acts of defendants, including but not limited to compensatory and punitive damages under 42 U.S.C. §1983.

71. The damages set forth in paragraph 62 of this complaint, otherwise provided for in the Michigan Wrongful Death Act, MCL 600.2922, may only be awarded to Plaintiff under 42 U.S.C. §1983 as a proximate result of the acts of defendants as described throughout this Complaint that caused the deprivation of his federally guaranteed rights.

## COUNT II- CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHT OF ACCESS TO COURTS

72. Plaintiff repeats and realleges and incorporates by reference the allegations in paragraph 1 through 71 above with the same force and effect as if herein set forth.

73. Defendants Police Chief, Ella Bully Cummings, Deputy Police Chief Cara Best, Asst. Deputy Police Chief Harold Cureton, Commander Craig Schwartz, Police Lt. Billy Jackson, Mayor Kwame Kilpatrick, Defendant Christine Beatty, and JOHN DOE POLICE OFFICERS

entered into an agreement with malicious intention to deprive plaintiff of his constitutional due process right to access of courts, as evidenced, without limitation by the following:

    a) Former Police Chief Oliver, Defendant Mayor Kilpatrick, Defendant Beatty and other City officials had a meeting regarding Brown's investigation, and decided to remove him from his position based on his investigation of allegations concerning the Manoogian Mansion party and the alleged crimes that were rumored to have occurred there;

    b) Lt. Al Bowman attended a meeting with Police Chief Ella Bully-Cummings, Assistant Chief of Police Harold Cureton, Commander Craig Schwartz, and Lt. Billy Jackson, where he was directed by them to cease investigating Greene's homicide and to put the Tamara Greene homicide file away;

    c) Systematic retaliation against Brown, Nelthrope and Bowman by several of these Defendants for their investigation of the alleged Manoogian Mansion party, the death of Tamara Greene and other alleged misconduct by members of Defendant Kilpatrick's security detail.

74. Defendants' actions resulted in the termination of Tamara Greene's murder investigation. Not only have Defendants' actions caused evidence to grow stale and cause the fading of material facts in the minds of witnesses and potential witnesses such that testimony and evidence have been irretrievably lost, but Defendants have also frightened and intimidated witnesses from coming forward as well as deterred homicide investigators from vigorously investigating Tamara Greene's murder.

75. Defendants' conduct as described herein coupled with the retaliatory actions taken against Bowman, Brown and Nelthrope was part of an on-going conspiracy to obstruct justice by covering up Greene's murder in order to avoid any embarrassment to Defendant Kilpatrick and his family.

76. As a proximate result of Defendants' actions as described herein, Plaintiff, or anyone acting on Plaintiff's behalf, has been foreclosed from filing suit in state court and seeking a meaningful state court remedy; it would be completely futile for the plaintiff to attempt to access

the state court system given (1) the missing evidence, (2) the expired statute of limitations, (3) the prior retaliation against Bowman, Brown and Nelthrope in their investigation of the murder and related misconduct, (4) the lack of evidence, (5) destroyed information, (6) the intimidation of witnesses, (7) the intimidation of investigators, (8) the total lack of any viable suspects, and other pre-filing abuses by defendants

77. The Plaintiff has suffered damages as a result of this conspiracy.

78. That at all times relevant herein, the defendants were state actors and their conduct was subject to and governed by 42 U.S.C. §§1983, 1985 and 1988.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter a Judgment in favor of Plaintiff and against Defendants, jointly and severally, for the violation of his civil rights for all actual, general, special, compensatory damages in the amount of Fifty Million ($50,000,000.00) Dollars, and punitive damages in the amount of One Hundred Million ($100,000,000.00) Dollars, in addition to costs, interest and attorney fees, and such other relief as this court deems Plaintiff to be entitled.

Dated: January 14, 2008

Respectfully Submitted,

Norman Yatooma & Associates, P.C.
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiffs
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600

**DEMAND FOR JURY TRIAL**

Plaintiffs, by and through their counsel of record, hereby demand a trial by jury.

Dated: January 14, 2008

Respectfully Submitted,

*[signature: Robert Zawideh]*

Norman Yatooma & Associates, P.C.
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiffs
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600

## CERTIFICATE OF SERVICE

I certify that I caused a true and correct copy of:

Plaintiff's Second Amended Complaint, Index of Exhibits, Exhibits and this Certificate of Service to be served upon:

**City of Detroit Law Department**
By: John A. Schapka (P36731)
Attorneys for Defendants
1650 First National Building
Detroit, Michigan 48226
(313) 224-4550
schaj@law.ci.detroit.mi.us

by CM/ECF filing on January 14, 2008.

/s/ Shannon L. Langley, legal Assistant to Robert S. Zawideh
Norman Yatooma & Associates, P.C.
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiff
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600
langley@normanyatooma.com