# UNITED STATES OF AMERICA
## IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ERNEST FLAGG, as Next Friend of
JONATHAN BOND, a minor,

                                 Case No.:05-CV-74253
                                 Hon. Gerald Rosen

        Plaintiff,

-vs-

CITY OF DETROIT, a municipal corporation;
DETROIT POLICE CHIEF ELLA BULLY-CUMMINGS;
DEPUTY DETROIT POLICE CHIEF CARA BEST;
JOHN DOE POLICE OFFICERS 1 - 20;
ASST. DEPUTY POLICE CHIEF HAROLD CURETON;
COMMANDER CRAIG SCHWARTZ;
POLICE LT. BILLY JACKSON;
MAYOR KWAME M. KILPATRICK,
CHRISTINE BEATTY, jointly and severally

        Defendants.

_____/

<table>
<tr><td>

**Norman Yatooma & Associates, P.C.**
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiffs
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600

</td><td>

**City of Detroit Law Department**
By: Krystal A. Crittendon (P49981)
Attorney for Defendant Harold Cureton
660 Woodward, Suite 1650
Detroit, Michigan 48226
(313) 237-3018

</td></tr>
<tr><td>

**City of Detroit Law Department**
By: John A. Schapka (P36731)
Co-Counsel for Defendants City of Detroit,
Mayor Kwame M. Kilpatrick, Detroit
Police Chief Ella Bully-Cummings,
Commander Craig Schwartz and Christine
Beatty.
1650 First National Building
Detroit, Michigan 48226
(313) 224-4550

</td><td>

**Morganroth & Morganroth, PLLC**
By: Mayer Morganroth (P17966)
By: Jeffrey B. Morganroth (P41670)
Attorneys for Defendants City of Detroit,
Mayor Kwame M. Kilpatrick, Detroit
Police Chief Ella Bully-Cummings,
Commander Craig Schwartz and Christine
Beatty.
3000 Town Center, Ste. 1500
Southfield, Michigan 48075
(248) 355-3084

</td></tr>
</table>

_____/

## <u>PLAINTIFF'S RESPONSE IN OPPOSITION TO</u>
## <u>DEFENDANTS' MOTION TO DISMISS</u>

Dockets.Justia.com

PLAINTIFF ERNEST FLAGG, as Next Friend of JONATHAN BOND, a minor, by his undersigned counsel, NORMAN YATOOMA & ASSOCIATES, P.C., in response to Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) states as follows:

1. Plaintiff Jonathan Bond, through his next friend Ernest Flagg, commenced this suit in this Court on November 7, 2005, alleging that the Defendant City of Detroit and several individuals - - including Detroit Mayor Kwame Kilpatrick, his former Chief of Staff Christine Beatty, the current and former Detroit Police Chiefs, certain unknown Detroit police officers, and Michigan Attorney General Mike Cox -- violated Plaintiff's federal constitutional right of access to the courts and conspired among themselves to commit this constitutional violation by intentionally interfering with the investigation of the murder of Plaintiff's mother, Tamara Greene. Additionally, these Defendants caused or effectuated the concealment of material evidence concerning this incident. Ms. Greene died from multiple gunshot wounds at close range after several shots were fired into her vehicle while parked in front of her residence on April 30, 2003.

2. On or about August 31, 2006, this Court entered an order granting in part and denying in part a Motion to Dismiss brought by several defendants. Specifically, this Court ruled that

> "Plaintiff should be given an opportunity to file an amended complaint that addresses the various shortfalls identified in this ruling. First and foremost, this amended complaint must include allegations which, if proven, would establish the unavailability of an effective and meaningful state-court remedy. As indicated, these allegations must extend beyond the mere assertion, as set forth in the initial complaint, (see Complaint at P 39), that Plaintiff presently is unable to ascertain the identity of the proper defendants to name in a state-court wrongful death action. In addition, Plaintiff must identify, in accordance with Harbury, some form of relief that is recoverable here but is "not otherwise available in some other suit that may yet be brought." *Harbury, 536 U.S. at 415, 122 S. Ct. at 2187*. Finally, Plaintiff must specifically identify actions allegedly taken by each Defendant that would subject this individual to liability under a denial-of-access theory. Upon Plaintiff's filing of such an amended pleading, Defendants may then file answers or renewed motions to dismiss, as each of them deems appropriate in response to the allegations of the amended complaint." (Footnote omitted).

3. Plaintiff filed a First Amended Complaint in this Court on or about September 21, 2006.

4. On January 14, 2008 Plaintiff, through his new undersigned counsel, filed via leave of this Court, his Second Amended Complaint, a copy of which is attached (without exhibits) to the accompanying Memorandum in Support, as Exhibit 1.

5. For the reasons set forth in the accompanying Memorandum in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss, Defendants' Motion should be denied because (a) Plaintiff's Second Amended Complaint includes allegations which, if proven, establish the unavailability of an effective and meaningful state-court remedy; (b) Plaintiff alleged in his Second Amended Complaint, pursuant to *Harbury*, a form of relief that is recoverable here, but is not otherwise available in some other suit that may yet be brought; (c) Plaintiff has specifically identified actions allegedly taken by each Defendant that would subject that individual to liability under a denial-of-access theory; and (d) since the filing of the Second Amended Complaint, Plaintiff has uncovered or otherwise learned of additional facts and actions taken by each Defendant that would further subject those individuals to liability under a denial-of-access theory.

**WHEREFORE, PLAINTIFF** respectfully requests this Court to DENY Defendants' Motion to Dismiss, and award costs and attorney fees so wrongfully incurred.

Respectfully Submitted,

Dated: February 29, 2008

/s/ Norman A. Yatooma
Norman Yatooma & Associates, P.C.
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiff
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600
nya@normanyatooma.com

3

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### ISSUES PRESENTED

I. WHETHER PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED WHERE PLAINTIFF SET FORTH WITH PARTICULARITY IN HIS SECOND AMENDED COMPLAINT THAT ANY STATE COURT REMEDY HAS BEEN RENDERED FUTILE BY DEFENDANTS' CONDUCT?

II. WHETHER THE PLAINTIFF HEREIN HAS STANDING TO SUE FOR A DEPRIVATION OF HIS RIGHT TO GAIN ACCESS TO THE COURTS WHERE THE CONSTITUTIONAL INJURY ALLEGED IN THE SECOND AMENDED COMPLAINT IS PERSONAL IN NATURE TO THE INJURED INDIVIDUAL?

III. WHETHER THE STATUTE OF LIMITATION ON A STATE WRONGFUL DEATH CLAIM HAS EXPIRED?

IV. WHETHER PLAINTIFF'S COMPLAINT SATISFIES THE "NONFRIVOLOUS" TEST AND SHOWS THAT THE "ARGUABLE" NATURE OF THE UNDERLYING CLAIM IS MORE THAN HOPE, IN ACCORDANCE WITH *CHRISTOPHER V. HARBURY*, 536 U.S. 403, 416 (2002) WHERE THE SECOND AMENDED COMPLAINT ALLEGES SPECIFIC CONDUCT BY EACH INDIVIDUAL NAMED DEFENDANT AND WHERE PLAINTIFF HAS SUPPORTED THE ALLEGATIONS OF THE SECOND AMENDED COMPLAINT WITH REFERENCES TO DEPOSITION TESTIMONY OF DETROIT POLICE OFFICERS, THE AFFIDAVIT OF LIEUTEANT AL BOWMAN AND OTHER DOCUMENTARY EVIDENCE OUTSIDE THE PLEADINGS?

NORMAN YATOOMA & ASSOCIATES, P.C.

# TABLE OF CONTENTS

ISSUES PRESENTED ............................................................................................................ i

TABLE OF CONTENTS ...................................................................................................... ii

CONTROLLING AUTHORITIES ...................................................................................... iii

**ARGUMENT** ........................................................................................................................ 1

    I.    STATEMENT OF FACTS ................................................................................... 1

        a.   Procedural Posture of Case ............................................................................ 1

        b.   Substantive Facts of Case .............................................................................. 3

    II.   STANDARD OF REVIEW ............................................................................... 11

    III.  DEFENDANTS' MOTION TO DISMISS MUST BE DENIED FOR THE REASON THAT PLAINTIFF HAS SUFFICIENTLY SET FORTH THE UNAVAILABLITY OF AN ADEQUATE OR MEANINGFUL STATE COURT REMEDY. ........................................... 12

    IV.  BECAUSE PLAINTIFF DIRECTLY SUFFERED A CONSTITUTIONAL INJURY, PLAINTIFF HAS STANDING TO ASSERT A DENIAL OF ACCESS CLAIM UNDER 42 U.S.C. § 1983. ........................................................................................................................ 17

    V.   CONTRARY TO DEFENDANTS' ASSERTIONS, THE APPLICABLE STATUTE OF LIMITATIONS HAS CLEARLY RUN ON A WRONGFUL DEATH CLAIM. .................... 20

    VI.  PLAINTIFF'S COMPLAINT FOR DENIAL OF ACCESS TO COURTS SUFFICIENTLY ALLEGES SPECIFIC ACTS BY MAYOR KWAME KILPATRICK, CHRISTINE BEATTY, POLICE CHIEF ELLA BULLY-CUMMINGS AND COMMANDER CRAIG SCHARTZ THAT WOULD SUBJECT THEM TO LIABILITY UNDER A DENIAL-OF-ACCESS THEORY AS REQUIRED BY THIS COURT ................................ 20

**CONCLUSION** ................................................................................................................... 24

NORMAN YATOOMA & ASSOCIATES, P.C.

# CONTROLLING AUTHORITIES

**Federal Cases**

*Baker v. McCollan*, 443 U.S. 137, 144, 99 S. Ct. 2689 (1979) .................................................... 17

*Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998) ........................................................................... 11

*Christopher v. Harbury*, 536 U.S. 403 (2002) ................................................................... passim

*Delew v. Wagner,* 143 F.3d 1219 (9th Cir. 1998) ............................................................ 16, 18, 23

*Gill v. Pontiac Police Officers Locricchio and Main*, 2006 U.S. Dist. LEXIS 19722 (ED Mich. 2006) ............................................................................................................................... 17

*Jaco v. Bloechle*, 739 F.2d 239 (1984) ...................................................................................... 18

*Kulling v. Grinders for Indus.*, 115 F. Supp. 2d 828 (ED Mich. 2000) ...................................... 18

*Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983) ...................................................................... 19

*Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S. Ct. 1683 (1974) .................................................. 11

*Sershen v. Cholish*, 2007 U.S. Dist. LEXIS 79627 ................................................................... 21

*Swekel v. City of River Rouge*, 119 F. 3d 1259 (6th Cir. 1997) ........................................... passim

*Wade v. Sawhney*, 2005 U.S. Dist. LEXIS 23173 (2005) ........................................................... 12

**Statutes**

MCL 600.2922 ..................................................................................................................... 18, 19

MCL 600.2922 (6)(d) ................................................................................................................. 20

**Rules**

FED. R. CIV. P. 12(d) .................................................................................................................. 12

**Constitutional Provisions**

U.S. CONST. amend. I .................................................................................................................. 17

U.S. CONST. amend. XIV, § 1 ...................................................................................................... 18

**State Cases**

*Cavin v. GMC*, 1997 Mich. App. LEXIS 2103 (Mich. App. Nov. 4, 1997) ................................ 17

*Panich v. Iron Wood Products Corp.*, 179 Mich. App. 136, 445 N.W.2d 795 (1989) ................. 17

*Trentadue v. Gorton*, 479 Mich. 378 (2007) .............................................................................. 20

**ARGUMENT**

I.    STATEMENT OF FACTS

    a.    Procedural Posture of Case

Plaintiff Jonathan Bond, through his next friend Ernest Flagg, commenced suit in this Court on November 7, 2005, alleging that the Defendant City of Detroit and several individuals -- including Detroit Mayor Kwame Kilpatrick, his former Chief of Staff Christine Beatty, the current and former Detroit Police Chiefs, certain unknown Detroit police officers, and Michigan Attorney General Mike Cox -- violated Plaintiff's federal constitutional right of access to the courts and conspired among themselves to commit this constitutional violation by interfering with the murder investigation of Plaintiff's mother, Tamara Greene, and concealing material evidence concerning this incident. Ms. Greene died from multiple gunshot wounds after several shots were fired into her vehicle while parked in front of her residence on April 30, 2003.

On or about August 31, 2006, this Court entered an order granting in part and denying in part a Motion to Dismiss brought by several Defendants.  Specifically, this Court ruled that

> Plaintiff should be given an opportunity to file an amended complaint that addresses the various shortfalls identified in this ruling. First and foremost, this amended complaint must include allegations which, if proven, would establish the unavailability of an effective and meaningful state-court remedy. As indicated, these allegations must extend beyond the mere assertion, as set forth in the initial complaint, (see Complaint at P 39), that Plaintiff presently is unable to ascertain the identity of the proper defendants to name in a state-court wrongful death action. In addition, Plaintiff must identify, in accordance with Harbury, some form of relief that is recoverable here but is "not otherwise available in some other suit that may yet be brought. *Harbury, 536 U.S. at 415, 122 S. Ct. at 2187.* Finally, Plaintiff must specifically identify actions allegedly taken by each Defendant that would subject this individual to liability under a denial-of-access theory.

Plaintiff filed a First Amended Complaint in this Court on or about September 21, 2006.

On January 14, 2008 Plaintiff, through his new undersigned counsel, filed via leave of this Court,

his Second Amended Complaint, **a copy of which is attached (without exhibits) hereto as Exhibit 1,** which is brought pursuant to 42 U.S.C. § 1983 alleging that Defendants, violated and conspired to violate Plaintiff's right to meaningful access to the courts guaranteed under the First and Fourteenth Amendments to the United States Constitution. In the Second Amended Complaint, Plaintiff went into great detail describing Defendants' efforts to deliberately and intentionally obstruct the investigation into the April 30, 2003 death of Plaintiff's mother, Tamara Greene, so as to render the investigation impossible and the murder unsolvable. The Defendants' actions include, but are not limited to: threats, intimidation and retaliation against Detroit Police investigators so as to chill and hinder any investigation relating to Ms. Greene's death; violating departmental and investigational procedures and protocols in the assignment and reassignment of the case among investigators and investigational units; the frightening and intimidating of witnesses so as to chill witness cooperation and restrict sources of information; and the destruction and concealment of reports, police files and material evidence concerning this incident. Further, the Second Amended Complaint (1) includes allegations which, if proven, will establish the unavailability of an effective and meaningful state-court remedy, and (2) identifies a form of relief that is recoverable here, but is not otherwise available in some other suit that may yet be brought.

Despite Defendants' less than cooperative approach to discovery, Plaintiff has, subsequent to the filing of the Second Amended Complaint, obtained significant information supporting his allegations, much of which is incorporated into this Statement of Facts and attached to this Memorandum. Such information includes, without limitation, the deposition transcripts of former Detroit Police Chief Jerry Oliver, Commander Donald Parshall, Inspector Steven Dolunt, Chief Information Officer Dave Rayford, and Lt. Alvin Bowman. Furthermore,

2

since the Court granted Plaintiff leave to file the Second Amended Complaint, all of the revelations concerning Defendant Beatty and Kilpatrick's perjury regarding the firing of Deputy Chief Gary Brown have come to light, together with their extraordinarily efforts manipulative efforts to cover-up the existence of those text messages and to deceive the Detroit City Counsel as to the true nature of their settlement with Gary Brown, Harold Nelthrope and Walter Harris. **See Deposition Transcript of Michael Stefani, attached hereto as Exhibit 2**.

     b.  Substantive Facts of Case

Tamara Greene was the mother of plaintiff Jonathan Bond, a 14-year-old minor child. Ms. Greene, a licensed exotic dancer purportedly performed at a widely-rumored party at the Detroit Mayor's official residence, the Manoogian Mansion, about six months before she was murdered in a drive-by shooting that occurred in front of her home on Roselawn in the City of Detroit. As a dancer, Ms. Greene was employed in various clubs in the City of Detroit and for private parties. She performed under the stage name of "Strawberry." The local media widely reported that, sometime in the fall of 2002, a wild party occurred at the Manoogian Mansion.[1] It was rumored that Defendant Kilpatrick attended this party,[2] as well as several of his close friends, certain Detroit Police Officers, and nude exotic dancers, including Tamara Greene. According to various accounts, it is alleged that Defendant Kilpatrick's wife, Carlita Kilpatrick arrived at the party unexpectedly, and assaulted one or more of the dancers, including Ms. Greene.

Following the alleged attack by Mrs. Kilpatrick, Defendant Kwame Kilpatrick's security detail, known as the Executive Protection Unit, or "EPU," escorted, transported, or otherwise accompanied the injured dancer to the emergency room of a local hospital. At least one

---

[1] The Manoogian Mansion is the traditional residence of the Mayor of the City of Detroit and his or her family.
[2] On information and belief, Defendant Kilpatrick and his family had not as yet moved into the Manoogian Mansion, as it was undergoing renovations at the time.

Emergency Medical Technician ("EMT") reported that, on or about the time of the alleged Manoogian party, individuals who appeared to be members of the EPU brought in an injured woman for treatment at Detroit Receiving Hospital, and that the woman was apparently beaten by Carlita Kilpatrick. **See Michigan State Police Supplemental Report Dated April 12, 2005, attached hereto as Exhibit 3.**

On or about the time of the alleged party, and at all relevant times thereafter, Harold Nelthrope ("Nelthrope") was a detective in the EPU before he was transferred. Beginning in March of 2003, Nelthrope reported allegations of illegal conduct and misconduct by fellow EPU officers and by Detroit Mayor Kwame Kilpatrick and his wife to the police department's Professional Accountability Bureau. These allegations included claims that close friends of Defendant Kwame Kilpatrick on EPU were claiming overtime pay to which they were not entitled, and were drinking on the job; there were also allegations that Carlita Kilpatrick assaulted one or more of the dancers at the alleged party at the Manoogian Mansion in the fall of 2002 and that there were efforts to cover up these crimes.

Gary Brown, the Deputy Chief of the Professional Accountability Bureau, ("PAB") requested that his subordinates in the PAB put these allegations in writing. Subsequently, a 5-page memorandum dated April 24 and April 30, 2003, **(attached hereto as Exhibit 4)** was prepared, purportedly authorizing a preliminary investigation into these allegations. According to the April 24/30, 2003 memo,

> [t]he most serious allegation made by Officer Nelthrope is that Mrs. Carlita Kilpatrick was involved in a physical altercation with a female dancer, causing bodily injury requiring medical attention. If this allegation is proven to be fact, the potential for assault charges to be filed against Mrs. Carlita Kilpatrick as well as potential obstruction of justice charges and or misconduct in office charges against anyone found to have collected and destroyed activity logs will warrant national headlines and severely damage the political future of Mayor Kilpatrick.

4

On the morning of April 30, 2003, *the same day that this memorandum was reduced to writing,* Tamara Greene was murdered in front of her home on Roselawn. She was shot approximately 18 times with a .40 caliber Glock handgun, "<u>the kind of weapon that is issued to police department members</u>." **See Deposition Transcript of Lt. Alvin Bowman taken May 19, 2005, p. 70, attached hereto as Exhibit 5 (emphasis added).**

On or before Tuesday May 6, 2003 Defendant Christine Beatty, then paramour of Defendant Kwame Kilpatrick, spoke to then Detroit Chief of Police Jerry Oliver and expressed concern that the Detroit Police Department was investigating the allegations of the wild party that occurred at the Manoogian Mansion some six months earlier. **See Deposition of Jerry Oliver, pp. 36-40 attached hereto as Exhibit 6 ("over conversations prior to that it was clear to me that there was a concern that the department was investigating allegations at the Manoogian Mansion.")** Chief Oliver assured Defendant Beatty that no such investigation was taking place and gave her a copy of another memorandum that Deputy Chief Brown prepared at Oliver's request regarding Nelthrope's allegations. *Id., see also* **Memorandum dated May 6, 2003, attached hereto as Exhibit 7.** This memorandum made no reference to the Manoogian Mansion party.

On May 9, 2003 Defendants Beatty and Kilpatrick fired Deputy Chief Brown. Not only is this fact alleged in the Second Amended Complaint, it is confirmed in the widely reported text messages between Beatty and Kilpatrick, messages that are the subject of the subpoenas that Defendants are currently moving to quash. On May 12, 2003 (the Monday following Brown's firing) a meeting was held with Chief Jerry Oliver, Commander Donald Parshall, Inspector Steven Dolunt and Deputy Chief Harold Cureton, to discuss the various investigations that now former Deputy Chief Gary Brown was conducting. The consensus of several of those officers

was that Defendant Kwame Kilpatrick fired Deputy Chief Gary Brown to avoid further investigation into Nelthrope's allegations of the "wild party," or that his wife, Carlita Kilpatrick, assaulted an exotic dancer at that party. **See Deposition Transcript of Commander Donald Parshall, p. 34-35, attached hereto as Exhibit 8.** Commander Parshall came away from that meeting with the understanding that he was instructed to go no further with the investigation into Nelthope's allegations. *Id.*; **see also the deposition transcript of Inspector Steven Dolunt, p. 24, attached hereto as Exhibit 9.** Indeed, Commander Parshall paraphrased Chief Oliver, quoting him as saying that "You guys investigating the Mayor, that's the dumbest shit I ever heard of, you haven't got the sense of an amoeba." *Id.,* **at 30 and 35**; *see also* **the deposition transcript of Inspector Steven Dolunt, p. 26, attached hereto as Exhibit 9** (quoting Chief Oliver: "'an amoeba had more sense than to investigate the Mayor' and that apparently we had less sense than an amoeba, and it went downhill from there. **Oh. We were told not to investigate anymore**.") (Emphasis added).

Unbeknownst to Parshall and Dolunt, on Friday, May 9, 2003 Defendant Beatty instructed the Chief Information Officer of the City of Detroit, Dave Rayford, to copy the computer files of and deny computer access to Deputy Chief Gary Brown, Inspector Steven Dolunt and Commander Donald Parshall. **See also the deposition transcript of Dave Rayford, p. 8, attached hereto as Exhibit 10.** Inspector Steven Dolunt only found out after the meeting with Chief Jerry Oliver on Monday, May 12, 2003 that he was denied access to his computer. The next day, on Tuesday, May 13, 2003 he contacted the Information Technology Section and spoke to Sgt. Hugh Morrison to gain access again and was denied. When he asked why, Inspector Steven Dolunt was told by Sgt. Hugh Morrison that "it came from the Mayor's office." **See deposition transcript of Inspector Steven Dolunt, p. 35, attached hereto as Exhibit 9.**

Inspector Steven Dolunt further testified that it would send a negative message to Command

Officers and Police Officers if a jury determined that Deputy Chief Gary Brown was terminated

solely because the Mayor and members of his staff, including Defendant Beatty, did not want

him investigating any allegations concerning the Mayor and his staff, and that it would be "more

or less be what we encountered in past administrations." **Id., at 48-49.**

At approximately the time of Brown's termination, members of Defendant Kwame

Kilpatrick's office then identified Nelthrope as being the source of the allegations of misconduct

to the media. When asked about Nelthrope's allegations by television reporters, Defendant

Kilpatrick publicly called Nelthrope a liar, and said that he hoped his wife and kids were

watching that broadcast. **See Deposition of Defendant Kwame Kilpatrick, pp. 60-62,**

**attached hereto in its entirety as Exhibit 11.** According to the two memorandums, Harold

Nelthrope was regularly wearing a bulletproof vest and feared for his life after being publicly

called out by Defendant Kilpatrick.

With the unfolding events surrounding the Brown termination and the Nelthrope

defamation and outing, the Detroit Police Department, Homicide Section, and in particular,

'Squad 8,' was assigned to investigate the murder of Tamara Greene. Lt. Al Bowman of the

Detroit Homicide section of the Detroit Police Department was in charge of 'Squad 8', the squad

responsible for Tammy Green's murder investigation. From the start of the murder investigation

up to his resignation on October 31, 2003 Chief of Police Jerry Oliver requested the Tamara

Greene homicide file on numerous occasions. When the file came back from Chief Jerry Oliver

it became apparent to the members of Squad 8 that several reports were missing from the file.

**See Deposition Transcript of Lt. Alvin Bowman taken May 19, 2005, p. 44, 70, 74, attached**

**hereto as Exhibit 5.** According to Lt. Bowman, all of Squad 8 concurred that Chief Oliver's

interest stemmed from the fact that Ms. Greene was rumored to have danced at the Manoogian

Mansion party, and these rumors were associated with the Mayor. *Id.*, at p. 71-73. Despite Chief

Oliver's interest, Lt. Bowman believed that whether Tamara Greene danced at the party or not,

the implications were there "and had to be looked into." *Id.*, at p. 67. Further, based on

information provided by the Michigan State Police, **Bowman testified at the deposition in his**

**lawsuit that there was a "nexus" between his investigation of her murder and her**

**association with the alleged party at the Manoogian Mansion**. *Id.*, at pp. 67, 81. That

information included a telephone number that was associated with a member of the Detroit

Police Department, and that friends or acquaintances of Defendant Kilpatrick were tied in with

the association of Tamara Greene. *Id.*, at 89. [3] Regarding the identity of the shooter, Lt. Al

Bowman concluded that given the number of rounds fired with that one individual with that one

gun, the shooter could have been someone in law enforcement and possibly a member of the

Detroit Police Department. **See Affidavit of Lt. Alvin Bowman, attached hereto as Exhibit**

**12.**

On or about November 3, 2003 Defendant Ella Bully-Cummings replaced Jerry Oliver as

Chief of the Detroit Police Department. Sometime after her appointment as Chief, Lt. Bowman

---

[3] Within days of the due date of this response brief, Plaintiff came into possession of the attached transcript of Lt. Alvin Bowman's deposition given on May 19, 2005 in his successful whistleblower action against the City of Detroit for retaliating against him in connection his investigation of Tamara Greene's murder. In that deposition, Lt. Bowman testified that he was aware that the Michigan State Police were in possession of a phone number linking Ms. Greene to the Manoogian Mansion party AND the Detroit Police Department:

> **Q.** And did the State Police have any evidence that in your opinion gave credibility to the rumor that Tamara Greene had danced at the rumored Manoogian party?
> **A.** Yes.
> **Q.** And what evidence did they have or what information did they develop that you're referring to?
> **A.** They had information relative to a phone number that was associated with a member of the Detroit Police Department. They had information documenting that friends or acquaintances of the mayor were named and tied in with the association of Tamara Greene.

> *See* **Deposition Transcript of Lt. Alvin Bowman taken May 19, 2005, p. 89, attached hereto as Exhibit 5.**

was called into a meeting with Defendants, Police Chief Ella Bully-Cummings, Executive Chief of Police Harold Cureton, Commander Craig Schwartz and Lt. Billy Jackson to discuss the Tamara Greene murder. Prior to that meeting, Lt. Bowman had never been called into a meeting in the Chief's office to discuss a homicide. **See Deposition Transcript of Lt. Alvin Bowman, p. at p. 94, attached as Exhibit 5.**

According to Lt. Bowman, after greeting everyone, Defendant Ella Bully-Cummings began the meeting by saying that "she understood the importance or the significance of the case and its sensitivity and its connection to the mayor and the party, alleged party." *Id.*, at 98. For that reason, Defendant Bully-Cummings informed Lt. Bowman and the others present that she did not want the information or the case discussed outside of her office," and as for the physical file, **"[i]t's to be placed away in safekeeping and not to be discussed openly with anybody."** *Id.*, at 97- 98.

Echoing rather colloquially Defendant Bully-Cummings' concerns, Defendant Cureton, who was also present at the May 12, 2003 meeting where prior Chief Oliver instructed Parshall and Dolunt to stop investigating the Mayor, commented that "this is a hot case" and then flatly asked Lt. Bowman **"Why can't this shit just go away?"** *Id.*, at 99. Despite their concerns, Lt. Bowman informed Defendants Cureton, Bully-Cummings, Schwartz and Jackson that he intended on pursuing all leads and bringing closure to this case. *Id.*, pp. 101. This included chasing down a lead that another stripper who allegedly attended the Manoogian Mansion party was allegedly murdered in Atlanta, Georgia after Tamara Greene was murdered. *Id.*, at 101-103. Nonetheless, after the meeting, the file was then put into a lock combination safe by Defendant Billy Jackson. As Lt. Bowman did not have the combination to that safe he was effectively denied access to the investigational file. *Id.*, at 105.

Sgt. Marian Stevenson was a homicide investigator who worked under Lt. Bowman on Squad 8 and also participated in the Tamara Greene murder investigation. According to her testimony during Lt. Bowman's whistleblower trial, Sgt. Stevenson concluded that someone ordered Greene's murder. The basis for her belief was that (1) Greene was shot first, (2) that Greene's passenger was able to exit the vehicle and (3) an eyewitness reported that the shooter's vehicle turned around after shooting Greene and had the opportunity to shoot the passenger as well, but did not. She further testified that someone erased her case notes on the Tamara Greene murder investigation from her police department computer hard drive and her zip storage files disappeared from a locked cabinet inside the police department. Nonetheless, Sgt. Stevenson did not report the theft to her superiors out of fear for her safety and her career.

The Monday following his meeting with Defendants Bully-Cummings, Cureton, Schwartz and Jackson, Lt. Bowman returned from a furlough and was surprised to learn from Defendant Jackson that the Tamara Greene murder investigation was reassigned to the Cold Case Squad, even though it did not meet the criteria for a Cold Case in order to be transferred. **See Deposition Transcript of Lt. Alvin Bowman, p. at 106, attached as Exhibit 5.** Subsequently, Lt. Bowman spoke to the head of the Cold Case, Sgt. Odell Godbold, who in response to Lt. Bowman's inquiry as to whether he knew he had the Tamara Greene case said **"It's a hot potato. We're not going to investigate this case"** because of the connections with the Mayor and the Manoogian Mansion party. *Id.,* **at 109-110.** Unbelievably, Godbold also informed Lt. Bowman that his ("Godbold's") nephew had a sexual relationship with the murder victim, Ms. Greene. Shortly thereafter, Lt. Bowman was informed that he was being transferred out of homicide for asking too many questions about the Tamara Greene case. *Id.,* **at 116.**

According to Lt. Bowman, but for the connections of Tamara Greene's homicide to the

Mayor, his associates, or the Manoogian Mansion party, there would never have been any retaliation against the officers investigating the file. Indeed, according to Lt. Bowman, "[t]he officers would have vigorously investigated the case; if it had no ties or connections or rumors or allegations of a nexus to the party in the mayor's association and/or his acquaintances, they would have pursued it. Probably in all likelihood, if the evidence and factual information was there, they would have solved it." *Id.*, **at p. 78**. In his affidavit, Lt. Bowman goes even further, stating "[t]he members of my Squad and I were aware or otherwise believed that Gary Brown was fired because Mayor Kilpatrick and his Chief of Staff Christine Beatty did not want there to be an investigation of the Manoogian Mansion party. The members of my Squad and I were aware or otherwise believed that the file was given to Cold Case and that I was transferred by Chief Ella Bully-Cummings, who in turn acted on behalf or the direct instruction of Mayor Kilpatrick and his Chief of Staff Christine Beatty because they did not want there to be an investigation of the Manoogian Mansion party, and they believed my homicide investigation would have lead to such an investigation." **Affidavit of Lt. Alvin Bowman, attached hereto as Exhibit 12.**

II. STANDARD OF REVIEW

The purpose of a motion under *FRCP 12(b)(6)* is to test the sufficiency of the complaint. When considering a motion to dismiss pursuant to *FRCP 12(b)(6)*, a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded allegations in the complaint as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974). Dismissal pursuant to a *Rule 12(b)(6)* motion is proper **_only_** if it is clear that no relief could be granted **under any set of facts that could be proved consistent with the allegations**. *Bloch v. Ribar,* 156 F.3d 673, 677 (6th Cir. 1998) (emphasis added). "A complaint will not

survive a *Rule 12(b)(6)* challenge unless it contains either direct ***or inferential*** allegations respecting all of the material elements necessary to sustain a recovery under a viable legal theory." *Wade v. Sawhney*, 2005 U.S. Dist. LEXIS 23173 (2005) (emphasis added). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d).

"Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant. Although we have no reason here to try to describe pleading standards for the entire spectrum of access claims, this is the place to address a particular risk inherent in backward-looking claims. Characteristically, the action underlying this sort of access claim will not be tried independently, a fact that enhances the natural temptation on the part of plaintiffs to claim too much, by alleging more than might be shown in a full trial focused solely on the details of the predicate action. Hence the need for care in requiring that the predicate claim be described well enough to apply the "nonfrivolous" test and to show that the "arguable" nature of the underlying claim is more than hope." *Christopher v. Harbury*, 536 U.S. 403, 416 (2002) (citations and footnotes omitted).

III.     DEFENDANTS' MOTION TO DISMISS MUST BE DENIED FOR THE REASON THAT PLAINTIFF HAS SUFFICIENTLY SET FORTH THE UNAVAILABLITY OF AN ADEQUATE OR MEANINGFUL STATE COURT REMEDY.

According to *Swekel v. City of River Rouge*, 119 F. 3d 1259 (6th Cir. 1997), the plaintiff must establish in his pleadings, in a case alleging pre-filing abuses that defendant's abuse, denied him "effective and meaningful" access to courts. The plaintiff can do this only by showing that

defendant's actions foreclosed him from filing suit in state court or that such a filing would be "futile." *Swekel*, at 1264. In its August 31, 2006 ruling, this court observed that *Swekel* recognized that a plaintiff who did not file a state court action could still maintain a denial-of-access claim if a state court action would be "completely futile." This recognized exception allows a plaintiff to avoid actually filing a state court action as long as he can establish that it would be "futile" because of the "actions" of a defendant by engaging in a police "cover up" of some incident or crime.

In *Swekel*, the court, *sua sponte*, ordered plaintiff to show cause why its complaint should not be dismissed against the City of River Rouge and certain individual police officers for failure to file a state court action first or to demonstrate that filing a state court action would be "futile." The court ultimately dismissed the complaint because plaintiff failed to show that filing a state court action would be "futile" because plaintiff had a "sufficient factual basis to bring a wrongful death 'John Doe'" suit in state court. The basis for the District Court's decision, and one of the significant distinctions with the case at bar, was that the plaintiff in *Swekel* knew of and had "suspected" identity of the driver of the second car that was involved in the accident that killed the decedent, Arnold F. Swekel. The plaintiff appealed the District Court's dismissal to the Sixth Circuit Court of Appeals. The Court of Appeals, in its decision affirming the District Court's dismissal of Swekel's case for denial of access with respect to the "sufficient factual basis to file a 'John Doe'" suit in state court, observed:

> [t]he District Court found that Swekel possessed a sufficient factual basis to file a "John Doe" suit in state court. These facts are as follows: On December 5, 1989, the Plaintiff deposed Estel Chaffins, who testified that two cars were involved in the accident. Furthermore, in another deposition taken on June 28, 1989, Plaintiff's counsel asked an accident witness whether he knew Todd Kulisnki. Finally, in early 1990, Plaintiff's counsel sent a copy of Mr. Chaffin's statement to the police and requested that they re-open the case. These actions demonstrated to the District Court that Swekel knew of a second driver before the

three-year statute of limitations had run and could have filed a suit in state court against a "John Doe" defendant. The District Court conceded that "John Doe" suits do not toll the statute of limitations in Michigan, See, e.g., *Fazzaire v. Desa Indus, Inc., 135 Mich App 1, 6 (1984)*, but reasoned that with the aid of discovery the identity of the second driver could be determined before the statute run. Consequently, the District Court granted summary judgment to defendants, *sua sponte*.

*Swekel v. City of River Rouge, supra., 1261.*

Thus, the Court concluded that based on the testimony of witnesses from a related wrongful death action against the known driver of another car that was involved in the same accident involving Swekel, plaintiff knew or suspected the identity of the driver of the second car in the accident, Todd Kulinski, the son of the police chief of the City of River Rouge. The known identification of a suspected driver of the second automobile from witnesses and deposition testimony in a related wrongful death action formed the "sufficient factual basis" for plaintiff to file a "John Doe" suit in state court as it relates to the driver of the second automobile.

The facts of *Swekel* and the case at bar are factually distinguishable in that Plaintiff in this case does not have a "sufficient factual basis" to bring a state action for "wrongful death." Unlike *Swekel*, the tampered murder investigation by the City of Detroit Police Department has not rendered a name or even a physical description of a "suspect" sufficient to bring a wrongful death action in the state court. Indeed, virtually every single effort to investigate anything remotely related to the death of Tammy Greene or the wild party that she attended at the Manoogian Mansion has been met with retaliation against the investigators by Defendants Kilpatrick, Beatty, Bully-Cummings, Cureton and Best. Former Chief of Police Oliver was apparently the last one to see certain reports contained in the homicide file before they inexplicably disappeared. Further, according to the head murder investigator, Lt. Bowman:

As of the date of my deposition in that case, which occurred on May 19, 2005, I believe that the Mayor, Chief Bully-Cummings, Christine Beatty, and Jerry Oliver made it impossible to investigate, let alone solve the murder of Tamara Greene. They disposed of reports that were contained in the homicide file, and retaliated against anyone that dared investigate anything having to do with the Manoogian Mansion party, even if it involved the death of this young girl, Tamara Greene.

The Mayor, Chief Bully-Cummings, Christine Beatty, and Jerry Oliver created a culture of fear and intimidation that not only scared off investigators and made them fear for the jobs and safety, but also scared off witnesses; witnesses who heard the rumors of Ms. Greene dancing at the party, saw what happened to Ms. Greene, learned of the retaliation against police officers who tried to investigate, and believed that if the good cops couldn't protect themselves, that they certainly could not protect the witnesses.

**See Affidavit of Lt. Bowman, attached hereto as Exhibit 12.**

Defendants' interpretation of *Swekel* is too broad because it essentially means that whenever there is a police cover up of a murder investigation, any plaintiff could bring a wrongful death action against a "John Doe" regardless of whether the actions of the Defendants have made such an endeavor a futile act. Rather, *Swekel* involved unique facts - that Plaintiff had information to enable it to bring a wrongful death action in state court. Specifically, Swekel had information or evidence of the "identity" of the **tortfeasor.** As of the date of this submission that information is not present in this case.[4]

The special circumstances that existed in *Swekel* to enable the plaintiff therein to pursue a "John Doe" wrongful death action are conspicuously absent here. First, there is no pending state action that grew out of the same transaction or occurrence that allows Plaintiff to engage in discovery that would lead to the identification of a suspect despite the cover up efforts of the defendants. Such a lawsuit would only provide Plaintiff with ninety days worth of discovery to learn the outcome of the tampered police investigation, at which point the State court-issued Summons would expire and the case would be dismissed. In the instant case, Plaintiff has

---

[4] Plaintiff and his counsel are hopeful that may change with the production of records previously subpoenaed or otherwise requested by Plaintiff in the case.

NORMAN YATOOMA & ASSOCIATES, P.C.

engaged in significant efforts to conduct discovery, which have been blocked every step of the way by Defendants. Plaintiff's counsel has even attempted to obtain records from Defendant City of Detroit through the Michigan Freedom of Information Act. **See FOIA Request to the City of Detroit, attached hereto as Exhibit 13.** Rather than provide us with the requested records the City denied the request on the basis of this litigation. **See City of Detroit's response to FOIA Request, attached hereto as Exhibit 14.** Given the considerable efforts taken by Defendants to block and deny discovery or to otherwise provide access to records which have been concealed or destroyed, a ninety day foray in the state court would not provide Plaintiff the same opportunity to discover the identity of his mother's killer that the Plaintiff could have utilized in *Swekel*.

Defendants further mischaracterize this Court's reliance on *Delew v. Wagner*, 143 F.3d 1219 (9th Cir. 1998). *Delew* did not stand for the proposition that "a Plaintiff must bring a state court action to determine whether the conduct of the defendants actually rendered any state court action ineffective and meaningless." In *Delew*, unlike the case at bar, the state court action <u>was pending simultaneously with the denial of access case</u>. "To prevail on their claim, the Delews must demonstrate that the defendants' cover-up violated their right of access to the courts by rendering any available state court remedy ineffective. **However, because the Delews' wrongful death action remains pending in state court, it is impossible to determine whether this has in fact occurred**." *Delew*, at 1223. Here, no such state action is pending, and unlike *Delew*, Plaintiff in the instant case has not only <u>pleaded</u> sufficient facts to demonstrate why the filing of such an action would be futile, <u>but has submitted to this court ample evidence</u> to support a finding of futility.[5]

---

[5] Defendants' argument that Plaintiff may maintain a cause of action for 'spoliation of evidence' under the laws of the state of Michigan is further misguided because no such cause of action exists in this state. *See Gill v. Pontiac*

IV.   BECAUSE PLAINTIFF DIRECTLY SUFFERED A CONSTITUTIONAL INJURY, PLAINTIFF HAS STANDING TO ASSERT A DENIAL OF ACCESS CLAIM UNDER 42 U.S.C. § 1983.

42 U.S.C. § 1983 states in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, **shall be liable to the party injured** in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983 (2007) (emphasis added).

The First Amendment to the United States Constitution provides in pertinent part:

Congress shall make no law...abridging...the right of the people...to petition the Government for a redress of grievances.

U.S. CONST. amend. I.

The Fourteenth Amendment to the United States Constitution provides in pertinent part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1.

42 U.S.C. § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979). "It is beyond dispute that the right of access to the courts is a fundamental right protected by the Constitution." *Swekel*, at 1262.

Contrary to Defendants' arguments, both implied and express, this is not an action

---

*Police Officers Locricchio and Main*, 2006 U.S. Dist. LEXIS 19722, *12 (ED Mich. 2006) (stating that "[t]he tort of spoliation of evidence is not available in Michigan. *Panich v. Iron Wood Products Corp.*, 179 Mich. App. 136, 445 N.W.2d 795 (1989); *Cavin v. GMC*, 1997 Mich. App. LEXIS 2103, Case No. 190558, 1997 WL 33340259 (Mich. App. Nov. 4, 1997).

brought under the Michigan Wrongful Death Act, MCL 600.2922. This is an action under 42 U.S.C. § 1983 alleging that Defendants violated and conspired to violate Plaintiff's rights to meaningful access to the courts guaranteed under the First and Fourteenth Amendments to the United States Constitution. "[A] wrongful death action brought for the benefit of the decedent's heirs is a state-law cause of action, even though it might be triggered by a violation of federally protected rights. Indeed, the Sixth Circuit expressly so held, stating that 'the claim of Jaco's heirs under the wrongful death enactment is a cause of action separate from the civil rights claim...'" *Kulling v. Grinders for Indus.*, 115 F. Supp. 2d 828, 851 (ED Mich. 2000), *citing Jaco v. Bloechle*, 739 F.2d 239, 243 (1984).

Defendants would have this court believe that this action is a wrongful death claim that gives rise to a civil rights violation. In order to make that leap, Defendants apparently are operating under the belief that Ms. Greene's murder was committed by State actors acting under color of State law. Plaintiff has not arrived there, and unfortunately may never arrive there because of Defendants' actions. This is a civil rights claim arising out of a cover-up of a murder investigation; indeed, Plaintiff alleges that the cover-up *actually prevented the filing of a wrongful death claim* against the murderer.

The question then follows: who is injured by the cover-up? Aside from the friends and family who are denied closure as a result of Defendants' cover-up, the actual beneficiaries identified in the wrongful death act itself are the true parties who suffer the injury. This is a case where Plaintiff, in his own individual capacity, has lost not only the only mother he will have in this life, but the right to receive his share of the proceeds from a wrongful death lawsuit. *See* Second Amended Complaint ¶ 71; MCL 600.2922(3)(a); *see also Delew*, at 1223, fn. 2: ("[w]e reject Wagner's argument that the Delews are precluded from alleging a constitutional violation

for conduct occurring after the death of Erin Rae Delew. **The victims of the cover-up are the decedent's survivors, not the decedent**." (Emphasis added).

In *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983), the *parents* of a murder victim individually filed suit alleging that two prosecutors covered up the fact that a murder had occurred and that the murderer was a fellow prosecutor. The plaintiffs claimed that by concealing such facts for eleven months, the defendants had caused them to delay bringing a wrongful death action against the murderer, and thus "wrongfully interfered with their access to the state courts." *Id.* at 969-70.

Under the Michigan Wrongful Death statute: "[a] person who may be entitled to damages under this section must present a claim for damages to the personal representative on or before the date set for hearing on the motion for distribution of the proceeds under subsection (6)." MCL 600.2922(7) (2007). Subsection (6) provides that

> [a]fter a hearing by the court, the court shall order payment from the proceeds of the reasonable medical, hospital, funeral, and burial expenses of the decedent for which the estate is liable. The proceeds shall not be applied to the payment of any other charges against the estate of the decedent. **The court shall then enter an order distributing the proceeds to those persons designated in subsection (3) who suffered damages and to the estate of the deceased for compensation for conscious pain and suffering, if any, in the amount as the court or jury considers fair and equitable considering the relative damages sustained by each of the persons and the estate of the deceased.**"

MCL 600.2922 (6)(d) (emphasis added).

Absent Defendants' cover-up of Ms. Greene's murder, Plaintiff would be able to directly file a claim in the state probate court in his individual capacity seeking his share of the distribution of proceeds of a wrongful death lawsuit brought on behalf of his mother. MCL 600.2922 (6)(d) even sets forth that such a claim brought by Plaintiff in his individual capacity could be heard by either a judge or a jury. Unfortunately, that day in court, and any other

meaningful access to the courts, has been willfully and intentionally taken from Plaintiff by Defendants.

V.  CONTRARY TO DEFENDANTS' ASSERTIONS, THE APPLICABLE STATUTE OF LIMITATIONS HAS CLEARLY RUN ON A WRONGFUL DEATH CLAIM.

Last year, the Michigan Supreme Court decided *Trentadue v. Gorton*, 479 Mich. 378 (2007). In *Trentadue*, Plaintiff's decedent was raped and murdered in November 1986 at her home in Flint. According to plaintiff's complaint, in 1981 Eby leased a residence in the gatehouse on the grounds of the Mott family estate from Ruth R. Mott (Mott) where Eby began to live. Eby was found raped and murdered on November 9, 1986 after last being seen alive on November 7, 1986." The rape and murder remained unsolved until 2002, when DNA evidence established that Defendant's employee committed the crime. Despite the inability to identify the murderer before the advent of DNA testing, the court struck down the common law discovery rule and ruled Plaintiff's claim was time-barred. Like the Plaintiff in *Trentadue*, Plaintiff's claims are likely barred. The accrual date of the wrongful death claim would be the date of Tamara Greene's murder, April 30. 2003. Like the Plaintiff in *Trentadue,* the fraudulent concealment statute is unavailing because there is no question that Plaintiff was aware of the claim on or about the time it arose. Furthermore, as argued above and as set forth in the Affidavit of Lt. Bowman, regardless of when the applicable statute of limitation expired or expires, Defendants' conduct in evidence spoliation, threatening investigators, and frightening witnesses, made it impossible to meaningfully bring a wrongful death claim in this state.

VI.  PLAINTIFF'S COMPLAINT FOR DENIAL OF ACCESS TO COURTS SUFFICIENTLY ALLEGES SPECIFIC ACTS BY MAYOR KWAME KILPATRICK, CHRISTINE BEATTY, POLICE CHIEF ELLA BULLY-CUMMINGS AND COMMANDER CRAIG SCHARTZ THAT WOULD SUBJECT THEM TO LIABILITY UNDER A DENIAL-OF-ACCESS THEORY AS REQUIRED BY THIS COURT.

In *Christopher v. Harbury*, 536 U.S. 403, 122 S.Ct. 2179, 2187 (2002) the United States Supreme Court stated "that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." The Court also stated that when the access claim is a backward looking case "the complaint must identify a remedy that may be awarded as recompense, but not otherwise available in some suit that may yet be brought." *Id.* *Harbury* further observed that the pleading standards for the denial-of-access-to-courts claim must be in accordance with Federal Rule of Civil Procedure 8(a). *Id.* at 2188. The pleading requirement under the Federal Rules of Civil Procedure is merely a plain statement giving the defendant an indication of the cause of action and the relief sought.

This lawsuit alleges not only a constitutional violation, it also alleges a conspiracy among the Defendants to violate Plaintiff's civil rights. "To sufficiently allege the second factor, conspiracy, 'a plaintiff must show a combination of two or more persons to do a criminal act, or to do a lawful act by unlawful means or for an unlawful purpose.' Plaintiff need only meet the liberal pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. Rule 8 requires only a 'short plain statement of the claim showing that the pleader is entitled to relief.' Conclusory allegations of concerted action absent facts actually reflecting such action, however, may be insufficient to state a conspiracy claim." *Sershen v. Cholish*, 2007 U.S. Dist. LEXIS 79627 (citations omitted).

Defendant argues that the Second Amended Complaint fails to allege specific conduct by specific defendants that establishes that they caused the foreclosure of the Plaintiff's ability to bring a state court action for the redress of the decedent's death. This is simply not true. The Second Amended Complaint alleges that Defendant Kilpatrick, Defendant Beatty and former

Chief of Police Jerry Oliver held a meeting to in which they decided to terminate Deputy Chief Gary Brown to prevent further investigation into the allegations of the "wild party," or that his wife, Carlita Kilpatrick, assaulted an exotic dancer at that party. See Second Amended Complaint at ¶¶ 23-25. While the Second Amended Complaint does allege in the passive voice that the computer file of Sgt. Stevenson, who was investigating the homicide of Tamara Greene, was deleted, and that her back up zip files were stolen out of a locked cabinet inside the police department (Second Amended Complaint at ¶33), the clear inference is that this action was committed by a Police Department official or employee who had access to the files. The identity of that person could be determined during the discovery process. Indeed, in his affidavit, Lt. Bowman reports that Sgt. Stevenson confirmed the action was taken by the City of Detroit IT department. **See Affidavit of Lt. Bowman, attached hereto as Exhibit 12.**

The Second Amended Complaint further alleges that Lt. Al Bowman was "told," by his superiors in the Police Department in a meeting with Police Chief Ella Bully-Cummings, Assistant Chief of Police Harold Cureton, Commander Craig Schwartz, and Lt. Billy Jackson, to cease the investigation of the Tamara Greene homicide and to "put the file away." Second Amended Complaint at ¶38. We now know that Lt. Bowman was even "locked out" and later denied access to the files. Eventually, he was transferred out of the homicide section altogether to the 2nd Precinct and assigned routine police duties on the midnight shift by Cara Best, a Police Department official. Second Amended Complaint at ¶40. The details of these actions are expanded upon by both the **Deposition Transcript of Lt. Alvin Bowman taken May 19, 2005, attached hereto as Exhibit 5, and his affidavit, attached hereto as Exhibit 12.** The Second Amended Complaint further alleges that the Tamara Greene murder investigation file was "seized" by some police official. This information is clarified again by the recently obtained

deposition transcript and affidavit of Lt. Alvin Bowman, both of which are attached hereto. According to the Second Amended Complaint, Defendant Ella Bully-Cummings "ordered" the Greene homicide file to be placed in the Cold Case file after only one year, contrary to the Detroit Police Department standard policy or practice of waiting two years before designating a homicide file as a "Cold Case." Second Amended Complaint at ¶44. The Second Amended Complaint also alleges that these Defendants, acting either individually or in concert with one another, have actively, intentionally and deliberately worked to terminate or otherwise hinder this investigation, and to deter qualified homicide detectives from investigating Tamara Greene's murder. Second Amended Complaint at ¶53. Further, the Second Amended Complaint sets forth that as a "proximate result of Defendants' actions as described herein, Plaintiff, or anyone acting on Plaintiff's behalf, has been foreclosed from filing suit in state court and seeking a meaningful state court remedy. It would be completely futile for the Plaintiff to attempt to access the state court system given (1) the missing evidence, (2) the expired statute of limitations, (3) the prior retaliation against Bowman, Brown and Nelthrope in their investigation of the murder and related misconduct, (4) the lack of evidence, (5) destroyed information, (6) the intimidation of witnesses, (7) the intimidation of investigators, (8) the total lack of any viable suspects, and other pre-filing abuses by Defendants." Second Amended Complaint at ¶68.

All of the heretofore described specific actions by specific Defendants constitute active concealment of the Greene homicide, an actual cover up of the murder investigation and a conspiracy to cover up that investigation. All that is required of Plaintiff to state claim for conspiracy under § 1983, is to allege at least facts from which an agreement by Defendants to deprive Plaintiff of his civil rights may be inferred. See *Delew v. Wagner*, 143 F.3d 1219, 1223 (9th Cir. 1998). These allegations are expanded upon in the attached deposition transcripts,

documentary evidence and affidavit of Lt. Bowman.[6] The submission of these additional materials constitute matters outside the pleadings that should be considered by this Court. Pursuant to FRCP 12(d), this Motion must be treated as one for summary judgment under Rule 56. As such, all parties must be given a reasonable opportunity to present all the material that is pertinent to the Motion. In order to accomplish that, Defendants' Motion should be dismissed, and the parties should be allowed the opportunity to conduct discovery.

## CONCLUSION

Plaintiff has provided ample notice to all of the Defendants of the nature of the claims against them. Plaintiff has no adequate remedy in the state courts, and since Plaintiff has suffered a direct constitutional injury as a result of Defendants' wrongful conduct, Plaintiff has standing to assert these claims before this court.

WHEREFORE, PLAINTIFF respectfully requests this Court to DENY Defendants' Motion to Dismiss.

Respectfully Submitted,

Dated: February 29, 2008 /s/ Norman A. Yatooma
Norman Yatooma & Associates, P.C.
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiff
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600
nya@normanyatooma.com

---

[6] Since the filing of the SECOND AMENDED COMPLAINT, Plaintiff has attempted to conduct discovery and gain information. However, true to form, Defendant have opposed those efforts every step of the way. In furtherance of their continuing efforts to cover up the brutal murder of Tamara Greene, Defendants filed numerous motions to quash subpoenas Plaintiff served on third parties. In the case of Skytel and the text messages they are holding, Defendants have even asserted the ridiculous argument that the request would be unduly burdensome *on Skytel*. The speciousness of this argument should be readily apparent in that Skytel has notified the parties that it stands ready to comply with our subpoena if this Court should deny Defendants' motion. **See February 8, 2008 from Stephen Oshinsky of Skytel, attached hereto as Exhibit 15.**

NORMAN YATOOMA & ASSOCIATES, P.C.

NORMAN YATOOMA & ASSOCIATES, P.C.

# CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2008 I electronically filed the foregoing papers with the Clerk of the Court using the CM/ECF system:

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

On the following:

**Morganroth & Morganroth, PLLC**
By: Mayer Morganroth (P17966)
By: Jeffrey B. Morganroth (P41670)
Attorneys for Defendants City of Detroit, Mayor Kwame M. Kilpatrick, Detroit Police Chief Ella Bully-Cummings, Commander Craig Schwartz and Christine Beatty.
3000 Town Center, Ste. 1500
Southfield, Michigan 48075
(248) 355-3084

**City of Detroit Law Department**
By: John A. Schapka (P36731)
Co-Counsel for Defendants City of Detroit, Mayor Kwame M. Kilpatrick, Detroit Police Chief Ella Bully-Cummings, Commander Craig Schwartz and Christine Beatty.
1650 First National Building
Detroit, Michigan 48226
(313) 224-4550

**City of Detroit Law Department**
By: Krystal A. Crittendon (P49981)
Attorney for Defendant Harold Cureton
660 Woodward, Suite 1650
Detroit, Michigan 48226
(313) 237-3018

February 29, 2008

/s/ Norman A. Yatooma
**Norman Yatooma & Associates, P.C.**
Attorneys for Plaintiff
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600
nya@normanyatooma.com