UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERNEST FLAGG, as Next Friend of
JONATHON BOND,

    Plaintiff,

v.

CITY OF DETROIT, a Municipal Corporation;
CITY OF DETROIT CHIEF OF POLICE
ELLA BULLY-CUMMINGS; DEPUTY CHIEF
OF POLICE CARA BEST; JOHN DOE OFFICERS 1-20;
ASSISTANT DEPUTY POLICE CHIEF HAROLD
CURETON; LIEUTENANT BILLY JACKSON;
MAYOR KWAME KILPATRICK; and CHRISTINE BEATTY,
jointly and severally,

    Defendants.

Case No. 05-CV-74253-DT
Hon. Gerald E. Rosen
Magistrate Judge Steven R. Whalen

---

| | |
|---|---|
| NORMAN YATOOMA & ASSOCIATES, P.C.<br>NORMAN A. YATOOMA (P54746)<br>ROBERT S. ZAWIDEH (P43787)<br>ATTORNEYS FOR PLAINTIFF<br>219 ELM STREET<br>BIRMINGHAM, MICHIGAN 48009<br>(248) 642-3600<br>nya@normanyatooma.com | MORGANROTH & MORGANROTH, PLLC<br>MAYER MORGANROTH (P17966)<br>JEFFREY B. MORGANROTH (P41670)<br>ATTORNEYS FOR CHRISTINE BEATTY<br>3000 TOWN CENTER, SUITE 1500<br>SOUTHFIELD, MI 48075<br>(248) 355-3084<br>jmorganroth@morganrothlaw.com |
| KRYSTAL A. CRITTENDON (P49981)<br>ATTORNEY FOR DEFENDANTS CITY OF DETROIT,<br>HAROLD CURETON & CRAIG SCHWARTZ<br>CITY OF DETROIT LAW DEPARTMENT<br>660 WOODWARD, SUITE 1650<br>DETROIT, MICHIGAN 48226<br>(313) 237-3018<br>critk@law.ci.detroit.mi.us | HONIGMAN MILLER SCHWARTZ AND COHN LLP<br>HERSCHEL P. FINK (P13427)<br>ATTORNEYS FOR INTERVENOR DETROIT FREE<br>PRESS, INC.<br>2290 FIRST NATIONAL BUILDING<br>DETROIT, MI 48226<br>(313) 465-7400<br>hpf@honigman.com |

---

**MOTION OF NONPARTY DETROIT FREE PRESS, INC.
TO INTERVENE AND IN OPPOSITION TO
<u>MOTION OF CITY OF DETROIT FOR GAG ORDER</u>**

Nonparty Detroit Free Press, Inc. moves to intervene for purposes of opposing the "emergency motion" of defendant City of Detroit for issuance of a gag order pursuant to FRCP 24(b), and because it has standing to object to judicial limitations on its right of access to judicial proceedings and information relating thereto under the First Amendment.

This motion is further supported by the accompanying memorandum of law.

|  |  |
|---|---|
|  | s/ Herschel P. Fink (P13427) |
|  | Honigman Miller Schwartz and Cohn LLP |
|  | Attorneys for Intervenor Detroit Free Press |
|  | 2290 First National Building |
|  | Detroit, MI 48226 |
|  | (313) 465-7400 |
| Dated: April 10, 2008 | hpf@honigman.com |

DETROIT.3068428.1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERNEST FLAGG, as Next Friend of
JONATHON BOND,

    Plaintiff,

v.                                             Case No.  05-CV-74253-DT
                                             Hon. Gerald E. Rosen
                                             Magistrate Judge Steven R. Whalen

CITY OF DETROIT, a Municipal Corporation;
CITY OF DETROIT CHIEF OF POLICE
ELLA BULLY-CUMMINGS; DEPUTY CHIEF
OF POLICE CARA BEST; JOHN DOE OFFICERS 1-20;
ASSISTANT DEPUTY POLICE CHIEF HAROLD
CURETON; LIEUTENANT BILLY JACKSON;
MAYOR KWAME KILPATRICK; and CHRISTINE BEATTY,
jointly and severally,

    Defendants.
_____/

| | |
|---|---|
| NORMAN YATOOMA & ASSOCIATES, P.C. | MORGANROTH & MORGANROTH, PLLC |
| NORMAN A. YATOOMA (P54746) | MAYER MORGANROTH (P17966) |
| ROBERT S. ZAWIDEH (P43787) | JEFFREY B. MORGANROTH (P41670) |
| ATTORNEYS FOR PLAINTIFF | ATTORNEYS FOR CHRISTINE BEATTY |
| 219 ELM STREET | 3000 TOWN CENTER, SUITE 1500 |
| BIRMINGHAM, MICHIGAN  48009 | SOUTHFIELD, MI  48075 |
| (248) 642-3600 | (248) 355-3084 |
| nya@normanyatooma.com | jmorganroth@morganrothlaw.com |
| | |
| KRYSTAL A. CRITTENDON (P49981) | HONIGMAN MILLER SCHWARTZ AND COHN LLP |
| ATTORNEY FOR DEFENDANTS CITY OF DETROIT, | HERSCHEL P. FINK  (P13427) |
| HAROLD CURETON & CRAIG SCHWARTZ | ATTORNEYS FOR INTERVENOR DETROIT FREE |
| CITY OF DETROIT LAW DEPARTMENT | PRESS, INC. |
| 660 WOODWARD, SUITE 1650 | 2290 FIRST NATIONAL BUILDING |
| DETROIT, MICHIGAN  48226 | DETROIT, MI  48226 |
| (313) 237-3018 | (313) 465-7400 |
| critk@law.ci.detroit.mi.us | hpf@honigman.com |

_____/

**MEMORANDUM IN SUPPORT OF MOTION OF NONPARTY
DETROIT FREE PRESS, INC. TO INTERVENE AND IN OPPOSITION TO
<u>MOTION OF CITY OF DETROIT FOR GAG ORDER</u>**

# Issue Presented

In this civil action involving public officials and questions of great public interest and importance, would a gag order be appropriate, necessary, effective and constitutional?

The Free Press answers, no.

## Principal Authority Relied Upon

*U.S. v Koubriti*, 307 F Supp 891 (ED Mich 2004)

*Nebraska Press Ass'n v Stuart,* 427 US 539 (1976)

*Virginia State Bd of Pharmacy v Virginia Citizens Consumer Council,* 425 US 748 (1976)

*CBS, Inc. v Young*, 522 F2d 234 (6th Cir 1975)

*U.S. v Salameh,* 992 F2d 445 (2nd Cir 1993)

# I. Introduction

This Court needs no reminder that the case before it is "tangentially-related"[1] to a pending criminal proceeding in which two high public officials, who are also defendants in this civil action, are charged with 11 felonies unrelated to the issues in this case. It would be a classic understatement to say that the allegations in this case, as well as the Wayne County criminal cases against Mayor Kwame Kilpatrick and his former Chief of Staff, Christine Beatty, are not of great public interest, and the subject of significant media attention and scrutiny as they deal with allegations of public corruption - - and worse.

This fact, however, militates in favor of a free flow of information -- not a "gag order" -- in this case.

Defendant City of Detroit urges this Court to broadly "issue a 'gag order' upon the parties, their counsel and any party working with or on behalf of the parties and their counsel." Defendant Detroit in its "amended emergency motion" provides no more detail as to the parameters of the gag order it urges. Presumably it wishes a total gag. [2]

## II. Argument

**A.     The Free Press Has Standing to Oppose the Gag Orders**

**1.     The Orders Curtail the Free Press' First Amendment Freedom of the Press**

As the Court well knows, the subject matter of this and related cases are of great public interest, involving matters of utmost public concern.

---

[1] Amended Emergency Motion, p 4.

[2] Detroit's Corporation Counsel, acting purportedly on behalf of the City of Detroit, fails to adequately explain why it is in reality being only an advocate for the interests of Mayor Kwame Kilpatrick with regard to the gag order, as well as a stay of proceedings. Apparently, the Corporation Counsel is unmindful of the ethical conflict between representing the City's interest and those of Kwame Kilpatrick, which continue to be the focus of investigations by the Wayne County Prosecutor, the Detroit City Council, and the Michigan Attorney Grievance Commission.

1

The proposed order would prohibit a wide range of unidentified persons from speaking with the press, and thereby tangibly impair the freedom of the press enshrined in the First Amendment:

> The protected right to publish the news would be of little value in the absence of sources from which to obtain it. This was recognized by the Supreme Court in *Branzberg v Hayes*, 408 US 665, 681 (1972), where the Court stated: "Without some protection for seeking out the news, freedom of the press would be eviscerated." News gathering thus qualifies for First Amendment protections.

*CBS, Inc v Young*, 522 F2d 234, 238 (CA6, 1975).

## 2. The Free Press May Advocate the First Amendment Rights of Those Restricted by the Proposed Gag Order

The proposed gag order unquestionably would impair the First Amendment rights of each person restrained from speaking. As to these persons, the gag orders are a prior restraint—the least tolerable infringement of First Amendment rights, that bear a "heavy presumption against . . . constitutional validity" under the First Amendment. *Nebraska Press Ass'n v Stuart*, 427 US 539, 545 (1976).

The United States Supreme Court's decision in *Virginia State Bd of Pharmacy v Virginia Citizens Consumer Council*, 425 US 748 (1976) makes plain that the Free Press has standing to challenge a prior restraint imposed on those who may otherwise speak to the Free Press:

> Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both. This is clear from the decided cases. In *Lamont v Postmaster General,* 381 U.S. 301 (1965), the Court upheld the First Amendment rights of citizens to receive political publications sent from abroad. More recently, in *Kleindienst v Mandel*, 408 U.S. 753, 762-763 (1972), we acknowledged that this Court has referred to a First Amendment right to "receive information and ideas," and that freedom of speech "'necessarily protects the right to receive.'" And in *Procunier v Martinez*, 416 U.S. 396, 408-409 (1974), where censorship of prison inmates' mail was under examination, we thought it unnecessary to assess the First Amendment rights of the inmates themselves, for it was reasoned that such censorship equally infringed the rights of noninmates to

whom the correspondence was addressed. There are numerous other expressions to the same effect in the Court's decisions. *See*, *e.g.*, *Red Lion Broadcasting Co v FCC*, 395 U.S. 367, 390 (1969); *Stanley v Georgia*, 394 U.S. 557, 564 (1969); *Griswold v Connecticut*, 381 U.S. 479, 482 (1965); *Marsh v Alabama*, 326 U.S. 501, 505 (1946); *Thomas v Collins*, 323 U.S. 516, 534 (1945); *Martin v Struthers*, 319 U.S. 141, 143 (1943). If there is a right to [speak], there is a reciprocal right to receive the [speech], and it may be asserted by these appellees.

*Id*. at 756-57. The Free Press hereby asserts standing to advocate the First Amendment rights of those restrained by the proposed gag order.

**B. Federal Courts Regularly Strike Down Similar Gag Orders As Impermissible Prior Restraints on First Amendment Rights**

**1. *CBS v Young*, the Kent State Massacre Case**

*CBS, Inc v Young* involved a highly publicized civil trial arising from the killing by National Guard troops of four students and the wounding of numerous others at Kent State University during a student demonstration against the invasion of Cambodia by American troops. The Ohio trial judge issued this order:

> ORDERED that in addition to all counsel and Court personnel, all parties concerned with this litigation, whether plaintiffs or defendants, their relatives, close friends, and associates are ORDERED to refrain from discussing in any manner whatsoever these cases with members of the news media or the public.

522 F2d 234, 236 (CA6, 1975). The Sixth Circuit first found that the press had standing to challenge the order, even though not directed at it. The court went on to order the trial court to vacate its order, concluding:

> [a]s the authorities demonstrate, any restrictive order involving a prior restraint upon First Amendment freedoms is presumptively void and may be upheld only on the basis of a clear showing that an exercise of First Amendment rights will interfere with the rights of the parties to a fair trial.

522 F2d at 241. Even more to the point, the Sixth Circuit had this to say concerning a case at least as publicized then as the instant action is now:

3

> A more restrictive ban upon freedom of expression in the trial context would be difficult if not impossible to find. The order's restrictive and limiting character is only compounded when its vagueness and overbreadth are considered. For example, "relatives, close friends and associates" are given no definition with the result that a news reporter covering the trial would be at a loss to know with any degree of certainty what persons were embraced by these terms. The order suffers equally from the infirmity of overbreadth as to the subject matter or content of any prohibited discussions.

522 F2d at 239, emphasis added.

### 2. *US v Salameh*, the First World Trade Center Bombing Case

A criminal case arising from the first World Trade Center bombing criminal trial further emphasizes the constitutional invalidity of broad gag orders on trial participants. In *US v Salameh*, 992 F2d 445 (2nd Cir, 1993), the Second Circuit struck down as violative of the First Amendment an order barring all defense counsel from publicly discussing any aspect of the case.

> The restraint on the attorneys' speech is not narrowly tailored; rather, it is a blanket prohibition that extends to any statements that "have anything to do with this case" or that even "may have something to do with the case." The court did not make a finding that alternatives to this blanket prohibition would be inadequate to protect defendants' rights to a fair trial before an impartial jury. There is no indication in the record that the court explored any alternatives or at all considered imposing any less broad proscription; indeed the court discouraged counsel from even proffering possible alternatives.

992 F2d at 447. Similarly, *United States v Scarfo*, 263 F3d 80 (3d Cir 2001); *United States v Krzyske*, 836 F2d 1013 (6th Cir 1988); *United States v Ford*, 830 F2d 596 (6th Cir 1987).

### C. As in These Cases, the Court Must Apply a Legal Standard That Gives Appropriate Weight to the Constitutional Rights Threatened by the Proposed Gag Order

The above-cited cases teach that gag orders restraining the speech of persons associated with a case are "prior restraints" that bear a "heavy presumption against . . . constitutional validity" under the First Amendment. *Nebraska Press*, 427 US at 545. Such orders are

"presumptively void and may be upheld only on the basis of a clear showing that an exercise of First Amendment rights will interfere with the rights of the parties to a fair trial." *CBS*, 522 F2d at 241. This First Amendment scrutiny is not reduced, moreover, simply because the gag order is targeted at those who would speak to the press, rather than at the press itself. *Virginia State Bd of Pharmacy*, 425 US at 756-57; *CBS*, 522 F2d at 241; *Salameh*, 992 F2d at 447.

D.  **The Proposed Gag Order Is an Unconstitutional and Unnecessary Prior Restraint of First Amendment Rights**

   1.  **The City's Attempt to Explain Its Reasons Only Demonstrates the Impropriety of a Gag Order**

The City's only cited authority for a gag order is this Court's opinion in *US v Koubriti*, 307 F Supp 891 (ED Mich 2004). The City is evidently unmindful of both the studied narrowness of this Court's ruling in *Koubriti,* not to mention the far different facts that compelled this Court to act in that criminal action involving national security concerns. This civil case could not be further in nature from *Koubriti*.

In *Koubriti,* given the extraordinary circumstances and narrowness of this Court's order, "counsel for the newspapers noted no opposition to it." *Id* at 896.

The reasons the newspapers - - including this intervenor - - did not object in *Koubriti* are reflected in this Court's opinion:

This Court said it faced "a serious concern that the classified intelligence information which the Court has been receiving from the government… may also be disseminated to the media" (*Id* at 894); and that there was a history of "classified sensitive national security and intelligence information" that had "already been disclosed to the media." (Id at 895)

Even so, this Court's response was "limited" and measured:

5

> Furthermore, The February 19, 2004 Order complied with *Gentile's* directive that the limitations on attorney speech should be no broader than necessary to protect the integrity of the judicial system and the defendants' right to a fair trial. Id, 111 S.Ct at 2737. As indicated, the Order prohibits only disclosure and comment upon "confidential, sealed and classified material that is not of public record." It is not a blanket prohibition on the attorneys or the parties' speech. And, there is no restraint whatsoever imposed on the media. (*Id* at 899)

This Court was deferential to the important Constitutional principle at issue in any request for a gag order:

> The Court has been very mindful and solicitous of the First Amendment rights of the parties as well as the vital role of vigorous media in informing the public about matters of important public interest. Because of these considerations, the Court has attempted to balance its own need for some regulation with these interests in two significant respects: (1) it has made its Order as narrowly focused as possible as to the scope of the information that covered, i.e., only confidential or classified information that is not of public record is covered, and (2) it has created a "safety valve" whereby, in the event counsel believe it necessary to comment to the media on covered information, they may come to the Court for guidance and, as stated in the Order, the Court will make itself immediately available for that purpose. The Court is satisfied that to the extent possible, these protections will achieve an appropriate balance between the Court's interest in ensuring the due process and fair trial rights of all parties and preserving the viability of its own review procedures, while at the same time, insuring that the parties' First Amendment rights are not seriously infringed and that the media will be able to continue to fulfill its critical role in fully informing the public about this important case. (Id at 900-901)

### 2. The City Gives No Justification for Its Extraordinary Request

The City's amended motion gives no rationale whatsoever for entry of a gag order. It merely complains that plaintiff's counsel has "made several statements in the press concerning the alleged misfeasance and malfeasance of the Defendants," has "conducted almost daily interviews with the media," and then draws the conclusion that "this type of negative media campaign will surely hinder the new criminally-charged Defendants' (Kilpatrick and Beatty's) right to receive a fair trial, as guaranteed by the United States Constitution." (p. 9) Of Course,

the proposed gag order could have no effect on the reporting of information from third parties uncovered by the press, nor the mountain of "spin" and "support rallies" orchestrated by Mayor Kilpatrick and his Washington, D.C. public relations consultant. It would serve only to muzzle one side - - and without any demonstration of need or effectiveness.

3.   **The Proposed Gag Order Fails the Four-Factor Strict Scrutiny Analysis**

   a.   **A Gag Order's Impact on First Amendment Rights Would Be Severe**

Not only would it impair the Free Press's constitutional right to gather and report information on a highly newsworthy judicial proceeding, but it would potentially impose a prior restraint on *every* individual or entity connected to this case.

*Sheppard v Maxwell,* 384 US 333 (1966), among other cases, made clear that such a prior restraint is anathema to our society, which holds as one of its dearest liberties the right to speak and debate freely on any matter of public concern. The well-known outcome in *Sheppard*, which vacated a sensational murder conviction, had little to do with the effect of pretrial publicity on the potential jury pool. 384 US at 354 ("we cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone"). Rather, it owed more to the unique, circus-like atmosphere that reigned *in the courthouse* during trial.[3] The *Sheppard* Court took pains to distinguish this unfortunate aberration from the vital role that robust press coverage of criminal trials serves in a free society:

> A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The

---

[3] "[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard. At a temporary table within a few feet of the jury box and counsel table sat some 20 reporters staring at Sheppard and taking notes. The erection of a press table for reporters inside the bar is unprecedented." *Sheppard*, 384 US at 355.

> press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

*Id* at 350 (emphasis added). Decades later, the Supreme Court in *Gentile v State Bar of Nevada* echoed this warning:

> The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations. It would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted. Public vigilance serves us well, for the knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power. Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account.

501 US 1030, 1035 (1991) (quotations and ellipses omitted, emphasis added).[4] Therefore, contemporaneous public scrutiny of judicial proceedings is not only permissible; it is one of the most important means of safeguarding our system of ordered liberty. By silencing public speech by virtually anyone with any first-hand knowledge of this case, the proposed gag order would deprive the public of its most vital check on judicial abuse of power.

At the very least, the proposed gag order is overbroad. It is highly questionable whether the Court even has jurisdiction to control the speech of non-parties such as "representatives" of parties or attorneys, and to broadly prohibit them from "speaking publicly about the instant civil matter." (Motion, p. 9)

---

[4] *See also United States v. Ford*, 830 F.2d 596, 599 (6th Cir. 1987) ("Trial judges, the government, the lawyers and the public must tolerate robust and at times acrimonious or even silly public debate about litigation. The courts are public institutions funded with public revenues for the purpose of resolving public disputes, and the right of publicity concerning their operations goes to the heart of their function under our system of civil liberty").

In contrast to such overly broad restrictions, the Michigan and United States Supreme Courts[5] have recognized only the following restrictions on attorney speech in Rule 3.6 of the Rules of Professional Conduct:

> Trial Publicity. A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding.

This common-sense limitation already binds the attorneys in this case. This is the only restriction that need be applied here.

### b. *The Proposed Gag Order Does Not Accomplish Any Objective Compelling Enough to Outweigh the Degradation of Free Speech*

The U.S. Supreme Court has severely limited the ability of any party to use negative pretrial publicity as a basis for a gag order. "In the overwhelming majority of criminal trials, pre-trial publicity presents few unmanageable, threats to [the] important [fair trial] right." *Nebraska Press*, 427 U.S. at 551. The Supreme Court's precedents "demonstrate that pre-trial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Id* at 554. Again, the *Gentile* Court reiterated this point in rejecting an analogous restriction on a criminal defense attorney's speech:

> Our decision . . . in *Mu'Min v. Virginia*, 500 U.S. 415 . . . (1991), provides a pointed contrast to respondent's contention in this case. There, the community had been subjected to a barrage of publicity prior to Mu'Min's trial for capital murder. News stories appeared over a course of several months and included, in addition to details of the crime itself, numerous items of prejudicial information inadmissible at trial. Eight of the twelve individuals seated on Mu'Min's jury admitted some exposure to pretrial publicity. We held that the publicity did not rise even to a level requiring questioning of individual jurors about the content of publicity.

---

[5] *See Gentile*, 501 US at 1036 (Kennedy, J., conc.) ("Interpreted in a proper and narrow manner," such a regulation could be constitutionally applied to attorneys).

9

*Gentile*, 501 US at 1039.  This civil case has attracted attention, but it is no more newsworthy than *Mu'Min*—and not nearly as notorious as the World Trade Center bombing or, the Kent State massacre, cases in which overbroad gag orders were vacated.  Nor is it clear how the incremental increase in media attention engendered by the speech of persons covered by the proposed gag order would meaningfully increase the risk over the substantial media attention that has already been given to this and the "tangentially related" case, including coverage of the highly unfavorable evidence likely to be presented in the upcoming preliminary exam, scheduled for June.

        c.        *Alternative Means*

The United States Supreme Court has listed several options in criminal trials that are far less imposing than a gag order, and are nearly always successful in blunting the potential effect of negative pretrial publicity on the fairness of criminal trials:

> (a) change of trial venue to a place less exposed to the intense publicity that seemed imminent in [the original] County;
>
> (b) postponement of the trial to allow public attention to subside;
>
> (c) searching questioning of prospective jurors, as Mr. Chief Justice Marshall used in the [Aaron] Burr case, to screen out those with fixed opinions as to guilt or innocence;
>
> (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court.
>
> Sequestration of jurors is, of course, always available. Although that measure insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pre-trial publicity and emphasizes the elements of the jurors' oaths.

*Nebraska Press*, 427 U.S. at 563-64 (citing *Sheppard*, 384 US at 357-62).  These alternatives should always be considered and tested before a court even considers the possibility of gagging

10

public speech. They are almost never necessary or appropriate, however in civil cases, such as this.

### d. *Time Limit on the Proposed Gag Order*

This and the criminal prosecution of Mayor Kilpatrick and Ms. Beatty could drag on for many months, followed by appeals The proposed gag order could conceivably cramp public debate and the public's right to know and speak about this case for years, all the while eroding the liberties of speech and open debate that the First Amendment was designed to protect.

### III. Conclusion

For all of the foregoing reasons, the Free Press respectfully requests that this Court (1) grant it leave to intervene in this case for the purpose of opposing the proposed gag order, and (2) deny the City's request for a gag order.

Respectfully submitted,

s/ Herschel P. Fink (P13427)
Honigman Miller Schwartz and Cohn LLP
Attorneys for Intervenor Detroit Free Press
2290 First National Building
Detroit, MI 48226
(313) 465-7400

Dated: April 10, 2008
hpf@honigman.com

# CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2008, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF participants to the case.

/s/ Herschel P. Fink    (P13427)
Honigman Miller Schwartz and Cohn LLP
Attorneys for Intervenor Detroit Free Press
2290 First National Building
Detroit, MI   48226
(313) 465-7400
hfink@honigman.com

DETROIT.3068476.1