# UNITED STATES OF AMERICA
## IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ERNEST FLAGG, as Next Friend of
JONATHAN BOND, a minor,

       Plaintiff,

-vs-

CITY OF DETROIT, a municipal corporation;
DETROIT POLICE CHIEF ELLA BULLY-CUMMINGS;
DEPUTY DETROIT POLICE CHIEF CARA BEST;
JOHN DOE POLICE OFFICERS 1 - 20;
ASST. DEPUTY POLICE CHIEF HAROLD CURETON;
COMMANDER CRAIG SCHWARTZ;
POLICE LT. BILLY JACKSON;
MAYOR KWAME M. KILPATRICK,
CHRISTINE BEATTY, jointly and severally

       Defendants.

_____/

Case No.: 05-CV-74253
Hon. Gerald Rosen
Mag. R. Steven Whalen

**<u>PLAINTIFF'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT</u>**

---

**NORMAN YATOOMA & ASSOCIATES, P.C.**
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiff
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600

**PLUNKETT COONEY**
By: Kenneth L. Lewis (P26071)
By: Said A. Taleb (P66030)
By: Randal M. Brown (P70031)
Attorneys for Defendant Ella Bully-Cummings
535 Griswold, Suite 2400
Detroit, MI 48226
(313) 983-4790

**JAMES C. THOMAS**
By: James C. Thomas (P23801)
Attorney for Defendant Mayor Kwame Kilpatrick
535 Griswold Street, Suite 2632
Detroit, Michigan 48226
(313) 963-2420

**CITY OF DETROIT LAW DEPARTMENT**
By: Krystal A. Crittendon (P49981)
Attorney for Defendants City of Detroit, Commander Craig Schwartz, Cara Best and Harold Cureton
1650 First National Building
Detroit, Michigan 48226
(313) 237-3018

1

| | |
|---|---|
| CITY OF DETROIT LAW DEPARTMENT<br>By: John A. Schapka (P36731)<br>Co-Counsel for Defendants City of Detroit<br>and Commander Craig Schwartz<br>1650 First National Building<br>Detroit, Michigan 48226<br>(313) 224-4550 | MORGANROTH & MORGANROTH, PLLC<br>By: Mayer Morganroth (P17966)<br>By: Jeffrey B. Morganroth (P41670)<br>Attorney for Defendant Christine Beatty<br>3000 Town Center, Suite 1500<br>Southfield, Michigan 48075<br>(248) 355-3084 |

_____/

NOW COMES THE PLAINTIFF, JONATHAN BOND, a minor, through his Next Friend, ERNEST FLAGG, and by his undersigned counsel, NORMAN YATOOMA & ASSOCIATES, P.C., and moves under Federal Rule of Civil Procedure 15(a) to amend his Second Amended Complaint entered with this Court January 14, 2008, to add as Plaintiffs Ashly Jackson, a minor, and India Bond, a minor, through their respective Next Friends, for the reason that both of them, like Plaintiff, are children of Tamara Greene, deceased, and to otherwise clarify the claims last set forth in the Second Amended Complaint as follows:

1. On May 5, 2008 counsel for Plaintiff contacted counsel for the Defendants via email, wherein Plaintiff's counsel requested Defendants' assent to the relief requested herein. Plaintiff's counsel explained the nature of the relief requested; however, concurrence was not obtained. **See Affidavit of Robert S. Zawideh attached as Exhibit 1.**

2. This Court should grant the Motion, because the principles of justice strongly support the amendment, and the exceptions justifying denial of the Motion are absent.

3. Plaintiff Jonathan Bond, through his Next Friend Ernest Flagg, commenced this suit in this Court on November 7, 2005, alleging that the Defendant City of Detroit and several individuals -- including Detroit Mayor Kwame Kilpatrick, his former Chief of Staff Christine Beatty, the current and former Detroit Police Chiefs, certain unknown Detroit Police Officers, and Michigan Attorney General Mike Cox -- violated Plaintiff's federal constitutional right of

access to the Courts and conspired among themselves to commit this constitutional violation by obstructing the investigation into the April 30, 2003, death of Plaintiff's mother, Tamara Greene, and concealing material evidence concerning this incident. Ms. Greene died from gunshot wounds after several shots were fired into her vehicle.

4. In accordance with an Order of this Court entered on or about August 31, 2006, granting in part and denying in part a Motion to Dismiss brought by several Defendants, Plaintiff Jonathan Bond filed a First Amended Complaint in this Court on or about September 21, 2006.

5. On January 14, 2008 Plaintiff, through his new counsel, filed via leave of this Court, his Second Amended Complaint.

6. Plaintiff Jonathan Bond seeks to amend his Second Amended Complaint to add as Plaintiffs his sisters, Ashly Jackson, a minor, and India Bond, a minor, through their respective Next Friends, for the reason that both of them, like Plaintiff, are children of Tamara Greene, deceased, and to otherwise clarify the claims last set forth in the Second Amended Complaint. **A copy of the proposed Third Amended Complaint is attached hereto (without exhibits) as Exhibit 2 to this Motion.**[1]

7. Ms. Greene performed as an exotic dancer at a widely-rumored party at the Detroit Mayor's official residence, the Manoogian Mansion, approximately six months before she was murdered in the above described drive-by shooting.

8. Tamara Greene was the mother of Plaintiff JONATHAN BOND, a 15 year-old minor child, ASHLY JACKSON, a 12 year-old minor child, and INDIA BOND, a 6 year-old minor child.

---

[1] Exhibits are not attached to the proposed Third Amended Complaint attached hereto because they are duplicative of the exhibits that are already attached in support of this Motion.

9. Tamara Greene was a licensed exotic dancer and employed in various clubs in the City of Detroit and by private parties. Ms. Greene, also known as Tamara Bond Greene, performed under the stage name of "Strawberry."

10. Sometime in the fall of 2002, a wild party occurred at the Manoogian Mansion.[2] It was rumored that Defendant Kilpatrick attended this party,[3] as well as several of his close friends, certain Detroit Police Officers, and nude exotic dancers, including Tamara Greene. According to various accounts, it is alleged that Defendant Kilpatrick's wife, Carlita Kilpatrick arrived at the party unexpectedly, and assaulted Tamara Greene, and perhaps at least one other dancer. **See Affidavit of Joyce Rogers, attached hereto as Exhibit 3, as well as Michigan State Police Supplemental Report dated August 6, 2003, attached hereto as Exhibit 4.**

11. On information and belief, that night, following the alleged attack by Mrs. Kilpatrick, Defendant Kwame Kilpatrick's security detail, known as the Executive Protection Unit, or "EPU", escorted, transported, or otherwise accompanied the injured dancer to the emergency room of a local hospital.

12. On information and belief, at least one Emergency Medical Technician ("EMT") reported to the media that, on or about the time of the alleged Manoogian party, individuals who appeared to be members of the EPU brought in an injured woman for treatment and arranged for all EMT's to be removed from the emergency room. **See Michigan State Police Supplemental Report Dated April 12, 2005 attached hereto as Exhibit 5.**

13. On or about the time of the alleged party, and at all relevant times thereafter, Harold Nelthrope ("Nelthrope") was a Detective in the EPU before he was transferred.

---

[2] The Manoogian Mansion is the traditional residence of the Mayor of the City of Detroit and his or her family.
[3] On information and belief, Defendant Kilpatrick and his family had not as yet moved into the Manoogian Mansion, as it was undergoing renovations at the time.

14. Beginning in March of 2003, Nelthrope reported allegations of illegal conduct and misconduct by fellow EPU officers and by Detroit Mayor Kwame Kilpatrick and his wife to the Detroit Police Department's Professional Accountability Bureau. These allegations included claims that close friends of Defendant Kwame Kilpatrick on EPU were claiming overtime pay to which they were not entitled, and were drinking on the job.

15. Specifically, the close friends referred to by Nelthrope are former EPU Police Officers Loronzo ("Greg") Jones and Mike Martin.

16. On information and belief, Jones was a high school football buddy of Mayor Kilpatrick. **See Affidavit of Lt. Alvin Bowman, attached hereto as Exhibit 6.**

17. On information and belief, Officer Martin was a close friend of Jones. Both EPU Officers came out of the 2nd Precinct, which was widely viewed by those in the Detroit Police Department as the "Wild Wild West." *Id.*

18. It was widely believed by those in the Detroit Police Department that both Jones and Martin had great influence over Mayor Kilpatrick, that they essentially had authority to do virtually anything they chose without fear of repercussions, and that where they were concerned, there was no chain of command. For example, even though he never exceeded the rank of Police Officer, Officer Jones had *de facto* control over the EPU, despite the fact that at all relevant times, Lieutenants and Sergeants were also assigned to the Executive Protection Unit. *Id.*

19. Further evidence of Jones' close ties to Defendant Kilpatrick is that his climb to the top of the EPU occurred despite his tarnished record. On information and belief,

- A misdemeanor gun charge from 1992 has been expunged from Jones' criminal record;
- In 1995, while off duty, Jones and several on-duty officers he called for help were sued for firing their guns during a car chase in which a man was shot to death. Jones

was accused of shooting into a man's car but was dropped from a civil lawsuit because another officer fired the fatal shots; and

- In 1996, while off duty, Jones fought with Police Officer Eugene Brown after he pulled over Jones' car. Jones was unsuccessfully prosecuted for resisting arrest and later sued Brown.

20. On information and belief, on or about April 26, 2003, Nelthrope was interviewed by an Officer from the Public Corruption Unit. In addition to discussing the above allegations, Nelthrope - **for the first time** - discussed the allegations that Carlita Kilpatrick assaulted one or more of the dancers at a party at the Manoogian Mansion in the fall of 2002. Nelthrope went on to discuss the efforts to cover up these crimes. **See the April 30, 2003 Memorandum, attached hereto as Exhibit 7, hereafter the "April 30th Memo"**.

21. This interview with Nelthrope was summarized in a 5-page memorandum inaccurately dated April 24 and April 30, 2003.[4] Gary Brown, then Deputy Chief of the Professional Accountability Bureau, authorized a preliminary investigation into these allegations. According to the April 30th Memo, "[t]he most serious allegation made by Officer Nelthrope is that Mrs. Carlita Kilpatrick was involved in a physical altercation with a female dancer, causing bodily injury requiring medical attention. If this allegation is proven to be fact, the potential for assault charges to be filed against Mrs. Carlita Kilpatrick as well as potential obstruction of justice charges and or misconduct in office charges against anyone found to have collected and destroyed activity logs will warrant national headlines and severely damage the political future of Mayor Kilpatrick." **Exhibit 7.**

22. On the morning of April 30, 2003, at approximately 3:40 in the morning, Tamara Greene was shot dead while sitting in her car with a friend in the driveway of her home. Ms.

---

[4] See the April 30th Memo, attached hereto as Exhibit 7. On information and belief, a problem with the word processing software used to prepare the memorandum is responsible for the appearance of the date "April 24, 2003." It is believed that the April 30th Memo was actually completed on April 30, 2003.

Greene was shot with a .40 caliber weapon, the kind of weapon that is issued to members of the Detroit Police Department. **Exhibit 6.**

23. On information and belief, two days after Nelthrope discussed the Manoogian Mansion party with Internal Affairs, and hours after Ms. Greene was shot dead, Jones sent the following text message to Defendant Christine Beatty: "When you get a chance, could you give me a call," to which Defendant Beatty answered "Yes." **See Page 4 of Attorney Michael Stefani's Supplemental Motion for Attorney Fees, attached hereto as Exhibit 8.**

24. At the request of then Chief of Police Jerry Oliver, Brown prepared another memorandum regarding Nelthrope's allegations. **See Memorandum dated May 6, 2003, attached hereto as Exhibit 9 (hereafter, the May 6th Memo).** <u>At Chief Oliver's direction, the conclusion of the May 6th Memo was rewritten to recommend that no further investigation be conducted.</u>

25. In the May 6, 2003 Memo, it was reported that Nelthrope made a point of saying that he was wearing a bulletproof vest because "he didn't trust many police officers."

26. The May 6, 2003 Memo was given to Chief Oliver, and then passed along to Defendant Christine Beatty, who at the time was Defendant Kilpatrick's Chief of Staff and paramour, and possibly to others in Defendant Kilpatrick's office.

27. At all relevant times, Defendant Kilpatrick, Defendant Beatty, Defendant Ella Bully-Cummings and others within the Detroit Police Department and Defendant Kilpatrick's administration conspired to terminate Brown, a decorated, well-respected twenty-year member of the Detroit Police Department.

7

28. In furtherance of that conspiracy, on May 9, 2003, Defendant Mayor Kwame Kilpatrick fired Deputy Police Chief Gary Brown. **See Defendant Kilpatrick's May 9, 2003, letter to Brown, attached hereto as Exhibit 10.**

29. Brown was fired to avoid further investigation into the allegations of the "wild party," or that Defendant Kilpatrick's wife, Carlita Kilpatrick, assaulted Tamara Greene at that party.

30. Further, members of Defendant Kwame Kilpatrick's office then identified Nelthrope as being the source of the allegations of misconduct to the media, and the Mayor publicly called Nelthrope a liar. **See June 26, 2004, Deposition Transcript of Defendant Kwame Kilpatrick, pp. 60-62, attached hereto in its entirety as Exhibit 11.**

31. At the scene of Ms. Greene's murder, twelve .40 caliber shell casings were found. Witnesses reported that the shooter left the scene in a "white Trailblazer." **Exhibit 6.**

32. The .40 caliber Glock, Model 22, is the standard issue weapon for members of the Detroit Police Department. **Exhibit 6.**

33. The Detroit Police Department, Homicide Division, Squad 8, was assigned to investigate the murder of Tamara Greene. **Exhibit 6.**

34. Lt. Al Bowman was the head of Squad 8, and participated in the investigation of the Greene homicide.

35. Sgt. Marian Stevenson, a homicide investigator who worked under Lt. Bowman, was also assigned to the Tamara Greene murder investigation. Sgt. Stevenson concluded that someone ordered Greene's murder. The basis for her belief was that (1) Greene was shot first, and (2) that Greene's passenger was able to exit the vehicle, and (3) an eyewitness reported that the shooter's vehicle turned around after shooting Greene and had the opportunity to shoot the passenger as well, but did not.

36. Every witness contacted by Squad 8 investigators in connection with the Greene murder investigation felt threatened and intimidated against coming forward on this case and testifying. Specifically, they feared retaliation by those close to the Mayor, individuals such as EPU Police Officers Loronzo Jones and Mike Martin. **Exhibit 6.**

37. From the start, the Greene murder investigation was treated differently than any other homicide investigated by the department. First of all, the file commanded an unexplainable amount of attention from then Chief of Police Jerry Oliver, and later from his successor, Defendant Ella Bully-Cummings. Both of these individuals answered to Defendants Kilpatrick and Beatty. **Exhibit 6.**

38. Regarding Chief Oliver, on numerous occasions, he requested the file be sent to his office for his review. **Exhibit 6.**

39. On each occasion, the file was returned to Squad 8 with reports missing from the file. **Exhibit 6.**

40. After she replaced Chief Oliver, Defendant Ella Bully-Cummings called Lt. Bowman into her office, along with Lt. Billy Jackson and Defendants Cureton and Schwartz.

41. At this meeting, which occurred on or about March 10, 2004, Defendant Ella Bully-Cummings stated that she was aware of the connection between the Tamara Greene investigation and the Mayor. She also stated that due to the nature and sensitivity of this case, that this case was not to be discussed outside of her office. In fact, she required the file to be placed away in safekeeping and not to be discussed openly with anybody. **Exhibit 6.**

42. At that point Defendant Cureton, who at that time held the number two position in the Detroit Police Department asked: "Why can't this shit just go away?" **Exhibit 6.**

43. Lt. Bowman explained to them that, while he was not there to investigate any rumors of a wild party involving Defendant Kilpatrick, he nonetheless had a duty, a responsibility and an obligation to bring closure to Ms. Greene's death and to investigate it properly and thoroughly, even if that meant chasing rumors to the Manoogian Mansion, Mayor Kilpatrick and those close to him. **Exhibit 6.**

44. Nonetheless, Lt. Billy Jackson took the file and put it in a combination locked safe. Lt. Bowman did not have the combination to that safe. **Exhibit 6.**

45. Sgt. Marion Stevenson told Lt. Bowman that her case notes on the Tamara Greene murder investigation were erased from her computer hard drive. Further, she stated that her 'zip' storage files disappeared from a locked cabinet inside the police department. She further informed Lt. Bowman that she learned this was the work of City IT personnel. **Exhibit 6.**

46. All Squad 8 members feared that they may lose their jobs and even feared for their physical safety if they continued to investigate Ms. Greene's murder. **Exhibit 6.**

47. Lt. Bowman's meeting with Defendant Bully-Cummings occurred on a Wednesday during his vacation, so when he left Chief Bully-Cummings' office, he did not return until the following Monday, approximately March 15, 2004. **Exhibit 6; see also Bowman's April 21, 2004, Whistleblower Complaint, attached hereto as Exhibit 12.**

48. When Lt. Bowman returned, Lt. Billy Jackson told him that the Tamara Greene investigation had been transferred to Cold Case. When Lt. Bowman asked him why, Lt. Jackson said that he [Bowman] had been asking too many questions about the Strawberry case. **Exhibit 6.**

49. At the time, the Tamara Greene murder investigation did not meet the criteria for transfer to the Cold Case Squad because it was less than a year old and was being actively

investigated. Pursuant to the policies and practices that were in place at the Detroit Police Department at that time, an investigation must be at least two years old to be designated as a "cold case." **Exhibit 6.**

50. Defendants Bully-Cummings, Cureton and Schwartz ordered that the file be transferred to Cold Case in order to prevent anyone from investigating anything that may relate to the Manoogian Mansion party. **Exhibit 6.**

51. Sgt. Odell Godbold, head of the Cold Case Squad responsible for investigating Ms. Greene's murder told Bowman that Greene's murder investigation is a "hot potato" and that he was "not going to investigate this case." He then explained that he feared retribution because of Ms. Greene's connection with the Manoogian Mansion. Sgt. Godbold also informed Lt. Bowman that his nephew had a sexual relationship with Tamara Greene. **Exhibit 6.**

52. On or about April 6, 2004, Lt. Bowman was transferred out of the homicide division to the 2nd Precinct, working the desk midnights in a uniform. **See Exhibit 11.**

53. According to Lt. Billy Jackson, Lt. Bowman was transferred because he asked too many questions about the Tamara Greene Case. **Exhibit 6.** Defendant Best attempted to cover-up the true reason for the transfer, however, by explaining to Lt. Bowman, a decorated 31-year veteran of the Detroit Police Department, that he was being transferred because in a report, he allegedly misspelled the word "homicide." **Exhibit 6.**

54. The officers on Squad 8 would have vigorously investigated the case if it had no ties or connections or rumors or allegations of a nexus to the party, to Defendant Kilpatrick, or his acquaintances. **Exhibit 6.**

55. Squad 8 would have solved Ms. Greene's murder but for the interference by Defendants Kilpatrick, Christine Beatty, Chief Ella Bully-Cummings, Former Chief Jerry Oliver, Cara Best, Commander Schwartz and Harold Cureton. **Exhibit 6.**

56. The officers of Squad 8 were aware or otherwise believed that Gary Brown was fired because Mayor Kilpatrick and his Chief of Staff Christine Beatty did not want there to be an investigation of the Manoogian Mansion party. **Exhibit 6.**

57. The officers of Squad 8 were aware or otherwise believed that the file was given to Cold Case and that Lt. Bowman was transferred because neither Defendant Kilpatrick nor his Chief of Staff and paramour Christine Beatty wanted there to be an investigation of the Manoogian Mansion party. **Exhibit 6.**

58. The officers of Squad 8 were also of the opinion that Defendants Ella Bully-Cummings and Harold Cureton reported directly to Defendant Kilpatrick and/or Defendant Beatty about the Greene homicide investigation and that they believed that the Tamara Greene homicide investigation would have overlapped with an investigation of the Manoogian Mansion party. **Exhibit 6.**

59. As of May 19, 2005, Defendants, acting in conspiracy or concert both with each other and others not parties to this action, made it impossible to investigate, let alone solve the murder of Tamara Greene. They disposed of reports that were contained in the homicide file, concealed or destroyed evidence and retaliated against anyone that dared investigate the Manoogian Mansion party, even if it involved the death of Tamara Greene. **Exhibit 6.**

60. Defendants Kilpatrick, Bully-Cummings and Beatty, as well as former Chief Jerry Oliver and others under the control of Defendants, created a culture of fear and intimidation that not only scared off investigators and made them fear for the jobs and safety, but also scared off

witnesses; witnesses who heard the rumors of Ms. Greene dancing at the party, saw what happened to Ms. Greene, learned of the retaliation against police officers who tried to investigate, and believed that if the good cops could not protect themselves, that they certainly could not protect the witnesses. **Exhibit 6.**

61. Lt. Alvin Bowman, and more recently former Detective Harold Nelthrope and former Deputy Chief Gary Brown of the Detroit Police Department were successful in convincing two different Wayne County juries that several of these Defendants retaliated against them for investigations that involved or were related to Ms. Greene's death.

62. The amendment is not futile, since it asserts its claims with greater specificity and asserts identical claims arising out of the same transaction and occurrence by Ms. Greene's two other children against these same Defendants.

63. Dilatory motive and bad faith are absent because discovery is ongoing, no depositions have yet been conducted, and these additional Plaintiffs have only very recently retained Plaintiff's counsel to represent them in this action.

**WHEREFORE, PLAINTIFF** respectfully requests that this Court grant his Motion and permit him to file and serve his Third Amended Complaint.

Respectfully Submitted,

Dated: May 5, 2008

/s/ **Norman A. Yatooma**
Norman Yatooma & Associates, P.C.
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiff
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600
nya@normanyatooma.com

## BRIEF IN SUPPORT OF MOTION TO AMEND COMPLAINT

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

ISSUES PRESENTED.....................................................................................................ii

CONTROLLING AUTHORITIES..................................................................................iii

ARGUMENT.....................................................................................................................1

    **UNDER FEDERAL RULE OF CIVIL PROCEDURE 15 AND *FOMAN V. DAVIS*, THE COURT SHOULD GRANT PLAINTIFF LEAVE TO FILE A THIRD AMENDED COMPLAINT TO ADD ASHLY JACKSON AND INDIA BOND, TAMARA GREENE'S REMAINING CHILDREN, BECAUSE THESE NEW PLAINTIFFS ARE ASSERTING THE SAME COUNTS AS THE CURRENT PLAINTIFF, AND THE PROPOSED THIRD AMENDED COMPLAINT ASSERTS THE SAME CLAIMS AGAINST ALL OF THE EXISTING DEFENDANTS WITH GREATER SPECIFICITY.**....................................................................................................1

## ISSUES PRESENTED

WHETHER, UNDER FEDERAL RULE OF CIVIL PROCEDURE 15 AND *FOMAN V. DAVIS*, THE COURT SHOULD GRANT PLAINTIFF LEAVE TO FILE A THIRD AMENDED COMPLAINT TO ADD ASHLY JACKSON AND INDIA BOND, TAMARA GREENE'S REMAINING CHILDREN, BECAUSE THESE NEW PLAINTIFFS ARE ASSERTING THE SAME COUNTS AS THE CURRENT PLAINTIFF, AND THE PROPOSED THIRD AMENDED COMPLAINT ASSERTS THE SAME CLAIMS AGAINST ALL OF THE EXISTING DEFENDANTS WITH GREATER SPECIFICITY.

# CONTROLLING AUTHORITIES

## Federal Cases

*Adams v. Gould,* 739 F.2d 858, 863 (3rd Cir. 1984) ................................................................ 2

*Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.,* 249 F.3d 564, 571 n.1 (6th Cir. 2001) ................................................................ 1

*Duggins v. Steak 'Shake, Inc.,* 195 F.3d 828, 834 (6th Cir. 1999) ................................................................ 1

*Inge v. Rock Financial Corp,* 388 F.3d 930, 937 (6th Cir. 2004) ................................................................ 1

*Tefft v. Seward,* 689 F.2d 637, 640 n.2 (6th Cir. 1982) ................................................................ 2

## Rules

Fed. R. Civ. P. 15(a) ................................................................ 1

ARGUMENT

UNDER FEDERAL RULE OF CIVIL PROCEDURE 15 AND *FOMAN V. DAVIS*, THE COURT SHOULD GRANT PLAINTIFF LEAVE TO FILE A THIRD AMENDED COMPLAINT TO ADD ASHLY JACKSON AND INDIA BOND, TAMARA GREENE'S REMAINING CHILDREN, BECAUSE THESE NEW PLAINTIFFS ARE ASSERTING THE SAME COUNTS AS THE CURRENT PLAINTIFF, AND THE PROPOSED THIRD AMENDED COMPLAINT ASSERTS THE SAME CLAIMS AGAINST ALL OF THE EXISTING DEFENDANTS WITH GREATER SPECIFICITY.

When a party requests leave to amend his pleading, "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); *accord, Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962); *Inge v. Rock Financial Corp*, 388 F.3d 930, 937 (6th Cir. 2004). Only certain specific reasons, like bad faith, dilatory motive, undue delay, futility, or repeated failure to cure deficiencies by earlier permitted amendments can justify denial of leave to amend. *Foman*, 371 U.S. 178, 182; *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 249 F.3d 564, 571 n.1 (6th Cir. 2001); *Duggins v. Steak 'n Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999).

The Sixth Circuit has read and evaluated the dilatory motive, undue delay, and prejudice factors together: "[D]elay by itself is not [a] sufficient reason to deny a Motion to Amend. **Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted.**" *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 458-459 (6th Cir. 2001); *accord, Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002); *Tefft v. Seward*, 689 F.2d 637, 640 n.2 (6th Cir. 1982) (emphasis added). "At some point, however, delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party.'" *Morse*, 290 F.3d 795, 800, quoting *Adams v. Gould*, 739 F.2d 858, 863 (3rd Cir. 1984). Thus, a party cannot ordinarily

1

"wait until the discovery date has passed(,) and a Motion for Summary Disposition has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories in an amendment." *Priddy v. Edelman,* 883 F.2d 438, 446 (6th Cir. 1989). **Nonetheless, "where 'the amended claim was obviously one of the objects of discovery and related closely to the original claim,'" the Rule 15 and *Foman* liberal amendment standards are controlling.** *Tokio Marine & Fire Ins. Co., Ltd. v. Employers Ins. of Wasau,* 786 F.2d 101, 103 (2d Cir. 1986); *see also, Miller v. American Heavy Lift Shipping,* 231 F.3d 242, 249 (6th Cir. 2000) (Where amendment "amplifies," clarifies, adds, or specifies facts, if not "entirely different 'operative facts,'" the preceding standards are controlling.)

Application of the above principles strongly supports granting leave to amend. Because purposeful delay and procedural "fencing" and "gamesmanship" are absent, dilatory motive and bad faith are nonexistent. Indeed the proposed Third Amended Complaint relates closely to the Second Amended Complaint. It adds Ms. Greene's two remaining minor children (who are asserting the identical claims as Jonathan Bond) and amplifies, clarifies, adds, and specifies facts that support the claims that were previously asserted against these Defendants.

There is no prejudice to the Defendants in granting this Motion. The proofs remain essentially the same and no meaningful discovery has been exchanged. Indeed, at the March 14, 2008 Status Conference, this Court instructed Plaintiff's counsel to reach out to the parent and guardian of these children to encourage them that, if they were to join this litigation, the time to do so is sooner, rather than later. Indeed, *to avoid* prejudice to the Defendants, it would be to everyone's advantage for the Court to grant this Motion now, at what is essentially the beginning of this discovery process.

Futility is also absent from this situation. The proposed Third Amended Complaint, like

2

the Second Amended Complaint, outlines in great detail the unavailability of any effective or meaningful state-court remedy. Consistent with this Court's rulings and Orders, this Third Amended Complaint identifies relief that is recoverable here but is not otherwise available in some other suit that may yet be brought. It specifically states that as a result of the Defendants' actions, individually or in concert or conspiracy with one another; and with third parties, no state court action is available, and that the claims alleged in the Third Amended Complaint are the only remaining vehicle Plaintiffs have to vindicate their trampled civil rights.

**WHEREFORE, PLAINTIFFS** respectfully requests this Court to grant this Motion and permit them to file and serve the attached proposed Third Amended Complaint (attached hereto without exhibits).

Respectfully Submitted,

Dated: May 5, 2008

/s/ **Norman A. Yatooma**
Norman Yatooma & Associates, P.C.
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiff
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600
nya@normanyatooma.com

# CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2008 I electronically filed the following papers with the Clerk of the Court using the CM/ECF system:

PLAINTIFF'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT

On the following:

**JAMES C. THOMAS**
By: James C. Thomas (P23801)
Attorney for Defendant Mayor Kwame Kilpatrick
535 Griswold Street, Suite 2632
Detroit, Michigan 48226
(313) 963-2420

**Plunkett Cooney**
By: Said A. Taleb (P66030)
By: Kenneth L. Lewis (P26071)
By: Randal M. Brown (P70031)
Attorneys for Defendant Ella Bully-Cummings
535 Griswold, Suite 2400
Detroit, MI 48226
(313) 983-4790

**City of Detroit Law Department**
By: Krystal A. Crittendon (P49981)
Attorney for Defendants City of Detroit, Commander Craig Schwartz, Cara Best and Harold Cureton
1650 First National Building
Detroit, Michigan 48226
(313) 237-3018

**City of Detroit Law Department**
By: John A. Schapka (P36731)
Co-Counsel for Defendants City of Detroit, Detroit Police Chief Ella Bully-Cummings, and Commander Craig Schwartz
1650 First National Building
Detroit, Michigan 48226
(313) 224-4550

**Morganroth & Morganroth, PLLC**
By: Mayer Morganroth (P17966)
By: Jeffrey B. Morganroth (P41670)
Attorney for Defendant Christine Beatty
3000 Town Center
Suite 1500
Southfield, Michigan 48075
(248) 355-3084

May 5, 2008

/s/ Norman A. Yatooma
**Norman Yatooma & Associates, P.C.**
Attorneys for Plaintiff
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600
nya@normanyatooma.com