# UNITED STATES OF AMERICA
## IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ERNEST FLAGG, as Next Friend of
JONATHAN BOND, a minor,
TARIS JACKSON, as Next Friend of
ASHLY JACKSON, a minor; and
DR. BRIAN GREENE, as Next Friend of
INDIA BOND, a minor;

        Plaintiff,

-vs-

CITY OF DETROIT, a municipal corporation;
DETROIT POLICE CHIEF ELLA BULLY-CUMMINGS;
DEPUTY DETROIT POLICE CHIEF CARA BEST
JOHN DOE POLICE OFFICERS 1 - 20;
ASST. DEPUTY POLICE CHIEF HAROLD CURETON;
COMMANDER CRAIG SCHWARTZ;
MAYOR KWAME M. KILPATRICK,
CHRISTINE BEATTY, jointly and severally

        Defendants.

Case No.: 05-CV-74253
Hon. Gerald Rosen

**THIRD AMENDED
COMPLAINT AND
DEMAND FOR JURY
TRIAL**

_____/

**NORMAN YATOOMA & ASSOCIATES, P.C.**
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiffs
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600

**PLUNKETT COONEY**
By: Kenneth L. Lewis (P26071)
By: Said A. Taleb (P66030)
By: Randal M. Brown (P70031)
Attorneys for Defendant Ella Bully-Cummings
535 Griswold, Suite 2400
Detroit, MI 48226
(313) 983-4790

**WILLIAMS, WILLIAMS, RATTNER & PLUNKETT**
By: Thomas G. Plunkett (P18957)
By: David E. Plunkett (P66696)
Attorneys for Bell Industries, Inc., d/b/a SkyTel

**JAMES C. THOMAS, P.C.**
By: James C. Thomas (P23801)
Attorney for Defendant Kilpatrick
535 Griswold Street, Suite 2632
Detroit, Michigan 48226
(313) 963-2420

**CITY OF DETROIT LAW DEPARTMENT**
By: John A. Schapka (P36731)
Attorney for Defendants City of Detroit,
Craig Schwartz, Cara Best and Harold
Cureton
660 Woodward Ave, Suite 1650
Detroit, Michigan 48226
(313) 237-3018

**CITY OF DETROIT LAW DEPARTMENT**
By: Krystal A. Crittendon (P49981)
Attorney for Defendants City of Detroit,
Craig Schwartz, Cara Best and Harold

380 N. Old Woodward Avenue, Suite 300
Birmingham, Michigan 48009
(248) 642-0333

Cureton
660 Woodward Ave, Suite 1650
Detroit, Michigan 48226
(313) 237-3062

**HONIGMAN MILLER SCHWARTZ & COHN**
By: Herschel P. Fink (P13427)
Attorney for Intervenor Detroit Free Press
660 Woodward Avenue, Suite 2290
Detroit, Michigan 48226-3583
(313) 465-7000

**MORGANROTH & MORGANROTH, PLLC**
By: Mayer Morganroth (P17966)
By: Jeffrey B. Morganroth (P41670)
Attorneys for Defendant Christine Beatty
3000 Town Center, Suite 1500
Southfield, Michigan 48075
(248) 355-3084

**MOSS & COLELLA PC**
By: David Moss (P36757)
By: Vince Colella (P49747)
Co-Counsel for Plaintiffs Ashly Jackson and
India Bond Only
29100 Northwestern Hwy., Suite 310
Southfield, Michigan 48034
(248) 945-0100

_____/

NOW COME THE PLAINTIFFS, JONATHAN BOND, a minor, through his Next Friend ERNEST FLAGG; ASHLY JACKSON, a minor, through her Next Friend TARIS JACKSON; and INDIA BOND, a minor, through her Next Friend, DR. BRIAN GREENE; by and through their attorneys, Norman Yatooma & Associates, P.C., who state the following in support of this Third Amended Complaint:

1. Plaintiff JONATHAN BOND, is a resident of the State of Michigan, County of Oakland and Township of West Bloomfield, and resides there with his father and Next Friend, ERNEST FLAGG.

2. Plaintiff ASHLY JACKSON is a resident of the State of Michigan, County of Wayne and City of Dearborn, and resides there with her father and Next Friend, TARIS JACKSON.

3. Plaintiff INDIA BOND is a resident of the State of Michigan, County of Kalamazoo and City of Kalamazoo, and resides there with her guardian and Next Friend, DR. BRIAN GREENE.

4. Jurisdiction is conferred on this Court pursuant to Title 28 U.S.C. §§ 1331 and 1343(a)(3), (4).

5. Defendant CITY OF DETROIT is a municipal corporation organized under the laws of the State of Michigan.

6. On information and belief, Defendant ELLA BULLY-CUMMINGS is a resident of the City of Detroit, County of Wayne, State of Michigan.

7. On information and belief, Defendant CARA BEST is a resident of the City of Detroit, County of Wayne, State of Michigan.

8. On information and belief, Defendant HAROLD CURETON is a resident of the City of Detroit, County of Wayne, State of Michigan.

9. On information and belief, Defendant CRAIG SCHWARTZ is a resident of the City of Detroit, County of Wayne, State of Michigan.

10. On information and belief, Defendant KWAME M. KILPATRICK current Mayor of the City of Detroit, is a resident of the City of Detroit, County of Wayne, State of Michigan.

11. On information and belief, Defendant CHRISTINE BEATTY the former Chief of Staff for Defendant Kwame M. Kilpatrick, is a resident of the City of Detroit, County of Wayne, State of Michigan.

## GENERAL ALLEGATIONS

12.     Tamara Greene was the mother of Plaintiff JONATHAN BOND, a 15 year-old minor child, Plaintiff ASHLY JACKSON, a 12 year-old minor child, and Plaintiff INDIA BOND, a 6 year-old minor child.

13.     Tamara Greene was a licensed exotic dancer and employed in various clubs in the City of Detroit and by private parties.  Ms. Greene, also known as Tamara Bond Greene, performed under the stage name of "Strawberry".

14.     Sometime in the fall of 2002, a wild party occurred at the Manoogian Mansion.[1]  It was rumored that Defendant Kilpatrick attended this party,[2] as well as several of his close friends, certain Detroit Police Officers, and nude exotic dancers, including Tamara Greene.  According to various accounts, it is alleged that Defendant Kilpatrick's wife, Carlita Kilpatrick arrived at the party unexpectedly, and assaulted Tamara Greene, and possibly one other dancer.  **See Affidavit of Joyce Rogers, attached hereto as Exhibit 1; see also Michigan State Police Supplemental Report dated August 6, 2003, attached hereto as Exhibit 2.**

15.     On information and belief, that night, following the alleged attack by Mrs. Kilpatrick, Defendant Kwame Kilpatrick's security detail, known as the Executive Protection Unit, or "EPU," escorted, transported, or otherwise accompanied the injured dancer to the emergency room of a local hospital.

16.     On information and belief, at least one Emergency Medical Technician ("EMT") reported to the media that, on or about the time of the alleged Manoogian party, individuals who appeared to be members of the EPU brought in an injured woman for treatment and arranged for

---

[1] The Manoogian Mansion is the traditional residence of the Mayor of the City of Detroit and his or her family.

[2] On information and belief, Defendant Kilpatrick and his family had not as yet moved into the Manoogian Mansion, as it was undergoing renovations at the time.

all EMTs to be removed from the emergency room. **See Michigan State Police Supplemental Report Dated April 12, 2005, attached hereto as Exhibit 3.**

17.     On or about the time of the alleged party, and at all relevant times thereafter, Harold Nelthrope ("Nelthrope") was a detective in the EPU before he was transferred.

18.     Beginning in March of 2003, Nelthrope reported allegations of illegal conduct and misconduct by fellow EPU officers and by Detroit Mayor Kwame Kilpatrick and his wife to the Detroit Police Department's Professional Accountability Bureau. These allegations included claims that close friends of Defendant Kwame Kilpatrick on EPU were claiming overtime pay to which they were not entitled, and were drinking on the job.

19.     Specifically, the close friends referred to by Nelthrope are former EPU Police Officers Loronzo ("Greg") Jones and Mike Martin.

20.     On information and belief, Jones was a high school football buddy of Mayor Kilpatrick. **See Affidavit of Lt. Alvin Bowman, attached hereto as Exhibit 4.**

21.     On information and belief, Officer Martin was a close friend of Jones. Both EPU Officers came out of the 2nd Precinct, which was widely viewed by those in the Detroit Police Department as the "Wild Wild West." *Id.*

22.     It was widely believed by those in the Detroit Police Department that both Jones and Martin had great influence over Mayor Kilpatrick, that they essentially had authority to do virtually anything they chose without fear of repercussions, and that where they were concerned, there was no chain of command. For example, even though he never exceeded the rank of Police Officer, Officer Jones had *de facto* control over the EPU, despite the fact that at all relevant times, Lieutenants and Sergeants were also assigned to the Executive Protection Unit. *Id.*

23. Further evidence of Jones' close ties to Defendant Kilpatrick is that his climb to the top of the EPU occurred despite his tarnished record. On information and belief,

    a. A misdemeanor gun charge from 1992 has been expunged from Jones' criminal record;

    b. In 1995, while off duty, Jones and several on-duty officers he called for help were sued for firing their guns during a car chase in which a man was shot to death. Jones was accused of shooting into a man's car but was dropped from a civil lawsuit because another officer fired the fatal shots; and

    c. In 1996, while off duty, Jones fought with Police Officer Eugene Brown after he pulled over Jones' car. Jones was unsuccessfully prosecuted for resisting arrest and later sued Brown.

24. On information and belief, on or about April 26, 2003, Nelthrope was interviewed by an Officer from the Public Corruption Unit. In addition to discussing the above allegations, Nelthrope - **for the first time -** discussed the allegations that Carlita Kilpatrick assaulted one or more of the dancers at a party at the Manoogian Mansion in the fall of 2002. Nelthrope went on to discuss the efforts to cover up these crimes. **See the April 30, 2003 Memorandum, attached hereto as Exhibit 5, hereafter the "April 30th Memo.**

25. This interview with Nelthrope was summarized in a 5-page memorandum inaccurately dated April 24 and April 30, 2003.[3] Gary Brown, then Deputy Chief of the Professional Accountability Bureau, authorized a preliminary investigation into these allegations. **Exhibit 5.**

26. According to the April 30th Memo, "[t]he most serious allegation made by Officer Nelthrope is that Mrs. Carlita Kilpatrick was involved in a physical altercation with a female dancer, causing bodily injury requiring medical attention. If this allegation is proven to be fact, the potential for assault charges to be filed against Mrs. Carlita Kilpatrick as well as potential

---

[3] See April 30th Memo, attached hereto as Exhibit 5. On information and belief, a problem with the word processing software used to prepare the memorandum is responsible for the appearance of the date "April 24, 2003." It is believed that the April 30th Memo was actually completed on April 30, 2003.

NORMAN YATOOMA & ASSOCIATES, P.C.

obstruction of justice charges and or misconduct in office charges against anyone found to have collected and destroyed activity logs will warrant national headlines and severely damage the political future of Mayor Kilpatrick." **Exhibit 5.**

27.     On the morning of April 30, 2003, at approximately 3:40 in the morning, Tamara Greene was shot dead while sitting in her car with a friend in the driveway of her home. Ms. Greene was shot with a .40 caliber weapon, the kind of weapon that is issued to members of the Detroit Police Department. **Exhibit 4.** Her friend survived the shooting.

28.     On information and belief, two days after Nelthrope discussed the Manoogian Mansion party with Internal Affairs, and hours after Ms. Greene was shot dead, Jones sent the following text message to Defendant Christine Beatty: "When you get a chance, could you give me a call," to which Defendant Beatty answered "Yes." **See Page 4 of Attorney Michael Stefani's Supplemental Motion for Attorney Fees, attached hereto as Exhibit 6.**

29.     At the request of then Chief of Police, Jerry Oliver, Brown prepared another memorandum regarding Nelthrope's allegations. **See Memorandum dated May 6, 2003, attached hereto as Exhibit 7 (hereafter, the May 6th Memo). <u>At Chief Oliver's direction, the conclusion of the May 6th Memo was rewritten to recommend that no further investigation be conducted.</u>**

30.     In the May 6, 2003 Memo, it was reported that Nelthrope made a point of saying that he was wearing a bulletproof vest because "he didn't trust many police officers."

31.     The May 6, 2003 Memo was given to Chief Oliver, and then passed along to Defendant Christine Beatty, who at the time was Defendant Kilpatrick's Chief of Staff and paramour, and possibly to others in Defendant Kilpatrick's office.

NORMAN YATOOMA & ASSOCIATES, P.C.

32.	At all relevant times, Defendant Kilpatrick, Defendant Beatty, Defendant Ella Bully-Cummings and others within the Detroit Police Department and Defendant Kilpatrick's administration conspired to terminate Brown, a decorated, well-respected twenty-year member of the Detroit Police Department.

33.	In furtherance of that conspiracy, on May 9, 2003, Defendant Mayor Kwame Kilpatrick fired Deputy Police Chief Gary Brown. **See Defendant Kilpatrick's May 9, 2003, letter to Brown, attached hereto as Exhibit 8**.

34.	Brown was fired to avoid further investigation into the allegations of the "wild party," or that Defendant Kilpatrick's wife, Carlita Kilpatrick, assaulted Tamara Greene at that party.

35.	Further, members of Defendant Kwame Kilpatrick's office then identified Nelthrope as being the source of the allegations of misconduct to the media, and the mayor publicly called Nelthrope a liar. **See June 26, 2004, Deposition Transcript of Defendant Kwame Kilpatrick, pp. 60-62, attached hereto in its entirety as Exhibit 9.**

36.	Twelve .40 caliber shell casings were found at Ms. Greene's murder scene. Witnesses reported that the shooter left the scene in a "white Trailblazer." **Exhibit 4**.

37.	The .40 caliber Glock, Model 22, is the standard issue weapon for members of the Detroit Police Department. **Exhibit 4.**

38.	The Detroit Police Department, Homicide Section, Squad 8, was assigned to investigate the murder of Tamara Greene. **Exhibit 4.**

39.	Lt. Al Bowman was the head of Squad 8, and participated in the investigation of the Greene homicide.

NORMAN YATOOMA & ASSOCIATES, P.C.

NORMAN YATOOMA & ASSOCIATES, P.C.

40.     Sgt. Marian Stevenson, a former homicide investigator who worked under Lt. Bowman, was also assigned to the Tamara Greene murder investigation.  Sgt. Stevenson concluded that someone ordered Greene's murder.  The basis for her belief was that (1) Greene was shot first, and (2) that Greene's passenger was able to exit the vehicle, and (3) an eyewitness reported that the shooter's vehicle turned around after shooting Greene and had the opportunity to shoot the passenger as well, but did not.

41.     Every witness contacted by Squad 8 investigators in connection with the Greene murder investigation felt threatened and intimidated against coming forward on this case and testifying.  Specifically, they feared retaliation by those close to the Mayor, individuals such as EPU Police Officers Loronzo Jones and Mike Martin.  **Exhibit 4.**

42.     From the start, the Greene homicide investigation was treated differently than any other homicide investigated by the department.  First of all, the file commanded an unexplainable amount of attention from then Chief of Police Jerry Oliver, and later from his successor, Defendant Ella Bully-Cummings.  Both of these individuals answered to Defendants Kilpatrick and Beatty.  **Exhibit 4.**

43.     Regarding Chief Oliver, on numerous occasions, he requested the file be sent to his office for his review.  **Exhibit 4.**

44.     On each occasion, the file was returned to Squad 8 with reports missing from the file.  **Exhibit 4.**

45.     After she replaced Chief Oliver, Defendant Ella Bully-Cummings called Lt. Bowman into her office, along with Defendants Cureton and Schwartz, and Lt. Billy Jackson.

46.     At this meeting, which occurred on or about March 10, 2004, Defendant Ella Bully-Cummings indicated that she was aware of the connection between the Tamara Greene

investigation and the Mayor. She also stated due to the nature and sensitivity of this case, that this case was not to be discussed outside of her office. In fact, she required the file to be placed away in safekeeping and not to be discussed openly with anybody. **Exhibit 4.**

47. At that point Defendant Cureton, who at the time held the number two position in the Detroit Police Department asked: "Why can't this shit just go away?" **Exhibit 4.**

48. Lt. Bowman explained to them that while he was not there to investigate any rumors of a wild party involving Defendant Kilpatrick; that he had a duty, a responsibility and an obligation to bring closure to Ms. Greene's death and to investigate it properly and thoroughly, even if that meant chasing rumors to the Manoogian Mansion, Mayor Kilpatrick and those close to him. **Exhibit 4.**

49. Nonetheless, Lt. Billy Jackson took the file and put it in a combination locked safe. Lt. Bowman did not have the combination to that safe. **Exhibit 4.**

50. Sgt. Marion Stevenson told Lt. Bowman that her case notes on the Tamara Greene murder investigation were erased from her computer hard drive. Further, she stated that her 'zip' storage files disappeared from a locked cabinet inside the police department. She further informed Lt. Bowman that she learned this was the work of City IT personnel. **Exhibit 4.**

51. All Squad 8 members feared that they may lose their jobs and even feared for their physical safety if they continued to investigate Ms. Greene's murder. **Exhibit 4.**

52. Lt. Bowman's meeting with Defendant Bully-Cummings occurred on a Wednesday during his vacation, so when he left Chief Bully-Cummings' office, he did not return until the following Monday, approximately March 15, 2004. **Exhibit 4; see also Lt. Bowman's April 21, 2004, Whistleblower Complaint attached hereto as Exhibit 10.**

NORMAN YATOOMA & ASSOCIATES, P.C.

53.     When Lt. Bowman returned, Lt. Billy Jackson told him that the Tamara Greene investigation had been transferred to Cold Case. When Lt. Bowman asked him why, Lt. Jackson said that he [Bowman] had been asking too many questions about the Strawberry case. **Exhibit 4.**

54.     At the time, the Tamara Greene murder investigation did not meet the criteria for transfer to the Cold Case Squad because it was less than a year old and was being actively investigated. Pursuant to the policies and practices that were in place at the Detroit Police Department at that time, an investigation must be at least two years old to be designated as a "cold case." **Exhibit 4.**

55.     Defendants Bully-Cummings, Cureton and Schwartz ordered that the file be transferred to Cold Case in order to prevent anyone from investigating anything that may relate to the Manoogian Mansion party. **Exhibit 4.**

56.     Sgt. Odell Godbold, head of the Cold Case Squad responsible for investigating Ms. Greene's murder told Bowman that Greene's murder investigation is a "hot potato" and that he was "not going to investigate this case." He then explained that he feared retribution because of Ms. Greene's connection with the Manoogian Mansion. Godbold also informed Lt. Bowman that his nephew had a sexual relationship with Tamara Greene. **Exhibit 4.**

57.     On or about April 6, 2004, Bowman was transferred out of the homicide division to the 2nd Precinct, working the desk midnights in a uniform. According to Lt. Billy Jackson, Lt. Bowman was transferred because he asked too many questions about the Tamara Greene Case. **Exhibit 4.** Defendant Best attempted to cover-up the true reason for the transfer, however, by explaining to Lt. Bowman, a decorated 31-year veteran of the Detroit Police Department, that he

was being transferred because in a report, he allegedly misspelled the word "homicide." **Exhibit 4.**

58.     The officers on Squad 8 would have vigorously investigated the case if it had no ties or connections or rumors or allegations of a nexus to the party, to Defendant Kilpatrick, or his acquaintances. **Exhibit 4.**

59.     Squad 8 would have solved Ms. Greene's murder but for the interference by Defendants Kilpatrick, Christine Beatty, Chief Ella Bully-Cummings, Former Chief Jerry Oliver, Cara Best, Commander Schwartz and Harold Cureton. **Exhibit 4.**

60.     The officers on Squad 8 were aware or otherwise believed that Gary Brown was fired because Mayor Kilpatrick and his Chief of Staff Christine Beatty did not want there to be an investigation of the Manoogian Mansion party. **Exhibit 4.**

61.     The officers of Squad 8 were aware or otherwise believed that the file was given to Cold Case and that Bowman was transferred because neither Defendant Kilpatrick nor his Chief of Staff and paramour Christine Beatty wanted there to be an investigation of the Manoogian Mansion party. **Exhibit 4.**

62.     The officers of Squad 8 also believed that Defendants Ella Bully-Cummings and Harold Cureton reported directly to Kilpatrick and/or Beatty about the Greene homicide investigation and that they believed that the Tamara Greene homicide investigation would have overlapped with an investigation of the Manoogian Mansion party. **Exhibit 4.**

63.     As of May 19, 2005, Defendants, acting in conspiracy or concert both with each other and with others not parties to this action, made it impossible to investigate, let alone solve the murder of Tamara Greene. They disposed of reports that were contained in the homicide file,

concealed or destroyed evidence and retaliated against anyone that dared investigate the Manoogian Mansion party, even if it involved the death of Tamara Greene. **Exhibit 4.**

64.    Defendants Kilpatrick, Bully-Cummings, and Beatty, together with former Chief Jerry Oliver and others under the control of Defendants, created a culture of fear and intimidation that not only scared off investigators and made them fear for the jobs and safety, but also scared off witnesses; witnesses who heard the rumors of Ms. Greene dancing at the party, saw what happened to Ms. Greene, learned of the retaliation against police officers who tried to investigate; these witnesses believed that if the good cops could not protect themselves or Ms. Greene, that they certainly could not protect the witnesses. **Exhibit 4.**

65.    Lt. Alvin Bowman, and more recently former Detective Harold Nelthrope and former Deputy Chief Gary Brown of the Detroit Police Department were successful in convincing two different Wayne County juries that several of these defendants retaliated against them for investigations that involved or were related to Ms. Greene's death.

66.    These Defendants, acting either individually or in concert with each other or with third parties not named herein, have actively, intentionally and deliberately worked to terminate or otherwise hinder the Greene homicide investigation, and to deter qualified homicide detectives from investigating Tamara Greene's murder.

67.    Defendants' conduct as described herein was motivated by an evil motive or intent; namely a desire to protect the mayoral administration of Kwame Kilpatrick from embarrassing allegations regarding himself or his family and to protect his political future.

68.    Defendants' conduct as described herein involves reckless or callous indifference to the federally-protected rights of others, particularly these Plaintiffs' right to meaningful access to the Courts.

69. On information and belief, as a direct and proximate result of Defendants' actions, the investigation into the murder of Tamara Greene has been effectively terminated.

70. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, the pertinent three-year statute of limitations has expired, thus barring a wrongful death action that may have been brought against the murderer of Tamara Greene.

71. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, key evidence or witness testimony has been irretrievably lost, and others have expressed fear for their careers and their very safety should they offer assistance of any kind in investigating the murder of Tamara Greene.

72. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiffs are foreclosed from bringing a state-court wrongful death action against "John Doe" defendants, which in turn would have provided a vehicle for discovery concerning any alleged concealment of evidence or any promising leads that were abandoned in the local and state investigations of Tamara Greene's death.

73. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiffs have been denied the opportunity to learn the identity of their mother's killer.

74. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiffs have been denied the opportunity to see their mother's killer brought to justice.

75. As a direct and proximate result of Defendants' actions, acting either individually or in concert with one another, Plaintiffs have been denied the opportunity to recover damages as a

state court or jury would have considered fair and equitable, under all the circumstances including reasonable medical, hospital, funeral, and burial expenses; reasonable compensation for the pain and suffering, while conscious, undergone by Tamara Greene during the period intervening between the time of the injury and death; and damages for the loss of financial support and the loss of the society and companionship of their mother.

## COUNT I - VIOLATION OF THE 1ST AND 14TH AMENDMENTS (RIGHT OF ACCESS TO COURTS) PURSUANT TO TITLE 42 U.S.C. §1983.

76.    That Plaintiffs repeat, reallege and incorporate by reference the allegations in paragraphs 1 through 75 above with the same force and effect as if herein set forth.

77.    Defendants, acting individually, in their official capacities, or in concert with one another and/or with third parties not named herein, deliberately and continuously delayed and obstructed the Greene murder investigation, and deliberately ignored and actively concealed material evidence in the investigation of Greene's death, and threatened and retaliated against anyone who investigated or otherwise pursued any aspect of the investigation.

78.    Defendants' acts described herein deprived Plaintiffs of their right of access to the Courts by denying them of the ability to receive the proceeds of a wrongful death action in state court.

79.    As a proximate result of Defendants' actions, the filing of a state court action would be futile and meaningless because:

    a)  Under the law of the State of Michigan there is no civil cause of action for "spoliation of evidence" that could be brought against the City of Detroit Police Department.

    b)  The Plaintiffs cannot bring an action against the City of Detroit for negligence in the investigation of the homicide of Greene because under Michigan law, police owe no duty to any one particular individual in performing their duties, and,

NORMAN YATOOMA & ASSOCIATES, P.C.

therefore, it would be a frivolous lawsuit that would subject plaintiffs to sanctions by the Court.

c) The Plaintiffs do not have a sufficient factual basis to file a "John Doe" suit in state court due to the fact that the investigation has been terminated and otherwise tampered with by these Defendants to the point that Defendants have rendered Ms. Greene's homicide unsolvable.

d) Further, the filing of a "John Doe" lawsuit does not toll the running of the statute of limitation applicable to an action under Michigan law. Defendants not specifically named in a "John Doe" complaint are not yet parties to the suit, and if added later are considered new parties to the litigation. Accordingly, amendments to a complaint that add new defendants do not relate back to the original complaint.

e) The Plaintiffs are precluded by the applicable statute of limitations from bringing any action in state court for the wrongful death of Tamara Greene. This preclusion is not circumvented by MCL §600.5855 (Fraudulent concealment of claim or identity of person liable) because concealment of the identity of parties liable, or concealment of the parties, has been held not to constitute concealment of the cause of action, and not to be available to avoid the running of the statute of limitations.

f) Michigan does not have a tolling provision, either common law or statutory, that will operate to save Plaintiffs' wrongful death action if the identity of the killer is discovered beyond the three-year statute of limitations period. *Trentadue v. Buckler Lawn Sprinkler*, 479 Mich. 378, 738 N.W.2d 664 (2007).

g) Further, the act of a third person in concealing a cause of action against the Defendant does not constitute a concealment so as to prevent the running of the statute of limitations in favor of the Defendant.

h) All applicable statutes of limitations have expired, barring Plaintiffs' state law claims.

i) Given the above enumerated facts of the case, there is no state court remedy available to Plaintiffs for damages.

j) The actions of Defendants resulted in the termination of Tamara Greene's murder investigation. Not only have Defendants' actions caused evidence to grow stale and cause the fading of material facts in the minds of witnesses and potential witnesses such that testimony and evidence have been irretrievably lost, but Defendants have also frightened and intimidated witnesses from coming forward, and have deterred officers from vigorously investigating Tamara Greene's murder.

80.     Defendants' actions were performed under color of state law, and violated Plaintiffs'

due process rights under the Fourteenth Amendment to the United States Constitution, as well as

their right to petition the government for a redress of grievances guaranteed under the First

Amendment to the United States Constitution.

81.     As a proximate result of Defendants' actions as described herein, Plaintiffs, or anyone

acting on Plaintiffs' behalf, have been foreclosed from filing suit in state court and seeking a

meaningful state court remedy.   It would be completely futile for the Plaintiffs to attempt to

access the state court system given (1) the missing evidence, (2) the expired statute of

limitations, (3) the prior retaliation against Bowman, Brown and Nelthrope in their investigation

of the murder and related misconduct, (4) the spoliation of evidence, (5) destroyed information,

(6) the intimidation of witnesses, (7) the intimidation of investigators, (8) the total lack of any

viable suspects, and other pre-filing abuses by Defendants.

82.     Defendants' conduct was willful and exhibited a flagrant disregard for Plaintiffs'

federally secured rights. Accordingly, the Defendants are liable to Plaintiffs under 42 U.S.C. §

1983.

83.     The Plaintiffs have suffered damages as a proximate result of the acts of Defendants,

including but not limited to compensatory and punitive damages under 42 U.S.C. § 1983.

84.     The damages set forth in this complaint, otherwise provided for in the Michigan

Wrongful Death Act, MCL § 600.2922, may only be awarded to Plaintiffs under 42 U.S.C. §

1983 as a proximate result of the acts of Defendants as described throughout this Complaint that

caused the deprivation of their federally guaranteed rights.

## COUNT II- CONSPIRACY TO VIOLATE PLAINTIFFS' CONSTITUTIONALLY GURANTEED RIGHT OF ACCESS TO COURTS

85.     Plaintiffs repeat, reallege and incorporate by reference the allegations in paragraphs 1 through 84 above with the same force and effect as if herein set forth.

86.     Defendants Police Chief Ella Bully-Cummings, Deputy Police Chief Cara Best, Asst. Deputy Police Chief Harold Cureton, Commander Craig Schwartz, Mayor Kwame Kilpatrick, Defendant Christine Beatty, and JOHN DOE POLICE OFFICERS entered into an agreement with malicious intention to deprive the Plaintiffs of their constitutional due process right of access to the Courts, as evidenced, without limitation by the following:

a)     Defendant Mayor Kilpatrick, Defendant Beatty and other City officials fired former Deputy Chief Gary Brown from his position as head of the Professional Accountability Bureau based on his investigation of the Manoogian Mansion party and the alleged crimes that were rumored to have occurred there;

b)     Former Police Chief Oliver, together with Defendant Harold Cureton instructed Commander Parshall and Inspector Dolunt to stop investigating Defendant Kilpatrick;

c)     Defendants Beatty and Kilpatrick, in coordination with others directed the release of the confidential May 6th Memo to the media to frighten and intimidate Nelthrope; Defendant Kilpatrick furthered this objective by publicly calling Nelthrope a liar;

d)     Lt. Al Bowman attended a meeting with Police Chief Ella Bully-Cummings, Assistant Chief of Police Harold Cureton, Commander Craig Schwartz, and Lt. Billy Jackson, where he was directed by them to cease investigating Greene's homicide and to put the Tamara Greene homicide file away; and

e)     Systematic and administration-wide retaliation against Brown, Nelthrope and Bowman by several of these Defendants for their investigation of the alleged Manoogian Mansion party, the death of Tamara Greene and other alleged misconduct by members of Defendant Kilpatrick's security detail.

87.     Defendants' actions resulted in the termination of Tamara Greene's murder investigation. Not only have Defendants' actions caused evidence to grow stale, and caused the

fading of material facts in the minds of witnesses and potential witnesses such that testimony and evidence have been irretrievably lost, but Defendants have also frightened and intimidated witnesses from coming forward, as well as deterred homicide investigators from vigorously investigating Tamara Greene's murder.

88. Defendants' conduct as described herein coupled with the retaliatory actions taken against Bowman, Brown and Nelthrope was part of an on-going conspiracy to obstruct justice by covering up Greene's murder in order to avoid any embarrassment to Defendant Kilpatrick and his family.

89. As a proximate result of Defendants' actions as described herein, Plaintiffs, or anyone acting on Plaintiffs' behalf, have been foreclosed from filing suit in state court and seeking a meaningful state court remedy. It would be completely futile for the Plaintiffs to attempt to access the state court system given (1) the missing evidence, (2) the expired statute of limitations, (3) the prior retaliation against Bowman, Brown and Nelthrope in their investigation of the murder and related misconduct, (4) the spoliation of evidence, (5) destroyed information, (6) the intimidation of witnesses, (7) the intimidation of investigators, (8) the total lack of any viable suspects and other pre-filing abuses by Defendants

90. The Plaintiffs have suffered damages as a result of this conspiracy.

91. That at all times relevant herein, the Defendants were state actors and their conduct was subject to and governed by 42 U.S.C. §§1983, 1985 and 1988.

WHEREFORE, Plaintiffs respectfully requests this Honorable Court to enter a Judgment in their favor and against Defendants, jointly and severally, for the violation of their civil rights for all actual, general, special and compensatory damages in the amount of Fifty Million ($50,000,000.00) Dollars, and punitive damages in the amount of One Hundred Million

($100,000,000.00) Dollars, in addition to costs, interest and attorney fees, and such other relief as this Court deems Plaintiffs to be entitled.

Dated: September 5, 2008     Respectfully Submitted,


       /s/ Norman Yatooma_____
       **Norman Yatooma & Associates, P.C.**
       By: Norman A. Yatooma (P54746)
       By: Robert S. Zawideh (P43787)
       Attorneys for Plaintiffs
       219 Elm Street
       Birmingham, Michigan 48009
       (248) 642-3600


## DEMAND FOR JURY TRIAL

Plaintiffs, by and through their counsel of record, hereby demand a trial by jury.


Dated: September 5, 2008     Respectfully Submitted,


       /s/ Norman Yatooma_____
       **Norman Yatooma & Associates, P.C.**
       By: Norman A. Yatooma (P54746)
       By: Robert S. Zawideh (P43787)
       Attorneys for Plaintiffs
       219 Elm Street
       Birmingham, Michigan 48009
       (248) 642-3600

NORMAN YATOOMA & ASSOCIATES, P.C.

I hereby certify that on September 5, 2008 I electronically filed the PLAINTIFF'S THIRD AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system on the following:

PLUNKETT COONEY
By: Kenneth L. Lewis (P26071)
By: Said A. Taleb (P66030)
By: Randal M. Brown (P70031)
Attorneys for Defendant Ella Bully-Cummings
535 Griswold, Suite 2400
Detroit, MI 48226
(313) 983-4790

WILLIAMS, WILLIAMS, RATTNER & PLUNKETT
By: Thomas G. Plunkett (P18957)
By: David E. Plunkett (P66696)
Attorneys for Bell Industries, Inc., d/b/a SkyTel
380 N. Old Woodward Avenue, Suite 300
Birmingham, Michigan 48009
(248) 642-0333

HONIGMAN MILLER SCHWARTZ & COHN
By: Herschel P. Fink (P13427)
Attorney for Intervenor Detroit Free Press
660 Woodward Avenue, Suite 2290
Detroit, Michigan 48226-3583
(313) 465-7000

MOSS & COLELLA PC
By: David Moss (P36757)
By: Vince Colella (P49747)
Co-Counsel for Plaintiffs Ashly Jackson and India Bond Only
29100 Northwestern Hwy., Suite 310
Southfield, Michigan 48034
(248) 945-0100

JAMES C. THOMAS, P.C.
By: James C. Thomas (P23801)
Attorney for Defendant Kilpatrick
535 Griswold Street, Suite 2632
Detroit, Michigan 48226
(313) 963-2420

CITY OF DETROIT LAW DEPARTMENT
By: John A. Schapka (P36731)
Attorney for Defendants City of Detroit, Craig Schwartz, Cara Best and Harold Cureton
660 Woodward Ave, Suite 1650
Detroit, Michigan 48226
(313) 237-3018

CITY OF DETROIT LAW DEPARTMENT
By: Krystal A. Crittendon (P49981)
Attorney for Defendants City of Detroit, Craig Schwartz, Cara Best and Harold Cureton
660 Woodward Ave, Suite 1650
Detroit, Michigan 48226
(313) 237-3062

MORGANROTH & MORGANROTH, PLLC
By: Mayer Morganroth (P17966)
By: Jeffrey B. Morganroth (P41670)
Attorneys for Defendant Christine Beatty
3000 Town Center, Suite 1500
Southfield, Michigan 48075
(248) 355-3084

September 5, 2008

/s/ Norman A. Yatooma

**Norman Yatooma & Associates, P.C.**
By: Norman A. Yatooma (P54746)
By: Robert S. Zawideh (43787)
Attorneys for Plaintiff
219 Elm Street
Birmingham, Michigan 48009
(248) 642-3600
nya@normanyatooma.com