**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ERNEST FLAGG, as Next Friend
of JONATHAN BOND; TARIS JACKSON,
as Next Friend of ASHLY JACKSON; and
BRIAN GREENE, as Next Friend of
INDIA BOND,

        Case No. 05-74253
        Hon. Gerald E. Rosen

        Plaintiffs,

v.

CITY OF DETROIT, *et al.,*

        Defendants.

_____/

**OPINION AND ORDER**
**REGARDING MOTION TO UNSEAL RECORD**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ May 26, 2010 _____

PRESENT:  Honorable Gerald E. Rosen
          Chief Judge, United States District Court

## I.  INTRODUCTION

In this case, the Plaintiff children of the late Tamara Greene — through their next

friends, Ernest Flagg, Taris Jackson, and Brian Greene — allege that the Defendant City

of Detroit, a number of former high-ranking City of Detroit officials, and certain current

and former Detroit police officials violated their federal constitutional right of access to

the courts by deliberately delaying and obstructing the investigation into the April 30,

2003 murder of Ms. Greene. During the course of a contentious discovery period —
which remains ongoing and is set to conclude at the end of July — the parties have filed a
number of motions and other materials under seal, and the Court has issued five orders
under seal. Nearly all of these sealed filings occurred between mid-December of 2009
and early April of 2010, as the parties entered a particularly intensive phase of discovery
and began to depose a number of non-parties.

In a letter to the Court dated March 23, 2010, counsel for the Detroit Free Press
has expressed concern that this case "is being litigated almost entirely in secret in
contravention of Constitutional requirements." (Free Press's 3/23/2010 Motion at 1.) As
noted in this letter — and as evidenced by the newspaper articles and other media reports
that invariably follow virtually every development or docket entry in this litigation — this
case involves matters of "genuine public interest" and a number of "high profile public
officials," (*id.* at 2), some of whom are parties but some of whom are not. In light of this
public interest, the Free Press seeks greater access to the record in this case through the
unsealing of all materials on the court docket and the lifting of what it characterizes as an
"undocumented gag order," arguing that the record in its present state violates an asserted
"common law right of access to judicial proceedings and records" and a First Amendment
"right of access to judicial documents." (*Id.* at 3, 5.)

At a hearing held on March 23, 2010 and in a subsequent April 2, 2010 order, the
Court directed that the Free Press's March 23 letter be placed on the docket and treated as

a motion.[1]  In addition, the parties were invited to file briefs setting forth their positions

on the Free Press's request to unseal all of the sealed materials on the docket, and the Free

Press filed an April 21, 2010 reply brief in further support of its request.  Finally, the

Court and counsel, for both the parties and for all interested local media outlets, addressed

this matter at length at a May 12, 2010 hearing.

As the Court stated at the May 12 hearing, this case has posed a number of

challenges, and the Court has expended considerable time and effort in managing the

discovery phase of this litigation.  Nonetheless, the procedural rules and legal principles

that govern the parties and the Court during this discovery period are precisely the same

as those that apply in every other case on this Court's civil docket.  Under Federal Rule of

Civil Procedure 26(b)(1), civil litigants are afforded broad pretrial discovery, *see Lewis v.*

*ACB Business Services, Inc.,* 135 F.3d 389, 402 (6th Cir. 1998), which often results in

"extensive intrusion into the affairs of both litigants and third parties," *Seattle Times Co.*

*v. Rhinehart,* 467 U.S. 20, 30, 104 S. Ct. 2199, 2206 (1984) (footnote omitted).  Because

of the potentially intrusive nature of discovery, "it is necessary for the trial court to have

the authority to issue protective orders conferred by Rule 26(c)," in order to regulate the

use and disclosure of information that "if publicly released could be damaging to

---

[1]Since this letter motion was docketed, the Detroit News, WXYZ-TV, and WDIV-TV
have sent letters to the Court expressing the support and concurrence of these media outlets
in the position advanced by the Free Press, and these letters also have been placed on the docket.
In addition, the Free Press's most recent submission has been joined by WJBK-TV.  For
convenience, however, the Court refers solely to the "Free Press" throughout the balance of this
opinion, as a shorthand reference to all of the media outlets that have joined in the Free Press's
position.

reputation and privacy." *Seattle Times,* 467 U.S. at 34-35, 104 S. Ct. at 2208-09.

The Supreme Court's reading of Rule 26 in the *Seattle Times* decision precisely fits the circumstances of this case. On the one hand, this Court has repeatedly emphasized, on the public record, its intent to permit Plaintiffs to pursue as broad a discovery effort as authorized under the Federal Rules of Civil Procedure and the rules of evidence, so that a complete record may be developed for future motion practice and, if necessary, for trial. Under the particular circumstances presented here, this complete course of discovery not only allows Plaintiffs to prosecute their case, but also advances a vital public interest, by shedding light on the actions of public officials who face serious allegations of obstruction of justice. On the other hand — and, again, as the Court has repeatedly explained on the public record — the Court has insisted that the parties conduct their discovery efforts in a manner that does not interfere with the ongoing investigation into the murder of Tamara Greene, and that does not unduly invade the privacy interests of individuals who are not parties, and who, in some cases, are neither public officials nor have anything beyond the slightest (if any) connection to the issues in this case. Throughout the ongoing discovery period in this case, the Court has attempted to navigate a course between these competing concerns, and has endeavored to explain, in as public a fashion as practicable, the decisions it has made and the reasons for these decisions.

As the Court observed at the May 12 hearing, and as set forth in greater detail below, the Free Press's arguments in support of its motion to unseal the record pay

insufficient heed to these basic rules and principles that govern the discovery phase of civil litigation and the concerns that animate this law.  In its characterization of the record in this case, the Free Press overstates the nature and extent of the sealed filings on the docket, while understating the justifications provided by the Court for keeping certain materials under seal.  In its characterization of the law, the Free Press largely misstates the standards that govern public access to discovery materials.  As the Supreme Court has expressly recognized — in a decision which notably is not cited in the Free Press's submissions, nor in Plaintiffs' brief in support of the Free Press's position — "restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information." *Seattle Times,* 467 U.S. at 33, 104 S. Ct. at 2208.  The Court's decisions to maintain certain materials under seal during the ongoing discovery phase of this litigation must be considered against this legal backdrop.

The Court is well aware of, and deeply respects, the vital role served by the media in reporting on the activities and exposing the wrongdoing of public officials.  The Court further acknowledges and commends the work done by the Free Press and other local media outlets to expose public corruption and wrongdoing in the City of Detroit.  In that same vein, the allegations of this case, if ultimately supported by admissible evidence and proven to the satisfaction of a jury, paint a truly troubling picture of deliberate malfeasance by high-ranking Detroit politicians and law enforcement officials.  The Court has not the slightest interest in inhibiting the public disclosure of any such evidence that might be turned up in discovery, protecting the reputations of government officials for

5

actions taken in their public roles, or interfering with the media's efforts to shed further light on the activities of these and other public officials.

Rather, the Court's interests are more immediate and limited to the four corners of the case before it. Quite simply, this litigation is still in its discovery phase, and the matters that the parties are exploring in discovery implicate both an ongoing murder investigation and sensitive privacy interests of non-parties who, when the dust settles at the end of the discovery period, may well prove to have no connection whatsoever to the claims, allegations, and defenses raised in this case. When these facts and circumstances are viewed in light of the applicable legal standards, the Court is confident that it has appropriately found "good cause," Fed. R. Civ. P. 26(c)(1), for the protective measures it has employed during the discovery process. Whether such measures will still be necessary at the conclusion of this process remains to be seen, and will be revisited by the Court and the parties under a more complete record as this case moves toward dispositive motion practice and trial.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Protective Measures Relating to the Tamara Greene Homicide File and the Ongoing Murder Investigation

As noted at the outset, Plaintiffs' claims in this case rest upon allegations that Defendants deliberately delayed and obstructed the police investigation into the April 30, 2003 murder of Tamara Greene. Accordingly, it has long been evident to the Court and the parties alike that Plaintiffs' discovery efforts would entail an inquiry into the Tamara

Greene homicide investigation, as well as the production of the Detroit Police Department ("DPD") file for this investigation. (*See, e.g.,* 3/20/2008 Op. at 17 (noting Plaintiffs' request for production of this file, and directing the Defendant City to produce it).)[2] Yet, the Court also has been continually advised, both in the early stages of the discovery period and repeatedly thereafter, that the Tamara Greene murder investigation remains active and ongoing. (*See, e.g.,* Plaintiffs' 3/7/2008 Response to Motion to Quash, Ex. 4, 2/21/2008 Letter from Wayne County Prosecutor Kym Worthy to Plaintiffs' Counsel (referencing an "ongoing criminal investigation"); Defendant City of Detroit's 4/7/2008 Motion for Stay at ¶ 14 (citing the DPD's "active" homicide investigation as one of the grounds for seeking a stay of this litigation); 4/29/2010 Letter from Wayne County Prosecutor Worthy to Court (describing the activities being pursued in the "ongoing investigation into the murder of Tamara Greene").)[3]

---

[2]The Court notes that although this suit was filed back in 2005, the parties did not commence their discovery efforts until early 2008. In the earlier stages of the case, the Court granted in part and denied in part a motion to dismiss the initial complaint, leading to the dismissal of some parties (including Michigan Attorney General Mike Cox) who were named as defendants in this initial pleading. Following this ruling, an amended complaint was filed, but this pleading was not served on several of the Defendants, leading the Court to issue an April 26, 2007 order to show cause why the claims against these unserved Defendants should not be dismissed. The suit then continued to languish for several more months, and the claims against several of the remaining Defendants were on the verge of dismissal, until Plaintiffs' initial counsel withdrew from the case and Plaintiffs' present counsel entered an appearance in late November of 2007. Soon thereafter, Plaintiffs filed a second amended complaint, the Court convened a scheduling conference, and the parties began to engage in discovery.

[3]Against this backdrop, the Court is at a loss as to how the Free Press can characterize the Tamara Greene murder investigation as "dormant." (*See* Free Press's 4/21/2010 Reply Br. at 5.) The Wayne County Prosecutor's recent letter to the Court flatly and explicitly refutes this assertion, stating that "[i]n spite of suggestions to the contrary, this investigation is not dormant." (*See* 4/29/2010 Letter at 1.) The Prosecutor evidently felt so strongly about this point, and about

Thus, from the very beginning of the discovery process, the Court has been acutely aware that protective measures would be necessary to achieve the proper balance called for under the discovery-related provisions of the Federal Rules of Civil Procedure. First, Rule 26(b)(1) guarantees Plaintiffs an opportunity to pursue full discovery of all matters relevant to the Tamara Greene murder investigation, as well as other matters implicated by Plaintiffs' claims and allegations. At the same time, the Court has an obligation under Rule 26(c)(1) to ensure that this discovery process does not interfere with the ongoing investigative efforts of third-party law enforcement agencies that have little or nothing to do with the backward-looking, historically-based claims and allegations in this case. Moreover, this typical balancing of competing interests, which occurs to some extent in every case, has played out in this case against an atypical backdrop of intense public and media interest. As discussed in detail below, this has complicated the Court's management of the discovery process. On the one hand, and as the Free Press observes, this genuine public interest fuels a greater (and wholly legitimate) demand for public and media access to court records and proceedings. On the other hand, and as confirmed by developments in this very case, the heightened public and media interest produces a greater potential for mischief, misuse of information learned in discovery, and interference with or harm to the interests of non-parties.

---

her concern that the discovery efforts in this case might negatively impact this investigation, that she asked an assistant prosecutor from her office, Robert Moran, to attend the May 12 hearing and emphasize these points on the record. As will be seen, the Free Press's reference to this investigation as "dormant" is only one of several examples of mischaracterizations of the record or unnecessary hyperbole in the newspaper's submissions to the Court.

Given the Court's awareness of these various considerations from the early stages of this case, it should come as no surprise that the record is replete with evidence of the Court's efforts to strike an appropriate balance between the full discovery contemplated by Rule 26(b)(1) and the imperative that this discovery process should not unduly interfere with the ongoing Tamara Greene homicide investigation. In a March 20, 2008 opinion, for example, the Court quashed subpoenas issued by Plaintiffs to Wayne County Prosecutor Kym Worthy and an assistant Wayne County prosecutor, citing a letter from Prosecutor Worthy objecting that the materials sought would implicate an ongoing criminal investigation, and noting that "[t]he federal courts have recognized a qualified law enforcement privilege that protects against the disclosure of investigative files in an ongoing criminal investigation." (3/20/2008 Op. at 15.) Although the Court did not foreclose the possibility that Plaintiffs might eventually be permitted to seek discovery from the Prosecutor's Office, it found that the subpoena at issue was premature, where there were "many avenues of party discovery that Plaintiff ha[d] yet to explore," and where the Wayne County Prosecutor's "investigation is not complete, but rather is at a point where compliance with the subpoenas at issue seems particularly likely to interfere with the operations and internal deliberations of the Wayne County Prosecutor's Office." (*Id.* at 16.)

In that same opinion, the Court also addressed Plaintiffs' request for production of the DPD file for the Tamara Greene murder investigation, ordering the Defendant City to produce a copy of this file to Plaintiffs "subject to a protective order being negotiated by

the parties." (*Id.* at 19.) When the City subsequently sought to delay this production on the ground that it threatened to interfere with an "active" homicide investigation "at a crucial time of the investigation," (Defendant City of Detroit's 4/7/2008 Motion for Stay at ¶ 14), the Court addressed this matter at an April 14, 2008 hearing, **with counsel for the Free Press in attendance,**[4] ordering that a copy of the DPD homicide file be produced under seal to the Court for an *in camera* review:

> THE COURT: Let me ask this . . . . Where is the homicide file?
>
> MS. CRITTENDON:[5] It's at the Detroit Police Department.
>
> THE COURT: Is it a historical file or ongoing file or both?
>
> MS. CRITTENDON: According to my information, it's an ongoing file.
>
> THE COURT: Is there historical information in it dating back to the beginning of the investigation that plaintiffs complain of?
>
> MS. CRITTENDON: Yes, there is, Your Honor.
>
> THE COURT: I want all of it produced to the Court by Friday under seal.

---

[4]One of the subjects addressed at this hearing was the Defendant City's request for a "gag" order, and the Free Press sought and was granted leave to intervene in order to state its opposition to the entry of such an order. Counsel for the Fress Press was invited to address this matter at the April 14 hearing, after which the Court denied the City's motion. The Court has since revisited the question whether to impose a "gag" order in this case, but has declined to do so, citing its unwillingness to impose the "drastic measure of a 'gag' order in a civil suit involving matters of public interest," and finding that this drastic measure could be avoided through the less-restrictive means of maintaining certain materials under seal. (*See* 11/16/2009 Order at 4-6.)

[5]Attorney Krystal Crittendon represented the City of Detroit at this hearing.

MS. CRITTENDON: When you say —

THE COURT: I don't want the original copies.

MS. CRITTENDON: You're not talking about just the historical portion, you want the entire file?

THE COURT: I want the entire file, all of it, going back to the beginning of the investigation. I want it produced under seal. And just so counsel understand how I intend to proceed here, I've done this in the past. And if I find something relevant, . . . I will notify counsel. I'll give the City an opportunity to object to those portions which I believe are within the scope of this lawsuit that the Court would consider to be producible to plaintiffs. And the City can file its objections and then plaintiff[]s will have an opportunity to respond.

If I do decide to produce any part of the files, it will be produced to plaintiff's counsel under strict regulation. They will be able to come to the Court's chambers, review the file in chambers, subject to a nondisclosure requirement, including nondisclosure to clients or to anybody else. They may use it as . . . work product to prepare their case. If they require any further use, they'll have to come to the Court first for permission. ***I do not in any way intend for this Court to interfere with any ongoing homicide investigation relating to Miss Greene's death,*** but I do intend to review the file.

It seems to me that the homicide file goes to the heart of the allegations in this case. And let's all be clear on what the allegations of this case are. The allegations in this case by the plaintiff are that the plaintiff's family has been denied access to the courts by virtue of the conduct of the homicide investigation. So the homicide file and perhaps related issues, the homicide file it seems to me, is central to the plaintiff's inquiry and to the Court's inquiry.

MS. CRITTENDON: I understand.

THE COURT: ***I think the City and the defendants here and the residents of the City are entitled to have this material produced under circumstances in which they can be assured that this information is not going to be simply leeched out in dri[b]s and drabs and become part of the public discourse, at least not until the Court is satisfied that the material***

> *in the homicide file is relevant to issues in this case.*

(4/14/2008 Hearing Tr. at 16-18 (emphasis added).)

This ruling then was set forth in writing in an April 15, 2008 order. In this order, the Court again acknowledged the City's concerns that at least portions of the homicide file were protected by a law enforcement privilege and that "disclosure of the file might impede the ongoing police investigation into Ms. Greene's death," but concluded that these concerns were "appropriately addressed through an *in camera* review of the homicide file," and "by carefully limiting Plaintiff's counsel's access to any portions of the file that are determined to be subject to production." (4/15/2008 Order at 2.)[6] To date, no party has ever moved for relief from these court-ordered restrictions upon access to the homicide file and use of information learned from that file.

Since that time, and throughout the discovery period, the Court has repeatedly and rigorously enforced this strict balance between Plaintiffs' right to explore the circumstances surrounding the DPD's investigation of Tamara Greene's murder and the compelling public and law enforcement interest in avoiding interference with an active and ongoing homicide investigation. The Court has repeatedly emphasized, for instance, that the review of the homicide file, and any use of this file's contents in discovery, could not proceed absent the entry of a suitable protective order that established appropriate

_____

[6]In subsequent orders dated February 2 and February 17, 2009, the Court advised the parties that it had completed its *in camera* review of the homicide file and determined that Plaintiffs' counsel should be given the opportunity to review the file in its entirety, albeit only under the strict conditions outlined in the April 15, 2008 order and set forth in greater detail in the February 17, 2009 order.

terms and conditions for the parties' and counsels' use and disclosure of this information

and other confidential or sensitive materials. (*See, e.g.,* 3/20/2008 Op. at 17; 4/15/2008

Order at 2 n.1, 4 n.2; 2/2/2009 Order at 2 & n.2; 2/17/2009 Order at 2-4 & n.1.)[7]

Beyond these measures directed at the DPD homicide file, the Court has made it

clear that this same balancing inquiry applied to other discovery efforts that threatened to

interfere with the ongoing murder investigation. As the Court stated at a November 10,

2009 hearing addressing the then-upcoming deposition of Michigan Attorney General

Mike Cox and other law enforcement witnesses:

> MR. MONTICELLO:[8] . . . [J]ust for the record, over the Attorney General's objections, it's my understanding that the Court is going to seal his deposition.
>
> THE COURT: Initially. I will seal his deposition initially. If either party wants the deposition unsealed or if the Attorney General wants it unsealed, I'll entertain a motion to unseal either all or part of it.
>
> MR. MONTICELLO: Very well.
>
> THE COURT: I understand why the Attorney General might wish to have the deposition unsealed, but quite honestly, those considerations are

---

[7]As reflected in this string of citations to various opinions and orders, seldom (if ever) has the Court encountered such difficulties in the negotiation and entry of a protective order in a civil suit. As discussed below, such protective orders are fairly routine in civil litigation, but the parties and their counsel repeatedly failed to reach agreement on the terms of a proposed protective order that would govern this case, despite the Court's exhortations for over a year, and despite the Court's clear statements on a number of occasions that certain materials (including the homicide file) would not be made available for review absent the entry of such an order. As a result, a stipulated protective order was not entered until June 8, 2009, on the eve of a scheduled hearing before the Magistrate Judge on Plaintiffs' motion seeking the entry of a protective order.

[8]Attorney Frank Monticello represented the Attorney General at this hearing.

not a consideration of the Court.  The consideration of the Court is whether or not there is going to be anything in the deposition that could potentially impact or chill an ongoing investigation.  That's the overriding consideration of the Court.

* * * *

Let me just say this.  As I discussed very directly in chambers with counsel, I have a concern that the ongoing investigation of the Tamara Greene homicide not be adversely impacted.  That is a major concern of the Court.

I'm trying to accomplish two overall objectives.  I'm trying to allow the plaintiffs as much discovery and latitude in discovery to discover their case and to prepare their case, while at the same time not trespassing upon the ongoing investigation such that it could unduly chill witnesses from coming forward, impact witness[es]' recollection of events, have people coming forward who may not be real witnesses, but may read things in the media that cause[] them to come forward and just want to be part of the investigation.  I have many concerns about the impact of this case on the ongoing investigation.  So I am, in all of these rulings, attempting to balance the need of the plaintiffs for information to develop their case and prepare it for further prosecution of the case, while at the same time attempting to ensure that the ongoing investigation not be adversely impacted.  If there are depositions beyond [the] depositions that we discussed that have the potential for interfering with or chilling the ongoing homicide investigation, my response is going to be the same.  It's going to be that those depositions should be sealed . . . .

So I guess I would say to counsel that [they] be guided by the guidelines that I'm setting out.  It's very difficult for me to judge whether any particular witness whose deposition is taken is going to or may have an adverse impact upon an ongoing investigation.  I would guess that [it] may even be difficult for counsel to know in advance and you should err on the side of caution.

(11/10/2009 Hearing Tr. at 22-26.)[9]  Finally, and as alluded to in the above-quoted

---

[9]At this same hearing, and in a status conference held in chambers immediately before this hearing, the Court addressed another ground advanced by counsel for the Michigan State

14

passage, counsel for the parties can readily attest that the Court has repeatedly stressed

this same concern in any number of status conferences held in chambers during the course

of the discovery period.[10]

## B.    Protective Measures Relating to the SkyTel Text Messages

Police for keeping certain deposition testimony and records under seal.  In particular, counsel cited the confidentiality conferred upon investigative subpoenas and the fruits of these subpoenas under Michigan's Investigative Subpoena Act, arguing that this state-law protection was analogous to the privilege conferred upon state and federal grand jury proceedings and materials. (*See* Michigan State Police 11/6/2009 Memorandum of Law at 4-8 (citing Mich. Comp. Laws §§ 767A.2(5), 767A.8).)  The Court, in turn, relied in part on this state-law privilege in ordering that the forthcoming depositions of two Michigan State Police troopers be conducted under seal. (*See* 11/10/2009 Hearing Tr. at 14-18, 32.)  Again, the parties and non-party deponents were reminded that they could move to unseal this deposition testimony, (*see* 11/16/2009 Order at 3 n.3), but no such motion has been brought to date.

[10]Against this backdrop of uniform, repeated, and almost entirely public expressions of the Court's concern that discovery be conducted in a way that avoids interference with the ongoing homicide investigation, the Free Press's characterization of the record in this case can only be termed misleading.  In particular, the newspaper charges that the Court has engaged in "blanket suppression without specified justification," and it claims that the "only" order on the docket that purports to impose restrictions on the use or disclosure of discovery materials is the June 8, 2009 stipulated protective order submitted by the parties.  (Free Press's 3/23/2010 Motion at 1.)  Similarly, while the Free Press seemingly concedes that restrictions upon access to and use of the DPD homicide file "presumably could be justified on recognized grounds," it denies that the Court has ever provided such justification in its rulings to date.  (*Id.* at 1-2.) These assertions reflect, at best, a studied indifference to the actual, publicly available record.

Regrettably, these inaccurate assertions are not confined to the Free Press's court filings, but also appear on its editorial pages.  In a recent editorial, the newspaper opined that this Court has been "reluctan[t] to specify what or whose interests [it] has sought to protect" in its orders requiring certain materials to be maintained and filed under seal, and it suggested that the Court could "enhance public confidence in the [judicial] process . . . by publicly explaining [its] motives" for imposing protective measures in this case.  Brian Dickerson, *Judge Rosen's Chamber of Secrets,* Detroit Free Press, March 28, 2010, at 25A.  Given the number of occasions on which the Court has thoroughly explained its concerns in open hearings and publicly available decisions, the Court is simply at a loss to understand the grounds for these contentions. Although the Free Press and other media may not be persuaded by the reasons given by the Court for its rulings during the discovery process in this case, it can hardly be said that the Court has failed to publicly explain its reasoning.

Although the protective measures imposed in this case have been motivated first and foremost by a desire to avoid interference with the ongoing Tamara Greene murder investigation, the Court also has taken steps to address other concerns and interests implicated by the parties' discovery efforts. Most notably, the Court determined that protective measures were warranted in connection with Plaintiffs' request for production of text messages that were sent or received over several time periods — which, together, spanned several years — by the named Defendants and a number of non-parties using SkyTel text messaging devices issued to them by the Defendant City. Again, the Court recognized at the initial stages of this discovery effort that Plaintiffs' request undoubtedly would sweep in countless communications that were wholly irrelevant to the claims and allegations in this case, as well as communications that could be privileged or that could infringe upon the privacy interests of both the named Defendants and non-parties. (*See* 3/20/2008 Op. at 9-10.) At the same time, the Court recognized that at least some of these communications might be discoverable. (*Id.* at 10-11.)

Consequently, as with Plaintiffs' request for production of the homicide file, the Court devised a set of procedures that were intended to ensure Plaintiffs' opportunity for discovery of the SkyTel text messages to the full extent permitted under Rule 26(b)(1), while at the same time (i) protecting against the disclosure of communications that were irrelevant, privileged, or otherwise not discoverable, and (ii) "preserv[ing] the confidentiality and limit[ing] the permissible uses of any SkyTel communications made

available to Plaintiff." (3/20/2008 Order at 6-7.)[11] As the Court explained in a subsequent ruling, this set of procedures for review and disclosure of the SkyTel text messages was adopted for the express purpose of "protecting against disclosure to Plaintiff of irrelevant, privileged, or otherwise non-discoverable materials." (8/22/2008 Op. at 13.) As to those text messages that ultimately were deemed discoverable — a set of just over 30 messages that the Magistrate Judges aptly described as "a few needles . . . found in [a] large haystack[]" consisting of over 626,000 messages, (10/19/2009 Op. at 5) — any private or confidential information contained within these messages has been protected against unwarranted public disclosure or use outside this litigation under the terms of the June 8, 2009 stipulated protective order that was entered before these communications were produced to Plaintiffs.

## C.    Protective Measures Based Upon the Privacy Interests of Non-Parties

The final category of interests that the Court has sought to safeguard through the protective measures employed to date is the privacy interests and reputations of non-parties who have been identified in the parties' discovery efforts as potentially possessing knowledge or information relevant to the claims, allegations, or defenses in this case. In light of this concern, the Court has determined that certain materials should be maintained and filed under seal during the discovery process. By necessity, the Court has been

---

[11]Again, no party to date has moved to set aside or alter the protective measures imposed on the disclosure and use of the SkyTel text messages. To the contrary, the parties adopted these measures in the June 8, 2009 stipulated protective order they submitted for entry by the Court.

unable to provide detailed public justifications for these determinations, because to do so would defeat the very purpose of the Court's rulings — namely, to protect the privacy interests and reputations of non-parties whose personal knowledge and activities have little (if any) bearing upon the claims and allegations of this case.

Nonetheless, the Court has publicly explained the need for such measures, at a March 23, 2010 hearing attended by members of the media:

> . . . [W]ith respect to the issue of sealing proceedings and sealing documents, I will say that the Court has already addressed the reasons for requiring a sealed proceeding or requiring a sealed deposition or requiring motions to be filed under seal in the past[,] which . . . is primarily animated by the ongoing homicide investigation. I have indicated on the record that because of the significant overlap between the issues raised in this case and the ongoing homicide investigation, and the sensitivity of those issues, . . . the Court has not wanted to in any way trespass upon or in any way impede the ongoing homicide investigation.

> The[re] [a]re also other issues. A number of the motions that have been filed in this case and a number of the proceeding[s,] including the depositions[,] have implicated sensitive privacy rights of people who are not parties to this case . . . . [T]hey have implicated sensitive priva[cy] rights of people who [are] not parties to this case and have raised other issues that require the court to make a determination before matters are open to the public whether the privacy rights of people not parties [to the] case . . . should be visited with the public specter of having certain things opened on a public record.

(3/23/2010 Hearing Tr. at 3-4.)[12] Then, after the Court addressed a number of discovery-related motions in a closed proceeding, the media representatives were invited back into

---

[12]No transcript of this March 23 hearing has been ordered, so the above-quoted passage has been taken from a rough draft of the transcript. In the event that a transcript is ordered and placed on the docket, the page numbers and exact language might differ from the above.

the hearing so that the Court could state its rulings on the public record. The Court

explained:

> I would only say to my friends in the media that the matters that
> were argued in connection with these motions reenforce the sensitivity
> across the board of the issues that I outlined earlier: the ongoing homicide
> investigation, people who are involved in the ongoing homicide
> investigation, private lives of people who are not connected to either the
> investigation or to the issues raised in this case [—] at least at this point[,]
> there's been no showing of a nexus between those people and the issues
> raised in this case [—] and the very real concern that the Court has of this
> case spiraling out of control to adversely impact the ongoing homicide
> investigation.

(*Id.* at 92-93.)

**D.     The Overall State of the Docket**

Finally, before turning to the specific issues raised in the Free Press's motion, a

brief survey of the overall docket is in order. Out of the over 370 entries on the docket to

date, approximately 60 entries (or about 16 percent) are under seal. Five of the sealed

entries are court orders:

> (i) an October 14, 2008 opinion by the Magistrate Judges summarizing
> their findings as to the discoverability of the first set of SkyTel text
> messages that had been submitted for their review, (*see* docket #158);[13]
>
> (ii) a December 22, 2009 order addressing requests for copies of the
> transcript of a December 11, 2009 conference in chambers regarding issues
> that arose during the first day of the deposition of Michigan Attorney

---

[13]The matters addressed in this opinion ultimately were resolved through the Court's
entry of a February 13, 2009 order, in which it held that none of these text messages met the
standards for discoverability under Rule 26(b)(1).

General Mike Cox, (*see* docket #265);[14]

(iii) a February 2, 2010 stipulated protective order setting forth the terms under which certain materials sought by Plaintiffs from the Michigan Department of Attorney General would be provided or otherwise made available for review, (*see* docket #304);

(iv) a March 23, 2010 order addressing motions brought by the Attorney General regarding a March 8, 2010 hearing before the Magistrate Judge, and also denying as moot Plaintiffs' motion to continue the Attorney General's deposition for a third day, (*see* docket #345); and

(v) an April 9, 2010 order issued by the Magistrate Judge regarding Plaintiffs' motion to compel the Attorney General to produce certain records, (*see* docket #357).

All of the Court's other (and numerous) rulings in this case have been entered on the public docket, and most of the proceedings in this case have likewise been open to the public, with the exception of a few *in camera* conferences and closed hearings at which the Court and counsel addressed matters arising during the discovery process. Even in these latter instances, the Court generally has reiterated its rulings at public hearings following these proceedings, or in written orders entered on the public docket.

Of the approximately 55 sealed entries attributable to the submissions of the parties (or interested non-parties), roughly half concern the now-completed deposition of Michigan Attorney General Mike Cox or Plaintiffs' other discovery efforts directed at the Attorney General, and these were sealed for the reasons identified above and stated on the

---

[14]In its motion, the Free Press erroneously characterizes this as an "order[] requiring sealing" that itself is sealed. (Free Press's 3/23/2010 Motion at 2.) In fact, this order specified the terms under which counsel would be given access to the transcript of the December 11 conference, and gave reasons for restricting this access.

public record.  Along the same lines, over 45 of these 55 submissions were made between

December 11, 2009 (the first day of the Attorney General's deposition) and April 7, 2010

(the last date of a sealed submission involving the Attorney General's deposition or a

related discovery effort).  Even during this peak period for sealed filings, however, these

45 sealed submissions accounted for less than half of the 100 docket entries during this

four-month period.  Thus, it is simply not true, as the Free Press contends, that "virtually

every court filing has been sealed" since November 10, 2009.  (Free Press's 3/23/2010

Motion at 1.)[15]  In any event, now that the Attorney General is no longer a subject of the

---

[15]At the May 12 hearing on the Free Press's motion, counsel for the Free Press posited that there was a causal connection between a November 8, 2009 article in the Free Press concerning the deposition of Michigan State Police detective Mark Krebs and the increased number of sealed filings since this article was published.  Counsel's theory, however, suffers from a number of flaws.  First and foremost, it overlooks the fact that Sergeant Krebs was one of the first (if not the first) witnesses to be deposed in this case.  Before the parties actually began to conduct depositions, the Court plainly had no occasion to decide whether any such depositions should be conducted under seal.  Likewise, it is hardly surprising that the bulk of the Court's decisions to maintain discovery materials under seal occurred *after* the parties began their discovery efforts in earnest in the fall of 2009.

Moreover, before the Free Press published its November 8, 2009 article about Sergeant Krebs's deposition, counsel for the Michigan State Police had already claimed a state-law investigative privilege as to this and other discovery sought by Plaintiffs from the Michigan State Police and its officers, and had requested that the Court impose protective measures in the event that these discovery efforts were permitted to go forward.  (*See* Michigan State Police 10/15/2009 Motion to Quash; Michigan State Police 11/6/2009 Memorandum of Law.)  Indeed, at Krebs's deposition itself, counsel invoked this privilege in instructing the witness not to answer a number of questions.  The Court then set this matter for hearing, in an order issued prior to the Free Press's article.  (*See* 10/22/2009 Order.)  And, of course, before Sergeant Krebs was deposed or the Free Press published its article, the Court had already ordered that some discovery materials — namely, the DPD homicide file and the SkyTel text messages — be maintained under seal.  Finally, simple inspection of the docket reveals that the next 17 entries after the Free Press published its article were *not under seal,* and that the next sealed submission was made over a month later, on December 10, 2009.  In light of all this, the Free Press and its counsel may rest assured that the Court's awareness of the need for protective measures during

parties' discovery efforts, it is reasonable to expect that the sealed filings in this case will diminish — and, in fact, no sealed submissions have been permitted since April 7, 2010, when briefing was completed on the last of the motions relating to the Attorney General.

To be sure, not all of the parties' sealed submissions have warranted this treatment. (*See, e.g.,* Docket Nos. 209, 210 (agreements to be bound by protective order, which need not have been filed on the docket); Docket Nos. 321, 324, 325, 326 (simple statements of concurrence in another party's motion); Docket Nos. 286, 291, 316, 323, 341 (motions for immediate consideration of accompanying motions).) In addition, the Free Press has identified instances in which clearly public documents, such as news stories or this Court's orders, have been attached as sealed exhibits to sealed motions or briefs. (*See, e.g.,* Docket Nos. 254, 255, 338.) In recognition of this growing tendency to submit materials under seal without sufficient justification, the Court has advised the parties that, going forward, it will strictly enforce the local rules of this District that set forth the procedures for filing materials under seal and the showing that must be made to do so. (*See* 4/2/2010 Order at 2-3.) This has led to sharply decreased sealed filings — only three such filings have been permitted since the Court issued this instruction at a March 23, 2010 hearing — and the Free Press and its counsel have served a salutary purpose in identifying this concern and urging the Court to take action.

### III.  ANALYSIS

---

discovery in this case did not originate with any newspaper article or media report.

**A.    A Showing of "Good Cause" Under Fed. R. Civ. P. 26(c)(1) Is Sufficient to Warrant the Protective Measures Employed by the Court in the Discovery Phase of This Case.**

Having surveyed at length the Court's rulings during the discovery process and the present state of the record, the Court now turns to the specific challenges advanced in the Free Press's motion.  In this motion, the Free Press argues that the protective measures imposed by the Court during the discovery phase of this case cannot be justified under what the newspaper views as the governing legal standards.  In particular, the Free Press maintains that a "stringent test" governs this Court's consideration whether to authorize sealed filings and employ other protective measures in this litigation, and it contends that this standard is met "[o]nly in the most extraordinary circumstances."  (Free Press's 3/23/2010 Motion at 4.)  Absent "a substantial probability [of] irreparable damage to a compelling interest," among other claimed prerequisites it has identified in the case law, the Free Press asserts that the Court and the parties cannot overcome the "strong presumption against barring the press and public from judicial proceedings and records." (*Id.* (internal quotation marks and citations omitted).)  In the newspaper's view, the present record fails to establish any of these posited "constitutional requirements" for maintaining any portion of the pretrial record under seal.  (*Id.*)

What has been entirely overlooked in the Free Press's submission, however, is that this case is still in its ***discovery phase.***  Several of the Federal Rules of Civil Procedure are devoted to this specific aspect of civil litigation, and one such Rule states that a federal district court is authorized, "for good cause, [to] issue an order to protect a party

or person from annoyance, embarrassment, oppression, or undue burden or expense"
arising from a discovery request. Fed. R. Civ. P. 26(c)(1). Rule 26(c)(1) further provides
that such an order may "forbid[] the [requested] disclosure or discovery," "specify[] terms
. . . for the disclosure or discovery," "forbid[] inquiry into certain matters," or "requir[e]
that a deposition be sealed and opened only on court order." Fed. R. Civ. P. 26(c)(1)(A)-
(F). "[P]rotective orders issued under Rule 26(c) serve the vital function of securing the
just, speedy, and inexpensive determination of civil disputes by encouraging full
disclosure of all evidence that might conceivably be relevant," an objective which
"represents the cornerstone of our administration of civil justice." *S.E.C. v.*
*TheStreet.Com,* 273 F.3d 222, 229 (2d Cir. 2001) (internal quotation marks, alterations,
and citations omitted); *see also In re Zyprexa Injunction,* 474 F. Supp.2d 385, 413
(E.D.N.Y. 2007) ("As civil discovery rules became more expansive over the course of the
last century, the role of the courts in protecting producing parties from undue invasions of
privacy has correspondingly increased.").[16]

---

[16]In a May 2, 2010 editorial that generously offers advice to this Court as to how to
manage this litigation, the Free Press makes the sweeping assertion that "the sealing of records in
a civil case is nearly unprecedented in federal court." *When Litigation Becomes Theater,* Detroit
Free Press, May 2, 2010, at 24A. This statement reflects a startling lack of familiarity with civil
litigation and the Federal Rules that govern civil suits. As noted, Rule 26(c)(1) expressly
authorizes federal courts to order that discovery materials be maintained by the parties under
strict confidentiality and filed only under seal. In addition, this District's enactment of local
rules regulating the filing of materials under seal in civil suits would seem to indicate that this
practice is not "unprecedented," but rather quite common. In fact, parties to civil litigation —
including, of course, the parties to this very case, (*see* 6/8/2009 Stipulated Protective Order) —
routinely submit proposed stipulated protective orders in which they invite the court to impose
protective measures (including requirements for sealed filing) upon materials that they have
designated as confidential. The Free Press need only have asked its own counsel, an experienced

24

As the Supreme Court has expressly recognized, in a decision that is directly on point and controlling here, "[b]ecause of the liberality of pretrial discovery permitted by Rule 26(b)(1), it is necessary for the trial court to have the authority to issue protective orders conferred by Rule 26(c)," in order to mitigate the "significant potential for abuse" posed by the discovery process.  *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 34, 104 S. Ct. 2199, 2208 (1984) (footnote omitted).  The Court further explained:

> This abuse is not limited to matters of delay and expense; discovery also may seriously implicate privacy interests of litigants and third parties.  The Rules do not distinguish between public and private information.  Nor do they apply only to parties to the litigation, as relevant information in the hands of third parties may be subject to discovery.
>
> There is an opportunity, therefore, for litigants to obtain — incidentally or purposefully — information that not only is irrelevant but if publicly released could be damaging to reputation and privacy.  The government clearly has a substantial interest in preventing this sort of abuse of its processes . . . .  The prevention of the abuse that can attend the

civil litigator, to confirm that such stipulated protective orders are a fairly common feature of civil litigation, particularly in cases involving corporate parties, and that such orders often lead to a plethora of sealed filings.

While such protective orders can be abused, *see Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.,* 93 F. Supp.2d 808, 810 n.1 (E.D. Mich. 2000), the absence of such measures would leave litigants and innocent third parties alike without recourse from the burdens, infringements upon privacy and confidentiality, and outright abuses that can accompany wide-ranging discovery.  Thus, protective orders and sealed filings are wholly legitimate measures that civil litigants may seek and a court may properly impose under the appropriate circumstances.  Indeed, the Free Press itself, as a party represented by its present counsel, has justifiably invoked Rule 26(c)(1) in seeking to protect the interests of the newspaper and its reporters against civil discovery efforts that it viewed as improperly motivated or infringing upon privileged newsgathering activities.  The Court declines to identify such cases by name, out of respect for the parties and the court orders entered in those cases.  It is enough to say that the Free Press and its counsel are well aware of the frequent use of Rule 26(c)(1) in the discovery phase of civil litigation, where confidential or sensitive information about parties, non-parties, businesses, or a government's deliberative or law enforcement activities may be implicated.

coerced production of information under a State's discovery rule is
sufficient justification for the authorization of protective orders.

*Seattle Times,* 467 U.S. at 34-36, 104 S. Ct. at 2208-09 (footnotes and citations omitted).

Thus, while the Court recognized that protective orders implicate the First

Amendment rights of litigants, as well as the "public interest in knowing more" about the

parties and their claims in a given case, it nonetheless rejected the need for "heightened

First Amendment scrutiny" of protective orders issued under Rule 26(c)(1) or its state-law

counterparts, reasoning that such an inquiry — akin to what the Free Press advocates here

— "would impose an unwarranted restriction on the duty and discretion of a trial court to

oversee the discovery process."  *Seattle Times,* 467 U.S. at 31-32, 36, 104 U.S. at 2206-

07, 2209.  In so ruling, the Court found it "important to recognize the extent of the

impairment of First Amendment rights that a protective order . . . may cause":

> As in all civil litigation, petitioners gained the information they wish to
> disseminate only by virtue of the trial court's discovery processes.  As the
> Rules authorizing discovery were adopted by the state legislature, the
> processes thereunder are a matter of legislative grace.  A litigant has no
> First Amendment right of access to information made available only for
> purposes of trying his suit.  Thus, continued court control over the
> discovered information does not raise the same specter of government
> censorship that such control might suggest in other situations.
>
> **Moreover, pretrial depositions and interrogatories are not public
> components of a civil trial.**  Such proceedings were not open to the public
> at common law, and, in general, they are conducted in private as a matter of
> modern practice.  Much of the information that surfaces during pretrial
> discovery may be unrelated, or only tangentially related, to the underlying
> cause of action. ***Therefore, restraints placed on discovered, but not yet
> admitted, information are not a restriction on a traditionally public source
> of information.***

Finally, it is significant to note that an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny. As in this case, such a protective order prevents a party from disseminating only that information obtained through use of the discovery process. Thus, the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes. In sum, judicial limitations on a party's ability to disseminate information discovered in advance of trial implicate[] the First Amendment rights of the restricted party to a far lesser extent than would restraints on dissemination of information in a different context.

467 U.S. at 32-34, 104 S. Ct. at 2207-08 (emphasis added) (footnotes and citations omitted).[17]

In the wake of this Supreme Court decision, the Courts of Appeals have uniformly recognized the distinct and more lenient standards that govern restrictions upon discovery materials, as opposed to materials submitted to and relied upon by the courts in making substantive rulings. In *Marshall v. Bramer,* 828 F.2d 355, 360 (6th Cir. 1987), for instance, the Sixth Circuit emphasized that "[t]he discovery process is generally private; monitored at the request of the parties by district courts, who have substantial latitude in

---

[17]This Supreme Court decision alone defeats the view of the law advanced in the Free Press's motion, with its various references to (i) a purported need for "particularized findings of extraordinary need and narrowly drawn restrictions" in order to sustain a protective order, (Free Press's 3/23/2010 Motion at 1), (ii) Supreme Court precedent that purportedly recognizes that only "truly exceptional circumstances . . . may permit very narrowly tailored exceptions to the rule of unrestricted access to court proceedings and records," (*id.* at 3), and (iii) a "prior restraint upon First Amendment freedoms" that the Court has either allowed or perpetrated in this case, (*id.* at 5). Such hyperbole and overheated rhetoric are unworthy of the Free Press or its accomplished and knowledgeable counsel. To be sure, Plaintiffs' submission in support of the Free Press's motion repeats nearly all of these same assertions, but this sort of unhelpful rhetoric is, unfortunately, all too common from Plaintiffs' counsel.

the exercise of their oversight." Similarly, the Eleventh Circuit has stated that "there is no common-law right of access" to discovery materials, and that "[m]aterials merely gathered as a result of the civil discovery process . . . do not fall within the scope of the constitutional right of access's compelling interest standard." *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.,* 263 F.3d 1304, 1310-11 (11th Cir. 2001). The Seventh Circuit recognized in one case that "pretrial discovery, unlike the trial itself, is usually conducted in private," *Citizens First National Bank v. Cincinnati Insurance Co.,* 178 F.3d 943, 944 (7th Cir. 1999), while stating more succinctly in another decision that "[s]ecrecy is fine at the discovery stage, before the material enters the judicial record," *Baxter International, Inc. v. Abbott Laboratories,* 297 F.3d 544, 545 (7th Cir. 2002).

To be sure, the courts have recognized, consistent with the *Seattle Times* decision and its discussion of First Amendment principles, that "[t]he rights of the public kick in when material produced during discovery is filed with the court." *Bond v. Utreras,* 585 F.3d 1061, 1075 (7th Cir. 2009). Even then, however, the extent of these rights depends upon the purpose for which the materials are filed and the use made of these materials by the court. For example, "the public does not acquire a right to access discovery material just because a judge might review it in camera in the course of discovery proceedings." *Bond,* 585 F.3d at 1075 n.8; *see also TheStreet.Com, supra,* 273 F.3d at 233. Similarly, some cases hold that "material filed with discovery motions is not subject to the common-law right of access." *Chicago Tribune,* 263 F.3d at 1312; *see also Phillips v. General Motors Corp.,* 307 F.3d 1206, 1213 (9th Cir. 2002) ("[W]hen a party attaches a sealed

discovery document to a nondispositive motion, the usual presumption of the public's right of access is rebutted, so that the party seeking disclosure must present sufficiently compelling reasons why the sealed discovery document should be released."). The public's right of access gains strength, in contrast, when materials are "filed in connection with pretrial motions that require judicial resolution of the merits," *Chicago Tribune,* 263 F.3d at 1312; *see also Foltz v. State Farm Mutual Automobile Insurance Co.,* 331 F.3d 1122, 1135-36 (9th Cir. 2003); *TheStreet.Com,* 273 F.3d at 232-33; *United States v. El-Sayegh,* 131 F.3d 158, 161-63 (D.C. Cir. 1997), or when they are introduced at trial, *see Citizens First National Bank,* 178 F.3d at 945.[18] Here, of course, the parties are still engaged in discovery, and no sealed materials have been filed for the purpose of securing this Court's ruling on the merits of any substantive issue, claim, or defense.

---

[18]One of the cases upon which the Free Press principally relies, *Detroit Free Press v. Ashcroft,* 303 F.3d 681, 696 (6th Cir. 2002), lies still farther along this spectrum, as it addressed the right of public access to deportation proceedings that the court deemed to be "quasi-judicial" in nature. Because these proceedings bore "a strong resemblance to judicial trials," the court found that there was "a First Amendment right of access to deportation proceedings," and that this right could be curtailed only to serve a "compelling governmental interest" and only through "narrowly tailored" means. *Detroit Free Press,* 303 F.3d at 698, 700, 705. As noted earlier, the Supreme Court has expressly held that protective orders "prohibiting dissemination of discovered information before trial" do not trigger such "exacting First Amendment scrutiny." *Seattle Times,* 467 U.S. at 33, 104 S. Ct. at 2208.

Indeed, in *Detroit Free Press,* the Sixth Circuit distinguished the *Seattle Times* decision on precisely this ground, observing that the protective measures imposed by the immigration authorities in deportation proceedings impermissibly prohibited the public disclosure of information "for an indefinite period of time," even after the termination of the proceedings. *Detroit Free Press,* 303 F.3d at 708. In contrast to these overbroad measures, the court found that the Government's legitimate interest in protecting sensitive information from public disclosure could be achieved on a more limited "case-by-case basis through protective orders or in camera review." 303 F.3d at 708. These, of course, are precisely the limited measures employed by the Court in this case.

The upshot of all this case law, including *Seattle Times* and the many appellate decisions issued in its wake, is that a finding of "good cause" under Rule 26(c)(1) is sufficient to meet any constitutional objections to restrictions imposed upon the public's or the media's right of access to discovery materials, whether these materials are filed with the court in connection with discovery matters or remain solely in the possession of the parties and their counsel. *See Chicago Tribune,* 263 F.3d at 1310. Such a finding also suffices to sustain a restriction upon any common-law right of access to discovery materials, at least until these materials are filed in support of a motion that elicits a ruling on the merits. *See Phillips,* 307 F.3d at 1213; *Chicago Tribune,* 263 F.3d at 1311; *Citizens First National Bank,* 178 F.3d at 945-46. Accordingly, the Court turns to the next question raised in the Free Press's motion — namely, whether the protective measures employed by the Court in the discovery phase of this case are supported by a finding of "good cause" within the meaning of Rule 26(c)(1).

**B.  The Court's Rulings to Date Have Established "Good Cause" for the Protective Measures It Has Imposed During Discovery for Restricting Public Access to Discovery Materials and Discovery-Related Proceedings That Could Interfere with an Ongoing Homicide Investigation or That Threaten the Privacy Interests of Non-Parties.**

Now that the Court has set out the appropriate legal standards by which to assess the protective measures it has employed during the discovery phase of this litigation, it remains only to ask whether the measures in question pass muster under these standards. As explained below, the Court concludes that they do.

As amply illustrated in the Court's survey of the procedural history of this case,

and as set forth in a number of the Court's rulings to date, the Court's first and foremost concern in restricting public access to certain discovery materials and processes has been to ensure that the parties' discovery efforts do not interfere with the active and ongoing investigation into the murder of Tamara Greene. Based on this concern, the Court has (i) ordered that the DPD file for the Tamara Greene murder investigation be produced to the Court under seal for an *in camera* review; (ii) continued to maintain this file under seal, with strict restrictions upon access to and use of this file; (iii) ordered that the depositions of certain law enforcement officers and officials — including the Michigan Attorney General, two Michigan State Police officers, and certain current and former Detroit Police officials and officers — be conducted under seal, with restrictions upon the disclosure and use of this deposition testimony; and (iv) imposed restrictions upon the disclosure and use of some additional materials produced in discovery, such as certain of the materials produced in response to Plaintiffs' subpoenas *duces tecum* served upon three non-party Michigan State Police officers, (*see* 11/16/2009 Order at 2-3).[19]

In its present motion, the Free Press seemingly does not dispute that the Court's desire to avoid interference with the Tamara Greene homicide investigation could provide "good cause" for protective measures under Rule 26(c)(1). Nor could the Free Press dispute this proposition, in light of the recognized federal "privilege that protects against

---

[19]As noted earlier, and as discussed in greater detail below, some of these restrictions have been based on interests or concerns in addition to a possible impact upon the ongoing murder investigation, including a state-law privilege covering information obtained through investigative subpoenas and the privacy interests of non-parties.

the disclosure of investigative files in an ongoing criminal investigation." (3/20/2008 Op. at 15 (citing cases).) If a federal court may, in the proper circumstances, altogether prohibit the disclosure of materials bearing upon an ongoing criminal investigation, it stands to reason that the court may take the lesser step of imposing restrictions upon the parties' (and the public's) access to such materials and information obtained during the discovery process. *See United States v. Amodeo,* 71 F.3d 1044, 1050 (2d Cir. 1995) (noting that the presumptive right of access to judicial documents may be overcome by a showing that such access "might adversely affect law enforcement interests"); *United States v. Valenti,* 987 F.2d 708, 714 (11th Cir. 1993) (affirming the trial court's denial of a newspaper's request to unseal certain pretrial motions and transcripts of closed pretrial proceedings in a case in which an assistant state attorney was charged with bribery and extortion, and concluding that the government had established a "compelling interest in the protection of a continuing law enforcement investigation").[20]

Rather than challenging this recognized interest in avoiding interference with an ongoing criminal investigation, the Free Press instead questions the sufficiency of the

---

[20]In other, closely analogous cases, the courts have found it appropriate to retain under seal materials that pose a danger of revealing matters pending before a grand jury, *see, e.g., In re Motions of Dow Jones & Co.,* 142 F.3d 496, 500-03 (D.C. Cir. 1998), as well as materials accompanying a search warrant application at the pre-indictment stage of a criminal investigation, *see, e.g., Times Mirror Co. v. United States,* 873 F.2d 1210, 1213-16 (9th Cir. 1989); *In re Search Warrant for Four Contiguous Parcels of Real Property,* No. 06-x-50457, 2006 WL 1779436, at *2-*5 (E.D. Mich. June 26, 2006). Moreover, and as noted earlier, Michigan law confers a similar privilege on information obtained through investigative subpoenas, *see* Mich. Comp. Laws § 767A.8, and the Court relied in part on this privilege in ordering that the depositions of two Michigan State Police officers and certain document productions made in connection with these depositions be kept under seal.

Court's "findings as to how openness would hamper the now seven year old murder investigation." (Free Press's 4/21/2010 Reply Br. at 5.) Yet, this challenge surely is defeated by the Wayne County Prosecutor's express representations to this Court that the progress of the ongoing murder investigation "could be hampered by the improper disclosure of information crucial to the case," and that "the risks of contaminating the investigation far outweigh[] any potential benefit" that might be derived from the media attention to this case. (4/29/2010 Letter from Wayne County Prosecutor at 2.) A representative of the Wayne County Prosecutor's Office reiterated this same view at greater length at the May 12 hearing on the Free Press's motion. "Inasmuch as [these statements from the Wayne County Prosecutor] establish that certain information revealed during [the discovery phase of this case ] could impede the ongoing . . . investigation" into Tamara Greene's death, the Court "defer[s] to the[] judgment" of law enforcement officials who are "certainly in a better position to understand the contours of the investigation." *Detroit Free Press,* 303 F.3d at 707.

Beyond these explicit statements from officials who are directly involved in the ongoing criminal investigation, this Court has previously expressed to counsel, on more than one occasion, its concern that the media coverage of this case might "impact witness[es]' recollection of events" and spur "witness" accounts from those who have merely "read things in the media . . . and just want to be part of the investigation." (11/10/2009 Hearing Tr. at 25.) On similar grounds, courts have limited or prohibited access to materials that might reveal matters pending before a grand jury or that

33

accompany pre-indictment search warrant applications, reasoning that public disclosure

of such materials might have a chilling effect upon prospective witnesses, might tip off

targets of the investigation, or might harm the reputations of those who are initially

identified as suspects but who are ultimately exonerated.  *See, e.g., Douglas Oil Co. v.*

*Petrol Stops Northwest,* 441 U.S. 211, 219, 99 S. Ct. 1667, 1673 (1979); *Times Mirror,*

873 F.2d at 1215-16; *In re Search Warrant,* 2006 WL 1779436, at *3-*4.  Notably, in the

last of these cases, the court denied a request by the Detroit Free Press to unseal a 2006

application for a warrant to search a horse farm for evidence relating to the disappearance

of Jimmy Hoffa over 30 years earlier.  While the Free Press cited "the passage of time,

the extensive media coverage of the Hoffa investigation and of those involved, and the

remote likelihood of prosecution" as making it unlikely that the unsealing of the warrant

application would have an "adverse [e]ffect on the investigation," the court found that

each of these factors favoring disclosure was "trump[ed]" by "the fact that the

government has not closed its case on the Hoffa disappearance."  *In re Search Warrant,*

2006 WL 1779436, at *4.

Against these concrete grounds for the Court's decision to maintain certain

discovery materials under seal, the Free Press cites only the vague and self-serving

assertions of Plaintiffs' counsel and their investigator that the media coverage of this case

has aided, rather than hindered, the criminal investigation into the murder of Tamara

Greene.  As an initial matter, the Court is more inclined to credit the statements of the

Wayne County Prosecutor on this subject over the contrary (and vague) assertion of

34

Plaintiffs' investigator that unnamed individuals in the Wayne County Prosecutor's Office have "expressed their appreciation for all of the information generated by the media coverage." (Plaintiffs' Response, Ex. 6, Timmons Aff. at ¶ 6.)

More importantly, even if the Court were to credit this latter assertion, it is largely immaterial to the Court's "good cause" inquiry. First, it surely is evident to even the most casual observer that Plaintiffs and their counsel have been quite successful in securing media coverage of this case *notwithstanding* the protective measures imposed by the Court. All that the Court has done, after all, is limit the parties' ability to publicly disclose the testimony of certain witnesses at their depositions and the contents of certain materials compiled during the Tamara Greene murder investigation or related investigations and produced in discovery. There is no "gag order" here — indeed, the regular and, at times, sensationalistic appearance of Plaintiffs' counsel in the local media renders counsel's claim to the contrary hardly worthy of response — and the parties and their counsel remain free to publicly discuss any of the claims and allegations in this case, so long as they do not disclose the limited range of discovery materials encompassed by this Court's protective orders. Moreover, any local media outlet remains free, of course, to interview anyone it wishes, apart from the parties and their counsel, about any matters relating to this case,[21] and to uncover and publish any materials bearing upon the Tamara

_____

[21]Notably, while the Free Press complains that the deposition of Attorney General Mike Cox was taken under seal, the newspaper conducted an extensive interview with the Attorney General shortly before he was deposed. This direct access — with, one assumes, no limits upon the newspaper's inquiry — surely assuages any professed concern that "the secrecy and suppression in this case" threatens the public's right to know about the activities of "high profile

Greene murder investigation that it is able to obtain through means other than the discovery process in this litigation.

It is difficult to see, then, how the protective measures employed by the Court in discovery — measures that are limited in both scope and duration — might have significantly chilled the media coverage of the events and activities at issue in this litigation, or how they might have materially impaired the self-professed efforts of Plaintiffs' counsel to use the media coverage of this case as a means to generate leads and locate witnesses. Nor, more relevantly, have Plaintiffs (or any other party) even attempted to show that these protective measures have "substantially harm[ed] [their] ability to collect the evidence necessary for prosecution of [their] case." *Knoll v. American Telephone & Telegraph Co.,* 176 F.3d 359, 365 (6th Cir. 1999). In any event, the Court is confident that any such modest effects, if they exist at all, are outweighed by the legitimate and well-founded concern that unwarranted and unnecessary disclosure of the parties' discovery efforts might interfere with an ongoing criminal investigation.

In addition to downplaying (if not ignoring) the Court's concerns on this score, the Free Press further contends that the Court's protective measures have encompassed witnesses — most notably, the Attorney General — who purportedly played no role in the

_____

public officials." (Free Press's 3/23/2010 Motion at 2.) Rather, under these circumstances, the "public right of access" seemingly boils down to a desire to compare notes as to what the Free Press and Plaintiffs' counsel thought to ask the Attorney General. As discussed below, in light of the considerable latitude given to Plaintiffs' counsel at the Attorney General's deposition, it can hardly come as a surprise to Plaintiffs that the Court would order the product of this inquiry to be kept under seal.

Tamara Greene homicide investigation. It follows, in the Free Press's view, that the public disclosure of the deposition testimony of such witnesses could not possibly interfere with this ongoing investigation. Yet, even assuming, for present purposes, that this was the sole justification for the Court's decision to shield this testimony from public disclosure during the discovery period — a flawed assumption, as discussed below — this Court has never claimed an ability to predict in advance whether a given witness's deposition testimony might touch upon matters which, if publicly disclosed at this juncture, might interfere with the Tamara Greene murder investigation. In fact, the Court stated precisely the opposite at a November 10, 2009 hearing, acknowledging that "[i]t's very difficult for me to judge whether any particular witness whose deposition is taken is going to or may have an adverse impact upon an ongoing investigation," and further observing that it "may even be difficult for counsel to know in advance." (11/10/2009 Hearing Tr. at 26.) Moreover, this difficulty of prediction does not turn solely upon what a given witness does or does not know, but also depends upon what counsel might choose to ask the witness — both matters about which the Court lacks any advance knowledge. Not surprisingly, then, the courts have acknowledged the practical difficulty of determining in advance whether a given proceeding should be sealed. *See, e.g., Valenti,* 987 F.2d at 714 n.1 (observing that "a trial judge cannot rule intelligently" on the question whether to retain the transcripts of proceedings under seal "until some information has been disclosed" to the court regarding the proceedings in question).

The remedy for any resulting overbreadth in protective measures, of course, is a

motion to unseal the discovery materials at issue.  Indeed, the Court made this very point

at the November 10, 2009 hearing.  (*See* (11/10/2009 Hearing Tr. at 23.)  Tellingly, no

party or witness has brought such a motion to date, despite the parties' and witnesses'

superior knowledge of exactly what transpired at each deposition and the testimony each

witness has given.  Since the Free Press, like the Court, lacks this information, it can do

no more than speculate that the disclosure of a given deposition transcript would not pose

any risk of undue interference with an ongoing criminal investigation.[22]  This is not

sufficient to overcome a finding of good cause.  *See Phillips,* 307 F.3d at 1213 (holding

that once a court has found good cause to protect material from public disclosure, there is

no longer any common-law right of access to this material, and "the party seeking

disclosure must present sufficiently compelling reasons why the sealed discovery

document should be released"); *see also Knoll,* 176 F.3d at 365 (placing the burden on the

---

[22]For what it is worth, the Free Press might be too dismissive in its assertion that nothing in the Attorney General's deposition could possibly implicate the Tamara Greene homicide investigation.  First, the Court notes that a request for documents served upon the Michigan Department of Attorney General in connection with this deposition resulted in the production of materials that also are contained in the DPD homicide file.  Under a February 2, 2010 order, these materials are subject to the same protective measures that apply to the homicide file itself. Next, a review of the unsealed deposition of Michigan State Police detective Mark Krebs reveals (i) that he was asked about matters related to the Tamara Greene homicide investigation, (ii) that certain information and materials uncovered in the Michigan State Police investigation were turned over to the Detroit Police Department for use in its Tamara Greene murder investigation, and (iii) that DPD officers involved in the Tamara Greene homicide investigation were interviewed as part of the Michigan State Police investigation.  Indeed, Sergeant Krebs was directly asked at his deposition whether the Michigan State Police investigation "included in any way an investigation into the murder of Tamara Green[e]," and he answered in the affirmative. (Krebs 10/20/2009 Dep. at 105.)  Because the Attorney General's Office supervised at least part of this Michigan State Police investigation, the Court is unwilling to state definitively that the Attorney General's deposition testimony could not possibly have any effect upon the ongoing Tamara Greene murder investigation.

party opposing a protective order entered for good cause to "demonstrate that the protective order was . . . unworkable"). In any event, many of these deposition transcripts have yet to be filed, and no right of public access can be claimed as to such unfiled discovery materials. *See Bond,* 585 F.3d at 1074-75; *Chicago Tribune,* 263 F.3d at 1310-11; *Amodeo,* 71 F.3d at 1050.[23]

Next, while the protective measures imposed by the Court have been primarily motivated by a desire to avoid interference with an ongoing criminal investigation, the Court also has cited the privacy interests of non-parties as a ground for maintaining certain discovery materials under seal. The case law provides ample support for treating such interests as the requisite "good cause" for protective measures. The Sixth Circuit has stated that protective orders are "commonly granted . . . as a means of protecting the privacy interests of nonparties while yet serving the needs of litigation." *Knoll,* 176 F.3d at 365; *see also Marshall, supra,* 828 F.2d at 360 (finding that the district court struck an appropriate balance by ordering the production of a Ku Klux Klan membership list while also issuing a protective order prohibiting the public disclosure of this list). Likewise, the Second Circuit has held that "the privacy interests of innocent third parties should weigh heavily" in a court's decision whether to impose protective measures. *Amodeo,* 71 F.3d

---

[23]Even as to those deposition transcripts that have been filed as exhibits to discovery-related submissions, such filings do not trigger a public right of access, absent any use of these materials by the Court to resolve a substantive issue in the case. *See Chicago Tribune,* 263 F.3d at 1312. In this case, it is fair to say that virtually all such filings to date have been wholly gratuitous — Plaintiffs, in particular, have shown a penchant for attaching all manner of affidavits and transcripts to their submissions — and have proven of little or no assistance to the Court in resolving even the discovery dispute at hand, much less any substantive issue.

at 1050-51.  And, of course, the Supreme Court emphasized in *Seattle Times* that because discovery efforts "may seriously implicate privacy interests of litigants and third parties," the courts are authorized to impose protective measures under Rule 26(c)(1) in order to regulate the disclosure of information which "if publicly released could be damaging to reputation and privacy."  *Seattle Times,* 467 U.S. at 35, 104 S. Ct. at 2208-09.

The Sixth Circuit decision that is the centerpiece of the Free Press's motion, *Brown & Williamson Tobacco Corp. v. Federal Trade Commission,* 710 F.2d 1165 (6th Cir. 1983), is not to the contrary.  In particular, the Free Press makes much of the court's statement in that case that "[s]imply showing that the information would harm the [plaintiff] company's reputation is not sufficient to overcome the strong common law presumption in favor of public access to court proceedings and records."  *Brown & Williamson,* 710 F.2d at 1179.  Yet, this cautionary note is inapplicable here on a number of grounds.  First, this Court already has explained that no such "strong . . . presumption in favor of public access" arises as to discovery materials, but rather comes into play only when such materials are filed and relied upon in substantive rulings.  The decision in *Brown & Williamson* is wholly consistent with this principle, as it was rendered against the backdrop of district court orders that placed under seal ***all*** of the documents filed with the court by the defendant federal agency, and that required the continued maintenance of these documents under seal even on appeal.  710 F.2d at 1176.  As the Sixth Circuit itself observed in vacating these orders, "[t]he public has an interest in ascertaining what evidence and records the District Court and this Court have relied upon in reaching our

40

decisions." 710 F.2d at 1181. No such public interest has yet arisen in this case.

Next, the protective measures employed by the Court here, as opposed to the ones at issue in *Brown & Williamson,* are not intended to shield against any harm to the reputation of a party, but instead seek to avoid embarrassment and harm to the reputations of ***non-parties.***[24] The Sixth Circuit has distinguished its ruling in *Brown & Williamson* on precisely these grounds, in a subsequent decision in which it denied the request of two intervening newspapers to vacate a protective order that authorized the removal of non-party information from the court record. *In re Knoxville News-Sentinel Co.,* 723 F.2d 470, 477-78 (6th Cir. 1983). In so ruling, the court explained that "[u]nlike the protected party in *Brown & Williamson,* who sought to deny public access because of the adverse business effect disclosure might cause, the individuals protected by the closure order here are third parties who were not responsible for the initiation of the underlying litigation." *Knoxville News-Sentinel,* 723 F.2d at 477.[25] The court then expressly confirmed that the privacy interests of these non-parties were "sufficiently compelling to justify non-

---

[24]Notably, to the extent that the Free Press might read *Brown & Williamson* as suggesting that the privacy interests of parties or concerns for their reputations may never provide "good cause" for a protective order under Rule 26(c)(1), the Supreme Court's subsequent decision in *Seattle Times* indicates that "the privacy interests of litigants" and concerns of "damag[e] to reputation and privacy" may warrant protective measures under appropriate circumstances. *Seattle Times,* 467 U.S. at 35, 104 S. Ct. at 2208-09. Indeed, even in *Brown & Williamson* itself, the Sixth Circuit acknowledged that "content-based exceptions to the right of access have been developed to protect competing interests," and that "these interests include certain ***privacy rights of participants*** or third parties." *Brown & Williamson,* 710 F.2d at 1179 (emphasis added).

[25]Once again, the Free Press has notably failed to cite this decision in its submissions to the Court, nor have Plaintiffs acknowledged this ruling in their brief in support of the Free Press's request to unseal.

disclosure." *Knoxville News-Sentinel,* 723 F.2d at 477.

Viewed against this legal backdrop, the protective measures employed by the Court in order to protect the privacy interests and reputations of non-parties easily pass muster under the "good cause" standard of Rule 26(c)(1). Setting aside the groundless suggestion that the Court has acted to protect the reputations of the parties, the remainder of the Free Press's challenge on this point is focused upon the sealing of the Attorney General's deposition. To be sure, the Attorney General is a public official whose actions are subject to public scrutiny. Nonetheless, he is not a party to this suit, and his privacy interests therefore are entitled to some weight in determining whether his deposition testimony should be made public while the discovery process remains ongoing. *See TheStreet.Com,* 273 F.3d at 232.

The Free Press insists, however, that any such privacy interests that the Attorney General might claim should be given minimal weight, if not deemed altogether abandoned, in light of the Attorney General's "highly publicized 'Media Blitz'" just before he was deposed, as well as his public expressions of his desire for his deposition testimony to be made public. (Free Press's 4/21/2010 Reply Br. at 6.) Yet, if a party or witness wishes the Court to revisit its decision to keep particular discovery materials under seal, such relief may be sought through a properly filed motion. Indeed, as indicated earlier, the Court has expressly stated at a public hearing in this case that if a party or witness sought to unseal a deposition, such a request could be made by motion. (*See* 11/10/2009 Hearing Tr. at 23.) The Court should not, and will not, search through

42

newspaper articles or public statements to determine whether such relief has been "requested." Simply stated, no such motion has yet been filed by any party or witness.

Even if such relief had been sought (and it has not), the Free Press cannot possibly claim to know what questions were posed by Plaintiffs' counsel during the Attorney General's deposition, nor whether this questioning might have intruded upon privacy interests beyond those implicated in the Attorney General's media interviews and public statements.[26] Neither has the Court had any occasion to undertake such an inquiry, for the

---

[26]Of course, if the Free Press hoped to be educated on this point by reviewing Plaintiffs' submission in support of the newspaper's request to unseal, it was surely disappointed. Despite the fact that Plaintiffs' counsel conducted all of the questioning at the Attorney General's deposition, and despite the fact that the Court was called upon to resolve a number of disputes that arose during this deposition as to the scope of this questioning, there is nary a hint in Plaintiffs' present brief of any possibility that the questioning permitted by the Court might have implicated any non-party privacy interests that warrant protection under Rule 26(c)(1). Neither does Plaintiffs' counsel acknowledge that a separate record was made ***under seal*** — a record that counsel presumably does not wish the Court to unseal, despite joining in the Free Press's motion — of an *ex parte* conference between Plaintiffs' counsel and the Court during the course of the Attorney General's deposition, at which counsel explained and sought to justify various lines of inquiry and the Court ruled on each such request. Ironically, the Court largely ruled in Plaintiffs' favor, triggering a heightened need for protection against public disclosure against which Plaintiffs' counsel now protests. Having received the Court's permission to explore these more attenuated subjects upon the express condition that the deposition remain under seal, Plaintiffs' counsel now seeks to undo the protection upon which the Court premised its grant of permission. It appears that no good deed goes unpunished.

Against this backdrop, Plaintiffs' counsel's present challenge to the continued maintenance of the Attorney General's deposition under seal is truly akin to a journey to an alternate reality. Plaintiffs' counsel knows better than anyone the interests implicated by this deposition testimony, because counsel affirmatively sought (and was largely granted) the latitude to explore lines of inquiry that implicated these interests. The failure of Plaintiffs' counsel to even acknowledge the existence of such concerns is tantamount to an outright misrepresentation of the record. Surely, the Court cannot be the intended audience for such distortions, as counsel is well aware that the Court knows better. Rather, counsel evidently is playing to a wider (and less informed) audience.

simple reason that, once again, no party or witness has moved to unseal the deposition. The Court declines at this juncture to predict, based upon its incomplete knowledge of the relevant considerations, how it might rule in the event that such a motion is brought.

More importantly, the Free Press inaccurately assumes that the Attorney General's deposition testimony implicates only the privacy interests of the Attorney General himself, and noone else. Yet, even if the Court were to completely discount the privacy interests of the Attorney General on the ground that he is a public figure with ready access to the media, the privacy interests of ***other non-parties*** — who, unlike the Attorney General, are not public figures — are not so readily disregarded. As the parties' counsel are well aware — although, once again, Plaintiffs' counsel pretends otherwise in agreeing with the Free Press that the Attorney General's deposition need not remain under seal — the inquiries made during the Attorney General's deposition implicated the privacy interests and reputations of private individuals who have only the most tenuous connection, if any, to the claims and allegations in this case, and who, unlike the Attorney General, cannot command an audience with the media to defend their reputations. This is precisely the situation contemplated in *Seattle Times*: namely, that a discovery effort created "an opportunity . . . for litigants to obtain — incidentally or purposefully — ***information that not only is irrelevant but if publicly released could be damaging to reputation and privacy.***" *Seattle Times,* 467 U.S. at 35, 104 S. Ct. at 2209 (emphasis

added).[27]

Moreover — and, again, as counsel in this case are well aware — the Attorney General's deposition was not the only discovery effort in this case that has triggered very real concerns of harm to the privacy, reputations, and other important interests of non-parties. When such matters have been brought to the Court's attention, it has directed that the pertinent discovery efforts be conducted under seal. As the Supreme Court has expressly recognized, this Court "clearly has a substantial interest in preventing this sort of abuse of its processes." *Seattle Times,* 467 U.S. at 35, 104 S. Ct. at 2209. Consequently, there is "good cause" for the protective measures imposed by the Court in order to prevent the public disclosure of information that could damage the reputations and privacy interests of non-parties who have, at best, an extremely tangential connection to the claims and allegations in this case.[28]

_____

[27]Indeed, in the Free Press editorial discussed earlier, the newspaper urges this Court to "take every step to stop the splatter from what could end up being a very small puddle of actual facts or evidence." *When Litigation Becomes Theater,* Detroit Free Press, May 2, 2010, at 24A. One recognized means, of course, of "stop[ping] the splatter" upon the private lives and reputations of non-parties is the entry of protective orders under Rule 26(c)(1) that require sensitive non-party information to be maintained in strict confidentiality and filed under seal. Yet, this same editorial rails against the "nearly unprecedented" sealing of discovery materials in this civil litigation — a notion addressed and refuted earlier — and the "secrecy" under which the parties are conducting their discovery efforts. *Id.* Although the Free Press's editorial advice undoubtedly is intended to assist the Court and promote a public interest, the Court confesses that it is bewildered by the mixed messages sent in this editorial — to say nothing of the contradictory positions taken in this editorial and in the newspaper's submissions to the Court, which seem to advocate a broad and fully public discovery process without regard for any resulting "splatter."

[28]At the May 12 hearing, counsel for the Free Press suggested as a fallback position that the transcript of the Attorney General's deposition (and perhaps others as well) could be publicly released in redacted form. Yet, regardless of whether the relevant interests could be protected

Finally, in assessing the need for protective measures, the Court cannot and need not ignore the surrounding circumstances that make this case an especially strong candidate for regulations upon the use and disclosure of discovery materials. This case has generated nearly daily media coverage, with play-by-play, up-to-the-minute accounts of nearly every filing on the docket, deposition, and other development during discovery. The attorneys are regularly quoted in these stories, and everything they say seemingly is deemed worthy of reporting, even if it is nothing more than rumors or allegations based upon one or more levels of hearsay. Very seldom do these stories remind the reader that

---

through redaction, the Court once again emphasizes that neither the Attorney General nor any other witness or party has moved to lift the seal on any portion of this (or any other) deposition testimony. And, again, there is no public right of access to this discovery material, unless and until it is submitted to the Court in support of a requested ruling on the merits of a substantive issue. In the meantime, nothing in the law requires the Court to review the transcripts of each deposition conducted to date to determine which portions may be disclosed to the media and the public. *See Bond,* 585 F.3d at 1075 ("That the court's discovery processes and rules are used to require litigants to produce otherwise private information to an opposing party is not enough to alter the legal rights of the general public.").

Finally, it bears emphasis that once the Court has found good cause for conducting a deposition under seal, the parties and the witness are entitled to rely on this ruling in eliciting and giving testimony on subjects that otherwise might be off-limits. *See Foltz,* 331 F.3d at 1137 (cautioning that "changing the ground rules later is to be avoided because protective orders that cannot be relied upon will not foster cooperation through discovery" (internal quotation marks and citation omitted)); *TheStreet.Com,* 273 F.3d at 230 ("If protective orders were easily modified . . . , parties would be less forthcoming in giving testimony and less willing to settle their disputes."); *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 897 (7th Cir. 1994) (noting that the district court in that case was presented with "a peculiar set of problems" in deciding whether to vacate a protective order, where "[i]n reliance on the seal, the parties had filed documents which otherwise would not be part of the public record"). Thus, a "party seeking disclosure" of such sealed material "must present sufficiently compelling reasons why the sealed discovery document should be released" into the public record, *Phillips,* 307 F.3d at 1213; *see also Knoxville News-Sentinel,* 723 F.2d at 478, and the parties, the witness, and any interested third parties must have an opportunity to be heard on this question before the Court takes such action.

the Court must ultimately base its substantive rulings upon admissible evidence, which typically requires a witness with personal knowledge of the matters upon which he or she testifies. *See* Fed. R. Civ. P. 56(e)(1).

There is nothing inherently improper in all of this. The attorneys are entitled to recount the allegations and legal theories they seek to prove, and they and their clients are entitled to a full and complete period of discovery in an effort to marshal evidentiary support for their claims or defenses. The local media outlets, for their part, are certainly entitled to run any stories they deem newsworthy and of interest to the public, and they, of course, are not bound by the standards of the Federal Rules of Civil Procedure or the Federal Rules of Evidence in exercising their editorial judgment.

This Court, however, *is* bound by these rules. Under these rules, the parties and their counsel are broadly entitled to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," and this "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Yet, these same rules further authorize the Court to issue orders "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," and such orders may specify the terms under which discovery may proceed or the conditions under which discovery materials may be publicly disclosed. Fed. R. Civ. P. 26(c)(1). In this case, like all others on its docket, the Court must attempt to strike the proper balance between the competing concerns and interests reflected in these rules. This has not always been an easy task in

this case, as perhaps illustrated by the length of the present opinion.

The Free Press and other local media representatives may rest assured, however, that the heightened public interest in this case does not alter this calculus in any way. Whether this case was subject to daily media coverage or none at all, the Court would be equally intent upon avoiding interference with an ongoing murder investigation and protecting the privacy interests and reputations of non-parties. The only real effect of the intensive media coverage has been to demand greater vigilance in the Court's protection of these interests. If, for example, the Court were to fail to appreciate the extent to which a particular discovery effort might harm the reputation or privacy interests of an innocent third party, it is far more likely in this case than in others that this failure would result in prompt and injurious disclosure of personal or sensitive information about this third party in the next day's newspaper. Likewise, the greater public and media attention to the docket in this case poses a heightened risk that the parties' filings might "become a vehicle for improper purposes," with the record in this case being "used to gratify private spite or promote public scandal," or "serv[ing] as [a] reservoir[] of libelous statements for press consumption." *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598, 98 S. Ct. 1306, 1312 (1978) (internal quotation marks and citations omitted); *see also Joy v. North,* 692 F.2d 880, 893 (2d Cir. 1982) (emphasizing that "[d]iscovery involves the use of compulsory process to facilitate orderly preparation for trial, not to educate or titillate the public").

This, then, is why the Court has acted in the more proactive manner noted in the

Free Press's motion, and why the Court has not been content to rely upon the vigilance of the parties and their counsel to conduct their discovery efforts subject to appropriate self-imposed protective measures.[29]  If this were an ordinary case, the parties' discovery efforts would be conducted largely "in private," *Seattle Times,* 467 U.S. at 33, 104 S. Ct. at 2208, and any trespasses upon ongoing criminal investigations or the privacy interests of non-parties would likely escape public notice and could be remedied even after-the-fact.  Because of the heightened media and public attention, however, the parties and the Court are afforded no such luxury.  Yet, the Court finds no support in the law for the proposition that this increased public interest somehow diminishes the authority the Court otherwise could exercise under Rule 26(c)(1) to regulate the discovery process.  Rather, the Court is confident that it possesses precisely the same authority in this case as in all others on its docket, and that it has appropriately exercised this authority to impose limited protective measures "for good cause" during the discovery phase of this litigation.

C.     **No "Gag Order," Whether Actual or Undocumented, Has Been Imposed on Counsel in This Case.**

---

[29]Such self-imposed protective measures are subject to abuse, of course, as illustrated by one of the cases cited in the Free Press's submissions. *See Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 227 (6th Cir. 1996) (disapproving of protective orders in which "the parties were allowed to adjudicate their own case based upon their own self-interest").  As is evident from the lengthy account of the procedural history of this litigation earlier in this opinion, this Court can hardly be accused of "abdicat[ing] its responsibility to oversee the discovery process" and "turn[ing] this function over to the parties."  *Procter & Gamble,* 78 F.3d at 227.  To the contrary, given the number of hearings held and orders issued relating to discovery matters, and given the number of these in which the Court has specifically addressed issues of public disclosure and justifications for sealing, the Free Press's appeal to the *Procter & Gamble* decision is particularly inapt here.

Finally, the Court turns to the Free Press's request that "an apparently undocumented gag order be removed" as this litigation goes forward. (Free Press's 3/23/2010 Letter at 5.) As an initial matter, it is unclear what the newspaper means by this, as it has not identified a single instance in which a party or attorney in this case has refused to speak to a reporter on the ground that the Court has forbidden it. To the contrary, hardly a day goes by when an attorney in this case is not quoted in a media account of the latest developments in this litigation. And, of course, the Court has expressly declined, on two separate occasions, to enter a "gag" order prohibiting counsel from speaking to the media. (*See* 4/15/2008 Order at 2; 11/16/2009 Order at 4-6.)

Alternatively, perhaps the Free Press means to contend only that the Court has failed to identify "good cause" for restricting the disclosure of certain discovery materials, and that this has resulted in undue interference with the parties' and counsels' opportunity to speak to the media about their discovery efforts. As explained, however, the Court believes that the protective measures it has imposed in this case are supported by the requisite finding of "good cause." Moreover, the parties themselves have stipulated to the entry of a protective order that encompasses many of the protective measures employed by the Court. Such "a stipulated protective order involves self-imposed secrecy and is therefore not the equivalent of a gag order." *Bond,* 585 F.3d at 1077. Finally, the Court has already noted the Supreme Court's observation that "an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Seattle Times,*

467 U.S. at 33, 104 S. Ct. at 2208.

More fundamentally, the restrictions imposed by the Court in this case, which are limited both in scope and in duration, simply do not warrant the Free Press's rather dramatic concern that this matter "is being litigated almost entirely in secret." (Free Press's 3/23/2010 Motion at 1.) Even assuming that the protective measures employed by the Court encompassed all of the parties' discovery efforts — rather than only those efforts that threaten to interfere with an ongoing murder investigation or that impinge upon the privacy interests of non-parties — this would mean only that *discovery* is being conducted "almost entirely in secret," in accordance with the usual practice in civil litigation. Yet, the discovery period in this case is scheduled to end in July. After that point, the parties will have to meet a heightened standard of scrutiny and overcome a stronger presumption of public access if they wish to file discovery materials under seal.

In the meantime, there are good reasons for the parties and their counsel to be circumspect in their dealings with the media. Their claims and defenses have yet to be fully explored and tested through a complete discovery process. Because of the liberal standards of Rule 26(b)(1), they are entitled to elicit deposition testimony and request documents that may ultimately prove irrelevant, inadmissible, or otherwise ineligible for consideration in dispositive motion practice or at trial. The attorneys, moreover, have a professional obligation to refrain from making a public statement if they "know[] or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding." Mich. R. Prof'l Conduct 3.6. Given all of this, as well as

the extensive demands of the discovery phase of this case, counsel should have ample incentive to focus on their clients' interests rather than their opportunities to interact with the media.

Yet, all of this is not to deny the media's legitimate interest in covering this case, which features serious allegations of wrongdoing by the City of Detroit and former high-ranking City officials.  Indeed, the Court is well aware that the media's investigations into the activities of some of these same officials have led to the exposure of public corruption and the holding of these individuals accountable for criminal misdeeds.  After the parties have had a full and fair opportunity to develop evidence in support of their claims and defenses, each side undoubtedly will be anxious to tell its side of the story, supported in accordance with the rules that govern dispositive motion practice and trial.  The Free Press and the other local media representatives that have expressed concerns about the sealed filings in this case may rest assured that any rulings on the merits will be placed on the public docket — as have nearly all of the Court's rulings to date in this case — and that the record relied upon in making these rulings, including the parties' motions, briefs, and supporting exhibits, will be made available to the public and the media to the greatest extent possible.  This is what the law requires, and the Court fully intends to follow this law to the letter in managing this litigation.

## IV. __CONCLUSION__

For the reasons set forth above, as well as the reasons stated at a May 12, 2010 hearing,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Detroit Free Press's

March 23, 2010 motion to unseal the record (docket #353), as joined in by the Detroit

News, WXYZ-TV, WJBK-TV, and WDIV-TV, is DENIED.


                                         s/Gerald E. Rosen
                                         Chief Judge, United States District Court

Dated:  May 26, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 26, 2010, by electronic and/or ordinary mail.

                                         s/Ruth A. Gunther
                                         Case Manager