## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ERNEST FLAGG, as Next Friend
of JONATHAN BOND; TARIS JACKSON,
as Next Friend of ASHLY JACKSON; and
BRIAN GREENE, as Next Friend of          Case No. 05-74253
INDIA BOND,                             Hon. Gerald E. Rosen

        Plaintiffs,

v.

CITY OF DETROIT and
KWAME KILPATRICK,

        Defendants.

_____/

## OPINION AND ORDER DENYING DETROIT
## FREE PRESS'S MOTION FOR RECONSIDERATION

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____June 24, 2010_____

PRESENT:  Honorable Gerald E. Rosen
                Chief Judge, United States District Court

## I.  INTRODUCTION

In a lengthy 53-page opinion issued on May 26, 2010, the Court denied a motion

filed by the Detroit Free Press, and joined in by a number of other local media outlets,

requesting that the Court lift various protective measures imposed during the ongoing

discovery process in this high-profile suit.  Through a motion filed on June 9, 2010, the

Free Press seeks reconsideration of the Court's May 26 ruling, principally on the ground

that the Court purportedly misapplied the Supreme Court's decision in *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S. Ct. 2199 (1984), the controlling precedent for resolving the issue presented here — namely, a First Amendment challenge to a protective order governing the fruits of pretrial civil discovery. More specifically, the Free Press contends that the *Seattle Times* ruling, properly applied, would dictate the public disclosure of the transcript of the deposition of Michigan Attorney General Mike Cox.

Each of the points raised in the Free Press's current motion, however, has been expressly addressed in the Court's May 26 ruling. It is not news to the Court that the Attorney General's deposition testimony is "a matter of importance to the public and voters," (Free Press's Motion for Reconsideration, Br. in Support (hereafter "Recons. Br.") at 13), in light of the Attorney General's status as a high-ranking state official and the legitimate public interest in the subject matter of this case. Nor is the Court unaware of the several instances in which the Attorney General, either directly and through his representatives, has "publicly declared . . . his desire for transparency and that the transcript of his deposition be made public." (*Id.* at 12.) Finally, the Court was not operating under the belief that it could "[j]ettison" any First Amendment scrutiny or consideration of the public interest, (*id.* at 5), as it determined whether certain discovery materials should be kept under seal while the parties' discovery efforts remain ongoing.

The Free Press need look no further than the May 26 opinion for reassurance that its stated concerns are misplaced. At the outset of that decision, the Court observed that a thorough course of discovery "not only allows Plaintiffs to prosecute their case, but also

advances a vital public interest, by shedding light on the actions of public officials who face serious allegations of obstruction of justice." (5/26/2010 Op. at 4.) The Court further emphasized that it "has not the slightest interest in inhibiting the public disclosure of any such evidence [of official malfeasance] that might be turned up in discovery, protecting the reputations of government officials for actions taken in their public roles, or interfering with the media's efforts to shed further light on the activities of these and other public officials." (*Id.* at 5-6.) Then, upon turning to the Free Press's more specific request that the Attorney General's deposition testimony be publicly disclosed, the Court expressly recognized that "the Attorney General is a public official whose actions are subject to public scrutiny." (*Id.* at 42.) If all of this is not sufficiently clear, the Court will repeat it again here: The public has a strong and undeniable interest in learning about the actions taken and decisions made by Michigan's highest-ranking law enforcement official in connection with the events and circumstances giving rise to this case.

Yet, much as the Free Press wishes to dwell upon the Attorney General's deposition and the claimed "controversy surrounding it" as purportedly "central . . . to the public interest in disclosure" of the information gathered by the parties in discovery, (Recons. Br. at 3), the Court has applied precisely the same rules and principles to *all* discovery materials in this case, whether the deposition testimony of the Attorney General or of John Doe. If the deposition testimony of any witness has touched upon matters that could interfere with the ongoing Tamara Greene homicide investigation, or has posed a threat to the privacy interests of the witness or, especially, of private individuals who

have nothing to do with the claims and allegations in this case, the Court has ordered the parties to refrain from publicly disclosing this testimony for the time being. If deposition testimony does not implicate these interests and concerns, it has not been made subject to a protective order. The public profile or political aspirations of the witness in question have not factored into the Court's inquiry, and the Free Press surely would not argue that this Court should attempt to gauge the surrounding political climate as it decides whether a particular protective measure is warranted.

This Court's approach enjoys the full support of *Seattle Times* and its progeny. More to the point, this same case law belies the Free Press's contention that certain witnesses have "special" status that somehow displaces the Court's authority to ensure an orderly discovery process and mitigate the "splatter effect" lamented on the Free Press's own editorial pages. Because this case law was thoroughly discussed in the Court's May 26 ruling, and because the governing rules and principles announced in this case law have been carefully adhered to and applied in this litigation, both in the May 26 decision and throughout the still-ongoing discovery process, the Court denies the Free Press's request to revisit this ruling.

# II.  ANALYSIS

As the Free Press recognizes, this Court will not grant a motion for reconsideration "that merely present[s] the same issues ruled upon by the court, either expressly or by reasonable implication."  Local Rule 7.1(g)(3), Eastern District of Michigan.  Given that the Court held a two-hour hearing on the Free Press's motion, followed by a 53-page opinion, it is difficult to imagine that the Free Press could identify an issue that was not addressed "either expressly or by reasonable implication" in the Court's ruling.  In an effort to do so, the Free Press notes that it did not discuss (or even cite) the *Seattle Times* decision in its prior motion papers, and the newspaper suggests that it should be given an opportunity to address the Court's purported misapplication of this ruling, where it did not "anticipate that the Court would rely so heavily on this case, or interpret the case in the manner that it did."  (Recons. Br. in Support at 4.)

Yet, regardless of the Free Press's and the Court's differing notions of the appropriate body of case law under which to analyze the newspaper's First Amendment challenge, the Free Press does not deny that the Court addressed each of the underlying ***issues*** raised or implicated by its motion to unseal.  The newspaper's mere disagreement with the Court's resolution of these issues — much less the Court's chosen analytical approach to resolving these issues — does not, under Local Rule 7.1(g)(3), provide a basis for the Court to revisit its rulings.

Moreover, by making the *Seattle Times* decision the focus of its present motion, the Free Press evidently acknowledges that this Supreme Court precedent has much to say

about — and, indeed, appears to control — the newspaper's First Amendment challenge to the protective measures imposed by the Court during the discovery phase of this case. Whether the Free Press "anticipate[d]" that the Court might look to this ruling, it cannot (and does not) deny that it was appropriate for the Court to do so. A motion for reconsideration is not a proper vehicle for addressing case law for the first time that was readily available to the Free Press and its counsel prior to the Court's ruling. *See Magnum Towing & Recovery v. City of Toledo,* No. 07-4212, 287 F. App'x 442, (6th Cir. July 15, 2008) (explaining that a court does not err "when it fulfills its obligation to apply the correct legal standard regardless of whether the parties correctly articulated it," nor is the court "permitted to rely only on precedent explicitly cited in the parties' briefs" (internal quotation marks and citation omitted)); *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.,* 90 F.3d 1264, 1270 (7th Cir. 1996) ("Reconsideration is not an appropriate forum for . . . arguing matters that could have been heard during the pendency of the previous motion.").

Be that as it may, the Free Press fails to persuade the Court that it has misread or misapplied *Seattle Times.* Contrary to the Free Press's contention, the Court did not construe this decision as "reject[ing] out of hand the applicability of the First Amendment," (Recons. Br. at 6), in a court's "good cause" inquiry under Fed. R. Civ. P. 26(c)(1). To the contrary, this Court expressly observed in its May 26 opinion that the Supreme Court "recognized [in *Seattle Times*] that protective orders implicate the First Amendment rights of litigants, as well as the 'public interest in knowing more' about the

parties and their claims in a given case." (5/26/2010 Op. at 26 (citing *Seattle Times,* 467 U.S. at 31-32, 104 S. Ct. at 2206-07).) Yet, this Court further read *Seattle Times* as emphasizing that these First Amendment interests are far more limited in the pretrial discovery phase of civil litigation. In particular, this Court viewed *Seattle Times* as holding that a trial court's exercise of its Rule 26(c) authority to issue protective orders is not subject to "heightened First Amendment scrutiny," but rather survives a First Amendment challenge so long as it is supported by a finding of "good cause" within the meaning of the Rule. (5/26/2010 Op. at 26, 30-31 (citing *Seattle Times* and other cases).) The Rule's "good cause" standard, in other words, is "sufficient to meet any constitutional objections to restrictions imposed upon the public's or the media's right of access to discovery materials, whether these materials are filed with the court in connection with discovery matters or remain solely in the possession of the parties and their counsel." (5/26/2010 Op. at 30.)

In challenging the Court's conclusion on this point, the Free Press reads *Seattle Times* as mandating at least "intermediate" First Amendment scrutiny of a protective order, and it suggests that this Court instead "beg[a]n[] and end[ed]" its First Amendment analysis with its observation that heightened scrutiny is not required. (Recons. Br. at 5.) Yet, regardless of precisely what "intermediate" scrutiny might entail — and regardless of how explicit the Court might have been in articulating the First Amendment interests implicated by the protective measures it has imposed in discovery — it seems fair to say that the Court's 53-page opinion would have been a great deal shorter if it had utterly

failed to perceive the need to weigh any First Amendment or public right-to-know interests whatsoever in its Rule 26(c) "good cause" analysis. In fact, the **entirety** of the Court's "good cause" inquiry, spanning nearly 20 pages of the May 26 opinion, was animated by the Court's awareness of, and deep appreciation for, the "strong common law presumption in favor of public access to court proceedings and records." (5/26/2010 Op. at 40 (quoting *Brown & Williamson Tobacco Corp. v. Federal Trade Commission,* 710 F.2d 1165, 1179 (6th Cir. 1983)).) Absent this recognized and genuine public interest in the issues raised by this case, there would be little or nothing to balance against the need for protective measures, because no party has shown (or even attempted to show) that these protective measures have hindered any legitimate discovery efforts. It was precisely **because** of the Court's recognition of a legitimate public interest in the subject matter of this case — a recognition publicly expressed by the Court well before the Free Press filed its motion to unseal, (*see, e.g.,* 11/16/2009 Order at 6) — that the Court has endeavored to explain and justify at length the grounds for the protective measures employed in this case. The Court is confident that this "good cause" analysis can withstand the degree of First Amendment scrutiny called for under *Seattle Times,* whether this is termed "intermediate" or goes by some other name.

The Free Press insists, however, that this Court "[o]verlooked a "[b]inding Sixth Circuit [d]ecision," *Courier-Journal v. Marshall,* 828 F.2d 361 (6th Cir. 1987), that calls

for more exacting First Amendment scrutiny. (Recons. Br. at 7.)[1] In that case, as here, a newspaper challenged protective orders restricting access to a non-party's deposition and a document produced by this non-party in civil discovery. The protected materials in that case, like the discovery materials to which access has been restricted in this case, implicated matters of genuine public interest — specifically, the deponent in *Courier-Journal* was a police officer who "admitted to being a [Ku Klux] Klan official," and he had been ordered to produce the names and addresses of the members of his Klan unit, some of whom were also law enforcement officers. *Courier-Journal,* 828 F.2d at 362. The news organization petitioned the Sixth Circuit for a writ of mandamus compelling the district court to vacate its protective orders restricting access to these discovery materials, but the Sixth Circuit denied this petition.

In so ruling, the Sixth Circuit began by recognizing that "[t]he Supreme Court has directly addressed the constitutionality of orders limiting access to the fruits of discovery" in its *Seattle Times* decision. *Courier-Journal,* 828 F.2d at 363-64.[2] After surveying this

_____

[1]The Free Press finds it "[c]urious[]" that the Court did not cite *Courier-Journal* in its May 26 opinion. (*Id.* at 7 n.2.) Yet, the Free Press likewise did not cite this decision in its prior motion papers. This is perhaps understandable because, as will become clear, *Courier-Journal* lends no support whatsoever to the Free Press's challenge to the protective measures the Court has imposed during discovery in this case. Indeed, in light of the ruling in *Courier-Journal,* the Court finds it curious — if not downright puzzling — that this decision features so heavily in the Free Press's present motion.

[2]Thus, as the Free Press acknowledges in its present motion, "the Sixth Circuit recognized *Seattle Times* as controlling" on the question of the constitutionality of protective measures in civil discovery. (Recons. Br. at 8.) It is all the more curious, then, that the Free Press did not recognize the controlling nature of this Supreme Court precedent in its initial motion papers, and that the newspaper and its counsel failed to "anticipate that the Court would

9

decision, the Sixth Circuit summarized its holding by quoting from the last sentence of the Supreme Court's opinion:

> [W]here, as in this case, a protective order is entered on a showing of good cause, . . . is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment.

*Courier-Journal,* 828 F.2d at 364 (quoting *Seattle Times,* 467 U.S. at 37, 104 S. Ct. at 2209-10). The Sixth Circuit then found that the challenged protective orders readily satisfied most aspects of this test, as they "limit[ed] access only to specified fruits of discovery" and did not "restrain the press from publishing any information it may obtain through its own initiative." *Courier-Journal,* 828 F.2d at 364. Consequently, the court explained that its inquiry was "limited to the question of whether the protective orders entered were premised upon a 'showing of good cause.'" 828 F.2d at 364.[3]

It is the Sixth Circuit's description of this "good cause" inquiry that the Free Press seizes upon as purportedly inconsistent with this Court's "good cause" analysis:

> The district court's showing of good cause consisted of a balancing of the [plaintiffs'] right to pursue discovery . . . against [the deponent's] assertion of a first amendment privilege, founded in freedom of association. In *Seattle Times,* the Court set forth the following balancing test:
>
> > [I]t is necessary to consider whether the "practice in question [furthers] an important or substantial governmental interest unrelated to the suppression of expression" and whether "the limitation of First Amendment freedoms [is] no greater than is

_____

rely so heavily on this case." (*Id.* at 4.)

[3]Notably, this Court used almost precisely the same language in its May 26 opinion to characterize its own inquiry. (*See* 5/26/2010 Op. at 30.)

> necessary or essential to the protection of the particular governmental interest involved."

467 U.S. at 32, 104 S. Ct. at 2207. The "practice" here is that of sealing deposition testimony; the "governmental interest" is that of permitting the [plaintiffs] to seek to vindicate their rights by conducting discovery, while protecting individuals who may once have joined the Ku Klux Klan (but who have no discoverable connection with the [plaintiffs'] case) from ostracism and retaliation based on past political associations; the first amendment freedom limited is that of the press to obtain and to publicize information of great public interest that is produced by the adjudicative process; and the question about the scope of the protective orders is whether they were "no greater than is necessary or essential" to permit the [plaintiffs] to obtain the membership list without exposing the affiliation of those whose names appear on it.

*Courier-Journal,* 828 F.2d at 364-65 (citations omitted). The Free Press reads this passage as "expressly instruct[ing] that, when determining the existence of good cause under Rule 26(c) . . . , *Seattle Times* requires the district court to apply intermediate First Amendment scrutiny, articulating an important governmental interest and limiting the protective order to only what is necessary to serve that interest." (Recons. Br. at 8.)

Leaving aside, once again, the label of "intermediate scrutiny" that the Free Press wishes to attach to this inquiry, the Court finds that its analysis in its May 26 ruling fully comports with the Sixth Circuit's application of the *Seattle Times* standard in *Courier-Journal.* Having set forth the relevant legal principles derived from *Seattle Times,* the Sixth Circuit turned first to the newspaper's argument that its First Amendment interests should predominate the inquiry because Ku Klux Klan members had no "associational rights under the first amendment that could give rise to a right not to have their affiliation disclosed." *Courier-Journal,* 828 F.2d at 365. The court rejected this contention,

explaining that "[n]ot only do the Klan members have associational rights, but the [plaintiffs] have a right to seek to vindicate their civil rights without their individual concerns being sacrificed to a generalized desire of the press to publish and the public to know every fact disclosed by the discovery process as soon as the parties do." 828 F.2d at 366.

The court then addressed (and turned aside) the newspaper's remaining challenges to the protective orders, with reasoning that is fully applicable here:

> The publisher's claim of a first amendment right of access to the fruits of discovery is equally unsound. The cases relied upon for this point uniformly predate *Seattle Times* or deal with public and press access to presumptively and historically open trial proceedings . . . .[4] In recent cases, *Seattle Times* has been relied upon repeatedly to reject challenges to protective orders concerning the fruits of civil discovery.
>
> Furthermore, the protective orders entered here were much narrower than those entered in such cases as . . . *CBS, Inc. v. Young,* 522 F.2d 234 (6th Cir. 1975).[5] The publisher insists that the scope of these orders is still much too broad, but the premise for this claim is the faulty one that Klan members have no rights. We consider these orders to be no more extensive than is absolutely necessary to preserve the anonymity of Klan members whose names appear on the membership list, but who are not discovered to have sufficient connection with the [plaintiffs'] suit to become parties or witnesses.
>
> The publisher insists that the "right to know" in this instance is peculiarly strong because there is a public issue raised by the revelation that some two dozen local law enforcement officers are Klan members. The

---

[4]As an example, the Sixth Circuit cited *Press-Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S. Ct. 2735 (1986), which the Free Press likewise has relied upon in its challenge to this Court's protective orders.

[5]Again, the Free Press also has cited the *CBS* decision in support of its challenge to the protective measures imposed in this case.

presence of Klansmen on the police force is, however, a marginal issue in the [plaintiffs'] suit. The possibility that the Klan may have a substantial foothold in the local constabulary has never been subject to the evidentiary contest of a trial and has not formed the basis for any court ruling. The membership list, if produced, will not become part of any presumptively public record. Under *Seattle Times,* the right of access simply does not extend this far.

We conclude that the extraordinary circumstances that would permit us to grant a writ of mandamus are not present here. The district court's protective orders were "limited to the context of pretrial civil discovery," and they did not "restrict the dissemination of the information if gained from other sources." *Seattle Times,* 467 U.S. at 37, 104 S. Ct. at 2209-10. Furthermore, the orders were "entered on a showing of good cause," *id.,* after fairly balancing the very limited right of access the press has to the presumptively nonpublic fruits of civil discovery against the right of civil rights plaintiffs to obtain discovery of a Ku Klux Klan membership list over a claimed privilege based on first amendment associational rights. The central issue, as the district court recognized, is not the relatively slight right of public access in this context, but whether the protective order was an appropriate means of facilitating discovery while respecting the rights of nonparties whose past or present associations might thereby be revealed.

*Courier-Journal,* 828 F.2d at 366-67 (citations omitted).

This Court is simply at a loss to see how the Free Press can read the *Courier-Journal* decision as somehow undermining its May 26 ruling in this case. In its "good cause" inquiry under Rule 26(c), this Court balanced the "relatively slight" right of public and media access to discovery materials against the important and legally recognized interests served by its protective orders, including (i) protection of the privacy rights of nonparties, and (ii) a desire to avoid interference with an ongoing homicide investigation. The Court's protective measures, like the orders under review in *Courier-Journal,* are "limited to the context of pretrial civil discovery" and do not "restrict the dissemination of

the information if gained from other sources."  Moreover, while the Court has recognized "that the 'right to know' in this instance is peculiarly strong" in light of the involvement of high-ranking government officials and Plaintiffs' allegations of corruption and wrongdoing in a murder investigation, many of the protective measures in this case have been directed at discovery efforts through which Plaintiffs have been permitted to explore "marginal issues[s]" that have "never been subject to the evidentiary contest of a trial and ha[ve] not formed the basis for any court ruling."  In short, regardless of whether the Court is called upon to apply "intermediate First Amendment scrutiny" to its "good cause" inquiry, (*see* Recons. Br. at 9), it is quite clear from *Courier-Journal* — and the Supreme Court precedent upon which it relies, *Seattle Times* — that the First Amendment interest claimed by the Free Press is quite limited while this case remains in its discovery phase,[6] that this interest is readily outweighed by the interests and concerns identified and discussed at length in the Court's May 26 ruling, and that the protective measures employed by the Court are narrowly tailored to secure these latter interests while not impeding Plaintiffs' opportunity for full discovery or the media's opportunity to uncover and disseminate any information gained independently from the parties' discovery efforts.

---

[6] If *Courier-Journal* were not clear enough on this point, the Sixth Circuit has since cited this decision (as well as *Seattle Times)* as an example of the courts' "reject[ion] [of] first amendment claims of access, even though the information involved was of undeniable public interest."  *Cincinnati Gas & Electric Co. v. General Electric Co.,* 854 F.2d 900, 905 n.6 (6th Cir. 1988).  The court further characterized *Courier-Journal* as holding that the petitioning "newspapers had no first amendment right of access to discovery materials, despite the recognition that [the] proceedings were of intense public concern."  *Cincinnati Gas & Electric,* 854 F.2d at 905 n.6 (internal quotation marks, alteration, and citation omitted).

More specifically, this Court's "good cause" inquiry fully supports the decision that is the principal focus of the Free Press's motion for reconsideration — namely, the Court's determination that the deposition of Michigan Attorney General Mike Cox should be conducted and maintained under seal. The Court, of course, extensively addressed this precise question in its May 26 decision, (*see* 5/26/2010 Op. at 42-49), and a motion for reconsideration is not the proper vehicle for seeking to reargue this issue.[7]

Moreover, all of the relevant considerations underlying the Court's ruling remain

---

[7]In its initial motion to unseal, the Free Press broadly asserted that this Court had engaged in "blanket suppression without specified justification." (3/23/2010 Motion at 1.) In its May 26 decision, however, the Court provided a detailed account of the protective measures it has employed and the public justifications it has offered for these measures, and it also explained at greater length the grounds for these measures. Faced with this extensive record of the Court's rulings and reasoning, the Free Press now takes a different tack, characterizing this record as reflecting the Court's "deep[] . . . involve[ment] in the conduct of" the Attorney General's deposition, (Recons. Br. at 3), and requesting that the Court publicly release the transcripts of the conferences and *in camera* hearings at which the Court and counsel addressed issues arising during this deposition.

This request must be denied, for reasons that have already been explained in the May 26 opinion. In particular, the Court observed that certain of its justifications for protective measures could not be publicly disclosed "because to do so would defeat the very purpose of the Court's rulings." (5/26/2010 Op. at 17-18.) Even more specifically, in the very same footnote cited by the Free Press as purportedly revealing the Court's "deep[] involve[ment]" in the conduct of the Attorney General's deposition, the Court described an *ex parte, in camera* conference at which Plaintiffs' counsel "explained and sought to justify various lines of inquiry and the Court ruled on each such request." (*Id.* at 43 n.26.) Clearly, then, Plaintiffs' counsel extensively disclosed protected work product during this conference — subject matter which, as the Court noted, counsel "presumably does not wish the Court to unseal." (*Id.*) Indeed, this record has not even been disclosed to other counsel, in light of the protected subject matter addressed at this conference. Notwithstanding its disingenuous request for public release of this record, the Free Press fails to suggest how the Court might go about gathering the information necessary to craft protective measures that reflect a proper balancing of all of the relevant interests, if all such information is subject to public disclosure — and thus can no longer be meaningfully protected — simply by virtue of the Court having learned it in the course of addressing a discovery issue.

unchanged, and the Free Press does not contend otherwise. The discovery process is still ongoing, and there is no way of knowing the extent (if at all) to which the deposition testimony of the Attorney General (or any other witness) will prove relevant to any substantive issue in the case. The privacy interests implicated by the Attorney General's deposition extend well beyond the Attorney General himself, and encompass private individuals who have no apparent connection to, nor personal knowledge bearing upon, the parties' claims and defenses.[8] Finally, neither the Attorney General nor any party has sought relief from the Court's protective order sealing the Attorney General's deposition, and anyone who wishes such relief surely knows how to bring an appropriate motion.[9]

---

[8]Although the Free Press once again argues, as it did in its initial motion papers, that the Attorney General has waived any claim of privacy through his statements to and interviews with the media, the Court specifically addressed this point in its May 26 decision, (*see* 5/26/2010 Op. at 42-43 & n.26), and the Free Press has not even attempted to challenge this reasoning. In addition, the overly simplistic notion of "waiver" advanced by the Free Press leads to a perverse corollary — namely, that a public official who avoids any contact with the media is in a better position to keep his deposition testimony out of the public domain. The case law lends no support to this proposition. To the contrary, the courts have pointed to the availability of information through other means as an important factor in determining whether to uphold a protective order that restricts the public disclosure of discovery materials. *See Seattle Times,* 467 U.S. at 34, 104 S. Ct. at 2208 (observing that the protective order in that case "prevent[ed] a party from disseminating only that information obtained through use of the discovery process," and thus permitted the "disseminat[ion] [of] the identical information covered by the protective order as long as the information is gained through means independent of the court's processes"); *Courier-Journal,* 828 F.2d at 364 (noting that the protective orders in that case "do not mention the press at all, and thus do not restrain the press from publishing any information it may obtain through its own initiative").

[9]The Free Press suggests, without citation to any authority, that "[t]here is no basis . . . to distinguish between an unsealing request made by the deponent, a party, or the media," and that "the Free Press — as a member of the media and as representative of the public — has standing to challenge the Court's sealing of a public interest judicial document." (Recons. Br. at 16.) This argument suffers from a number of factual and legal defects. First and foremost, as the Court explained in its May 26 decision, the Attorney General's deposition is not a "judicial

16

In the end, the Free Press's present motion rests upon a false premise — namely,

that the Court has disregarded the First Amendment rights of the media and the legitimate

---

document," because neither it nor any other sealed materials "have been filed for the purpose of securing this Court's ruling on the merits of any substantive issue, claim, or defense." (5/26/2010 Op. at 29; *see also id.* at 39 & n.23.) Under these circumstances, it is debatable whether the Free Press has standing to pursue a challenge to the protective order prohibiting public disclosure of the Attorney General's deposition. *See Bond v. Utreras,* 585 F.3d 1061, 1072-78 (7th Cir. 2009).

Even assuming — as the Court did in its May 26 ruling, without actually considering or deciding the point — that the Free Press has the necessary standing, it can claim only a "very limited right of access . . . to the presumptively nonpublic fruits of civil discovery." *Courier-Journal,* 828 F.2d at 367. The parties, in contrast, are in a far stronger position to identify ways in which their interests as litigants might be harmed by the Court's protective measures, and to explain how these measures could be loosened or lifted in a way that continues to protect any relevant privacy or other interests while removing an impediment to that party's discovery efforts. Likewise, a witness is in the best position to argue that the witness's own interests are not served by restricting public disclosure of his or her deposition testimony. And, of course, the parties and the deponent are far better informed than the media (or the Court) as to what actually transpired at a deposition. Thus, the Court cannot agree with the Free Press's contention that all requests to unseal — whether brought by a party, a deponent, or the media — stand on precisely the same legal footing, should be judged by the same standards, and enjoy an equal chance of success.

Neither can the Court accept the Free Press's assertion that courts lack the authority to enter protective orders *sua sponte.* Rule 26(c)(1) seemingly permits a court to do so, as it confers in separate sentences (i) the right of "[a] party or any person from whom discovery is sought" to "move for a protective order," and (ii) a court's authority to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," without in any way suggesting a necessary causal link between the two. In addition, many courts have found that they possess the requisite authority to issue protective orders *sua sponte, see, e.g., McCoy v. Southwest Airlines Co.,* 211 F.R.D. 381, 385 (C.D. Cal. 2002); *Sokolski v. Trans Union Corp.,* 178 F.R.D. 393, 400 (E.D.N.Y. 1998); *Sanchez v. Zabihi,* 166 F.R.D. 500 (D.N.M. 1996); *Lesal Interiors, Inc. v. Resolution Trust Corp.,* 153 F.R.D. 552, 558 n.4 (D.N.J. 1994), and the Free Press has not cited any case law to the contrary. Finally, it is fair to say that the bulk of the protective measures employed by the Court in this case have not been *sua sponte* edicts issued on the Court's initiative alone, but instead have been the product of iterative exchanges among the Court, the parties, and witnesses, with a party seeking to pursue a particular discovery effort, other parties or the relevant witness lodging objections, and the Court then determining the terms under which the discovery effort could go forward.

public interest in this case as it has inquired whether there is "good cause" for shielding certain discovery materials from public disclosure.  In reliance on this incorrect premise, the Free Press suggests that the Court's "good cause" analysis is most flawed as to the Attorney General, whose high public profile makes him a especially poor candidate for measures that would shield his deposition testimony from public disclosure or media scrutiny.

If the law governing a Rule 26(c) "good cause" inquiry were as the Free Press represented it — with the outcome of this inquiry largely dependent upon the public stature of a given witness and the extent of the public's interest in this witness's testimony — the Court would wholeheartedly agree that there would be no basis for restricting public access to the Attorney General's deposition testimony.  As the Court has recognized, "the Attorney General is a public official whose actions are subject to public scrutiny," (5/26/2010 Op. at 42), and it is possible that the information learned in discovery in this case may shed additional light on the official actions of high-ranking government officials, including not only the defendant former mayor of Detroit but also the Michigan Attorney General and a number of other non-party witnesses.  The laudatory investigative efforts of the Detroit Free Press and other local media outlets have led to greater public awareness of the activities of these and other elected officials, and the Court has no interest whatsoever in impeding these efforts.  The Free Press, and the community at large, may rest assured that if discovery materials compiled by the parties prove in any way relevant to the issues in this case or are relied upon by the Court in

resolving any substantive matter, these materials will become part of the public record of official government activity.

In the meantime, however, these discovery efforts remain ongoing, and the courts have repeatedly emphasized that the media and the public may claim only a limited right of access to discovery materials before they are submitted to and used by the court in its substantive rulings. This same case law has amply explained the necessity for such limits, where a broad discovery effort often entails the exploration of confidential, private, and sensitive matters. This Court has permitted precisely this sort of broad discovery here, thereby generating an attendant need to protect the privacy interests of non-parties and to avoid interference with an ongoing murder investigation. When these discovery efforts have concluded (in the not-too-distant future), the Court will then be able to reassess the need for continued protective measures under a complete record, and with a better understanding of precisely how the information learned in discovery bears upon the substantive issues in the case. Moreover, the First Amendment and public interests cited by the Free Press will then be entitled to greater weight, particularly as to any discovery materials filed with the Court in connection with a dispositive motion or introduced at any eventual trial.

At present, however, the Court finds that its May 26 ruling rests upon a proper balancing of all of the interests that are relevant to a "good cause" inquiry under Rule 26(c), including the limited public right of access to the fruits of an ongoing discovery process. The immediate release of these discovery materials would not only be premature

and unfair to private individuals who are neither parties to this case nor involved in it in any way, but would, quite properly, subject the Court to legitimate criticism for allowing the broad civil discovery process to contribute to the already sensational and prurient atmosphere surrounding this case. This would serve neither the First Amendment nor the interests of justice.

### III.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Detroit Free Press's June 9, 2010 motion for reconsideration (docket #382) is DENIED.


<u>s/Gerald E. Rosen</u>
Chief Judge, United States District Court

Dated:  June 24, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 24, 2010, by electronic and/or ordinary mail.

<u>s/Ruth A. Gunther</u>
Case Manager