**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ERNEST FLAGG, as Next Friend of J. B.,
a minor; TARIS JACKSON, as Next Friend
of A. J., a minor; and BRIAN GREENE, as
Next Friend of I. B., a minor,                    Case No. 05-74253
                                                  Hon. Gerald E. Rosen
            Plaintiffs,

v.

CITY OF DETROIT and KWAME M. KILPATRICK,

            Defendants.
_____/

**OPINION AND ORDER REGARDING**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____November 1, 2011_____

PRESENT:  Honorable Gerald E. Rosen
                Chief Judge, United States District Court

## I.  INTRODUCTION

On April 30, 2003, Tamara Greene was killed in a drive-by shooting in Detroit,

Michigan.  Her murder remains unsolved.  In this case, Ms. Greene's minor children — J.

B., through his next friend Ernest Flagg; A. J., through her next friend Taris Jackson; and

I. B., through her next friend Brian Greene — seek an award of damages under 42 U.S.C.

§ 1983 against the City of Detroit and its former mayor, Kwame Kilpatrick, alleging that

these Defendants deliberately obstructed the Detroit Police Department investigation into

their mother's murder, thereby abridging their right of access to the courts as guaranteed by the U.S. Constitution. Plaintiffs claim that, but for this obstruction, they could have brought a state court wrongful death action against their mother's killer, and successfully recovered an award of damages from this wrongdoer to compensate them for the loss of their mother.

Through the present pair of motions filed in September of 2010, the two remaining Defendants, the City of Detroit and former Mayor Kilpatrick,[1] seek an award of summary judgment in their favor on Plaintiffs' § 1983 claims of denial of access to the courts. In its motion, the Defendant City argues that Plaintiffs cannot forge the requisite link between any interference with the Tamara Greene homicide investigation and a City of Detroit policy, as required to impose liability on a municipality under § 1983. The Defendant City further contends that, even if Ms. Greene's children cannot bring a wrongful death action against their mother's killer, a loss of consortium claim is an adequate alternative remedy that remains available to them once they reach the age of majority. For his part, Defendant Kilpatrick asserts in his motion that despite ample opportunity for discovery, Plaintiffs have failed to produce evidence that he took any action to obstruct or impede the investigation into Tamara Greene's murder.

Defendants' motions have been fully briefed by the parties. In addition, the Court

---

[1] Other City of Detroit and senior Detroit Police Department officials were named as Defendants in Plaintiffs' third amended complaint, but the claims against these other Defendants have been voluntarily dismissed.

2

held an October 5, 2011 hearing on these motions, at which counsel for the parties were given an opportunity to present further arguments in support of their respective positions. Having thoroughly reviewed the parties' written submissions and accompanying, voluminous exhibits, and having carefully considered the arguments of counsel at the October 5 hearing,[2] the Court now is prepared to rule on Defendants' motions. This opinion and order sets forth the Court's rulings on these motions.

## II. <u>GOVERNING LEGAL PRINCIPLES</u>

At the outset of this opinion, the Court believes it appropriate to highlight some of the basic legal principles that govern the Court's present inquiry, and to provide some context for the discussion and legal analysis that follow. From the inception of this litigation, the Court has emphasized its strongly held view that it was in the best interests of both the parties and the public to allow the development of a full, robust discovery record upon which to decide this case. This lengthy and sometimes contentious discovery process has garnered considerable public and media attention. Yet, as will be seen, the parties' discovery efforts have sometimes unearthed information or revelations that, while perhaps deemed worthy subjects of media reports and public discussion, have turned out

---

[2]Shortly after the October 5 hearing, Plaintiffs filed a motion seeking leave to submit a brief in which they would correct various purported misstatements made by defense counsel at the hearing. Having reviewed this motion and the accompanying brief, the Court elects to permit this supplemental filing. Nonetheless, the parties may rest assured that regardless of this post-hearing submission, the Court has undertaken its own independent review of the record in light of counsel's assertions at the October 5 hearing, and has discounted any such assertions that lack evidentiary support. More generally, the Court is fully mindful of the principle (as set forth below) that for purposes of deciding Defendants' summary judgment motions, the record must be construed in a light most favorable to Plaintiffs.

to have little or no bearing on the proper disposition of Defendants' summary judgment motions. Against this backdrop of an exhaustively compiled and extensively reported discovery record, it is especially important to emphasize the issues that are — and are not — relevant to the Court's resolution of the pending motions, and to describe the legal framework within which the Court will decide these issues.

**A.    The Factual Issues of Relevance to Defendants' Summary Judgment Motions**

Turning first to the factual record compiled during the lengthy discovery period in this case, it is fair to say that the parties — and, in particular, Plaintiffs — were given wide latitude to pursue any and all matters that were arguably relevant to their claims or defenses, and to undertake broad discovery efforts — including numerous depositions and the production and examination of a voluminous documentary record[3] — so long as they "appear[ed] reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). In light of the considerable and sometimes breathless coverage of this case by the Detroit media, it was perhaps to be expected that a good portion of the information unearthed in the parties' discovery efforts would find its way into newspaper articles and television reports. Yet, the rules of discovery, by their express terms, permit the exploration of matters that may ultimately prove to be unhelpful or wholly irrelevant to the parties' claims or defenses, and this case certainly has not been immune from this

---

[3]Most notably, the discovery period in this case was significantly lengthened by the laborious task, ably performed by Magistrate Judges Whalen and Hluchaniuk, of reviewing over 600,000 text messages exchanged among certain key City of Detroit and Detroit Police Department officials during several relevant time periods.

necessary byproduct of liberal civil discovery rules.  Consequently, much of the information learned and exchanged among the parties in this litigation — and, in turn, much of the information found in the media reports of this case — has little or no role to play in the Court's resolution of Defendants' summary judgment motions.

Perhaps most notably, it will be apparent from this opinion that, now that the discovery dust has settled, the Court has little need to dwell on the much-discussed, much-rumored party at the Detroit mayor's official residence, the Manoogian Mansion, in or around the fall of 2002.  In Plaintiffs' view — backed, they say, by admissible evidence — this party actually happened, and Tamara Greene performed as a dancer at this party in the presence of then-Mayor Kwame Kilpatrick.  Yet, whether or not this is so, this party's occurrence — and Ms. Greene's presence at this rumored party, as well as other details of what might have transpired there — has only limited relevance to this case, and even less significance to the outcome of Defendants' motions.  The rumored Manoogian Mansion party, and the salacious allegations surrounding it, are relevant here largely because they suggest a reason why Defendants might have wished to interfere with the Tamara Greene homicide investigation.  In particular, Plaintiffs contend that a proper, thorough investigation into Ms. Greene's murder invariably would have led investigators to inquire whether this party occurred, and this, in turn, would have led to embarrassing revelations — or worse, depending on what one believes about what actually transpired at this rumored party — about the conduct of Defendant Kilpatrick and, perhaps, his family and associates.

5

All of this, however, is largely immaterial to the Court's present inquiry. To the extent that the rumored Manoogian Mansion party might serve as a motive for Defendants' alleged violation of Plaintiffs' constitutionally protected right of access to the courts, motive is not an element of Plaintiffs' § 1983 claims, and Plaintiffs have no obligation to shed any light on Defendants' possible reasons for violating their constitutional rights, whether now or at trial. Rather, Plaintiffs' present task is to produce evidence from which a trier of fact could conclude that their rights were violated, for whatever reason. In the remainder of this opinion, then — and in accordance with the legal principles discussed below — the Court simply assumes that the rumored party occurred, with little attention given to the evidence submitted by the parties (or the information and claims published by the Detroit media) that might tend to prove or disprove this rumor.[4]

Another example of an ultimately tangential matter to which Plaintiffs and their counsel devoted considerable attention in discovery, and that spawned a veritable wave of media coverage and editorializing, is the investigation launched by former Michigan

_____

[4]For what it is worth, it seems unlikely that it will ever be established with any degree of certainty whether this rumored party, or something like it, actually took place. The witness accounts produced by Plaintiffs lack specificity, rest to some extent on inadmissible hearsay, and contradict one another in various respects. On the other hand, it seems fairly well documented at this point that Defendant Kilpatrick kept an active social calendar during his days as mayor of Detroit. Nonetheless, whether this particular party occurred at this particular locale at this particular time is likely to remain an unsolved mystery. Be that as it may, one thing is now clear: the occurrence (or non-occurrence) of the rumored Manoogian Mansion party is not especially pertinent to the issues that must be decided in this case, but instead serves largely as a titillating backdrop to the true points of contention.

6

Attorney General Mike Cox and the Michigan State Police into allegations relating to the rumored Manoogian Mansion party and purported misconduct by members of then-Mayor Kilpatrick's security detail.  Although Plaintiffs' counsel advanced myriad theories and beliefs as to the putative relevance of Attorney General Cox's investigation to the issues in this case, and although the Court permitted counsel to pursue some of the less fanciful of these theories, this line of inquiry proved almost entirely fruitless in uncovering evidence that could assist Plaintiffs in establishing their § 1983 claims.  As is often the case with discovery initiatives in large, complex civil suits, while Plaintiffs firmly believed that this effort had some potential to unearth admissible evidence bearing upon the pertinent issues in this case, this potential value went largely unrealized.[5]

Moreover, although Plaintiffs' initial complaint named Attorney General Cox as a party, the Court held in an August 31, 2006 ruling that the allegations directed against the former Attorney General were "wholly inadequate" to state a viable claim, (8/31/2006

---

[5]The Court is aware of the media's heightened interest in this aspect of Plaintiffs' discovery effort, and its desire that the transcript of the former Attorney General's deposition be unsealed and made available to the public.  Yet, as the Court explained at length in an opinion prompted by the Detroit Free Press's request to unseal the discovery record in this case, the public right of access to discovery materials is triggered only when these materials are submitted to and relied upon by the Court in addressing the parties' claims or defenses on the merits.  (*See* 5/26/2010 Op. at 23-30.)  The Court further assured the Free Press and other local media representatives that its rulings on the merits would be "placed on the public docket," and that "the record relied upon in making these rulings, including the parties' motions, briefs, and supporting exhibits, will be made available to the public and the media to the greatest extent possible."  (*Id.* at 52.)  As will become clear in the balance of the present opinion, the Court has had no occasion to rely on any aspect of the former Attorney General's deposition in resolving Defendants' summary judgment motions.  Under these circumstances, it would serve no proper litigation or jurisprudential purpose to unseal the transcript of this deposition, and the Court will not do so.

Op. at 20-21 n.11), and Plaintiffs never sought to reinstate or otherwise pursue any such claim against Attorney General Cox in any of their several amendments to their pleadings (nor has the Court's independent review revealed any basis for him to have been a party to this suit).

These are only the most prominent examples of matters that were explored in the parties' discovery efforts and have been raised in media reports about this case, yet have little or no bearing on the Court's resolution of Defendants' motions. The specific focus of this case is the Tamara Greene homicide investigation, and this subject alone has generated an ample evidentiary record and complex legal issues for the Court to consider, as evidenced by the length of the present opinion.

The Court, of course, is fully mindful of the place this litigation has occupied in the larger public debate about the conduct and transgressions of former Mayor Kilpatrick and members of his administration, and nothing in this opinion should be construed as the Court's having turned a blind eye to the dismaying and distressing record compiled during the Kilpatrick administration, with its numerous instances of unethical conduct, criminal wrongdoing, official hubris, and utter disregard for the obligations owed by public officials. Yet, this case must be decided under its own record, and the Court's rulings must be limited to the issues implicated by Plaintiffs' specific claims. The Court has neither the jurisdictional charge nor the ambition to use this litigation as a forum for a wide-ranging examination of the activities of City of Detroit officials during Defendant Kilpatrick's tenure as mayor. While this surely is a legitimate and worthy subject of

8

public concern and media scrutiny, the Court's present task is far more narrowly focused, as well as sharply circumscribed by the rules and principles that govern the resolution of summary judgment motions. Accordingly, the Court turns to a discussion of these rules and principles.

**B.    The Legal Standards Governing the Court's Resolution of Defendants' Motions**

Through the present motions, the City of Detroit and former Mayor Kilpatrick seek summary judgment in their favor on Plaintiffs' federal § 1983 claims. Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).[6] As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In this case, there plainly has been "adequate time for discovery," so if Plaintiffs' claims are to withstand Defendants' Rule 56 challenge, Plaintiffs must point to record

---

[6]Effective December 1, 2010, Rule 56 has been revised in various respects. However, unless explicitly noted otherwise, the language quoted here and elsewhere in this opinion reflects the Rule as it read when Defendants filed their motions. None of the recent amendments to the Rule would materially affect the Court's disposition of Defendants' motions.

9

evidence sufficient to establish each of the elements of the § 1983 claims they have asserted, as well as a basis for holding each of the two Defendants liable for the alleged violations of their federal constitutional rights.

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the requisite "favorable" review is not a wholly uncritical and unquestioning review — nothing in Rule 56 demands that the Court simply accept at face value the assertions made in the parties' written submissions or the information found in the accompanying exhibits.  Rather, to merit consideration, the parties' factual statements in their briefs must be backed by citation to the record,[7] and the materials offered in support of these statements must satisfy the applicable legal and evidentiary standards to be eligible for consideration by the Court.

Rule 56 itself establishes many of these standards.  First, the Rule dictates that the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters

---

[7]The recent amendments to Rule 56 make this explicit, with the Rule now mandating that a party's factual assertions be supported by  "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A) (effective Dec. 1, 2010).

stated." Fed. R. Civ. P. 56(e)(1). The requirement of "personal knowledge" serves to exclude statements of a witness's "mere belief," as opposed to statements about matters or incidents that the witness actually "perceived or observed." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.,* 452 F.3d 1193, 1200 (10th Cir. 2006) (internal quotation marks and citations omitted); *see also State Mutual Life Assurance Co. v. Deer Creek Park,* 612 F.2d 259, 264 (6th Cir. 1979) ("Affidavits composed of . . . opinion evidence do not satisfy Rule 56(e) and must be disregarded."). The limitation to facts that "would be admissible in evidence" necessarily incorporates the standards embodied in the Federal Rules of Evidence, including (i) the requirement that the opinion testimony of a lay witness must be "rationally based on the perception of the witness," Fed. R. Evid. 701, and (ii) the prohibition against consideration of hearsay, *see* Fed. R. Evid. 802; *see also U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189 (6th Cir. 1997). More generally, the Sixth Circuit has emphasized that "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." *Sperle v. Michigan Department of Corrections,* 297 F.3d 483, 495 (6th Cir. 2002).

It cannot be said that the parties here have rigorously adhered to these standards in their briefs in support of and opposition to Defendants' motions. Plaintiffs' brief in response to these motions, for instance, includes the following account of the deposition testimony of Lieutenant Alvin Bowman, one of the Detroit Police Department ("DPD") officers who investigated Tamara Greene's murder:

11

> Based upon his role as the Lieutenant in charge of [Homicide] Squad 8 from November 2003 until March 10, 2004, Bowman believed that [Defendant] Kilpatrick, [former DPD police chief Jerry] Oliver, [former DPD police Chief Ella] Bully-Cummings and [former chief of staff Christine] Beatty, as well as other high ranking DPD executives, impeded the Greene homicide investigation. Bowman believed that Squad 8 would have found Greene's killer but for the interference in the investigation. Bowman testified that the conduct of Kilpatrick, Oliver, Bully-Cummings and Beatty made it "impossible to investigate, let alone solve the murder of Tamara Greene." Bowman testified that Kilpatrick, Oliver, Bully-Cummings and Beatty disposed of reports from the Greene homicide file and "retaliated against anyone that dared investigate anything having to do with the Manoogian Mansion party."

(Plaintiffs' Response Br. at 61 (footnotes with citations omitted).) What Plaintiffs notably fail to mention, however, is that Lt. Bowman *expressly acknowledged* at his deposition that these were merely his personal opinions and beliefs, and that he was unaware of any evidence that supported these beliefs. (*See* Plaintiffs' Response, Ex. 50, Bowman Dep. at 192-98.) Such subjective beliefs, unbacked by facts within the personal knowledge of the witness, cannot assist Plaintiffs in withstanding summary judgment. *See Arendale v. City of Memphis,* 519 F.3d 587, 605 (6th Cir. 2008); *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.,* 176 F.3d 921, 928 (6th Cir. 1999); *Cox v. Electronic Data Systems Corp.,* 751 F. Supp. 680, 692 (E.D. Mich. 1990).

In addition, both sides invite the Court to rely on hearsay in deciding Defendants' motions. As one of many examples, Plaintiffs have offered the affidavit of former DPD officer Sandy Cardenas, who states that on "[o]ne night in the fall of 2002" when she was working as a 911 dispatcher, she "received several calls to dispatch police units to a disturbance call[] located at the Manoogian Mansion." (Plaintiffs' Response, Ex. 14,

12

Cardenas Aff. at ¶ 8.)  This affidavit is replete with hearsay, including (i) statements purportedly made by DPD Sergeant Shawn Gargliano over a police radio upon his arrival at the Manoogian Mansion, (ii) statements purportedly made by other, unnamed DPD officers who allegedly responded to the call, and (iii) statements purportedly made by other (again unnamed) police dispatchers that an unidentified DPD officer had come into the dispatch area on the night of the Manoogian Mansion incident and "removed all of the 911 tapes of the run."  (*Id.* at ¶¶ 15-19, 21, 27.)  Not to be outdone, the Defendant City of Detroit has produced the affidavit of a federal prison inmate, Tommy Lee Hodges, who reports that an individual named Darrett King told him in a conversation in the summer of 2003 that he (King) "was the shooter of Tamara Greene."  (Defendant City's Motion, Ex. 33, Hodges Aff. at ¶ 4.)[8]  None of this hearsay may be considered by the Court in resolving Defendants' motions.

Indeed, a particular form of hearsay features quite prominently in Plaintiffs' brief in opposition to Defendants' motions.  Specifically, Plaintiffs frequently direct the Court's attention to text messages purportedly exchanged among City of Detroit officials using City-issued SkyTel text messaging devices.  (*See* Plaintiffs' Response, Ex. 31

---

[8]Remarkably, in the brief in support of its motion, the City states that this affidavit "demonstrates that Greene's death was neither factually, nor legally, nor causally connected to the existence of the long rumored Manoogian party."  (Defendant City's Motion, Br. in Support at 19.)  Even if the affidavit did not rest upon inadmissible hearsay, a single individual's claim that someone purportedly confessed to him in the past does not "demonstrate" anything about the death of Ms. Greene.  Indeed, given that Mr. Hodges's claim has not led to any prosecutions or arrests, it certainly does not appear that his assertions have "demonstrated" anything of any consequence to any prosecuting or investigative authority.

13

(compilation of text messages).)  Each such text message, of course, is an out-of-court

statement, and therefore must be excluded from consideration as hearsay unless Plaintiffs

are able to identify a ground for its admissibility.  To be sure, there are theories under

which at least some of these text messages could be deemed admissible — *e.g.,* as the

statements of a party (Defendant Kilpatrick), *see* Fed. R. Evid. 801(d)(2)(A), or the

statements of City officials concerning matters within the scope of their employment, *see*

Fed. R. Evid. 801(d)(2)(D), or statements offered for a purpose other than "to prove the

truth of the matter asserted," Fed. R. Evid. 801(c).[9]  Unfortunately, while Plaintiffs have

made liberal use of text messages in their response to Defendants' motions, they have left

the Court largely to its own devices in identifying the legal bases upon which these out-

of-court statements may properly be considered in resolving the present motions.[10]

Finally, it is worth noting that this case features an evidentiary wrinkle that

typically is not present in this Court's consideration of a summary judgment motion.

Because some of the witnesses deposed by the parties — including, most notably,

Defendant Kilpatrick — invoked their Fifth Amendment privilege against self-

incrimination in response to certain questions, a trier of fact would be permitted to draw

---

[9]Beyond the issue of admissibility, there is the question whether the text messages can be properly authenticated as the statements of particular City officials.  *See* Fed. R. Evid. 901.

[10]For reasons that will become clear later in this opinion, the Court finds it unnecessary to resolve the difficult evidentiary questions raised by Plaintiffs' reliance on the SkyTel text messages.  In particular, even assuming that the messages cited in Plaintiffs' response brief are eligible for consideration as non-hearsay and could be properly authenticated, these messages do not alter the Court's disposition of Defendants' motions.

an adverse inference from this assertion of the privilege. *See Baxter v. Palmigiano,* 425

U.S. 308, 318, 96 S. Ct. 1551, 1558 (1976); *Keating v. Office of Thrift Supervision,* 45

F.3d 322, 326 (9th Cir. 1995). Similarly, in a recent opinion, the Court adopted the

Magistrate Judge's recommendation that the trier of fact be permitted to draw an adverse

inference arising from the Defendant City's destruction of e-mails sent to and received by

four former high-ranking City officials, including Defendant Kilpatrick, between August

2002 and June 2003. (*See* 10/5/2011 Op. and Order.) Later in the present opinion, the

Court will specifically address the impact of these adverse inferences upon the resolution

of Defendants' summary judgment motions.

## III. <u>FACTUAL BACKGROUND</u>

In the early morning hours of April 30, 2003, Tamara Greene was killed in a drive-

by shooting as she sat in a car at the corner of Roselawn Street and Outer Drive in

Detroit. Ms. Greene was pronounced dead at the scene, and a second passenger in the

car, Eric Mitchell, was taken to a nearby hospital and treated for gunshot wounds.

According to a statement Mitchell gave to the police, he had seen Ms. Greene earlier that

evening at the All Stars lounge where she worked as a dancer, and he then left the lounge

at around 1:00 a.m. and went to a friend's house. Ms. Greene called Mitchell after she

got off work at around 2:00 a.m. and offered to pick him up from his friend's house and

drive him home. According to Mitchell, Ms. Greene was parking her car in front of his

house on Roselawn when a white sport utility vehicle drove past and the occupants of the

SUV began shooting at Ms. Greene's vehicle. Mitchell immediately ducked down in the

15

passenger seat to avoid further injury, but Ms. Greene was fatally wounded in the gunfire, and was found slumped over the steering wheel of her car.

**A.     The Detroit Police Department Investigation into Tamara Greene's Murder**

**1.      The Investigation by Homicide Squad 8**

During the course of the Detroit Police Department ("DPD") investigation into Tamara Greene's murder, several different teams of DPD officers were given responsibility for this investigation.  Initially, on the night of Ms. Greene's murder, Sergeant Marian Stevenson of DPD's Homicide Squad 8 was among the DPD officers called to the scene, and Sgt. Stevenson was advised the next morning that she had been designated as the officer in charge of the murder investigation.[11]  At the time, Sgt. Stevenson reported to Lieutenant Billy Jackson, the Squad 8 supervisor, and Lt. Jackson, in turn, reported to Inspector Craig Schwartz, the head of DPD's Homicide Section.

Within days after she began her investigation, Sgt. Stevenson reported in her progress notes that several anonymous tips had been received and were being investigated.  (*See* Homicide File, Bates No. 752, 5/2/2003 Progress Note.)[12]  In one such tip received by a DPD officer on May 21, 2003, an anonymous caller inquired whether the woman shot on Roselawn a few weeks earlier was named "Strawberry" — a name

---

[11]Sgt. Stevenson testified that she had a "97% closure rating" while she worked in Squad 8, meaning that a suspect was arrested in 97 percent of the cases on which she served as the officer in charge.  (*See* Plaintiffs' Response, Ex. 18, Stevenson Dep. at 25.)

[12]As Plaintiffs observe, although Sgt. Stevenson references tips received on or before May 2, 2003, the earliest — and, evidently, the only — tip sheet actually contained in the homicide file is dated May 21, 2003.  (*See id.,* Bates No. 749, 5/21/2003 Homicide Tip Sheet.)

16

evidently used by Ms. Greene in her work as a dancer — and the caller further stated that "Strawberry" was "one of the dancers at the mansion" and that she had been "complaining that she did not get paid for dancing at the party." (*Id.* Bates No. 749, 5/21/2003 Homicide Tip Sheet.)[13] Thus, from the early days of the DPD investigation, Sgt. Stevenson and her supervisor, Lt. Jackson, were aware of suggestions that there was a possible link between Ms. Greene's death and a rumored party at the Detroit mayor's residence, the Manoogian Mansion, that allegedly had occurred several months earlier, in the fall of 2002. (*See* Stevenson Dep. at 61-62; *see also* Plaintiffs' Response, Ex. 71, Jackson Dep. at 280-81.)

This possible link drew the attention of both Sgt. Stevenson's colleagues and her superiors. Sgt. Stevenson testified at her deposition that the other members of Squad 8 "continuous[ly] teas[ed]" her and stated that they did not want to work with her as she investigated Ms. Greene's murder, and she recounted an incident when she was walking down the hall at DPD headquarters and "someone kind of ducked and said, 'Oh, we can't walk too close to you. You might get shot like Tammy.'" (Stevenson Dep. at 62-63.) In addition, the day after a DPD officer received the May 21, 2003 anonymous tip

---

[13]Plaintiffs note that the day after this tip was received, a case progress note was prepared by Sergeant Danny Marshall, proposing a number of steps that should be taken to "quickly substantiate or rule out that information concerning the party at the Mayor's Mansion." (*Id.*, Bates No. 748, 5/22/2003 Case Progress Note.) There is no indication in the homicide file that anyone followed up on these suggestions, at least until Lieutenant Alvin Bowman became the Squad 8 supervisor in late 2003. Moreover, Plaintiffs observe that there appear to be no more notes from or references to Sgt. Marshall in the homicide file, and they state that they were unable to locate this officer during the discovery period in this case.

17

suggesting a possible link between Ms. Greene's death and her alleged performance as a dancer at a rumored party at the Manoogian Mansion, Commander Fred Campbell of DPD's Central Services Bureau[14] met with Sgt. Stevenson and Lt. Jackson to discuss the progress of the homicide investigation, and he then forwarded the tip information to Assistant Chief of Police Timothy Black and Deputy Chief Harold Cureton and briefed these superior officers on the status of the investigation. (*See* Homicide File, Bates No. 751, Campbell Memo.) Then-Chief of Police Jerry Oliver called Assistant Chief Black while Commander Campbell was conducting this briefing, and the Assistant Chief proceeded to brief Chief Oliver regarding the investigation. (*See id.*)[15]

As the Greene murder investigation progressed into the fall of 2003, Lt. Jackson was promoted to serve as the acting head of the Homicide Section, and his direct superior officer, Craig Schwartz, was promoted to Commander of the Major Crimes Division, which encompassed Homicide and a number of other sections. In November of 2003, Lieutenant Alvin Bowman was designated to take Lt. Jackson's place as the head of Squad 8, with Sgt. Stevenson and the other members of this squad reporting to Lt. Bowman. According to Lt. Bowman, when he initially met with the members of Squad 8

---

[14]At the time, Commander Campbell was the direct supervisor of Inspector Schwartz, the head of DPD's Homicide Section. (*See* Plaintiffs' Response, Ex. 75, Schwartz Dep. at 29.)

[15]As Plaintiffs point out, Commander Campbell's memo in the homicide file appears to contradict the deposition testimony of former Chief Oliver that he first learned of Tamara Greene's murder when he read about it in the newspaper after his retirement as DPD police chief in October of 2003, and that he was not aware of any suggested link between Ms. Greene's death and a rumored Manoogian Mansion party. (*See* Plaintiffs' Response, Ex. 1, Oliver Dep. at 155-57.)

to discuss the Greene investigation, they were "all apprehensive" in light of "rumors" they had heard, and they expressed concern "that there would be retaliation against them, could be career ending or transferred out of Homicide, they'd lose their good job." (Plaintiffs' Response, Ex. 50, Bowman Dep. at 36.)  Sgt. Stevenson, in particular, told Lt. Bowman that she was "scared as hell" and "afraid to work" the case, but that she understood "it's my job, I got to do it, and I'm in."  (*Id.*)  Similarly, another female officer in the squad "emphatically told [Lt. Bowman] that she didn't want to work the case at all because of fear of being retaliated against."  (*Id.* at 39.)

During the time that Sgt. Stevenson was the officer in charge of the Greene investigation — a time period that spanned nearly a year, from the day of Ms. Greene's murder to March of 2004 — she reported that some of the materials compiled in her investigation had been taken or were missing.  In one instance, she arrived at work and discovered that the case notes she had been entering into her computer had been erased from the computer's hard drive.  (*See* Stevenson Dep. at 51-52.)[16]  She also discovered that four floppy disks on which she kept backup copies of computer-based information about the Greene investigation had been taken from a locked plastic case she kept on her desk.  (*See id.* at 52-53.)

More generally, when Sgt. Stevenson reviewed the copy of the homicide file that

---

[16]Although Plaintiffs assert in their response brief that Sgt. Stevenson's computer had been "tampered with," Sgt. Stevenson makes no such claim in her deposition testimony.  Rather, she testified that upon reporting the lost computer data to her superiors, she was told that there was "something wrong with the computers over the weekend" and the "computers messed up." (*Id.* at 54.)

the Defendant City of Detroit produced during discovery in this case, she found that some of the materials she had compiled during her investigation were not present in this copy of the file.  Sgt. Stevenson testified, for instance, that a spiral notebook in which she kept notes of her activities in the Greene investigation was missing from the homicide file. (*See* Stevenson Dep. at 210.)  She further testified that her handwritten notes of witness interviews and other investigative activities were missing from the file, (*see id.* at 39-40, 158-61, 198), as well as a videotape of Ms. Greene's funeral that she had been given by Ms. Greene's pastor, Kenneth Hampton, (*see id.* at 68, 73-74).[17]

### 2.    The Reassignment of the Greene Murder Investigation from Homicide Squad 8 to the Cold Case Squad

On March 10, 2004, the Greene murder investigation was reassigned from Homicide Squad 8 to three members of the Cold Case Squad:  Sergeant Odell Godbold, Sergeant Erika Lee, and Investigator Donald Hughes.[18]  This reassignment evidently was

---

[17]Sgt. Stevenson testified that upon receiving and reviewing this videotape, she was "surprised" to see that some "people from the police department" had attended Ms. Greene's funeral, including "a couple [of] officers from Homicide" and two members of then-Mayor Kilpatrick's Executive Protection Unit, Mike Martin and Loronzo Jones.  (*Id.* at 69-71.)  As Plaintiffs observe, both Martin and Jones were deposed in this case, and both denied that they attended Ms. Greene's funeral.  (*See* Plaintiffs' Response, Ex. 72, Martin Dep. at 124; Ex. 73, Jones Dep. at 119.)

[18]Apart from these and other DPD officers, the membership of the Cold Case Squad also included officers or representatives of the Michigan State Police, the federal Drug Enforcement Administration, and the Wayne County Prosecutor's Office.  The above-referenced DPD officers in the Cold Case Squad, like the members of Squad 8, reported at the time to Lt. Jackson, the acting head of the Homicide Section.  In fact, Lt. Jackson testified that under the "specific orders" he received from his superiors, the Greene investigation was not transferred to the Cold

precipitated by a meeting that day between Lt. Bowman and two Michigan State Police ("MSP") officers, John Figurski and Mark Krebs.  Lt. Bowman asked Lt. Jackson to attend this meeting with the MSP officers, and at some point during the meeting, Lt. Jackson invited Commander Schwartz to join the meeting.  (*See* Jackson Dep. at 74-75; *see also* Bowman Dep. at 286-87.)

During the course of this meeting, the MSP officers stated their view that the rumored Manoogian Mansion party had actually occurred.  (*See* Jackson Dep. at 74; Bowman Dep. at 271.)[19]  There also was some discussion at this meeting about another woman who allegedly had danced at the rumored party, and who had since been killed in Georgia.  (*See* Bowman Dep. at 287; Schwartz Dep. at 41.)  In addition, Lt. Bowman advised Commander Schwartz of his belief that Ms. Greene had been killed by a member of Mayor Kilpatrick's Executive Protection Unit ("EPU").  (*See* Schwartz Dep. at 41.) When Commander Schwartz asked what had led Lt. Bowman to this belief, Lt. Bowman reportedly responded by pointing to the fact that .40 caliber bullet casings had been found at the murder scene.  (*Id.)*

Commander Schwartz has testified that as this meeting continued, he became "increasingly suspicious" and "very disturbed" that he was hearing information that, in

---

Case unit, but rather was transferred to three specific officers — Godbold, Lee, and Hughes — who happened to be members of the Cold Case Squad.  (*See* Jackson Dep. at 106-07.)

[19]Lt. Jackson has testified that it was this assertion by the MSP officers that caused him to call Commander Schwartz and invite him to join the meeting.  (*See* Jackson Dep. at 74.)  He explained that when "the State Police were saying that the party had happened," he determined that this was a matter "that my chain of command needed to know."  (*Id.* at 241.)

his view, "[h]ad no basis in fact, had no substantiation and was based on wild speculation." (*Id.* at 42, 51.)  Thus, at the conclusion of the meeting, Commander Schwartz contacted Assistant Chief of Police Harold Cureton and recounted what he had been told by the MSP officers and Lt. Bowman.  Commander Schwartz then recommended to Assistant Chief Cureton that the Greene investigation be reassigned, based on his opinion that "we had a police lieutenant of the Homicide Section making what, by all appearances, was wild speculation regarding a case that had the potential to attract media attention," and that "[w]e had police investigators that were making groundless statements without supporting evidence that called into question their objectivity to conduct this investigation." (*Id.* at 43-44.)  Next, Commander Schwartz and Assistant Chief Cureton "discussed what squad should handle the investigation" after it was transferred from Homicide Squad 8, and they determined that a meeting should be convened with then-Chief of Police Ella Bully-Cummings to address the reassignment of the investigation. (*Id.* at 43.)

Accordingly, Lt. Jackson and Lt. Bowman were instructed to make two or three copies of the homicide file, and to bring these materials to a meeting later that day with Commander Schwartz, Assistant Chief Cureton, and Chief Bully-Cummings.  According to Commander Schwartz, Lt. Bowman "laid out his information" at this meeting regarding his investigation, and he then left the meeting. (*See id.* at 54.)  The remaining participants at the meeting then discussed Commander Schwartz's recommendation that the Greene investigation be reassigned to the Cold Case Squad — which, in Schwartz's

22

view, "had the time and the ability to conduct that investigation" — and Chief Bully-Cummings concurred in this recommendation and approved the reassignment. (*Id.* at 54-55.) Lt. Jackson could not recall whether Chief Bully-Cummings said anything in particular at this meeting in response to the information presented by Lt. Bowman, but he observed that she "didn't look very happy about it." (Jackson Dep. at 77-78.) Lt. Bowman has testified, in contrast, that Chief Bully-Cummings stated that she "want[ed] this [Greene] file put away in a safe place," and that "this case [wa]s not to be discussed outside of this room." (Bowman Dep. at 292.)[20]

Following this meeting with the police chief, the Greene homicide investigation was reassigned to the above-referenced team of three Cold Case Squad officers, Sgt. Godbold, Sgt. Lee, and Investigator Hughes. In addition, Lt. Jackson was ordered by Commander Schwartz to gather up the original homicide file and the copies made for the meeting with Chief Bully-Cummings and store these materials in a file cabinet in his office. (*See* Jackson Dep. at 78-79, 105-06.)[21] Lt. Jackson testified that this reassignment

---

[20]Commander Schwartz could not recall any such instruction being given by Chief Bully-Cummings at the meeting. (*See* Schwartz Dep. at 54-55.) He testified that while his superiors "didn't want people going to the media or to anybody on the outside and . . . revealing information on a case that's open and under investigation," there was "never any attempt to restrict the information from those people that needed to have it to conduct the investigation." (*Id.* at 55.)

[21]Commander Schwartz could not recall specifically how the file was stored after the meeting with Chief Bully-Cummings, but he agreed that "it was to be kept away from people not involved in the investigation." (Schwartz Dep. at 55.) Schwartz testified that such measures were employed "from time to time" in "high profile" investigations "where there would be the potential [for] or actual great media interest," and he explained that in such cases "you're not going to leave [the file] setting out on a desk." (*Id.* at 56.)

was "unusual," and that "generally the officer who has that case, Sergeant Stevenson, for example, would have kept that case as long as she was in Squad 8." (Jackson Dep. at 79-80.) Lt. Jackson further stated that the Cold Case Squad "[g]enerally" was given only "older cases" that "weren't being actively investigated," and he agreed that the Greene investigation did not fit this profile. (*Id.* at 106-07.)

Likewise, Sgt. Stevenson questioned why the case was reassigned from Squad 8 to the Cold Case Squad, and she expressed her displeasure to Lt. Bowman about this development. (*See* Stevenson Dep. at 77-80.) In her view, investigations were reassigned to the Cold Case Squad only in cases "that you've had for at least one and a half to two years and you had no leads," and Sgt. Stevenson still had leads that she wished to pursue. (*Id.* at 77-78, 132-33.) In particular, Sgt. Stevenson testified that at the point the case was taken from her, she was about to pursue leads — including, for example, following up on the information gleaned from her viewing of the videotape of Tamara Greene's funeral — that would have led her to question Officers Martin and Jones of the Mayor's EPU, as well as members of the Mayor's staff. (*See id.* at 74-76, 120-21.) More generally, Sgt. Stevenson testified that she had never before had a homicide investigation taken from her. (*See id.* at 130-31.)

Within a fairly short time after the Greene investigation was reassigned to the Cold Case officers in March of 2004, Sgt. Stevenson, Lt. Bowman, and Lt. Jackson all were transferred under circumstances or with explanations that they deemed suspicious. In April of 2004, shortly after his meeting with Chief Bully-Cummings regarding the Greene

24

investigation, Lt. Bowman was reassigned to work the midnight shift in the Second

Precinct.  (*See* Bowman Dep. at 296, 348-49.)  According to Lt. Bowman, his direct

superior, Lt. Jackson, advised him that he had been transferred because he had "been

asking too many questions about the Strawberry case."  (*Id.* at 295.)  Upon exploring this

matter up the chain of command, Lt. Bowman was told by Deputy Chief Cara Best that he

had been transferred for misspelling the word "homicide" in a report.  (*Id.* at 296-97.)[22]

Lt. Bowman subsequently challenged his transfer in a state court whistleblower suit and,

following a three-week trial, a jury returned a verdict in his favor and against the City of

Detroit in the amount of $200,000.  (*See id.* at 323-24.)[23]

        Later in 2004, Sgt. Stevenson was transferred to the Ninth Precinct.  Although she

was "never given an explanation" for her transfer, she viewed it as "punishment" for

investigating Ms. Greene's murder.  (*Id.* at 81-82, 130.)  At around the same time, Lt.

Jackson was reassigned to the Special Assignment Squad, and Lieutenant Roy

McCallister was placed in charge of the Homicide Section.  (*See* Jackson Dep. at 258-59,

306.)  Lt. Jackson testified that it came as "kind of a shock when I was replaced with no

---

        [22]Lt. Jackson testified that he found Lt. Bowman's reassignment "troubling," both
because it left him short an officer in Squad 8, and because it was "unusual" to transfer an officer
for the minor error cited in Deputy Chief Best's explanation to Lt. Bowman.  (Jackson Dep. at
112-14.)

        [23]In a July 6, 2005 opinion denying a motion for summary judgment brought by the City
and Chief Bully-Cummings, the state court found that Lt. Bowman had produced evidence that
his transfer violated Michigan's Whistleblower Protection Act because it "ma[d]e him an
example by way of discrimination against him and others who might undertake to investigate
this notorious [Tamara Greene] homicide which could implicate high officials of the City of
Detroit."  (Plaintiffs' Response, Ex. 94, 7/6/2005 State Court Op. at 5.)

explanation," and he "speculate[d] that after my . . . meeting with the State Police, my days were numbered as being the officer in charge of the homicide section." (*Id.* at 259-60, 315.)

### 3.    The Cold Case Squad Investigation

Upon assuming the lead role in the Greene homicide investigation in the spring of 2004, Sgt. Godbold of the Cold Case Squad testified that he was "dismayed" to discover that the investigative file was "so thin," leading him to conclude that "extensive work needed to be done" and that he and his squad "needed to start from scratch." (Plaintiffs' Response, Ex. 49, Godbold Dep. at 39, 381-82.)  Like Lt. Jackson, Sgt. Godbold agreed that it was the DPD's usual practice to transfer files to the Cold Case Squad only after they were at least two years old, and he could not recall receiving any cases that were less than two years old prior to the reassignment of the Greene investigation. (*See id.* at 34, 303.)[24]  Nonetheless, when he met with the squad members and asked whether they were reluctant to participate in the Greene investigation, they "looked at me like I was crazy" and advised Godbold that they had "no concerns." (*Id.* at 38.)[25]

---

[24]Indeed, Sgt. Godbold testified that the federal funding received by the Cold Case Squad was conditioned on a requirement that the cases transferred to the squad be at least two years old. (*See id.* at 304-06.)

[25]Sgt. Godbold testified that when he took over the investigation from Sgt. Stevenson, she warned him that he was "going to get in trouble over this," and she expressed her belief that there had been efforts to sabotage her investigation. (*Id.* at 232-33.)  Sgt. Godbold did not share this belief, however, but instead felt that his superiors at the time supported rather than interfered with his investigation. (*See id.* at 71-73, 233.)  As discussed below, Sgt. Godbold's views on this point underwent a considerable change by the end of his time as officer in charge of the Greene investigation.

Over the next several months, Sgt. Godbold and the other members of the Cold Case Squad actively pursued various leads in the Greene homicide investigation,[26] undertaking such tasks as re-examining the crime scene, interviewing witnesses, speaking with Ms. Greene's family and co-workers, and administering polygraph examinations to suspects and persons of interest.[27]  Sgt. Godbold testified that as he began his investigation, he was urged by each of his superior officers at the time — Lt. Jackson, Commander Schwartz, and Assistant Chief Cureton — to investigate and endeavor to solve the case no matter what it took or where the evidence might lead.  (*See id.* at 70-72.) When Sgt. Godbold expressed concern that his investigative efforts were being hindered by the requirement that the file be kept in Lt. Jackson's office, Sgt. Godbold was promptly given possession of the file, and he testified that the file remained in his office throughout the time he was in charge of the investigation without any indication of tampering or materials going missing.  (*See id.* at 32, 289, 298.)[28]

---

[26]Sgt. Godbold testified that while other members of the Cold Case Squad assisted in the investigation, he and Sergeant Ken Ducker of the Michigan State Police were the "co-leads" in his unit's investigative efforts.  (*Id.* at 57-58, 277-78, 318-19.)

[27]As Plaintiffs observe, contrary to the Defendant City's wholly gratuitous assertion in its summary judgment brief that Ms. Greene was killed by Darrett King, Sgt. Godbold testified that he eliminated King as a suspect based on a polygraph test and an alibi that Godbold and his team looked into and confirmed to their satisfaction.  (*See id.* at 83.)

[28]Like other DPD officers who took part in the investigation, however, Sgt. Godbold testified that various materials — including handwritten notes, witness statements, and polygraph results — appeared to be missing from the copy of the homicide file produced by the City of Detroit in the course of discovery in this litigation.  (*See id.* at 333-36, 353-57.)

As Plaintiffs observe, Sgt. Godbold also testified at one point in his deposition that a cell phone belonging to Ms. Greene and recovered from the crime scene had disappeared during the

During his investigation, Sgt. Godbold elected not to pursue information he and his team received suggesting that Ms. Greene might have danced at the rumored Manoogian Mansion party.  On one occasion, for instance, Sgt. Godbold was told by one of Ms. Greene's relatives that Ms. Greene had "expressed some fears and she was fearful for her life," and that she had told this relative that "she had danced at the mansion and that there was a fight."  (*Id.* at 388-89.)  Sgt. Godbold testified that he "wasn't interested" in this information and made little or no further inquiry concerning Ms. Greene's presence at the rumored party because he "didn't think that Ms. Greene was the target" of the drive-by shooting in which she was killed, but instead believed that Ms. Greene's fellow passenger, Eric Mitchell, was the shooter's intended target.  (*Id.* at 389-90.)  Likewise, Sgt. Godbold did not place any notes in the homicide file regarding his discussion with Ms. Greene's relative about Ms. Greene having reportedly danced at the rumored party, based on his belief at the time that this alleged party was not relevant to Ms. Greene's death or the murder investigation.  (*See id.* at 392-94.)

Similarly, Sgt. Godbold received other information relating to the rumored Manoogian Mansion party that he elected not to pursue, but that nonetheless led, in his view, to his removal as officer in charge of the Greene investigation.  At some point in

---

course of the DPD homicide investigation.  (*See id.* at 376-78.)  Yet, Sgt. Godbold acknowledged later in his deposition that the phone ordinarily would be kept in the DPD evidence room, and he appeared uncertain whether the phone might, in fact, be among the property held by the DPD's evidence custodians.  (*See id.* at 457-58.)  He also agreed that there were records of the calls made from and received by this cell phone in the homicide file.  (*See id.* at 458-59.)

28

the summer of 2004, a retired DPD officer, Bryan Turnbull — a member of former Chief Oliver's staff in 2002 — approached Sgt. Godbold while he was at lunch in Greektown and told him that an active DPD officer had danced at the Manoogian Mansion party and had been assaulted.  (*See id.* at 127-29, 134.)  Turnbull further stated that this DPD officer had shown up to work injured and had been sent home with pay for three weeks, after which "they hid her, in [Turnbull's] words," in another department.  (*Id.* at 129.)[29]  Later, in the fall of 2004, the DPD officer who allegedly danced at the party called Sgt. Godbold and asked him to meet her outside of DPD headquarters, where she approached Sgt. Godbold with "watery eyes" and told him, "I'm scared.  I don't know what to do."  (*Id.* at 86-89.)  Sgt. Godbold responded that he did not "want to hear about no party" and "could care less," and he advised her to "[j]ust keep your mouth shut."  (*Id.* at 89.)[30]  Sgt. Godbold testified that he did not pursue this matter and "didn't care" whether this DPD officer had danced at a Manoogian Mansion party because "[i]t had nothing to do with [the Greene investigation], as far as I was concerned at that point in time."  (*Id.* at 132-33,

---

[29]For his part, Turnbull testified that he recalled seeing this DPD officer appear at a meeting in the fall of 2002 with bruises on her face.  (*See* Plaintiffs' Response, Ex. 78, Turnbull Dep. at 25.)  Turnbull denied any knowledge, however that this officer had performed as an exotic dancer after becoming a member of the DPD, and he further denied that he told any fellow DPD officer that this female officer had suffered injuries while attending and dancing at a party at the Manoogian Mansion.  (*See id.* at 24-26.)  Turnbull also denied telling Sgt. Godbold that this female officer had been sent home with pay for three weeks due to injuries she sustained at a Manoogian Mansion party.  (*See id.* at 30-31.)

[30]Sgt. Godbold explained that he did not wish to hear any further details from this DPD officer because "if I received information of alleged misconduct, as a supervisor, I am required to report it."  (*Id.*)

141.)

Later in 2004 and into the first half of 2005, Sgt. Godbold's then-superiors —
Lieutenant James Tolbert, the head of the Homicide Section; Deputy Police Chief Tony
Saunders, the head of the Major Crimes Division; and Assistant Chief of Police Walter
Martin — took a number of steps and issued orders that, in Sgt. Godbold's view, impeded
his investigation, prevented him from exploring various leads, and ultimately led to his
removal from the Greene investigation and the disbanding of the Cold Case Squad. First,
for about two or three months in late 2004 and early 2005, Sgt. Godbold was assigned to
a newly-formed Special Long-Term Investigative Section, an eight-man team that was
tasked to undertake narcotic-related homicide investigations. (*See id.* at 74.) In this
position, Sgt. Godbold was relocated to work in the basement of the Fisher Building,
while the Greene file remained in the Cold Case Squad offices at DPD headquarters. Sgt.
Godbold came to believe that this assignment was a "ruse" to ensure that he "could not
work the Tamara Greene homicide investigation," because an existing squad already was
responsible for investigating the same sorts of narcotics-related homicides to be handled
by the new unit, and because this new group was given little or no work to do. (*Id.* at 75,
166, 221, 423.) During this period when Sgt. Godbold worked at the Fisher Building, he
was told by Deputy Chief Saunders that "I don't want you coming over" to DPD
headquarters, even though he remained the officer in charge of the Greene investigation,
and he testified that only "[m]inimum" work was done on this investigation while he
carried out his new assignment. (*Id.* at 325, 423-25.)

30

After he was ordered to return to DPD headquarters and the Cold Case Squad offices in early 2005, Sgt. Godbold resumed his investigative efforts on the Tamara Greene case, but only for a few more months. At some point in the late spring or early summer of 2005, the then-acting head of the Major Crimes Division, Inspector William Rice, asked Sgt. Godbold to bring him the Greene homicide file for his review, and Sgt. Godbold complied with this request from a superior officer. (*See id.* at 212-15.) Upon learning of this, Assistant Chief Martin became angry and told Sgt. Godbold that he had disobeyed an order not to show the Greene file to anyone, and Martin subsequently ordered Godbold in July of 2005 to deliver the file to his (Martin's) office. (*See id.* at 176-78, 215, 433-34.) Sgt. Godbold testified that this essentially brought his investigation to an end, because "you could not even begin to conduct a thorough investigation" with the file in "someone else's office." (*Id.* at 263.)

A short time later, in August of 2005, the Cold Case Squad was shut down, with Sgt. Godbold arriving at work one day to discover that the squad's offices had been emptied and its computers taken away. (*See id.* at 264-65.) Sgt. Godbold testified that he did not know who made this decision or why it was made. (*See id.*) Sgt. Godbold was reassigned to Squad 6, which he viewed as a demotion to a position without supervisory authority. (*See id.* at 267.) In Sgt. Godbold's view, the various above-referenced steps taken by his superiors to impede his investigation into Tamara Greene's murder — including his transfer to a new unit at a different location, the relocation of the file to Assistant Chief Martin's office, and the disbanding of the Cold Case Squad — were

31

motivated by a desire to protect the DPD officer who allegedly had danced at the rumored

Manoogian Mansion party. (*See id.* at 437-41.) Sgt. Godbold ultimately elected to retire

from the DPD in 2006, explaining at his deposition that "there was a conspiracy to

undermine the integrity of . . . Ms. Greene's investigation," and that he "wanted no part of

it." (*Id.* at 442.)

Following his retirement as a DPD officer, Sgt. Godbold worked for

approximately six months for "Crime Stoppers," a nonprofit organization based in

southeast Michigan that encourages and gathers anonymous reports of criminal activity.

Upon reviewing the organization's files, he discovered that Crime Stoppers had received

a number of tips over the years relating to the Tamara Greene homicide that he had not

seen in his role as the DPD's lead investigator of this crime. (*See id.* at 205.) For at least

some of these tips, the Crime Stoppers records indicated that they had been faxed to DPD

at the time they were received, but Sgt. Godbold testified that these tips had not been

forwarded to him for use in the DPD investigation. (*See id.* at 217-19.) While at Crime

Stoppers, Sgt. Godbold re-transmitted these tips to DPD, but he reported that he saw only

"[s]ome of them" upon reviewing the copy of the homicide file produced by the City in

discovery. (*Id.* at 207.)

### 4.    The Investigation by the Reconstituted Cold Case Squad

In late 2005, shortly before his retirement as a DPD officer, Sgt. Godbold was

ordered by Assistant Chief Martin to deliver the Greene homicide file to Wayne County

32

Prosecutor Kym Worthy. (*See id.* at 66-69.)[31]  At some point, the file was returned to

DPD custody, and in December of 2007, the Greene investigation was assigned to

Sergeant Michael Russell, the officer in charge of DPD's reconstituted Cold Case Unit.

(*See* Plaintiffs' Response, Ex. 51, Russell Dep. at 11.)[32]  Sgt. Russell testified that the

active phase of his investigation spanned from December of 2007 to approximately

September of 2008; while the case remained under his purview after that time, he

explained that there were "no new witnesses or no new information that came forward to

cause me to investigate any further."  (Russell Dep. at 11-14, 82-85.)

Sgt. Russell testified that he never perceived any reason to look into the rumored

Manoogian Mansion party or to explore whether Ms. Greene might have danced at any

such party.  He explained that, in his view, "[t]he focus of my investigation was not to see

if there was a party," but instead was "trying to figure out who killed" Ms. Greene and

attempted to kill the other passenger in her car, Eric Mitchell.  (*Id.* at 44.)  Upon

reviewing the materials in the homicide file — including, among other items, a report of a

Michigan State Police investigation into the rumored Manoogian Mansion party — Sgt.

Russell opined that "there was no evidence in that file that said there was a party."  (*Id.* at

44-45.)  Moreover, while Sgt. Russell acknowledged that "[t]here's people who state she

danced here [or] danced there," and that the homicide investigators had been advised of

---

[31]The present suit was filed in November of 2005, at around the same time the Greene
homicide file was sent from the DPD to the Wayne County Prosecutor's Office.

[32]Sgt. Godbold testified that after the Cold Case Squad was shut down in August of 2005,
it was re-opened at some point in 2006.  (*See* Godbold Dep. at 273, 324.)

"a bunch of rumors" about such activities, he stated that, in his view, no evidence had been uncovered that any such party "had something to do with" the murder of Ms. Greene and the attempted murder of Mr. Mitchell, or that the shootings were "the result of a party at someone's house [or] at the mansion." (*Id.* at 45-48, 97-99.)

According to Sgt. Russell, the Greene investigation remained essentially inactive from September of 2008 until the spring or early summer of 2010, when the file was forwarded to the Violent Crimes Task Force for "another review." (*Id.* at 12-13, 85.) He testified that "things slowed down on the case" in the fall of 2008, with "nothing there for us to do" and no "new evidence or new witnesses." (*Id.* at 82-84.) So far as the record reveals, Ms. Greene's murder remains unsolved, and no suspects have been charged or prosecuted in connection with her death.

**B.      Plaintiffs' Other Evidence of Alleged Interference in Law Enforcement Activities by Defendant Kilpatrick and Other Senior City of Detroit Officials**

Plainly, the most direct means by which Plaintiffs can establish the requisite interference with or obstruction of the Tamara Greene homicide investigation is through evidence of purported irregularities in the Greene investigation itself. Beyond this evidence, however, Plaintiffs also seek to establish a *de facto* City of Detroit policy or custom to interfere with law enforcement investigations — or, at least, investigations that raised concerns for high-ranking City officials — by pointing to a number of instances where, in their view, senior City of Detroit officials attempted to obstruct such investigations or otherwise influence law enforcement operations  This evidence as to

34

other alleged instances of obstruction or interference is summarized below.

### 1. Defendant Kilpatrick's Alleged Interference with a DPD Internal Affairs Investigation into the Rumored Manoogian Mansion Party and Wrongdoing by Members of Former Mayor Kilpatrick's Executive Protection Unit

Plaintiffs' primary example of alleged interference by senior Detroit officials with a law enforcement investigation will no doubt be familiar to many Detroit-area residents. In February of 2003, DPD Officer Harold Nelthrope was transferred out of Mayor Kilpatrick's Executive Protection Unit ("EPU"). Shortly thereafter, Officer Nelthrope met with officers in the DPD's Internal Affairs ("IA") Section to report alleged misconduct by two EPU members, Officers Loronzo Greg Jones and Mike Martin. At a subsequent meeting with an IA officer in late April of 2003, Officer Nelthrope expanded on these allegations by reporting a "rumor" he had heard about a party at the Manoogian Mansion, at which a dancer had been assaulted by Mayor Kilpatrick's wife, Carlita Kilpatrick. (*See* Plaintiffs' Response, Ex. 22, Nelthrope Dep. at 94-96.)[33]

Officer Nelthrope's allegations were summarized in a memo prepared by an IA officer, Lieutenant Brian Stair, with the intention that this information would then be forwarded to Deputy Chief Gary Brown, the head of the DPD's Professional Accountability Bureau ("PAB").[34] Deputy Chief Brown, in turn, incorporated this

---

[33]Officer Nelthrope testified that he had no firsthand knowledge about the alleged Manoogian Mansion party, but was merely passing along "[r]umor[s]" and "information that [he had] gotten from other sources" that he could not identify. (Nelthrope Dep. at 174-75.)

[34]As head of the PAB, Deputy Chief Brown oversaw the operations of two DPD sections, one of which was IA. Former Chief of Police Jerry Oliver testified that he selected Deputy Chief

35

information into a memo to Chief of Police Oliver dated April 24 and April 30, 2003.

(*See* Plaintiffs' Response, Ex. 38 (memo to Chief Oliver reporting Nelthrope's

allegations).)[35]  Notably, during this same time period, a number of high-ranking City of

Detroit and DPD officials — including Mayor Kilpatrick's Chief of Staff, Christine

Beatty, the City's Corporate Counsel, Ruth Carter, then-Assistant Police Chief Ella Bully-

Cummings, and Chief Oliver's Chief of Staff, Inspector Shereece Fleming-Freeman —

exchanged text messages expressing their dislike for Deputy Chief Brown.  (*See*

Plaintiffs' Response, Ex. 31, Text Messages at 133-34.)[36]

　　The events that followed have been widely reported in the media, and were the

subject of extensive trial testimony in the state court whistleblower suit brought by

Deputy Chief Brown and Officer Nelthrope against Defendant Kilpatrick and the City of

Detroit.  (*See* Plaintiffs' Response, Ex. 41, Complaint in *Brown v. City of Detroit,* Case

No. 03-317557-NZ.)  First, on approximately May 2, 2003, Inspector Fleming-Freeman

---

Brown for this position following a "fairly elaborate internal process" that was designed to select "the best and the brightest" for key DPD positions.  (Plaintiffs' Response, Ex. 1, Oliver Dep. at 36-38.)

[35]The first page of this memo is dated April 24, 2003, and the remaining four pages of the memo are dated April 30, 2003.  (*See id.*)

[36]Deputy Chief Brown opined at his deposition that due to a "leak in my office," Mayor Kilpatrick and his Chief of Staff, Christine Beatty, were given a copy of his memo to Chief Oliver regarding Officer Nelthrope's allegations about EPU officer misconduct and the alleged Manoogian Mansion party.  (*See* Plaintiffs' Response, Ex. 23, Brown Dep. at 83-84.)  Deputy Chief Brown identified Lt. Stair as the source of this leak, based on his review of telephone records reflecting calls made and received by Lt. Stair "in close proximity" to meetings at which the subject matter of this memo was discussed.  (*Id.* at 84-85.)

advised Deputy Chief Brown that Christine Beatty was "now in charge" of the Mayor's EPU, and that Beatty was to be informed of any efforts to investigate or interview EPU members.  (*See* Brown Dep. at 15, 80-81.)  Deputy Chief Brown testified that this was "totally inappropriate," and that never before, in his 26-year history with the DPD, had he been aware of such involvement by the Mayor's staff in DPD affairs.  (*Id.* at 15.)

On May 5, 2003, Deputy Chief Brown met with Chief Oliver to discuss Officer Nelthrope's allegations and the IA investigation.  Chief Oliver requested that Deputy Chief Brown prepare a brief bullet-point memo summarizing the information Officer Nelthrope had provided to the IA investigators.  (*See id.* at 38-39; *see also* Plaintiffs' Response, Ex. 42 (5/6/2003 Memo).)[37]  The next day, May 6, 2003, Chief Oliver shared this memo with Christine Beatty.  (*See* Oliver Dep. at 120.)  On May 7, 2003, Beatty directed the City of Detroit's information technology staff to back up Deputy Chief Brown's computer files and deny him access to these files,[38] and she sent a text message to Defendant Kilpatrick confirming that this had been done.

On May 9, 2003, Mayor Kilpatrick, Christine Beatty, and Chief Oliver met in the

---

[37]As observed by Plaintiffs, this bullet-point memo notably omitted any mention of Officer Nelthrope's allegations concerning the rumored Manoogian Mansion party, and instead referenced only his allegations concerning alleged misconduct by EPU members.

[38]In order to carry out Beatty's directive, the City's information technology ("IT") personnel had to gain access to the DPD computer system, and to interact with and instruct the DPD's separate IT staff.  DPD's computer network administrator, Sergeant Hugh Morrison, has testified that in his years of experience, this was the first time that someone "from outside the police department" had been permitted to come in and disable a DPD officer's computer account.  (*See* Plaintiffs' Response, Ex. 45, Morrison Investigative Subpoena Testimony at 11-12.)

Mayor's office, and Chief Oliver was instructed to fire Brown.  Chief Oliver has testified that he was "shock[ed]" by this directive and told Beatty it was a "major mistake," and that Mayor Kilpatrick and Beatty refused to give any reasons for this decision.  (Oliver Dep. at 128-29.)  Upon relaying this decision to Deputy Chief Brown, Chief Oliver stated that he "didn't know why [Brown] was being fired" and that it "wasn't his idea," and he "pretty much apologized for having to do it."  (Brown Dep. at 116.)  In Deputy Chief Brown's view, however, his termination was attributable, at least in part, to a desire to forestall an IA investigation that might have uncovered evidence of the rumored Manoogian Mansion party and other questionable activities by then-Mayor Kilpatrick.  (*See* Brown Dep. at 127.)[39]

The day after Deputy Chief Brown's dismissal, Chief Oliver met with the remaining executive staff and membership of the PAB in order to better understand the

---

[39]At one point in his deposition, Defendant Kilpatrick appears to deny that he was aware of a possible IA investigation into his and his family's activities at the time the decision was made to terminate Deputy Chief Brown.  (*See* Plaintiffs' Response, Ex. 2, Kilpatrick Dep. at 115-17.)  At another point, however, he testified that Christine Beatty gave him copies of two IA memos during the process leading up to Deputy Chief Brown's dismissal, and that one of these memos mentioned the rumored Manoogian Mansion party.  (*See id.* at 104-05.)  Moreover, a text message sent by Defendant Kilpatrick's wife Carlita on May 6, 2003, before Deputy Chief Brown's termination, reflects that she, at least, was aware of Officer Nelthrope's report to IA of allegations that she had assaulted a dancer at this rumored party.  (*See* Plaintiffs' Response, Ex. 31, 5/6/2003 text message.)  In any event, regardless of Defendant Kilpatrick's awareness that the rumored party and his and his family's activities were the possible subjects of an IA investigation, he has denied that this was the reason for Deputy Chief Brown's removal as the head of the PAB, and he instead has testified that this decision was based on a concern that Deputy Chief Brown was "investigating overtime and car accidents and rumors about parties" rather than addressing the "nearly 600 cases that were backlogged in IA."  (Kilpatrick Dep. at 111-12.)

38

reason for this decision.  In the course of this meeting, Chief Oliver was shown a memo
— evidently, the memo from Deputy Chief Brown dated April 24 and April 30, 2003 —
reflecting Officer Nelthrope's allegations about a Manoogian Mansion party, and this led
him to conclude that the IA investigation into these allegations had led to Deputy Chief
Brown's removal as head of the PAB.  (*See* Oliver Dep. at 97, 137.)  According to one IA
investigator who was present at this meeting, Chief Oliver became "very agitated" upon
reading this memo, expressing his amazement that "you guys are investigating the
mayor," stating "[t]hat's the dumbest s*** I ever heard of," and opining that "you don't
have the sense of an amoeba . . . to conduct this type of investigation."  (Plaintiffs'
Response, Ex. 47, Parshall Investigative Subpoena Testimony at 44-45.)

As noted earlier, following his dismissal, Deputy Chief Brown, along with Officer
Nelthrope, brought a state court whistleblower suit against the City of Detroit and
Defendant Kilpatrick.  Following a lengthy trial in August and September of 2007, a jury
awarded a combined $6.5 million in damages to Brown and Nelthrope.  Later that fall, the
City and Defendant Kilpatrick agreed to a settlement calling for Brown and Nelthrope to
receive $8.4 million.  It was subsequently learned, however, that the settlement included a
provision mandating the non-disclosure of text messages revealing an intimate personal
relationship between Defendant Kilpatrick and his Chief of Staff, Christine Beatty.  When
these text messages were publicly disclosed through the investigative efforts of the
Detroit Free Press, it was discovered that they contradicted the sworn testimony given by
Defendant Kilpatrick and Beatty during the Brown/Nelthrope whistleblower trial.  This

39

led to criminal charges of perjury and obstruction of justice against Defendant Kilpatrick

and Beatty, both of whom pled guilty to a subset of these charges and served prison

terms, and both of whom resigned from their positions with the City of Detroit.

> **2.      The Alleged Effort to Influence an Investigation by the Michigan State Police and Former Michigan Attorney General Mike Cox into the Rumored Manoogian Mansion Party and Alleged Misconduct by Members of the Mayor's EPU**

The next example cited by Plaintiffs of interference by former Mayor Kilpatrick

and his administration in a law enforcement investigation rests on evidence revealing, in

Plaintiffs' view, that Defendant Kilpatrick and other senior City of Detroit officials

attempted to influence the course of an investigation launched by then-Michigan Attorney

General Mike Cox and the Michigan State Police ("MSP") into the rumored Manoogian

Mansion party and alleged misconduct by members of the mayor's EPU.  In the

immediate aftermath of the removal of Deputy Chief Brown as head of the PAB, efforts

were begun to identify an outside law enforcement agency that would be given the task of

investigating the allegations made by Officer Nelthrope to the DPD's Internal Affairs

Section.[40]  In mid-May of 2003, it was announced that Attorney General Cox and the

MSP would conduct this investigation.

---

[40]Then-Police Chief Oliver has testified that it would not have been appropriate for the DPD to investigate the mayor or his EPU, because such an investigation would lack the appearance of objectivity and would be perceived as a "whitewash."  (Oliver Dep. at 225, 231-32.)  Indeed, he testified that he ultimately came to believe that it was appropriate to remove Deputy Chief Brown from his position as head of the PAB, based on his determination that Brown "had been deceptive and . . . not forthcoming" in disclosing the nature and extent of the Internal Affairs investigation into the activities of the mayor's EPU officers.  (*Id.* at 221-22, 231.)

During this time period, a number of text messages were sent and received by senior City of Detroit officials — including Police Chief Oliver, Chief of Staff Beatty, and Corporate Counsel Ruth Carter — discussing which outside agency would or should be given this investigative task.  In one such message sent on May 19, 2003, Ruth Carter reported to Defendant Kilpatrick that she had spoken to Attorney General Cox in the wake of news stories that he and the MSP would be conducting this investigation, and that he had asked "who we would rather be cleared by," "him or [Wayne County Prosecutor Mike] Duggan."  (Plaintiffs' Response, Ex. 31, 5/19/2003 text message.)  In Plaintiffs' view, Defendant Kilpatrick and his administration preferred Attorney General Cox to lead this investigation because, among other reasons, Carter and Cox were former co-workers in the Wayne County Prosecutor's Office.  As further support for this inference, Plaintiffs point to text messages sent by Carter later that day, stating that "I don't think we'll be ambushed by" the Attorney General, and that "I spoke to Cox a few ago and he and I will coordinate the investigation."  (*Id.*, 5/19/2003 text messages.)

After the Attorney General and the MSP commenced their investigation, Kilpatrick administration officials continued to exchange text messages regarding this investigation.  On May 21, 2003, for example, Carter sent Defendant Kilpatrick a text message asking whether he was "comfortable with shifting the 'focus' [of the investigation] from you to the DPD ie EPU," and Defendant Kilpatrick responded that he was "[v]ery [c]omfortable" with this.  (*Id.*, 5/21/2003 text messages.)  Carter then sent Defendant Kilpatrick another text message promising to "get that started."  (*Id.*)  Carter

41

also sent a text message to Christine Beatty inquiring whether certain witnesses were "friends" that she should "work with" before they spoke to the Attorney General. (*Id.,* 5/28/2003 text message.)

In Plaintiffs' view, the strongest indication of the Kilpatrick administration's influence over the MSP investigation was the Attorney General's decision to personally interview Defendant Kilpatrick, without the participation of the MSP officers who had conducted most of the activities in this investigation. Only Attorney General Cox, his assistant Thomas Furtaw, Defendant Kilpatrick, and Ruth Carter were present for this interview, and the session was not recorded.[41] One of the MSP investigators, Detective Sergeant Mark Krebs, testified that this treatment of Defendant Kilpatrick differed from that of "every other investigative participant," and that the circumstances of his interview were "completely unheard of." (Plaintiffs' Response, Ex. 57, Krebs Dep. at 78.) Likewise, MSP Colonel Robert Bertee described this interview process as "ridiculous" and "unprecedented in [his] 30 years [with] the Michigan State Police." (Plaintiffs'

---

[41]As an unfortunate and perhaps inevitable byproduct of the decision not to record this interview, the participants have different recollections of what was discussed. Former Attorney General Cox has testified that he asked Defendant Kilpatrick about the rumored Manoogian Mansion party only "at the end" of a 30 to 40 minute interview, explaining that "there was nothing to ask him about" in light of the absence of any supporting evidence that would suggest that such a party had occurred. (Plaintiffs' Response, Ex. 53, Cox Dep. at 314-15.) Similarly, while Thomas Furtaw has passed away, the notes he apparently took during this interview indicate that the rumored Manoogian Mansion party was not discussed at all. (*See* Plaintiffs' Response, Ex. 58.) Defendant Kilpatrick, in contrast, testified that from "[w]hat little I can recall," most of the interview was devoted to questions about the rumored party. (Kilpatrick Dep. at 126.) Yet, when he was shown Furtaw's notes, Defendant Kilpatrick stated that "I actually cannot remember what we discussed in that room," explaining that "it wasn't like a huge moment in my life." (*Id.* at 138-39.)

Response, Ex. 56, Bertee Dep. at 42.)  When Col. Bertee expressed this concern to
Thomas Furtaw, he was told to "consider it a meeting between two elected officials."  (*Id.*
at 42-43.)

Shortly after this interview, the MSP investigators were told that Attorney General
Cox had decided to conclude the investigation.  Sgt. Krebs has testified to his belief that
Thomas Furtaw was "under a strain to get this closed out quickly because Mike Cox
wanted it done."  (Krebs Dep. at 40.)  Similarly, Col. Bertee testified that he protested to
Furtaw that there still were tips to pursue and witnesses to interview, but that Furtaw
"scream[ed] through the phone, 'Goddamn it, the Attorney General of the State of
Michigan ought to be able to decide when an investigation is over.'"  (Bertee Dep. at 50.)

Following approximately five weeks of investigation, Attorney General Cox issued
a June 24, 2003 press release announcing the findings of his nine-member investigative
team.  The Attorney General described the investigation as focusing on "whether any
criminal acts occurred," explaining that the investigative team was not asked "to examine
whether civil lawsuits concerning wrongful firings are appropriate nor to audit police
management decisions nor to pass political judgments."  (Plaintiffs' Response, Ex. 55,
6/24/2003 Press Release at 1.)  With regard to the rumored Manoogian Mansion party,
Attorney General Cox stated that "[n]ot one witness had any direct or indirect credible
knowledge of such an event," and he concluded that "[t]hese allegations appear to be
founded solely on wild rumor and speculation" and that "[t]he party has all the earmarks
of an 'urban legend.'"  (*Id.*)

### 3.   The Kilpatrick Administration's Alleged Exercise of Influence to Secure Promotions of Certain DPD Officers

Plaintiffs next suggest that Defendant Kilpatrick and his mayoral administration were able to influence DPD investigations by promoting "friends" within the DPD who would do their bidding.  When Chief Oliver left the DPD in the fall of 2003, for example, Defendant Kilpatrick appointed Ella Bully-Cummings as the new Chief of Police.  As evidence that Chief Bully-Cummings would be viewed as a "friend" to the Kilpatrick administration, Plaintiffs point to an occasion in the fall of 2002 when then-Assistant Chief Bully-Cummings assisted the mayor's wife, Carlita Kilpatrick, in obtaining a Lincoln Navigator paid for with City funds.  Plaintiffs also cite text messages arguably suggesting that then-Assistant Chief Bully-Cummings served as an inside DPD source in the events and activities surrounding the removal of Deputy Chief Brown as head of the PAB and the determination as to who should be named to replace Brown.

Along the same lines, Plaintiffs suggest that Lt. Brian Stair of the Internal Affairs Section was promoted and placed in charge of Internal Affairs as a reward for his alleged leak of Deputy Chief Brown's memo regarding Officer Nelthrope's allegations to Defendant Kilpatrick and Chief of Staff Beatty.  Finally, Plaintiffs point to the testimony of Sgt. Godbold that three of his superior officers — Lt. Tolbert, Deputy Police Chief Saunders, and Assistant Police Chief Martin — received promotions as a result of their efforts to "hinder[]" the Greene homicide investigation.  (Godbold Dep. at 497-98.)  Sgt. Godbold testified, however, that it was "[j]ust my speculation" and "my opinion" that

these three superior officers were promoted as a reward for interfering with the Greene

investigation.  (*Id.* at 497-98, 502-03.)[42]

# IV.  ANALYSIS

A.    **The Law Governing Plaintiffs' § 1983 Claims**

In their third amended complaint, Plaintiffs have asserted two claims, each arising

under 42 U.S.C. § 1983.  To prevail on a § 1983 claim, a plaintiff must establish (1) that

he or she was deprived of a right, privilege, or immunity secured by the U.S. Constitution

or federal law; and (2) that the deprivation was caused by a person acting under color of

---

[42]Apart from the allegations and evidence addressed in this opinion, Plaintiffs' response brief raises additional examples of instances where, in Plaintiffs' view, Defendant Kilpatrick and his administration sought to interfere with or influence investigative activities by law enforcement agencies, or where Defendant Kilpatrick engaged in alleged abuses of his mayoral authority.  Plaintiffs cite, for example, Defendant Kilpatrick's acknowledgment at his deposition that he engaged in an inappropriate personal relationship with an individual appointed by the federal court to monitor the DPD's compliance with a consent judgment entered into in a suit brought by the U.S. Department of Justice against the City of Detroit.  Plaintiffs further note that Defendant Kilpatrick presently faces a number of federal charges arising from his alleged activities during his term as mayor of Detroit.  Finally, in a motion filed shortly before the October 5, 2011 hearing on Defendants' summary judgment motions, Plaintiffs have sought to supplement the record with still more purported evidence of allegedly similar activities by Defendant Kilpatrick.

The Court sees no need to address these matters, as the evidence offered by Plaintiffs on these points — to the extent that it is relevant and may properly be considered in resolving Defendants' summary judgment motions — is wholly cumulative of other evidence in the record.  As discussed below, there is no shortage in the record of "other acts" evidence that raises issues of fact as to Defendant Kilpatrick's efforts to interfere with or influence investigations other than the Tamara Greene homicide investigation.  To the extent that such evidence aids Plaintiffs in their efforts to oppose Defendants' motions and to identify genuine issues of material fact for trial, more of such evidence cannot further assist these efforts.  Accordingly, the Court declines to lengthen this opinion even further by addressing these additional, peripheral matters, and the Court likewise concludes that Plaintiffs' recent motion to supplemental the record should be denied.

state law.  42 U.S.C. § 1983; *see also Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155-56, 98 S. Ct. 1729, 1733 (1978); *Ziegler v. Aukerman*, 512 F.3d 777, 782 (6th Cir. 2008). The parties here agree that the Defendant City of Detroit and its former mayor, Defendant Kwame Kilpatrick, both qualify as state actors under the second prong of this standard. Thus, the overarching question before the Court is whether the evidentiary record would permit the conclusion that one (or both) of the Defendants deprived Plaintiffs of a right guaranteed to them under federal law.

As this Court observed in the early stages of this litigation, the federal right that forms the basis for Plaintiffs' § 1983 claims is the constitutionally protected right of access to the courts.  *See Flagg v. City of Detroit,* 447 F. Supp.2d 824, 829 (E.D. Mich. 2006); *see also Swekel v. City of River Rouge,* 119 F.3d 1259, 1262 (6th Cir. 1997) (stating that "the right of access to the courts finds support in several provisions of the Constitution including:  the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause, the First Amendment, and the Privileges and Immunities Clause of Article IV" (citations omitted)).  Cases addressing the alleged denial of this right of access to the court fall into two general categories.  "In the first are claims that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," such as a prisoner's claim that he has been denied access to a lawyer or law library.  *Christopher v. Harbury,* 536 U.S. 403, 413, 122 S. Ct. 2179, 2185 (2002).  "The second category covers claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter

46

what official action may be in the future," with these claims targeting official acts that "allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief." *Harbury,* 536 U.S. at 413-14, 122 S. Ct. at 2186 (footnote and citations omitted). Cases falling in this latter group "do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." 536 U.S. at 414, 122 S. Ct. at 2186 (footnotes omitted). "The ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future." 536 U.S. at 414, 122 S. Ct. at 2186.

Plaintiffs' claims in this suit fall squarely within the second category of denial-of-access claims described in *Harbury.* Specifically, Plaintiffs allege that due to Defendants' interference with and obstruction of the Detroit Police Department investigation into the murder of their mother, Tamara Greene, they can no longer pursue a viable wrongful death action against their mother's killer. Thus, they seek here the award of damages they can no longer recover directly from the individual (or individuals) responsible for their mother's death.

Earlier in this case, this Court emphasized that a denial-of-access claim of the sort brought by Plaintiffs "cannot be predicated upon the failure of the police or other government officials to investigate or prosecute a crime." *Flagg,* 447 F. Supp. 2d at 829

47

(citing *White v. City of Toledo,* 217 F. Supp.2d 838, 841 (N.D. Ohio 2002)). "This is true

even where, as is alleged here, the police are lax in their investigative duties." *Flagg,* 447

F. Supp.2d at 829 (internal quotation marks and citations omitted). Rather, such a claim

must be supported by proof of deliberate concealment or destruction of evidence, or some

other wrongful, intentional act to impede or obstruct a police investigation, done for the

purpose of frustrating the plaintiff's right of access to the courts. *See Swekel,* 119 F.3d at

1262-63; *Crowder v. Sinyard,* 884 F.2d 804, 812 (5th Cir. 1989), *overruled on other*

*grounds by Horton v. California,* 496 U.S. 128 (1990). A plaintiff must further show that

this act of concealment, obstruction or interference "foreclosed her from filing suit in

state court or rendered ineffective any state court remedy she previously may have had."

*Swekel,* 119 F.3d at 1263-64; *see also Harbury,* 536 U.S. at 415, 122 S. Ct. at 2187

(holding that "the underlying cause of action, whether anticipated or lost, is an element"

of a denial-of-access claim, separate and apart from the requirement that the plaintiff

allege and prove "the official acts frustrating the litigation").

Beyond these substantive elements of a claim of denial of access to the courts,

Plaintiffs must satisfy the standards for the imposition of liability under § 1983. First,

with regard to the sole remaining individual Defendant, former Mayor Kilpatrick, while

Harry Truman's famous phrase, "The buck stops here," might be a laudable principle of

responsible leadership, the showing demanded under § 1983 is more direct and personal.

In particular, "liability under § 1983 must be based on active unconstitutional behavior,"

and cannot rest solely upon an individual's supervisory role or "the right to control

48

employees." *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999); *see also Binay v. Bettendorf,* 601 F.3d 640, 650 (6th Cir. 2010) (emphasizing that in a § 1983 suit, "[e]ach defendant's liability must be assessed individually based on his own actions"). Consequently, it is not enough for Plaintiffs to identify a constitutional violation by some City of Detroit official who ultimately was answerable to Defendant Kilpatrick. Rather, Plaintiffs must produce evidence (i) that Defendant Kilpatrick himself took action to obstruct or interfere with the Tamara Greene murder investigation, or (ii) that he "encouraged" such obstruction or interference by a Detroit official "or in some other way directly participated in it." *Shehee,* 199 F.3d at 300 (internal quotation marks and citation omitted). "At a minimum, a plaintiff must show that the [defendant] official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee,* 199 F.3d at 300 (internal quotation marks and citation omitted).

A similar requirement of "personal" liability applies as well to the Defendant City of Detroit, albeit by reference to standards defining what it means for a municipality to take "personal" action to deprive a plaintiff of a federally protected right. In its seminal decision in *Monell v. Department of Social Services,* 436 U.S. 658, 691, 694, 98 S. Ct. 2018, 2036-37 (1978), the Supreme Court held that "a municipality cannot be held liable *solely* because it employs a tortfeasor," and that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or

49

by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell,* 436 U.S. at 494, 98 S. Ct. at 2037-38.  The requisite municipal "policy" can be drawn from "the decisions of [a local government's] duly constituted legislative body," *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 403, 117 S. Ct. 1382, 1388 (1997), or from the act of a local government official who "possesses final authority to establish municipal policy with respect to the action ordered," *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S. Ct. 1292, 1299 (1986).  Alternatively, a municipality may be held liable for "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker," provided that "the relevant practice is so widespread as to have the force of law."  *Board of County Commissioners,* 520 U.S. at 404, 117 S. Ct. at 1388.

Yet, the Supreme Court has emphasized that "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality."  *Board of County Commissioners,* 520 U.S. at 404, 117 S. Ct. at 1388.  Rather, "[t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."  520 U.S. at 404, 117 S. Ct. at 1388.  "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  520 U.S. at 404, 117 S. Ct. at 1388.  As discussed in greater detail below, to establish the "requisite degree of culpability" here, Plaintiffs must point to municipal

50

conduct evidencing the Defendant City's "deliberate indifference to the risk" that its action would result in an abridgement of Plaintiffs' right of access to the courts.  520 U.S. at 411, 117 S. Ct. at 1392.

Finally, apart from their claims that each of the two Defendants acted to deprive them of their constitutionally guaranteed right of access to the courts, Plaintiffs separately allege in count II of their third amended complaint that Defendant Kilpatrick conspired with others to deprive them of this federally protected right.  To establish a claim of conspiracy under § 1983, Plaintiffs must produce evidence from which a trier of fact could find "an agreement between two or more persons to injure another by unlawful action."  *Hooks v. Hooks,* 771 F.2d 935, 943-44 (6th Cir. 1985).  The Sixth Circuit has explained that "[e]xpress agreement among all the conspirators is not necessary" to establish the existence of a conspiracy, and that "[e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved."  *Hooks,* 771 F.2d at 944.  Instead, "[a]ll that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant."  771 F.2d at 944.

**B.    Plaintiffs' § 1983 Claims Against Defendant Kilpatrick Fail for Lack of Evidence of His Participation or Involvement in Any of the Instances of Alleged Interference with the Tamara Greene Homicide Investigation.**

Defendant Kilpatrick's principal challenge to Plaintiffs' § 1983 claims rests upon a simple premise:  namely, that Plaintiffs have failed to produce evidence linking him to

51

any of the acts or incidents Plaintiffs have identified as interfering with or obstructing the Tamara Greene homicide investigation. Upon reviewing the voluminous record and considering each of Plaintiffs' various efforts to forge this requisite causal connection, the Court agrees that there is no evidentiary basis upon which a trier of fact could conclude that Defendant Kilpatrick participated, whether directly or through his approval of the actions of others, in any obstruction of or interference with the DPD investigation into Ms. Greene's murder.

As a general matter, Plaintiffs have identified two forms of alleged interference with the Tamara Greene homicide investigation. First, they point to alleged instances of tampering with the materials in the Greene homicide file, either during the course of the homicide investigation or in connection with the production of this file during the discovery process in this litigation. Next, they contend that the investigation was impeded through the reassignment of the case from one DPD investigative team to another, and through the transfers of various DPD officers who were involved in the investigation. The Court addresses each of these forms of interference in turn, considering as to each whether there is any evidence of Defendant Kilpatrick's involvement in these alleged acts of obstruction.

First, Plaintiffs have produced evidence of at least a few instances in which materials from the Tamara Greene homicide file went missing during the course of the DPD investigation into Ms. Greene's murder. Most notably, the initial officer in charge of the investigation, Sgt. Stevenson, testified at her deposition that at some point during

52

her investigation, her case notes were erased from her computer's hard drive and four

floppy disks with backup copies of computer-based information about the Greene

investigation were removed from a locked plastic case on her desk.  (*See* Stevenson Dep.

at 51-53.)  Sgt. Stevenson testified that at the time these materials went missing, she was

told that "there was something wrong with the computers over the weekend," and she

assumed that the floppy disks were taken by someone who "needed a floppy disk, and

they just borrowed it."  (*Id.* at 54, 208.)[43]  It was only later that she came to view these

losses as intentional, and that she formed the "thought" that "[s]omebody didn't want me

to finish the case." (*Id.* at 55, 208-09.)  Even then, however, she acknowledged that her

beliefs as to the intentional taking and deletion of Greene investigative materials were

based on "speculation," that she could not say whether these records were deliberately

taken or accidentally lost, and that she did not know who might have deleted the

information from her computer or why this data was erased.  (*Id.* at 208, 232-33, 241.)

More to the point, she had no basis for believing that Defendant Kilpatrick was involved

in any way in the deletion or loss of these materials.  (*See id.* at 233-34, 241.)[44]

---

[43]In addition, Sgt. Stevenson testified that the entire hard drive of her computer had been erased, and not just her notes from the Greene investigation.  (*See id.* at 231-32.)

[44]Apart from Sgt. Stevenson's missing computer data and floppy disks, Plaintiffs also point to Sgt. Godbold's deposition testimony that a cell phone recovered from the scene of Ms. Greene's murder went missing from the homicide file at some point during the investigation. (*See* Godbold Dep. at 376-78.)  Yet, as noted earlier, Sgt. Godbold acknowledged later in his deposition that it was possible the cell phone was in the custody of the DPD's evidence technicians, rather than in the homicide file.  (*See id.* at 457-58.)  In any event, there is no evidence of Defendant Kilpatrick's involvement in the purported disappearance of this phone from the Greene homicide file.

Plaintiffs fare no better in their effort to link Defendant Kilpatrick to the more general loss of materials from the Greene homicide file by the time it was produced during discovery in this case. At least two of the Greene homicide investigators, Sgt. Stevenson and Sgt. Godbold, testified that some of the materials and notes they compiled during their investigative efforts were not in the version of the homicide file produced by the Defendant City during discovery and kept in this Court's chambers. (*See* Stevenson Dep. at 39-40, 73-74, 158-61, 198, 210; Godbold Dep. at 333-36, 353-57.)[45] Yet, both of these investigators testified that the homicide file remained largely intact while they were investigating Ms. Greene's murder. (*See* Stevenson Dep. at 99, 241 (testifying that, apart from the computer-based data addressed above, the file was complete and no materials were missing when the case was reassigned from her to Sgt. Godbold); Godbold Dep. at 298 (testifying that the file remained "under lock and key" and that no materials went missing or were tampered with while he was the officer in charge of the investigation).) Not surprisingly, then, neither investigator was in a position to say when any materials might have gone missing or who might have had custody of the file at the time. (*See*

---

[45]In the brief in support of its motion, the Defendant City contends that at least some of these materials are, in fact, contained in the copy of the homicide file delivered to the Court. (*See* Defendant City's Motion, Br. in Support at 39.) The City further observes that it produced an additional, supplemental copy of the homicide file on compact disc ("CD") that contains some materials not found in the hard-copy version of this file, but that most of the witnesses who reviewed the file *in camera* did not examine this CD to ascertain whether any purportedly missing materials might be found in this computer-based version of the file. (*See id.*)

54

Stevenson Dep. at 231; Godbold Dep. at 452-56.)[46]  And, again, neither these two nor any other DPD officer involved in the Greene homicide investigation identified any basis for believing that any materials went missing from the homicide file as a result of anyone's deliberate act, or that Defendant Kilpatrick was involved with, approved, or acquiesced in any such deliberate removal of materials from the homicide file.  (*See, e.g.,* Stevenson Dep. at 231; Godbold Dep. at 452-53; Bowman Dep. at 197.)[47]

Next, apart from this evidence of purported tampering with or removal of materials from the Greene homicide file, Plaintiffs seek to establish Defendants' deliberate interference with or obstruction of the Greene murder investigation by pointing to instances where investigators were removed from the case or the investigation was reassigned under purportedly suspicious circumstances.  First and foremost, Plaintiffs suggest that there were a number of irregularities in the manner in which Sgt. Stevenson and Lt. Bowman were removed from the Greene homicide investigation and the case was reassigned to Sgt. Godbold of the Cold Case Squad.  Most notably, this reassignment was made on the very same day that two Michigan State Police ("MSP") officers met with Lt.

---

[46]In fact, the homicide file did not remain exclusively in DPD custody at all relevant times, but instead was delivered to the Wayne County Prosecutor's Office at some point in late 2005, where it remained until some time prior to December of 2007.

[47]The Court notes that a copy of the homicide file was delivered to the Court in late April of 2008.  There is no evidence in the record that Defendant Kilpatrick — who remained in his post as Detroit mayor for a few more months, until September of 2008 — was involved in this document production, much less that he might have participated in, ordered, or acquiesced in the removal of any materials from the homicide file as it was being copied and forwarded to the Court.

Bowman and his two immediate superiors, Lt. Jackson and Commander Schwartz. During this meeting, the MSP officers reportedly stated their view that the rumored Manoogian Mansion party had actually occurred, and Lt. Bowman, in turn, advised Commander Schwartz of his belief that Ms. Greene had been killed by a member of Defendant Kilpatrick's Executive Protection Unit ("EPU"). Immediately after this meeting, Commander Schwartz contacted Assistant Police Chief Cureton and recommended that the Greene investigation be reassigned, and this recommendation was approved by then-Chief of Police Bully-Cummings at a meeting later that same day.

Plaintiffs view this reassignment as suspicious in a number of respects. First, it came immediately on the heels of a meeting at which senior DPD officials learned that the Greene homicide investigators were looking into a possible link between Ms. Greene's death and the rumored Manoogian Mansion party, as well as the possibility that a member of the mayor's EPU might have been involved in Ms. Greene's death. Next, Sgt. Stevenson testified that she had never before been removed from a homicide investigation, that this removal occurred at a point when she was about to pursue leads involving members of Mayor Kilpatrick's EPU and his staff, and that cases generally were reassigned to the Cold Case Squad only after one and a half or two years and when there were no more leads. (*See* Stevenson Dep. at 74-78, 120-21, 130-33.) Likewise, the acting head of the Homicide Section at the time, Lt. Jackson, testified that the reassignment was "unusual," and that the Cold Case Squad typically was given only older cases that were not being actively investigated. (*See* Jackson Dep. at 79-80, 106-07; *see*

56

*also* Godbold Dep. at 34, 303 (testifying that the DPD's usual practice was to transfer files to the Cold Case Squad only after two years, and that he could not recall receiving any cases that were less than two years old prior to the Greene investigation).)  Finally, Lt. Bowman was not only removed from the Greene investigation but was transferred out of the Homicide Section shortly thereafter, and Sgt. Stevenson and Lt. Jackson likewise were reassigned to other positions in moves that they viewed as "punishment," (Stevenson Dep. at 82), and as "kind of a shock," (Jackson Dep. at 315).

Be all this as it may, nothing in the record suggests that this reassignment or any of its surrounding, purportedly suspicious circumstances were traceable to Defendant Kilpatrick.  Each of these matters was handled internally within the DPD, rising at most to the level of then-Police Chief Bully-Cummings.  In particular, Commander Schwartz and Assistant Police Chief Cureton met with Chief Bully-Cummings to secure her approval of their recommendation that the Greene investigation be taken away from Lt. Bowman and Homicide Squad 8 and reassigned to Sgt. Godbold of the Cold Case Squad. (*See* Schwartz Dep. at 54-55; *see also* Plaintiffs' Response, Ex. 74, Cureton Dep. at 67-68 (testifying that this reassignment "wouldn't have been done if [Chief Bully-Cummings] didn't agree").)  In addition, Lt. Bowman has testified — based evidently on testimony given during his state court whistleblower suit — that Chief Bully-Cummings took responsibility for his transfer shortly after he was removed from the Greene investigation. (*See* Bowman Dep. at 128.)  Yet, while some aspects of this reassignment of the Greene investigation and the ensuing transfers of Lt. Bowman, Sgt. Stevenson, and Lt. Jackson

57

might have been approved at the highest levels of the DPD, there is no evidence in the record suggesting that Defendant Kilpatrick or any members of his staff were involved in any of these decisions, or that Defendant Kilpatrick ordered, approved of, or acquiesced in any of these decisions.  (*See, e.g.,* Plaintiffs' Response, Ex. 76, Bully-Cummings Dep. at 96-97, 288-89; Cureton Dep. at 122-23; Schwartz Dep. at 95; Bowman Dep. at 192-94, 198; Stevenson Dep. at 242-43.)

Similarly, Plaintiffs have failed to produce any evidence of Defendant Kilpatrick's involvement in the other reassignments of the Greene investigation or the transfers of other DPD officers who participated in this investigation.  To the extent, for example, that Plaintiffs cite the temporary, two or three month assignment of Sgt. Godbold to the Special Long-Term Investigative Section as having impeded the Greene investigation, Sgt. Godbold testified that he had no basis for believing that this decision rose even to the level of Chief Bully-Cummings.  (*See* Godbold Dep. at 222.)  Likewise, while Plaintiffs point to the August 2005 disbanding of the Cold Case Squad as an effort to deliberately interfere with the Greene investigation, Sgt. Godbold testified that he did not know who made this decision or when it was made, and he stated more generally that he had no basis for believing that Chief Bully-Cummings or Defendant Kilpatrick were part of any conspiracy to undermine the Greene investigation by shutting down the Cold Case Squad. (*See id.* at 264-65, 492, 497.)

Indeed, throughout their lengthy response to Defendants' motions, Plaintiffs seemingly do not claim that they have unearthed any evidence, whether direct or

58

circumstantial, of any actions taken by Defendant Kilpatrick himself to interfere with the Greene homicide investigation.  Nor have Plaintiffs identified any evidence of Defendant Kilpatrick's encouragement of, or personal involvement in, any of the discrete acts through which the Greene investigation purportedly was obstructed or impeded — namely, the alleged destruction and removal of evidence and materials from the homicide file, the reassignment of the case to different investigators, and the transfers of DPD officers involved in the investigation.  Rather, in lieu of evidence that might reflect Defendant Kilpatrick's participation in, or even awareness of, any aspect of the Greene investigation, Plaintiffs apparently seek to rely on inferences drawn from the evidence of Defendant Kilpatrick's actions under purportedly similar circumstances — including, most prominently, his participation in the removal of Deputy Chief Gary Brown from his position as the head of the DPD's Professional Accountability Bureau.  Specifically, Plaintiffs evidently invite the Court — as well as the trier of fact at any eventual trial — to infer that because Defendant Kilpatrick allegedly took steps to interfere with an investigation by the DPD's Internal Affairs Section and Deputy Chief Brown that was likely to trigger an inquiry into the activities of the mayor and his EPU, as well as the rumored Manoogian Mansion party, Defendant Kilpatrick must *also* have taken steps to interfere with the Greene investigation, at least insofar as the DPD homicide investigators might have been inclined to look into the rumored Manoogian Mansion party and the conduct of the mayor and his EPU.

This proposed inference, however — often referred to in the law as a "propensity

59

inference," *see United States v. Lucas,* 357 F.3d 599, 614 (6th Cir. 2004) (Rosen, D.J.,

concurring) — runs afoul of a very basic and centuries-old legal principle that has been

codified in the Federal Rules of Evidence.  Specifically, under Federal Rule of Evidence

404(b), evidence of an individual's "other crimes, wrongs, or acts is not admissible to

prove the character of [that] person in order to show action in conformity therewith."  In

accordance with this Rule, the courts have consistently held in § 1983 suits that evidence

of a defendant's past constitutional violations or other wrongful acts is not admissible to

show that the defendant committed a similar constitutional violation in the present case.

*See, e.g., Turner v. Scott,* 119 F.3d 425, 430 (6th Cir. 1997); *Franklin v. Messmer,* No.

03-5184, 111 F. App'x 386, 388 (6th Cir. Sept. 14, 2004); *Hudson v. District of*

*Columbia,* 558 F.3d 526, 532 (D.C. Cir. 2009); *Berkovich v. Hicks,* 922 F.2d 1018, 1022

(2d Cir. 1991); *Luka v. City of Orlando,* No. 09-13969, 382 F. App'x 840, 842-43 (11th

Cir. June 11, 2010).

 To be sure, Rule 404(b) permits the introduction of so-called "other acts" evidence

for certain specified purposes, such as proof of motive or intent.  It is possible, then, that

Plaintiffs' evidence of Defendant Kilpatrick's actions with respect to Deputy Chief

Brown might be admissible for these purposes, if any such issues of motive or intent were

to prove relevant at any eventual trial.  What the Rule does ***not*** permit, however, is the

introduction of this evidence for the purpose proposed by Plaintiffs in their response to

Defendants' motions:  namely, to give rise to the inference that because Defendant

Kilpatrick participated in the removal of Deputy Chief Brown as he and his Internal

Affairs unit apparently were about to investigate the activities of the former mayor and the rumored Manoogian Mansion party, Defendant Kilpatrick *also* must have been involved in one or more of the acts of alleged interference with the Greene homicide investigation.

In *Becker v. ARCO Chemical Co.,* 207 F.3d 176, 189-94 (3d Cir. 2000), the Third Circuit Court of Appeals extensively addressed an analogous effort to introduce evidence that raised concerns under Rule 404(b).  The plaintiff in that case, William Becker, alleged that he had been discharged from his employment on account of his age, but the defendant employer, ARCO, justified the plaintiff's discharge as due in part to customer complaints about his job performance.  At trial, plaintiff Becker sought to establish the "trumped up" nature of these customer complaints by introducing evidence that another employee, Linwood Seaver, also had been discharged on the basis of "trumped up" charges of poor job performance.  The district court admitted this evidence, but the Third Circuit reversed, holding that the evidence should have been excluded under Rule 404(b).

In so ruling, the court first recognized that a plaintiff in an employment discrimination suit must establish the employer's discriminatory intent.  *See Becker,* 207 F.3d at 191.  Against this backdrop, the evidence at issue was arguably relevant to this question of intent because it supported the proposition that ARCO had "fabricated" the charges of Becker's poor job performance, thereby "render[ing] ARCO's purported nondiscriminatory reasons [for Becker's discharge] weak or implausible."  207 F.3d at 191.  Nonetheless, the court observed that Rule 404(b) dictates the exclusion of otherwise

61

relevant evidence if the "chain of logical inferences" leading to its relevance includes the "inference that a bad person is disposed to do bad acts." 207 F.3d at 191 (internal quotation marks and citations omitted). The court then found that the evidence at issue concerning the termination of another employee, Seaver, "fail[ed] this test" for admissibility of other acts evidence under Rule 404(b):

> . . . [T]he logical connection between ARCO's alleged "fabrication" of performance problems in relation to Seaver's dismissal and its purported conduct in terminating Becker is the inference that ARCO was likely to have fabricated customer complaints and other performance problems in Becker's case merely because ARCO previously engaged in a similar impropriety in facilitating Seaver's dismissal. The problem is, as we recognized in [a prior case], this is the very evil that Rule 404(b) seeks to prevent. Put another way, the evidence of ARCO's "manner" of terminating Seaver simply is not relevant on the issue of whether ARCO discriminated against Becker absent the inference that ARCO had a propensity to act in a certain way, and that in firing Becker, it acted in conformity with its prior conduct. Accordingly, because Becker has failed to articulate how the Seaver evidence fits into a chain of logical inferences pointing towards ARCO's intent without involving the inference that because ARCO committed the first act it was more likely to have committed the second, we cannot agree with the district court's conclusion that the evidence was admissible under Rule 404(b) to establish ARCO's intent to discriminate against Becker.

207 F.3d at 191-92 (internal quotation marks and citations omitted).

Precisely the same can be said here about Plaintiffs' theory as to the relevance of the evidence of Defendant Kilpatrick's involvement in the removal of Deputy Chief Gary Brown from the DPD's Professional Accountability Bureau. In their brief in response to Defendants' motion, Plaintiffs posit a "decision" by Defendant Kilpatrick that there was not to be any investigation of "any matter . . . [or] inquiry[] pertaining to events that

occurred at Manoogian Mansion involving Greene, as doing so would inevitably expose the prior wrongdoing on the part of the Mayor, his wife, and his friends at the DPD." (Plaintiffs' Response Br. at 94-95.)  Yet, in the many pages of discussion that follow, the only evidence identified by Plaintiffs concerning actions taken by Defendant Kilpatrick himself or at his direction to shut down or impede any such investigation is the evidence reflecting his involvement in the removal of Deputy Chief Brown as head of the Professional Accountability Bureau.  (*See id.* at 95-105.)

Faced with this dearth of evidence connecting Defendant Kilpatrick himself or any subordinate acting at his direction to any act of alleged interference with the Greene homicide investigation, Plaintiffs offer only the contention that these instances of purported interference themselves "give[] rise to a reasonable inference that such events had been coordinated at the direction of a higher authority."  (*Id.* at 103; *see also id.* at 99 (asserting that "it would "fl[y] in the face of all reasonable inferences" to conclude that these acts were undertaken "without [Defendant Kilpatrick's] direction or knowledge as the highest executive official in the City of Detroit").)  One necessary link in this chain of "reasonable inferences" is clear:  that because Defendant Kilpatrick allegedly took action to impede an Internal Affairs inquiry into his activities and the rumored Manoogian Mansion party by participating in the removal of Deputy Chief Brown, he is more likely to have ***also*** taken action to involve himself in one or more of the instances of alleged interference with the Greene investigation.  Indeed, Plaintiffs' counsel perfectly encapsulated this line of reasoning at the October 5, 2011 hearing, summarizing the

63

various acts of alleged interference with the Greene investigation and then asking, "What else could it be?"

Absent this proposed inference arising from Defendant Kilpatrick's conduct on other occasions, Plaintiffs are left only with evidence of Defendant Kilpatrick's ***motive*** to impede any inquiry into his activities or the rumored Manoogian Mansion party, without any indication that he ever ***acted*** on this motive to interfere with or impede the Greene investigation.[48]  Because Plaintiffs' effort to forge this necessary link between motive and action rests upon the inference that Defendant Kilpatrick acted in conformity with a demonstrated propensity to interfere with investigations into his activities, and because Rule 404(b) dictates the exclusion of evidence that is offered solely for the purpose of inviting this inference, Plaintiffs cannot raise a genuine issue of material fact as to Defendant Kilpatrick's participation or involvement in any act of interference with the Greene investigation by appealing to his involvement in Deputy Chief Brown's removal.[49]

---

[48]In fact, Plaintiffs' response brief is replete with discussions of evidence that purportedly tends to establish Defendant Kilpatrick's motive to impede investigations into his conduct.  (*See, e.g.,* Plaintiffs' Response Br. at 97, 98, 101, 105.)  Yet, as observed earlier, motive is not an element of Plaintiffs' § 1983 claims.  It follows that Plaintiffs' ability to raise a genuine issue of fact as to Defendant Kilpatrick's motives is of extremely limited value in their effort to withstand summary judgment, serving only to suggest why Defendant Kilpatrick might have wanted to interfere with the homicide investigation, but not tending to establish that he actually did so.

[49]It is still more clear that Plaintiffs cannot raise an issue of fact as to Defendant Kilpatrick's alleged interference with the Greene investigation by pointing to more general evidence of the former mayor's purportedly questionable character — *e.g.,* his inappropriate relationship with a court-appointed monitor in the federal suit filed by the U.S. Department of

To be sure, Rule 404(b) governs only "other act" evidence, and does not preclude the introduction of evidence of acts that are "intrinsic" to the conduct at issue. *See United States v. Henderson,* 626 F.3d 326, 338 (6th Cir. 2010). Arguably, then, Plaintiffs' appeal to the facts surrounding Deputy Chief Brown's removal could be viewed as a proffer of "intrinsic" evidence of a single, overarching violation of the law, with Defendant Kilpatrick's alleged interference in the Internal Affairs and Greene investigations being two constituent episodes in this single "spree" of unlawful obstructive activity.

Yet, there is a critical distinction between these two episodes that would prevent them from being viewed as two parts of a larger whole, at least for purposes of this case. In particular, while Defendant Kilpatrick's conduct with respect to Deputy Chief Brown gave rise to a state court whistleblower suit, it did not constitute (or even contribute to) a violation of Plaintiffs' (or anyone else's) federal constitutional rights, whether under a denial-of-access or any other theory. By ordering the removal of Deputy Chief Brown, Defendant Kilpatrick surely cannot be said to have taken action in furtherance of a larger effort or unified course of conduct intended to impede the Greene homicide investigation, much less to deny Plaintiffs' right of access to the courts. Indeed, Deputy Chief Brown was removed from his position with the Professional Accountability Bureau just a few

---

Justice challenging various DPD policies and practices, his state court criminal conviction, and the pending federal criminal charges against him. Once again, regardless of whether this evidence might be admissible at trial for a purpose permitted under Rule 404(b), it cannot be considered for the purpose of inferring that because Defendant Kilpatrick committed (or allegedly committed) these other bad acts, he must also have interfered with the Greene investigation.

days after Ms. Greene's death, and nothing in the record suggests that he or the Internal Affairs officers he supervised had any intention of investigating her murder. Thus, Defendant Kilpatrick's involvement in the removal of Deputy Chief Brown does not qualify as "intrinsic" evidence of the constitutional violation alleged by Plaintiffs here, such that it could be considered without regard to the standards of Rule 404(b).

Alternatively, Plaintiffs perhaps could seek to introduce the evidence regarding the removal of Deputy Chief Brown under the theory that it tends to establish a "plan," which is one of the purposes expressly identified as permissible under Rule 404(b). Any such effort, however, would fail on essentially the same ground that precludes the introduction of this evidence as "intrinsic" to a single, overarching course of conduct. As discussed at length in *Becker, supra,* the admission of "other acts" evidence as part of a "plan" typically requires that "both [acts] must be inspired by the same impulse or purpose," with the prior act and the act at issue in the present suit representing "steps toward the accomplishment of the same final goal" and "different stages of the plan." 207 F.3d at 195-97 (internal quotation marks and citation omitted). Yet, as explained, there is no evidentiary basis for concluding that the removal of Deputy Chief Brown was intended to achieve the only "goal" or "purpose" of relevance here — namely, to abridge Plaintiffs' right of access to the courts. Under these circumstances, to view the removal of Deputy Chief Brown and the alleged interference with the Greene investigation as part of a single, overarching "plan" would beg the very evidentiary question at issue here — specifically, whether the record provides any basis for concluding that Defendant

66

Kilpatrick was involved in any alleged act of interference with the Greene investigation, apart from drawing an impermissible propensity inference of such involvement from the evidence of his interference with another investigation.

Moreover, any "plan"-based theory of the admissibility of this evidence, even if accepted, would not automatically result in its introduction, but would instead trigger an inquiry under Fed. R. Evid. 403 whether the probative value of this evidence "is substantially outweighed by the . . . confusion of the issues . . . , or by considerations of undue delay [or] waste of time." *See United States v. Franco,* 484 F.3d 347, 352 (6th Cir. 2007) (recognizing that even if evidence is admissible under Rule 404(b), it still must be assessed under the standards of Rule 403).  In particular, while there is at least some evidence in the record that Deputy Chief Brown's removal might have been motivated by a desire to shut down an Internal Affairs inquiry into the rumored Manoogian Mansion party or allegations of misconduct by former Mayor Kilpatrick or his EPU, there also is evidence in the record — including, most notably, the testimony of Defendant Kilpatrick himself — that the removal of Deputy Chief Brown was intended to serve different, more appropriate objectives.  Under these circumstances, a "mini-trial" would likely be necessary for the trier of fact to choose between these possible motives, just so that the trier of fact could then decide how much weight to give the evidence of Deputy Chief Brown's removal as part of Defendant Kilpatrick's alleged "plan" to interfere with investigations that might explore disfavored matters.  Given the length and contentiousness of Deputy Chief Brown's own whistleblower trial, there is ample reason

67

for concern that such a "mini-trial" in this case would result in "confusion of the issues" and "undue delay" that would substantially outweigh the probative value of the evidence of Deputy Chief Brown's removal as indicative of a "plan" under Rule 404(b).[50]

This same reasoning defeats Plaintiffs' effort to support their denial-of-access claim against Defendant Kilpatrick by reference to the evidence of his purported attempts to influence or interfere with the investigation by the Michigan State Police ("MSP") and former Michigan Attorney General Mike Cox into the rumored Manoogian Mansion party and alleged misconduct by members of the former mayor's EPU.  Again, to the extent Plaintiffs offer this evidence to further demonstrate Defendant Kilpatrick's propensity to interfere with investigations, Rule 404(b) forecloses the use of this evidence to infer that Defendant Kilpatrick acted in conformity with this predisposition by interfering with the Greene investigation.

Nor does this evidence qualify as "intrinsic" to Plaintiffs' denial-of-access claim against Defendant Kilpatrick.  Whatever it might say about Defendant Kilpatrick's ethical judgment or sense of public responsibility that he allegedly would attempt to influence or

---

[50]Before leaving this "plan"-based theory of admissibility, the Court emphasizes that this discussion applies only to Plaintiffs' effort to introduce the evidence of Deputy Chief Brown's removal in support of their § 1983 claims against Defendant Kilpatrick.  The courts generally are more willing to admit "other acts" evidence of this sort in support of § 1983 claims against a municipality, because this evidence often is directly relevant to the question whether the municipality had a policy or custom that was the moving force behind the plaintiff's constitutional injury.  *See, e.g., Foley v. City of Lowell,* 948 F.2d 10, 13-14 (1st Cir. 1991); *Luka, supra,* 382 F. App'x at 842.  In light of this distinction, the Court separately addresses below the significance of the evidence of Deputy Chief Brown's removal to Plaintiffs' § 1983 claim against the Defendant City.

impede the former Attorney General's investigation, any such effort cannot be viewed as another aspect of the constitutional violation alleged by Plaintiffs, nor as contributing to any such violation. The focus of the MSP investigation was the rumored Manoogian Mansion party and the activities of the former mayor's EPU, not the death of Ms. Greene. Moreover, while Defendant Kilpatrick at least had some means to exercise control over DPD investigations — by, for example, ordering the removal of high-ranking police officials, as he evidently did with Deputy Chief Brown — his ability to influence a state-level investigation surely was much more limited, presumably to such means as political persuasion. Consequently, the evidence of Defendant Kilpatrick's alleged interference with the MSP investigation, like the evidence of his involvement in the removal of Deputy Chief Brown, does not serve to overcome Plaintiffs' failure to produce evidence of Defendant Kilpatrick's participation, approval, or knowing acquiescence in any act to obstruct or impede the Greene homicide investigation.

Indeed, Plaintiffs' repeated appeals to Defendant Kilpatrick's active involvement in Deputy Chief Brown's removal and his apparent efforts to influence the MSP investigation serve only to highlight the dearth of evidence in the record that the former mayor interfered with the Greene investigation. As exhaustively detailed in Plaintiffs' response to Defendants' motions, there is ample evidence linking Defendant Kilpatrick to the removal of Deputy Chief Brown from his position as the head of the DPD's Professional Accountability Bureau, including text messages exchanged among the former mayor and members of his administration, contemporaneous documents, and the

69

deposition testimony of those (such as then-Police Chief Oliver) who were directly involved in Brown's removal.[51]  Likewise, there is at least some evidence that Defendant Kilpatrick and members of his administration attempted to exert some degree of influence over the MSP's and former Attorney General's investigation.  In stark contrast, there is **no** such record linking Defendant Kilpatrick to any of the specific activities or incidents Plaintiffs have identified as interfering with or impeding the Greene homicide investigation.

Under these circumstances, if Plaintiffs were permitted to proceed with their effort to use evidence of other acts of alleged interference to raise inferences about Defendant Kilpatrick's purported obstruction of the Greene investigation, this would serve not merely to bolster or shed light on an independent body of evidence indicating that Defendant Kilpatrick violated Plaintiffs' constitutionally protected right of access to the courts, but would instead operate as an outright *substitute* for the body of evidence that Plaintiffs have been unable to produce.  As explained, Rule 404(b) flatly precludes this mode of proof of a § 1983 claim.  In addition, the Court harbors serious doubt that such evidence of alleged interference with other investigative efforts, unrelated to the Greene homicide investigation, could possibly serve to show not only that Defendant Kilpatrick interfered with the latter investigation, but that he did so "for the purpose of frustrating"

---

[51]The existence of this evidentiary record presumably helps to explain the substantial jury verdict in Deputy Chief Brown's favor in his state court whistleblower suit against Defendant Kilpatrick and the City of Detroit.

Plaintiffs' right of access to the courts.  *See Crowder, supra,* 884 F.2d at 812.

At the October 5, 2011 hearing on Defendants' motion, Plaintiffs' counsel suggested that it would be unfair or unreasonable to require "smoking gun" evidence of Defendant Kilpatrick's obstruction of the Greene investigation, and that, even in the absence of such evidence, Plaintiffs should be permitted to argue before a jury that the various acts of alleged interference with the homicide investigation were too numerous and suspicious to be coincidental, but instead must have been orchestrated by a higher authority.  Throughout this litigation, however, the Court has been at pains to remind the parties, counsel, and everyone else that this case must be resolved under the applicable rules of evidence, procedure, and law, and not through speculation and guesswork. Simply stated, what Plaintiffs must prove here is not that the former mayor and his administration were involved generally in unethical, corrupt, or otherwise questionable activities, but that in this specific instance, Defendant Kilpatrick took specific steps to obstruct or impede the DPD investigation into Tamara Greene's death, resulting in an abridgement of Plaintiffs' right of access to the courts.

Under this proper understanding of the issues raised by this litigation and the elements of Plaintiffs' § 1983 claims, Plaintiffs' "what else could it be" theory of liability suffers from a number of infirmities that preclude its presentation to a jury.  First, it is not unusual that a plaintiff is called upon to prove a defendant's intentional wrongdoing, and it is equally commonplace that the plaintiff lacks direct, "smoking gun" evidence that the defendant acted in this fashion.  In employment discrimination suits, for example, a

71

plaintiff must establish that his employer took adverse action against him on the basis of impermissible considerations such as race, age, or gender, and it is fairly rare case in which the plaintiff is able to uncover a direct statement by the employer that it acted on such an impermissible ground.  Instead, the plaintiff often must proceed by resort to circumstantial evidence, such as proof that a similarly situated employee outside the protected class was treated more favorably, or evidence suggesting that the employer's stated reason for its action is unworthy of belief.  Likewise, in this case, Plaintiffs need not have produced direct evidence of Defendant Kilpatrick's obstruction of the Greene investigation, but could have identified circumstantial evidence of such interference.  To see that this is so, one need look no further than the circumstantial evidence in the record indicating that Defendant Kilpatrick removed Deputy Chief Brown from his position as head of the DPD's Professional Accountability Bureau in retaliation against Brown's apparent effort — whether already begun or soon to commence — to investigate the activities of the mayor and his EPU and the rumored Manoogian Mansion party.[52]  The evidentiary burden shouldered by Plaintiffs here is not substantially different from that faced by plaintiffs in countless other civil suits.

Next, Plaintiffs' claim of a series of events that "could not be coincidental" rests upon a linkage of these events that the record simply does not support.  As discussed

---

[52]Again, as noted earlier, there evidently was a sufficient record of such circumstantial evidence to persuade a jury to find in Deputy Chief Brown's favor in his whistleblower suit against Defendant Kilpatrick and the City of Detroit.

earlier, the record concerning the "disappearance" of materials from the homicide file largely fails to establish that these missing materials were attributable to ***any*** act of deliberate human agency, much less that each of these losses was part of a unified effort by one or more individuals acting at the behest of a higher authority to obstruct the homicide investigation.  Likewise, while some of the homicide investigators have opined that their subsequent transfers were intended in some way to punish them for their involvement in the Greene investigation, none of these investigators has identified a factual basis for his or her belief, and the Court already has explained that such subjective, unsupported beliefs can play no part in the disposition of a summary judgment motion.  Even assuming, then, that it could be characterized as "more than a coincidence" that several of the Greene homicide investigators have arrived at such a belief, the aggregation of several such unfounded beliefs nonetheless cannot give rise to a genuine issue of fact that could withstand an award of summary judgment.

Finally, even accepting that all of the various acts of alleged interference with the Greene investigation "could not be a coincidence," but instead must have reflected the will of a higher authority, Plaintiffs' only evidence that ***Defendant Kilpatrick*** was this higher authority consists of examples of his alleged interference with other investigations.  As explained above, this evidence merely invites the propensity inference that Rule 404(b) expressly forbids.  Beyond this impermissible inference, Plaintiffs' theory of Defendant Kilpatrick's § 1983 liability rests only on "hypothetical 'plausibility' based on a lack of evidence," which is insufficient as a matter of law to "withstand a properly

73

supported motion for summary judgment." *Chappell v. City of Cleveland,* 585 F.3d 901, 912 (6th Cir. 2009); *see also Lewis v. Philip Morris, Inc.,* 355 F.3d 515, 533 (6th Cir. 2004) ("In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." (internal quotation marks, citations, and alterations omitted)).

This leaves only the question whether Plaintiffs can surmount the evidentiary deficiencies in their § 1983 claims against Defendant Kilpatrick by resort to the adverse inferences that arise from his assertion at his deposition of his Fifth Amendment privilege against self-incrimination.  Defendant Kilpatrick's assertions of this privilege were limited almost exclusively to instances where he was asked to confirm that he had sent or received a particular SkyTel text message, or where Plaintiffs' counsel phrased a question by reference to these text messages.[53]  At most, then, any adverse inferences arising from these assertions of privilege could establish only that Defendant Kilpatrick sent the text messages at issue, or that the content of these messages accurately reflected his beliefs, understandings, and intentions.  Yet, the subject matter of these text messages does not address or touch upon the Greene homicide investigation at all, whether directly or tangentially.

---

[53]The decision to assert a Fifth Amendment privilege in response to such questions evidently reflected a determination by Defendant Kilpatrick and his counsel that any authentication of the SkyTel text messages as actually sent or received by him could prove incriminating as Defendant Kilpatrick defends against the criminal charges pending against him.

Under this record, Plaintiffs cannot identify any specific inferences that could reasonably be drawn from Defendant Kilpatrick's various assertions of Fifth Amendment privilege that would bridge the most significant evidentiary gap they face in their § 1983 claims against him — namely, the absence of evidence of Defendant Kilpatrick's involvement in any of the acts of alleged interference with the Greene investigation.  To the contrary, when Defendant Kilpatrick was directly asked whether he attempted in any manner to obstruct the Greene investigation, directed anyone to do so, or knowingly acquiesced in any interference in this investigation, he did not assert any privilege, but instead answered each of these questions in the negative.  (*See* Plaintiffs' Response, Ex. 2, Kilpatrick Dep. at 295-96.)[54]  Accordingly, the adverse inferences arising from

---

[54]In their most detailed effort to forge the necessary link between Defendant Kilpatrick's assertions of privilege and matters specifically pertaining to the Greene homicide investigation, Plaintiffs cite a passage from Defendant Kilpatrick's deposition in which their counsel quoted from a text message purportedly sent by Defendant Kilpatrick to Christine Beatty regarding the dismissal of Deputy Chief Brown, and then asked Defendant Kilpatrick whether this text message evidenced his "fear[] that Gary Brown, if permitted to remain in his job, was ultimately going to discover the obstruction that you were engaged in as it related to the investigations concerning Tammy Greene."  (Kilpatrick Dep. at 275.)  Defendant Kilpatrick's counsel instructed his client not to answer this question on Fifth Amendment grounds, (*see id.*), and Plaintiffs contend that this gives rise to an inference that Defendant Kilpatrick did, in fact, direct Deputy Chief Brown's removal in order to conceal his obstruction of the Greene homicide investigation.

Such inferences, however, must be tethered in some way to the evidentiary record, and cannot be based solely on Plaintiffs' counsel's choice of wording in questioning Defendant Kilpatrick at his deposition.  The text message that formed the factual predicate for counsel's question had nothing whatsoever to do with Tamara Greene, her murder, or the DPD homicide investigation, but instead was addressed solely to Deputy Chief Brown's dismissal.  Although Plaintiffs' counsel framed his question in a manner that drew a connection to the Greene investigation, Defendant Kilpatrick's assertion of privilege in response cannot reasonably be viewed as an adoption of all of the many factual premises and assumptions that counsel injected into his question.  To the contrary, when Plaintiffs' counsel asked essentially the same question

Defendant Kilpatrick's assertions of his Fifth Amendment privilege against self-incrimination do not aid Plaintiffs in establishing Defendant Kilpatrick's involvement in any acts of interference with the Greene homicide investigation.

Finally, just as there is no evidence that Defendant Kilpatrick acted to deprive Plaintiffs of their right of access to the courts, there is no evidence that he conspired with others to carry out this objective.  Again, with respect to Plaintiffs' allegations of tampering with the Greene homicide file, no witness has come forward with any evidence that materials were deliberately removed from this file for the purpose of interfering with the homicide investigation, much less that two or more individuals entered into an agreement to do so.  Likewise, as to Plaintiffs' allegations of suspicious reassignments of the Greene investigation and transfers of DPD officers who participated in this investigation, there is no evidence that anyone outside the DPD was involved in these decisions, much less that Defendant Kilpatrick acted in concert with the relevant DPD officials to bring about these results.  Accordingly, Defendant Kilpatrick is entitled to summary judgment in his favor on Plaintiffs' § 1983 claims.

**C.    Plaintiffs' § 1983 Claim Against the Defendant City of Detroit Fails for Lack of Evidence of a Municipal Policy or Custom That Was the Moving Force Behind Any Instance of Alleged Interference with the Greene Homicide**

---

without reference to any text message — inquiring, in particular, whether Defendant Kilpatrick had "attempt[ed] in any manner to obstruct Tamara Greene's homicide investigation" or had "direct[ed] anyone" to do so —  Defendant Kilpatrick did not assert a Fifth Amendment privilege, but instead responded, "Absolutely not." (*Id.* at 295.)  Under this record, there is simply no basis for a trier of fact to infer that Defendant Kilpatrick invoked his Fifth Amendment privilege in order to avoid acknowledging his involvement in any alleged act of interference with the Greene investigation.

**Investigation.**

Turning next to Plaintiffs' § 1983 claim against the Defendant City of Detroit, the Court observed earlier that the City may be held liable for a violation of Plaintiffs' constitutional rights only if a City of Detroit policy or custom was the "moving force" behind this constitutional injury. *See Board of County Commissioners,* 520 U.S. at 404, 117 S. Ct. at 1388. Accordingly, just as the Court has surveyed Plaintiffs' allegations of interference with the Greene homicide investigation to determine whether Defendant Kilpatrick could be linked with any of these alleged acts of interference, the Court now proceeds to consider whether any of these alleged acts of interference may be attributed to a City of Detroit policy or custom. As discussed below, the Court finds that the evidentiary record largely fails to forge this requisite link between any alleged act of interference with the Greene investigation and deliberate municipal conduct, whether evidenced by a widespread City of Detroit practice or the activities of City officials with policymaking authority. In addition, to the extent that Plaintiffs have produced evidence of an arguable nexus between alleged obstruction of the Greene investigation and deliberate municipal action, the record fails to establish that any such action was undertaken with the requisite "deliberate indifference to the risk," *Board of County Commissioners,* 520 U.S. at 411, 117 S. Ct. at 1392, that the City's action would result in a denial of Plaintiffs' right of access to the courts.

At the outset, it is helpful to consider and catalog the means through which Plaintiffs seek to identify the required policy or custom giving rise to the Defendant

77

City's potential § 1983 liability.  There is no claim here of a policy arising from the formal decision or act of a Detroit legislative body.  Rather, Plaintiffs rely primarily upon the Supreme Court's recognition that a municipal policy may arise from the single act or decision of a local government official with policymaking authority.  *See Pembaur,* 475 U.S. at 480-81, 106 S. Ct. at 1298-99.  In particular, the Defendant City acknowledges in its motion that Defendant Kilpatrick, former Chief of Police Jerry Oliver, and former Chief of Police Ella Bully-Cummings possessed policymaking authority during the period of relevance to this case, so that their decisions and actions may form the basis for the City's liability under § 1983.[55]  In addition, Plaintiffs seek to show that City of Detroit officials and employees acted pursuant to municipal customs — that is, practices that are "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell,* 436 U.S. at 691, 98 S. Ct. at 2036 (internal quotation marks, citation, and footnote omitted).

Against this backdrop, the Court turns once again to the acts of alleged interference with the Greene investigation upon which Plaintiffs rest their denial-of-access claim.  First, as to Plaintiffs' allegations that materials in the homicide file were

---

[55]Plaintiffs seemingly suggest that Defendant Kilpatrick's former Chief of Staff, Christine Beatty, and the former head of the City of Detroit Law Department, Ruth Carter, also may qualify as City officials with policymaking authority.  (*See* Plaintiffs' Response Br. at 95.)  The Court finds it unnecessary to decide this question, however, because the evidence as to any purportedly relevant actions taken by these individuals is cumulative of evidence of actions taken by acknowledged policymakers — namely, Defendant Kilpatrick and the two former Detroit police chiefs.  Thus, it adds nothing to Plaintiffs' argument to view these individuals as additional policymakers.

tampered with or removed during the course of the investigation, these allegations fail to support a claim against the Defendant City for the same reason they fail to support a claim against Defendant Kilpatrick — namely, for a complete lack of evidence indicating who might have been responsible for the removal of these materials, when this might have occurred, or what might have motivated the (unknown) individuals who removed these materials.  Plainly, given all these unknowns — and, most notably, given the absence of evidence that anyone acted with the deliberate purpose of tampering with, or otherwise bringing about the loss of materials from, the Greene homicide file in particular[56] — it cannot be said that a City policy or custom was the moving force behind the alleged removal of materials from the homicide file.  Moreover, Plaintiffs have made no effort to establish a widespread municipal practice of permitting or acquiescing in the removal of materials from DPD investigative files for the purpose of impeding police investigations.  Neither have they endeavored to show that DPD officers were

_____

[56]As Plaintiffs observe, the removal of floppy disks from Sgt. Stevenson's desk must have been the product of deliberate action, because the individual who took these disks had to pry open a locked plastic box in order to gain access to these disks.  (*See* Stevenson Dep. at 52-53, 64-65.)  The record is silent, however, as to the further question whether the individual who pried open this locked box did so for the purpose of retrieving the specific disks that Sgt. Stevenson used to store information concerning the Greene investigation.  To confirm that the motivation for this action remains open to question and speculation, one need look no further than the deposition testimony of Sgt. Stevenson herself, who stated that she thought at the time "that maybe somebody needed a floppy disk, and they just borrowed it and broke into my cabinet and took a couple," and that she "really didn't think [at the time] it had to do with the [Greene] case."  (*Id.* at 54.)  While Sgt. Stevenson later came to believe that these disks were removed by "[s]omebody [who] didn't want me to finish the case," she acknowledged that this was "just . . . my thought" and "speculation," and she testified that she had no basis for believing that these disks were taken by or at the direction of Defendant Kilpatrick or then-Chief of Police Bully-Cummings.  (*Id.* at 208-09, 233-34.)

inadequately trained in record retention practices, or that officers who engaged in the destruction or removal of investigative materials were subject to insufficient discipline. Under this record, any removal or loss of materials from the homicide file during the course of the Greene investigation cannot give rise to municipal liability.

Similar evidentiary deficiencies defeat any claim against the Defendant City arising from the absence of materials from the copy of the homicide file produced by the City during discovery. Most significantly, the record fails to shed any light whatsoever on when these materials went missing and who had custody of the file at the time. In fact, given that the file was turned over to the Wayne County Prosecutor's Office at one point, it would be a matter of sheer speculation to conclude that a City of Detroit employee was responsible for the missing materials. Further speculation would then be required to reach the additional, legally necessary conclusion that this unknown City employee was acting pursuant to a municipal custom or policy, and that the loss of materials was due to something more than mere negligence. *See Board of County Commissioners,* 520 U.S. at 407, 117 S. Ct. at 1390 (emphasizing that "[a] showing of simple or even heightened negligence will not suffice" to satisfy the deliberate indifference standard of municipal liability).

In any event, even assuming that some City of Detroit employee acted both deliberately and pursuant to a City custom or policy in removing materials from the homicide file at some unknown point, there is no evidence that this actually contributed to Plaintiffs' injury by impeding the homicide investigation. *See Board of County*

80

*Commissioners,* 520 U.S. at 404, 117 S. Ct. at 1388 (emphasizing that to impose liability on a municipality under § 1983, a plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights"). To the contrary, and as discussed earlier, the Greene homicide investigators testified that the file remained largely intact — with the exception, of course, of the materials that were lost or removed during the investigation, as addressed immediately above — during the course of their investigations. (*See* Stevenson Dep. at 99, 241; Godbold Dep. at 298.) Plainly, any materials that went missing *after* these officers concluded their investigative efforts cannot have hindered these efforts. And, again, Plaintiffs do not claim that these materials went missing as a result of a more general City of Detroit policy, custom, or widespread practice to tamper with or remove materials from DPD investigative files, or that the City has failed to train its DPD officers in the proper retention of investigative records. It follows from all of this that Plaintiffs' claim against the Defendant City cannot be sustained on the basis of their allegations of tampering with the Greene homicide file, whether during the course of the homicide investigation or in the process of furnishing a copy of this file to the Court.

Accordingly, the Court turns next to the multiple reassignments of the Greene investigation, as well as the transfers of DPD officers who worked on this investigation. These incidents offer a more promising opportunity for Plaintiffs to identify the requisite municipal policy, in light of the direct participation or involvement of an acknowledged City of Detroit policymaker, former Police Chief Ella Bully-Cummings, in at least some

of these decisions. In particular, Chief Bully-Cummings expressly approved the decision to reassign the Greene investigation from Homicide Squad 8 to Sgt. Godbold of the Cold Case Squad, and the record arguably suggests that she had at least some involvement in Sgt. Godbold's temporary reassignment to the Special Long-Term Investigative Section, (*see* Plaintiffs' Response, Ex. 79 (October 2004 memo indicating that Chief Bully-Cummings named Lt. James Tolbert to head this new section)), as well as perhaps Lt. Bowman's transfer out of Homicide Squad 8, (*see* Bowman Dep. at 128 (citing Chief Bully-Cummings' purported statement that she took responsibility for this transfer)).

Nonetheless, even assuming that then-Chief of Police Bully-Cummings made or approved each of these decisions and acted as a City of Detroit policymaker in doing so, Plaintiffs still face a number of evidentiary obstacles in their effort to forge the requisite "direct causal link," *Board of County Commissioners,* 520 U.S. at 404, 117 S. Ct. at 1388, between these acts of municipal policy and an alleged deprivation of their constitutionally protected right of access to the courts. First, there is little or no basis in the record for concluding that the reassignments of the Greene investigation and transfers of DPD investigators did, in fact, impede the effort to identify Ms. Greene's killer, at least to the extent necessary to establish a constitutional denial-of-access violation. To the contrary, Ms. Greene's murder was the subject of an ongoing and reasonably active investigation from the date of her death in April of 2003 until the Cold Case Squad was shut down in the summer of 2005. While the members of Homicide Squad 8, and particularly Sgt. Stevenson and Lt. Bowman, certainly opposed having the case taken away from them and

82

had additional leads that they wished to pursue, it cannot be said that the reassignment of

the case to Sgt. Godbold utterly derailed the investigation or foreclosed the possibility

that he would pursue these outstanding leads.  Rather, it appears from the record that this

reassignment, at worst, caused some duplication of effort and retracing of steps, as

opposed to any wholesale, irremediable disruption of the investigation.  Along the same

lines, it is difficult to see how the transfer or demotion of investigators *after* they were

removed from the case would impede the efforts of those officers who had been

designated to take their place in the homicide investigation.[57]

In an effort to establish such a detrimental impact upon the investigation, Plaintiffs

point to the testimony of their expert, William R. Rice, who spent much of his 35-year

career with the DPD as a homicide investigator and supervisor in the Homicide Section.

Most notably, Mr. Rice has opined that the Greene investigation suffered from excessive

oversight and hands-on involvement by the DPD chain of command, that the

reassignments of the case resulted in a lack of continuity and the absence of an

overarching case strategy, and that the homicide file reflected considerable periods of

inactivity.  (*See* Plaintiffs' Response, Ex. 83, Rice Dep. at 78, 112-13; Plaintiffs'

Response, Ex. 69, Rice 10/11/2010 Suppl. Report at 2.)[58]  Yet, the opinions of Plaintiffs'

---

[57]The only apparent way in which these transfers of officers who were no longer investigating Ms. Greene's murder might affect the investigative efforts of those who replaced them is if these transfers had some sort of "chilling effect" on subsequent investigators.  The Court addresses this possibility below.

[58]Mr. Rice further opined that the excessive attention paid to the case by senior DPD officers left investigators fearful of retaliation and reluctant to pursue certain leads and lines of

expert on this subject establish only that the Greene investigation was carried out in a less than optimal fashion, and that steps could have been taken to improve this investigation. As noted earlier, it is not enough to show that the police have been "lax in their investigative duties." *Flagg,* 447 F. Supp.2d at 829 (internal quotation marks and citations omitted). Rather, a denial-of-access claim must rest upon evidence of wrongful, intentional actions taken to impede or obstruct a police investigation. *See Swekel,* 119 F.3d at 1262-63; *Crowder,* 884 F.2d at 812. Plaintiffs have not directed the Court's attention to any aspect of Mr. Rice's testimony or report in which he identifies any deliberate, wrongful actions intended to impede the Greene investigation.

Next, and more importantly, even assuming that some or all of these reassignments and transfers had a detrimental effect on the effort to identify Ms. Greene's killer — and further assuming, for present purposes, that Chief Bully-Cummings made each of these decisions in her role as a City of Detroit policymaker — there is no evidence that any of these decisions were made for the deliberate purpose of obstructing or interfering with the Greene investigation, or with deliberate indifference to the risk that these decisions would result in an abridgment of Plaintiffs' right of access to the courts. This key requirement of municipal culpability was addressed at length in *Board of County Commissioners,* 520 U.S. at 404-12, 117 S. Ct. at 1388-92. In that case, the plaintiff alleged that an officer of the defendant county used excessive force in arresting her, and she sought to impose

---

inquiry. (*See* Rice Dep. at 126.) Again, this claim of a "chilling effect" is addressed below.

liability on the county under the theory that a proper background check of this officer during the hiring process would have revealed prior misdemeanors and driving infractions, which in turn should have signaled his unsuitableness for employment as a police officer.

In analyzing this theory of municipal liability, the Supreme Court first emphasized that "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Board of County Commissioners,* 520 U.S. at 404, 117 S. Ct. at 1388. Rather, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." 520 U.S. at 404, 117 S. Ct. at 1388. The Court observed that when "a particular municipal action *itself* violates federal law, or directs an employee to do so" — as when, for example, a municipal policy expressly authorizes the use of a degree of force that the law deems excessive — "these issues of fault and causation are straightforward." 520 U.S. at 404-05, 117 S. Ct. at 1388-89. In the case before the Court, however, the decision to hire the police officer in question "was itself legal," and there was no evidence that the county or any policymaker authorized this officer to use excessive force. 520 U.S. at 405, 117 S. Ct. at 1389. Instead, the plaintiff sought to hold the county liable under a more indirect theory — namely, that its flawed hiring process led to its employment of an unfit officer who, in turn, had used excessive force in arresting the plaintiff.

Under these circumstances, "[w]here a plaintiff claims that the municipality has

85

not directly inflicted an injury, but nonetheless has caused an employee to do so," the Court emphasized that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." 520 U.S. at 405, 117 S. Ct. at 1389.  In order to avoid this overly broad imposition of municipal liability, the Court held that "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." 520 U.S. at 411, 117 S. Ct. at 1392.  In the specific context of a municipal hiring decision, the Court explained that "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" 520 U.S. at 411, 117 S. Ct. at 1392.  Applying this standard to the facts of the case, the Court found that the traffic offenses and misdemeanors reflected in the record of the officer in question, while perhaps making him "an extremely poor candidate" for the position of county police officer, did not render this officer's subsequent use of excessive force a "plainly obvious consequence" of the county's decision to hire him.  520 U.S. at 414-15, 117 S. Ct. at 1393.

The principles set forth in *Board of County Commissioners* provide considerable guidance in the proper resolution of Plaintiffs' § 1983 claim against the Defendant City. Here, as in that case, the municipal actions at issue — *i.e.,* the various decisions to

86

reassign the homicide investigation and to transfer or demote particular investigators —

cannot be viewed as direct infringements upon Plaintiffs' right of access to the courts.

Clearly, investigations may be reassigned and officers transferred for all sorts of reasons,

good or bad, and such decisions will not invariably jeopardize the success of the

investigation. Most notably, when the Greene investigation was initially reassigned from

Homicide Squad 8 to Sgt. Godbold of the Cold Case Squad, the head of the Major Crimes

Division at the time, Commander Schwartz, testified that he recommended this

reassignment because, in his view, Lt. Bowman was engaging in "wild speculation" and

"making groundless statements without supporting evidence that called into question [his]

objectivity to conduct this investigation." (Schwartz Dep. at 43-44.) Likewise,

Commander Schwartz's superior officer, Assistant Chief of Police Cureton, testified that

he recommended to Chief Bully-Cummings that the Greene investigation be reassigned

because he "wanted the case solved," and because, in his view, Sgt. Godbold and the

Cold Case Squad "had the resources" and the "expertise to solve it." (Cureton Dep. at

121, 133.) Regardless of whether one accepts this testimony as to the reasons for the

reassignment of the Greene investigation, nothing in the record belies the claim that this

reassignment was intended to advance, rather than impede, the investigation.

More to the point, nothing in the record supports the notion that the ***true*** reason for

this reassignment — or for any of the other reassignment or transfer decisions cited by

Plaintiffs as having impeded the identification of their mother's killer — was to interfere

with or obstruct the Greene investigation. As noted, the only municipal policymaker

87

involved in any of these decisions was former Chief of Police Bully-Cummings.
Plaintiffs have not identified any evidentiary basis for believing that Chief Bully-
Cummings was motivated by a desire to impede the Greene investigation, or that she
herself might have had any reason to pursue this objective.

Instead, Plaintiffs evidently wish to proceed under the theory that former Police
Chief Bully-Cummings was generally beholden to Defendant Kilpatrick, so that she
would have been willing to carry out *his* desire — or, as Plaintiffs would have it, his
policy adopted under his authority as the City's highest official — that any investigation
into his activities or the rumored Manoogian Mansion party should not be allowed to go
forward.  Once again, however, this theory suffers from an utter absence of supporting
evidence.  In particular, even assuming that Defendant Kilpatrick adopted such a general
policy to obstruct DPD investigations into his activities, and even assuming Chief Bully-
Cummings would have been willing to assist in its implementation, there is simply no
evidence that any such policy was ever communicated to the former police chief, much
less that she made any decisions with respect to the Greene investigation in furtherance of
or in accordance with such a policy.  Rather, Plaintiffs again offer only idle speculation
on these points, as yet another instance of their "what else could it be" theory of liability.

Just as importantly, nothing in the record supports the additional finding mandated
by *Board of County Commissioners* in order to impose liability upon the City — namely,
that one or more of the decisions to reassign the Greene investigation and to transfer or
demote officers who worked on the case were made with "deliberate indifference to the

88

risk that a violation of [Plaintiffs' right of access to the courts] will follow the decision."
*Board of County Commissioners,* 520 U.S. at 411, 117 S. Ct. at 1392.  Even if one were

to conclude that one of these decisions was questionable, irrational, or even unlawful, this

does not mean that its "plainly obvious consequence," 520 U.S. at 415, 117 S. Ct. at

1393, was to bring about the specific constitutional injury alleged by Plaintiff here.

Likewise, even accepting the testimony of Plaintiffs' expert that these various

reassignments and transfers had a negative impact on the Greene investigation, there is no

basis in the record for concluding that these decisions were made with deliberate

indifference to the risk that Plaintiffs' right of access to the courts would be abridged as a

result.  Simply put, Plaintiffs have offered no evidence that would take these questions of

culpability and causation beyond the realm of idle speculation and satisfy the more

rigorous standard of deliberate indifference.  *See McDowell v. Brown,* 392 F.3d 1283,

1292 (11th Cir. 2004) (recognizing that *Board of County Commissioners* requires more

than a showing of "but for" causation, and that it is not enough that a challenged

municipal decision made a violation of the plaintiff's rights "more likely").

   In contending otherwise, Plaintiffs make much of the fact that it was unusual to

reassign a one-year-old case with active leads to the Cold Case Squad, and they suggest

that the DPD might have violated its own guidelines, or at least its usual practice, in doing

so.[59]  Nonetheless, Plaintiffs have not identified any basis in the record for concluding

---

[59]For what it is worth, Assistant Chief Cureton testified that it was a matter of
"discretion" whether to transfer cases that were less than two years old to the Cold Case Squad,

that the DPD decisionmakers who violated (or at least disregarded) these purported guidelines did so for the purpose of impeding the Greene investigation, or with deliberate indifference to this plainly obvious outcome. And, as noted, Commander Schwartz and Assistant Chief Cureton have testified directly to the contrary, stating that this reassignment was intended to jump-start the investigation.

Alternatively, Plaintiffs suggest that the requisite finding of deliberate indifference can be inferred from the fact that several DPD officers involved in the Greene investigation, including Sgt. Stevenson, Lt. Bowman, Lt. Jackson, and Sgt. Godbold, have raised questions about the motives behind their subsequent transfers. In particular, two of these officers, Lt. Bowman and Sgt. Godbold, have brought state court suits alleging that they were demoted in retaliation for their work on the Greene investigation.[60] Sgt. Stevenson, in turn, testified that she viewed her transfer as "punishment" for investigating Ms. Greene's murder, (Stevenson Dep. at 130), and Lt. Jackson testified to his "speculat[ion]" that his "days were numbered" as the head of the Homicide Section after he met with officers of the Michigan State Police to discuss their findings and conclusions regarding the rumored Manoogian Mansion party, (Jackson Dep. at 259-60).

These claims of retaliation fail in two respects to support the inference that these

---

and that it was not "necessarily" true that a case had to be inactive before being handed over to this squad. (Cureton Dep. at 71-72.) Similarly, Sgt. Godbold agreed that members of the Cold Case Squad had "in the past assisted with cases less than two years old." (Godbold Dep. at 105.)

[60]As noted earlier, a jury awarded $200,000 to Lt. Bowman in his state court whistleblower suit, and he later agreed to a $225,000 settlement. Sgt. Godbold's state court suit remains pending, and has not yet gone to trial.

90

transfer decisions were made with deliberate indifference to the risk that they would

obstruct the Greene investigation, and thereby deprive Plaintiffs of their constitutional

right of access to the courts.  First, and as explained earlier, the subjective, factually

unsupported beliefs of these four DPD officers as to the reasons for their transfers do not

give rise to an issue of fact as to the actual grounds for these transfers.[61]  Next, even

accepting the truth of these claims of retaliatory transfers, they do nothing to support the

further (and legally required) proposition that the decisions to transfer these officers were

made with deliberate indifference to the risk that these transfers would impede the Greene

investigation.  Rather, the evidence suggests the contrary, where each such transfer

occurred *after* the investigator in question had been removed from the case.[62]

---

[61]Arguably, Lt. Bowman's claim of a retaliatory transfer is based on at least some record evidence beyond his subjective belief, where he has testified that he was told by his supervisor, Lt. Jackson, that he had been transferred for "asking too many questions about the Strawberry case."  (Bowman Dep. at 295.)  Yet, Lt. Jackson has testified that he did not know why Lt. Bowman was transferred, and that, when Lt. Bowman asked him the reason for this decision, he could not provide an answer, but instead referred Lt. Bowman to Deputy Chief Cara Best for an explanation.  (*See* Jackson Dep. at 112, 269.)  Thus, even if Lt. Jackson made the statement attributed to him by Lt. Bowman, it was not made with personal knowledge of the actual reason for Lt. Bowman's transfer.

[62]Moreover, it bears emphasis that a claim of retaliation may succeed — as did the claims of Deputy Chief Brown and Lt. Bowman in their state court whistleblower suits — without regard for the objective that the retaliator might have sought to achieve or the success of this objective.  If an employee, for example, makes a report of suspected wrongdoing, Michigan law generally affords protection against retaliation for making this report, regardless of the accuracy of the report, and regardless of whether the retaliator has any personal stake in seeing that the matter reported is not investigated.  It is hardly unprecedented that someone in a position of authority might take issue with, and even retaliate against, any effort to question his actions or look into his activities, even if this individual has "nothing to hide" and no particular reason to fear such an investigation.

In this case, then, even if Defendant Kilpatrick or other high-ranking City of Detroit

In Plaintiffs' view, however, the requisite proof of deliberate indifference is not to be found in the affirmative record compiled by these investigators in the course of the Greene homicide investigation, but rather in the purported ***absence*** of a particular sort of evidence from this record — namely, evidence that any of the investigators "seriously considered or pursued" a possible link between Ms. Greene's death and her alleged performance as a dancer at the rumored Manoogian Mansion party. (Plaintiffs' Response Br. at 94-95.) Plaintiffs argue that the DPD investigators' consistent failure to explore this possibility serves as evidence of a City of Detroit policy to refrain from any investigative efforts that would trigger an inquiry into the activities of Defendant Kilpatrick, the conduct of members of his EPU, or the rumored Manoogian Mansion party. From this purported failure to explore this avenue of investigation, coupled with the record of transfers of investigators, Plaintiffs surmise that Defendant Kilpatrick used the "power of government" and "his allies in the DPD" to "assure adverse consequences" for any investigator who pursued these disfavored subjects, (*id.* at 95), thereby chilling any investigation into these matters and foreclosing the opportunity to pursue any leads

officials made it a routine practice to retaliate against anyone who might ask too many questions about the activities of the Kilpatrick administration, it does not follow that such retaliation would necessarily be fueled by a desire to obstruct any particular investigation or see that it did not reach a successful conclusion. Rather, as noted by the Court at the October 5 hearing on Defendants' motions, such obstruction or interference might at most be "collateral damage" from the retaliation. Under these circumstances, it cannot necessarily be said that the retaliator was "deliberately indifferent" to the risk that his retaliation might impede an investigation, or that such interference was the "plainly obvious consequence" of the retaliation. If this were sufficient by itself to establish deliberate indifference, a viable denial-of-access claim could be pursued any time a police investigator suffered retaliation, on behalf of any third party with an interest in any matters this officer was investigating.

92

that such an investigation might have uncovered.

Once again, however, the evidentiary record fails to support this theory of municipal liability. Most significantly, none of the officers in charge during the course of the DPD's investigation of the murder of Ms. Greene has testified that he or she was forbidden from pursuing any line of inquiry, whether concerning Defendant Kilpatrick, the rumored Manoogian Mansion party, or any other matter. Sgt. Stevenson testified that she did not believe any restrictions were placed upon her while she was the officer in charge of the investigation. (*See* Stevenson Dep. at 207;[63] *see also* Jackson Dep. at 264 (testifying that during the time he supervised the Squad 8 investigation, "we followed every lead that came up").) Sgt. Stevenson further testified that during her investigation, she never uncovered any reliable evidence that Ms. Greene had danced or been assaulted at a party at the Manoogian Mansion, but instead heard only "gossip" on this subject. (*Id.* at 234-35.)

Similarly, Sgt. Godbold testified that when he took over the investigation, his superior officers at the time urged him to vigorously investigate and solve the case no matter where the evidence might lead. (*See* Godbold Dep. at 70-72.) In addition, he testified that he and his fellow members of the Cold Case Squad conducted an active,

---

[63]As a follow-up to this question about restrictions, Sgt. Stevenson was asked whether she believed that her investigation was restricted when the homicide file was physically removed from her custody. (*See id.*) She responded that the file was taken shortly before she was removed from the case, and she agreed that "[n]ear the end, well, yeah, there were restrictions." (*Id.* at 208.) Sgt. Stevenson then testified that "75% of the time I had the case I didn't think I had any restrictions," but when she was asked to identify any such restrictions other than the relocation of the file, she stated that "I wasn't given any restrictions." (*Id.*)

aggressive investigation into Ms. Greene's murder while he was the officer in charge, with this effort ceasing only when a new round of superior officers began to place obstacles in his way, such as his temporary reassignment to the Special Long-Term Investigative Section and the disbanding of the Cold Case Squad.  (*See id.* at 71, 220-24, 278-79.)  More generally, Sgt. Godbold testified that he did not feel threatened or intimidated while he led the Greene investigation.  (*See id.* at 299.)  Although Sgt. Godbold received information in the course of his investigation concerning the rumored Manoogian Mansion party, he elected not to follow up on it because he did not view this alleged party as relevant to Ms. Greene's death or the homicide investigation.  (*See id.* at 389-90, 393-94.)

Likewise, the most recent DPD officer in charge of the Greene investigation, Sgt. Russell, testified that he "made it clear when I took the [Greene] homicide file that I'm investigating a homicide," and that "if it takes me to the mansion, it takes me to the mansion."  (Russell Dep. at 97.)  He further testified that he continued to pursue this investigation until "things slowed down" in approximately September of 2008 and there were "no new witnesses or no new information that came forward to cause me to investigate any further."  (*Id.* at 14, 82.)  Like Sgt. Godbold before him, Sgt. Russell testified that he did not uncover any evidence that the rumored Manoogian Mansion party "had something to do with" Ms. Greene's murder, nor that her death was "the result of a party at someone's house [or] at the mansion."  (*Id.* at 48, 97-98.)  Finally, and more generally, these three officers in charge of the Greene investigation uniformly testified

that they had no basis for believing that either Chief Bully-Cummings or Defendant

Kilpatrick interfered with or obstructed their investigative efforts.  (*See* Stevenson Dep. at

242-43; Godbold Dep. at 173-74, 222, 492, 497-98; Russell Dep. at 129.)

This record poses an insurmountable obstacle to Plaintiffs' effort to establish a

municipal policy of directing the Greene homicide investigators away from an exploration

of "forbidden" subject matter.  In particular, it is difficult to see how Plaintiffs can

establish a constitutional injury arising from a policy of deliberate avoidance of particular

investigative avenues, when none of the investigating officers has claimed that his or her

day-to-day investigative efforts were guided, chilled, constrained, or influenced by any

such policy, directive of a superior officer, or even a general understanding that certain

subject areas were not to be considered.  Even assuming that a high-ranking City official

might have strongly wished, or even mandated, that all DPD investigations be steered

away from specified "forbidden" subjects, such a policy cannot be said to have been

brought to bear in the Greene homicide investigation absent evidence that ***some*** DPD

officer who participated in this investigation was advised or otherwise came to understand

that certain investigative areas were off limits.  *See City of Los Angeles v. Heller,* 475

U.S. 796, 799, 106 S. Ct. 1571, 1573 (1986) (observing that "[i]f a person has suffered no

constitutional injury at the hands of the individual police officer, the fact that the

departmental regulations might have *authorized* [a constitutional violation] is quite beside

the point").  The Court sees no such evidence in the record before it, and it is no substitute

for this necessary proof that Ms. Greene's murder has not been solved, that some leads

95

might have been pursued but were not, or that Plaintiffs and their expert would have emphasized some leads or lines of inquiry over the ones chosen by the DPD homicide investigators.

Yet, even assuming that Chief Bully-Cummings or some other City of Detroit official with policymaking authority imposed such a policy that foreclosed certain lines of inquiry, and even assuming that this policy led some DPD homicide investigator to steer his or her efforts away from, say, the rumored Manoogian Mansion party, the record provides no basis for concluding that the plainly obvious consequence of such a policy was to thwart the identification of Ms. Greene's killer, such that Plaintiffs have been denied the opportunity to seek redress from this killer. If the rumored party actually occurred, as two of Plaintiffs' witnesses have claimed, Defendant Kilpatrick might well have wished to avoid any investigative efforts that might have confirmed the truth of this rumor. This desire, moreover, need not have stemmed from the fact that a dancer who performed at this party was killed in a drive-by shooting several months later — it requires no great imagination to conceive why the former Detroit mayor might wish to conceal the existence of the alleged Manoogian Mansion party even without this subsequent development.[64] Plaintiffs, however, fail to explain how actions designed to cover up the rumored Manoogian Mansion party would have the plainly obvious

---

[64]Indeed, Plaintiffs themselves contend that the effort to cover up the rumored Manoogian Mansion party began on the night of the party itself or immediately thereafter, when 911 tapes of police runs to the mansion that night allegedly were removed from a police precinct by a DPD officer.

consequence of inflicting the particular constitutional injury claimed here — namely, a denial of Plaintiffs' opportunity to bring a wrongful death action against their mother's killer.

In fact, Plaintiffs' attempt to equate a cover-up of the rumored Manoogian Mansion party and obstruction of the Greene homicide investigation reveals a fundamental logical flaw in their denial-of-access claim. Although Plaintiffs invite the Court to assume that the Greene investigation invariably would suffer if the investigating officers were prevented from inquiring about the rumored party, this is so only if there was, in fact, a link between this rumored party and Ms. Greene's death several months later. Absent such a link, it would be a waste of the investigating officers' time and effort to explore the circumstances surrounding the alleged party — as, indeed, two of the investigating officers, Sgt. Godbold and Sgt Russell, expressly concluded in the course of their investigations. Yet, the record sheds no light whatsoever on the existence of such a link.[65] Under these circumstances, it is a matter of rank speculation to say that a City of Detroit policy of precluding inquiry into the rumored Manoogian Mansion party

---

[65]The Court recognizes that Plaintiffs have produced a witness affidavit that purports to establish a more direct connection between Defendant Kilpatrick and Ms. Greene. The pertinent portion of this affidavit is patent hearsay, however, and is utterly unreliable evidence in any event. Thus, it can play no part in the Court's resolution of Defendants' summary judgment motions. Likewise, while a portion of Plaintiffs' response brief is devoted to churning up a haze of innuendo about nebulous "connections" between Defendant Kilpatrick and Ms. Greene, these claims rest on mere gossip and anonymous "word on the street" which, again, may not be considered in deciding Defendants' motions. In any event, even this inadmissible rumor and innuendo does not forge a direct link between the rumored Manoogian Mansion party and Ms. Greene's death, but rather provides, at best, additional cause for Defendant Kilpatrick to be concerned about any investigation into this rumored party.

97

necessarily would reflect a deliberate indifference to the risk that someone's right of access to the courts might be abridged as a result of this policy.

Finally, apart from their efforts to establish the requisite municipal policy by reference to the reassignments and transfers that occurred during the course of the Greene investigation, and by reference to the homicide investigators' purported failure to pursue certain leads, Plaintiffs appear to suggest that Defendant Kilpatrick engaged in a "pattern" of interference with DPD investigations — as evidenced, most prominently, by his involvement in the removal of Deputy Chief Brown — and that the resulting municipal "custom" of interference negatively impacted the Greene homicide investigation. This theory, however, suffers from many of the same flaws addressed above. First, given the lack of evidence of Defendant Kilpatrick's involvement in any aspect of the homicide investigation, and given the uniform testimony of the homicide investigators that they had no factual basis for believing that Defendant Kilpatrick impeded their investigative efforts, it is difficult to see how any such "custom" of interference had any effect upon the Greene investigation. Next, and as discussed earlier, there is no evidence that Defendant Kilpatrick's allegedly obstructive acts with respect to the DPD Internal Affairs and Michigan State Police investigations operated to abridge Plaintiffs' constitutional right of access to the courts. It follows, then, that such acts cannot be viewed as giving rise to a "custom" or widespread practice that caused the deprivation of this federally protected right. Finally, and as explained above, it is a matter of sheer speculation to say that actions designed to curtail any investigation into the rumored Manoogian Mansion

98

party would have the effect of impairing the Greene homicide investigation, much less that this was the plainly obvious consequence of such actions.

It remains only to consider whether Plaintiffs can withstand summary judgment on their claim against the Defendant City by resort to the permissive adverse inference that Plaintiffs have been granted as a result of the City's discovery violation. Specifically, the Magistrate Judge recommended in a August 3, 2011 report that the trier of fact at any eventual trial be permitted to draw adverse inferences arising from the City's destruction of e-mails sent or received by four former high-ranking City officials — Defendant Kilpatrick, his Chief of Staff Christine Beatty, Detroit corporation counsel Ruth Carter, and then-Assistant Police Chief Bully-Cummings — during the period from August 1, 2002 through June 30, 2003.[66] The Court, in turn, adopted this recommendation in an October 5, 2011 opinion and order. The question, then, is whether these adverse inferences can assist Plaintiffs in overcoming the various evidentiary deficiencies in their § 1983 claim against the City.

The Court finds that they cannot. The period covered by these inferences extends only until June 30, 2003, or two months after Ms. Greene's death on April 30, 2003. Yet, none of the alleged instances of interference with the Greene homicide investigation occurred during this two-month period. No materials went missing from the homicide

---

[66]It is worth noting that Bully-Cummings was not yet the chief of police during this time period, but instead was appointed to this post later in the fall of 2003. Thus, she would not qualify as a City official with policymaking authority during this period.

file during this time,[67] and the first reassignment of the investigation (to Sgt. Godbold of the Cold Case Squad) did not occur until March of 2004, over eight months later.  More generally, nothing in the record suggests that the homicide investigation was impeded in any way during this initial two-month period after Ms. Greene's death.

Under this record, the deleted e-mails could not possibly have assisted Plaintiffs in establishing any connection between any instance of interference with the Greene investigation and a City official with policymaking authority, unless one is prepared to believe that these e-mails laid out a "road map" for acts of interference that would not be undertaken until several months (or even years) later.  It is clear that this would not be a reasonable inference that a trier of fact would be permitted to draw.  Indeed, the available evidence from this time period tends to foreclose such an inference.  Although senior members of the Kilpatrick administration, including Defendant Kilpatrick himself, evidenced no reluctance to address all manner of topics, both personal and professional, in the text messages they exchanged during this period, none of these messages touched upon Tamara Greene or the homicide investigation in any way.  Likewise, no other record evidence or testimony relating to this time period suggests that these City officials

_____

[67]The first such report of missing materials was Sgt. Stevenson's account of the files on her computer being erased and floppy disks being taken from a locked box on her desk.  Sgt. Stevenson could not recall when this occurred.  (*See* Stevenson Dep. at 51-52.)  She testified, however, that Lt. Bowman was her supervisor at the time, (*see id.* at 53), and Lt. Bowman, in turn, testified that he joined Homicide Squad 8 in November of 2003, (*see* Bowman Dep. at 33-34; *see also* Jackson Dep. at 17 (testifying that he was promoted out of his position as Sgt. Stevenson's direct supervisor in late 2003 or early 2004)).  Evidently, then, these losses of materials occurred, at the earliest, in the late fall of 2003.

discussed, much less involved themselves in, any aspect of the Greene investigation.

Under this record, it would be a bridge too far to permit the trier of fact to infer that the

deleted e-mails would have revealed a City policymaker's plan or scheme to interfere

with or otherwise participate in the obstruction of the Greene investigation.

To be sure, the Court has previously expressed its dismay at the "egregious

conduct" of the City and its counsel that caused e-mails from a pertinent time period to be

destroyed, thereby "undermin[ing] the truth-seeking mission of civil litigation."

(10/5/2011 Op. at 12.)  Against this backdrop, the Court is reluctant to be seen as

condoning the City's misconduct in discovery, and nothing in this opinion should be

viewed as doing so.  Nonetheless, in the specific context of the present motions, the Court

is called upon to consider only whether the reasonable adverse inferences to be drawn

from this destruction of evidence can assist Plaintiffs in identifying a City of Detroit

custom or policy that was the moving force behind any act of alleged interference with

the Greene investigation.  For the reasons explained, the Court finds that these adverse

inferences fail to give rise to a genuine issue of material fact that would defeat the

Defendant City's entitlement to an award of summary judgment in its favor.

101

# V.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant Kwame M.

Kilpatrick's September 22, 2010 motion for summary judgment (docket #469) is

GRANTED.  IT IS FURTHER ORDERED that the Defendant City of Detroit's

September 23, 2010 motion for summary judgment (docket #470) also is GRANTED.

Next, IT IS FURTHER ORDERED that Plaintiffs' September 23, 2011 motion to

supplement the summary judgment record (docket #609) is DENIED.  Finally, IT IS

FURTHER ORDERED that Plaintiffs' October 20, 2011 motion for permission to correct

the oral argument record (docket #614) is GRANTED.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  November 1, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record
on November 1, 2011, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager